UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF NEW YORK
———————————————————————————

DESEAN HILL,

                                    Plaintiff,

                                                              9:18-CV-1203
v.                                                            (DNH/TWD)

ANTHONY ANNUCCI, et al.,

                                    Defendants.

———————————————————————————

APPEARANCES:                              OF COUNSEL:

DESEAN HILL
Plaintiff, *pro se*
14-A-0857
Southport Correctional Facility
P.O. Box 2000
Pine City, New York 14871

HON. LETITIA JAMES                        NICHOLAS LUKE ZAPP, ESQ.
Attorney General for the State of New York   Assistant Attorney General
Counsel for Defendants
The Capitol
Albany, New York 12224

**THÉRÈSE WILEY DANCKS**, United States Magistrate Judge

## <u>ORDER AND REPORT-RECOMMENDATION</u>

On October 9, 2018, Desean Hill ("Plaintiff"), an inmate in custody of the New York

State Department of Corrections and Community Supervision ("DOCCS"), commenced this

action pursuant to 42 U.S.C. § 1983 ("Section 1983"), asserting certain DOCCS personnel failed

to protect him while he was incarcerated at Great Meadow Correctional Facility ("Great

Meadow"). (Dkt. No. 1.) On November 20, 2018, the District Court ordered Acting

Commissioner Anthony Annucci ("Annucci"), Associate Commissioner Anne M. McGrath

("McGrath"), Office of Mental Health ("OMH") Therapist Kathleen Grey ("Grey"), OMH Unit

Chief Jackson ("Jackson"), Superintendent Miller ("Miller"), and Guidance Staff Member M. Bernard[1] ("Bernard") (collectively "Defendants") to answer or otherwise respond to Plaintiff's Eighth Amendment failure to protect claims.

In lieu of answering, Defendants moved, pursuant to Rule 12(b)(6) of the Federal Rules of Civil Procedure, to dismiss Plaintiff's complaint because, according to Defendants, his allegations do not state an Eighth Amendment failure to protect claim, and he failed to allege Annucci, Miller, and Jackson were personally involved in the alleged constitutional violation. (Dkt. No. 28-1 at 7-17.[2]) Plaintiff opposed the motion. (Dkt. No. 32.) The Honorable David N. Hurd, United States District Judge, referred this motion to the undersigned for a report-recommendation, pursuant to 28 U.S.C. § 636(b) and Local Rule 72.3(c). For the reasons that follow, the Court recommends Defendants' motion be granted in part and denied in part.

## I.    FACTUAL BACKGROUND[3]

Plaintiff is a self-described "informant" who alleges he has cooperated with law enforcement. (Dkt. No. 1 at 3, 5.) Given that status, Plaintiff fears certain of his "co-

---

[1] Bernard was originally identified as "Jane Doe." (Dkt. No. 1.) The District Court subsequently granted Plaintiff's motion to amend the caption to identify the Jane Doe defendant as "M. Bernard." (Dkt. No. 9 at 6 n.6.)

[2] Citations to the docket are to the pages the Court's CM/ECF electronic filing system automatically assigns. The capitalization of letters in Plaintiff's complaint is not preserved.

[3] The following facts are derived from the complaint and are accepted as true for the purposes of deciding the pending motion. *See Erickson v. Pardus*, 551 U.S. 89, 94 (2007). The Court also considers the exhibits included with the complaint (Dkt. No. 1-1) to the extent they are relevant to the incidents at issue. *Cortec Indus., Inc. v. Sum Holding L.P.*, 949 F.2d 42, 47 (2d Cir. 1991) (a complaint "is deemed to include any written instrument attached to it as an exhibit or any statements or documents incorporated in it by reference"). Moreover, the Court considers the papers submitted in response to Defendants' motion to dismiss (*see* Dkt. Nos. 32, 32-1). *Trombley v. O'Neill*, 929 F. Supp. 2d 81, 93 (N.D.N.Y. 2013) ("[A] *pro se* plaintiff's papers in response to a defendant's motion to dismiss for failure to state a claim may be considered as effectively amending the allegations of his complaint—to the extent those papers are consistent with the allegations in the complaint.").

2

defendants" who are also incarcerated will retaliate against him unless he is separated from them. *Id.* at 3, 5, 7. Generally, Plaintiff's complaint alleges Defendants failed to follow DOCCS' policies and procedures and should have "placed [him] in [involuntary] protective custody for [his] safety [and the] safety of the facility," to prevent "foreseeable" attacks against him on September 13, 2017, and October 28, 2017. *Id.* at 3, 5-6, 9-10. Plaintiff contends Defendants had "knowledge of the facilit[ies] they placed [him] in having a high percentage rate" of inmate-on-inmate assaults. *Id.* at 5. He further alleges Defendants were deliberately indifferent in placing Plaintiff in facilities with certain other inmates only for Plaintiff to be attacked again and later sent to another facility. *Id.* at 6.

Specifically, beginning in 2014 and over a "four year period," Plaintiff alleges he forwarded "numerous" letters and court documents to Annucci regarding his safety. *Id.* at 3, 6-7.[4] This correspondence asserted there was a "contract on [Plaintiff's] life by known gang members" and that Plaintiff had been labeled an "inform[a]nt." *Id.* at 3. Plaintiff asked Annucci to place him in the Assessment and Program Preparation Unit ("APPU") or in special housing. *Id.* Plaintiff's correspondence also "address[ed] his safety concerns, housing placement and names of co-defendants" from whom Plaintiff should be separated. *Id.* at 7. Plaintiff contends Annucci "[had] this knowledge" and was "aware of the Plaintiff['s] life or death concerns" but "failed to address the issue" or take action. *Id.* at 3, 7.

According to Plaintiff, Annucci forwarded his correspondence to McGrath. *Id.* at 3, 7. On March 21, 2017, McGrath wrote a letter to Plaintiff stating "Acting Commissioner Annucci

---

[4] Plaintiff alleges he was "seriously assaulted on five different occasions" between 2014 and October 2017. (Dkt. No. 1 at 6.) These assaults occurred at various DOCCS facilities where Plaintiff was housed, including Elmira Correctional Facility, Auburn Correctional Facility, Clinton Correctional Facility, Attica Correctional Facility, and Great Meadow. *Id.*

has referred your recent correspondence regarding transfer and safety concerns, to me for response." (Dkt. No. 1-1 at 1.) McGrath noted inmates such as Plaintiff, "who have extensive transfer histories, represent a difficult challenge when reviewing for transfer options." *Id.* Thus, McGrath concluded Plaintiff's placement at Attica was "deemed appropriate" at that time. *Id.*

Subsequent to McGrath's March 2017 letter, Plaintiff was transferred to Great Meadow.[5] (Dkt. No. 1 at 9.) Upon Plaintiff's arrival there, Bernard, his guidance counselor, interviewed him. *Id.* Bernard "reviewed" Plaintiff's inmate history and "was aware Plaintiff had a history of being assaulted and placed in protective custody." *Id.*

On June 27, 2017, Miller, the Superintendent at Great Meadow, received an email regarding Plaintiff's safety and security "due to the Plaintiff having a history of being assaulted." *Id.* at 3, 10. Miller forwarded this email to Bernard. *Id.* at 10. That same day, Bernard called Plaintiff to her office and told him Miller had directed her to "handle an e-mail that they received [concerning] Plaintiff['s] safety and security." *Id.* at 9. Bernard told Plaintiff he was doing well and needed to "complete [his] programs." *Id.* She told him there was no programming in protective custody and to "sign this paper and just stay out of trouble." *Id.* Plaintiff signed a protective custody refusal and was sent back to his cell. *Id.* Plaintiff asserts that under DOCCS policies and procedures Miller was obligated to take action "once he was aware a [protective custody] refusal was signed." *Id.* at 10. Specifically, Miller was supposed to either investigate or place Plaintiff in involuntary protective custody for his safety. *Id.* Miller "never followed up" with Bernard "to make sure all polic[ies] [and] procedures were followed." (Dkt. No. 32 at 8.)

---

[5] Plaintiff has not alleged facts as to the date of his transfer to Great Meadow, but it appears to have been sometime between March 21, 2017, and June 27, 2017. (*See* Dkt. No. 1-1 at 1-2.)

On July 5, 2017, McGrath sent another letter to Plaintiff in response to correspondence Plaintiff had sent to Annucci. (Dkt. No. 1-1 at 2.) McGrath conducted a "review" of Plaintiff's record and noted guidance staff interviewed Plaintiff on June 27, 2017, "regarding [his] request for protective custody." *Id.* According to McGrath's letter, during this interview Plaintiff indicated he "had no safety concerns" and "signed a protective custody refusal form." *Id.*

On September 13, 2017, an inmate attacked Plaintiff at Great Meadow. (Dkt. Nos. 1 at 9; 1-1 at 12.) Plaintiff was struck from behind in the back of the head while waiting in line. (Dkt. No. 1-1 at 12.) Plaintiff and the inmate who struck him then "squared off" and exchanged punches. *Id.* Plaintiff and the other inmate disregarded "several direct orders" to stop but ultimately broke off the fight. *Id.* A few days later, on September 22, 2017, Plaintiff reported this attack to Grey, his OMH therapist, during a one-on-one session. (Dkt. No. 1 at 8.) Plaintiff informed Grey he was struck on the back of the head by a "known gang member" and was "now being extorted by gang members." *Id.* According to Plaintiff, Grey "failed to assist" him. *Id.* at 3. Plaintiff alleges his conversation with Grey was not confidential and should have been reported to the "proper" authority ("security") pursuant to DOCCS and OMH policy. *Id.* at 8.

Although Grey did not report to "security," she allegedly informed OMH Unit Chief Jackson that Plaintiff reported a known gang member attacked him on September 13, 2017, and he was being extorted. (Dkt. Nos. 1 at 8; 32-1 at 4 (Grey's notes reading "Email the Unit Chief these concerns").) Jackson, however, "withheld" this information from "security," thereby placing Plaintiff's life and the facility in danger. (Dkt. No. 1 at 8.)

On October 28, 2017, only a few weeks after Plaintiff made his reports, Plaintiff was "cut by an unknown inmate from behind with a dangerous object." *Id.* at 3. This attack resulted in

Plaintiff being sent to Albany Medical Center, where he received twenty-two stitches for a cut

eight centimeters long "on the left side from ear to chin."  (Dkt. Nos. 1 at 3-4; 1-1 at 4, 6-11.)

On December 13, 2017, McGrath wrote to Plaintiff to inform him that a "SHU to SHU

transfer [had] been approved [and he would be moved] as soon as appropriate space becomes

available."  (Dkt. No. 1-1 at 3.)

## II.    DISCUSSION

### A.    Standard of Review

A defendant may move to dismiss a complaint for "failure to state a claim upon which

relief can be granted" under Rule 12(b)(6) of the Federal Rules of Civil Procedure.  The motion

tests the legal sufficiency of the complaint and whether it conforms to Rule 8(a)(2) of the Federal

Rules of Civil Procedure.  To survive a motion to dismiss, the complaint must "contain sufficient

factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'"  *Ashcroft

v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570

(2007)).  "Determining whether a complaint states a plausible claim for relief . . . requires the . . .

court to draw on its judicial experience and common sense . . . .  [W]here the well-pleaded facts

do not permit the court to infer more than the mere possibility of misconduct, the complaint has

alleged—but it has not shown—that the pleader is entitled to relief."  *Id*. at 679 (internal citation

and punctuation omitted).  "Factual allegations must be enough to raise a right to relief above the

speculative level."  *Twombly*, 550 U.S. at 555.

A complaint may be dismissed pursuant to Rule 12(b)(6) only where it appears there are

not "enough facts to state a claim to relief that is plausible on its face."  *Id*. at 570.  While Rule

8(a)(2) "does not require detailed factual allegations, . . . it demands more than an unadorned,

the-defendant-unlawfully-harmed-me-accusation."  *Iqbal*, 556 U.S. at 678 (citation and internal

quotation marks omitted). In other words, a complaint which "tenders 'naked assertion[s]' devoid of 'further factual enhancement'" does not suffice. *Id.* (citation omitted).

"In reviewing a complaint for dismissal under Rule 12(b)(6), the court must accept the material facts alleged in the complaint as true and construe all reasonable inferences in the plaintiff's favor." *Hernandez v. Coughlin*, 18 F.3d 133, 136 (2d Cir. 1994). However, "the tenet that a court must accept as true all of the allegations contained in a complaint is inapplicable to legal conclusions. Threadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice." *Iqbal*, 556 U.S. at 678.

Where a party is proceeding *pro se*, the court is obliged to "read [the *pro se* party's] supporting papers liberally, and . . . interpret them to raise the strongest arguments that they suggest." *See Burgos v. Hopkins*, 14 F.3d 787, 790 (2d Cir. 1994); *see also Harris v. Mills*, 572 F.3d 66, 72 (2d Cir. 2009) (courts remain obligated to construe *pro se* complaints liberally even after *Twombly*). Where a *pro se* complaint fails to state a cause of action, the court generally "should not dismiss without granting leave to amend at least once when a liberal reading of the complaint gives any indication that a valid claim might be stated." *Cuoco v. Moritsugu*, 222 F.3d 99, 112 (2d Cir. 2000) (citation and internal quotation marks omitted). An opportunity to amend is not required where "[t]he problem with [the plaintiff's] causes of action is substantive" such that "better pleading will not cure it." *Id.*

## B.    Failure to Protect Claims

### i.    *Legal Standards*

Plaintiff brings this action pursuant to Section 1983, which establishes a cause of action for "the deprivation of any rights, privileges, or immunities secured by the Constitution and laws" of the United States. 42 U.S.C. § 1983. "Section 1983 itself creates no substantive rights [but] provides only a procedure for redress for the deprivation of rights established elsewhere."

*Sykes v. James*, 13 F.3d 515, 519 (2d Cir. 1993).  To state a cognizable claim under Section

1983, a complaint must allege "(1) 'that some person has deprived [the plaintiff] of a federal

right,' and (2) 'that the person who has deprived [the plaintiff] of that right acted under color of

state law.'"  *Velez v. Levy*, 401 F.3d 75, 84 (2d Cir. 2005) (quoting *Gomez v. Toledo*, 446 U.S.

635, 640 (1980)) (alteration omitted).

The Eighth Amendment explicitly prohibits the infliction of "cruel and unusual

punishments," U.S. Const. amend. VIII, and requires prison officials to take "reasonable

measures to guarantee the safety of inmates in their custody."  *Hayes v. New York City Dep't of

Corr.*, 84 F.3d 614, 620 (2d Cir. 1996) (citing *Farmer v. Brennan*, 511 U.S. 825, 832-33 (1994)).

In particular, prison officials "have a duty . . . to protect prisoners from violence at the hands of

other prisoners."  *Farmer*, 511 U.S. at 833 (quoting *Cortes-Quinones v. Jimenez-Nettleship*, 842

F.2d 556, 558 (1st Cir. 1988)).  Prison officials are liable under the Eighth Amendment for harm

incurred by an inmate if they act with deliberate indifference to the inmate's safety.  *Morales v.

New York State Dep't of Corr.*, 842 F.2d 27, 30 (2d Cir. 1988) ("[A] state prison guard's

deliberate indifference to the consequences of his conduct for those under his control and

dependent upon him may support a claim under [Section] 1983.").

To prevail on a failure to protect claim, a plaintiff must demonstrate two elements, one

objective and one subjective.  To satisfy the objective prong, "the inmate must show that he is

incarcerated under conditions posing a substantial risk of serious harm."  *Farmer*, 511 U.S. at

834.  That is, the deprivation "must be, in objective terms, 'sufficiently serious.'"  *Hathaway v.

Coughlin*, 37 F.3d 63, 66 (2d Cir. 1994) (quoting *Wilson v. Seiter*, 501 U.S. 294, 298 (1991)).

The standard "contemplates 'a condition of urgency, one that may produce death, degeneration,

or extreme pain.'"  *Id.* (quoting *Nance v. Kelly*, 912 F.2d 605, 607 (2d Cir. 1990)).  Under this

standard, the plaintiff "must demonstrate that this grave harm was 'actual or imminent.'" *Dublin v. New York City Law Dep't*, No. 10 Civ. 2971 (LAP), 2012 WL 4471306, at \*5 (S.D.N.Y. Sept. 26, 2012) (quoting *Benjamin v. Fraser*, 343 F.3d 35, 51 (2d Cir. 2003)).[6]

As to the second prong, "[t]o prove deliberate indifference, the plaintiff must show that the 'official [knew] of and disregard[ed] an excessive risk to inmate health or safety.'" *Celestin v. Premo*, No. 9:12-cv-301 (GLS/RFT), 2014 WL 272443, at \*5 (N.D.N.Y. Jan. 24, 2014) (quoting *Farmer*, 511 U.S. at 836) (alterations in original). Indeed, "[t]he official must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, *and* he must also draw the inference." *Id.* Mere negligence by a prison official will not suffice. *Hayes*, 84 F.3d at 620; *Hathaway*, 37 F.3d at 66 ("Deliberate indifference requires more than negligence, but less than conduct undertaken for the very purpose of causing harm.").

Whether a prison official had the requisite knowledge of a substantial risk is a "question of fact" and may be demonstrated by drawing inferences from circumstantial evidence. *Farmer*, 511 U.S. at 842-43 (noting a factfinder may infer a prison official's knowledge of a substantial risk "from the very fact that the risk was obvious," such as where evidence of a risk of inmate attacks was "longstanding, pervasive, well-documented, or expressly noted by prison officials in the past"). However, prison officials who knew of a substantial risk to inmate safety may escape liability if they "responded reasonably to the risk, even if the harm ultimately was not averted." *Id.* at 844.

Additionally, "'personal involvement of defendants in alleged constitutional deprivations is a prerequisite to an award of damages under [Section] 1983.'" *Wright v. Smith*, 21 F.3d 496,

---

[6]  The Court will provide Plaintiff with copies of all unpublished decisions cited herein in accordance with the Second Circuit's decision in *Lebron v. Sanders*, 557 F.3d 76 (2d Cir. 2009) (*per curiam*).

501 (2d Cir. 1994) (quoting *Moffitt v. Town of Brookfield*, 950 F.2d 880, 885 (2d Cir. 1991)).  As

the Supreme Court has noted, a defendant may only be held accountable for his actions under

Section 1983.  *See Iqbal*, 556 U.S. at 683 ("[P]etitioners cannot be held liable unless they

themselves acted on account of a constitutionally protected characteristic.").  Thus, to prevail on

a Section 1983 cause of action against an individual, a plaintiff must show "a tangible connection

between the acts of a defendant and the injuries suffered."  *Bass v. Jackson*, 790 F.2d 260, 263

(2d Cir. 1986).  With respect to individuals sued based on their supervisory capacities (like

defendants Annucci, Miller, and Jackson in this action), "vicarious liability is inapplicable to . . .

[Section] 1983 suits."  *Iqbal*, 556 U.S. at 676.

In this circuit, a supervisory official is personally involved in a constitutional violation if

he or she: (1) directly participated in the violation; (2) failed to remedy that violation after

learning of it through a report or appeal; (3) created, or allowed to continue, a policy or custom

under which the violation occurred; (4) was grossly negligent in managing subordinates who

caused the violation; or (5) exhibited deliberate indifference to the rights of inmates by failing to

act on information indicating that the violation was occurring.  *Colon v. Coughlin*, 58 F.3d 865,

873 (2d Cir. 1995).[7]

With these standards in mind, the Court turns to Plaintiff's claims.

---

[7] "*Iqbal* has . . . engendered conflict . . . about the continuing vitality of the supervisory liability test set forth in *Colon*," *Reynolds v. Barrett*, 685 F.3d 193, 205 n.14 (2d Cir. 2012), and the Second Circuit has not resolved the conflict.  *See, e.g.*, *Hogan v. Fischer*, 738 F.3d 509, 519 n.3 (2d Cir. 2013) ("We express no view on the extent to which the Supreme Court's decision in *Ashcroft v. Iqbal* . . . 'may have heightened the requirements for showing a supervisor's personal involvement with respect to certain constitutional violations.'" (citation omitted)).  Nevertheless, district courts in this Circuit have consistently held that "[w]here the constitutional claim . . . relies on the . . . deliberate indifference standard[] of the . . . Eighth Amendment[]," *Colon* still applies.  *Sash v. United States*, 674 F. Supp. 2d 531, 544 (S.D.N.Y. 2009); *see also Williams v. Adams*, No. 9:18-CV-1041 (BKS/TWD), 2019 WL 350215, at *7 (N.D.N.Y. Jan. 29, 2019) (citing cases).

###### ii.    *Plaintiff's Claims*

##### 1.    **Objective Prong**

As noted above, to satisfy the objective prong, the inmate must demonstrate that the prison official's act or omission results in denial of "the minimal civilized measure of life's necessities." *Farmer*, 511 U.S. at 834. Here, Plaintiff claims he was "seriously assaulted on five different occasions" at the various DOCCS facilities where he was housed. (Dkt. No. 1 at 6.) These assaults allegedly were due to Plaintiff's reputation as an informant. *Id.* at 3. According to Plaintiff, although he made Defendants aware of his safety concerns and requested protective housing, he was not placed in any special housing. *See, e.g.*, *id.* at 3, 7. Therefore, he was vulnerable and was "foreseeabl[y]" attacked on September 13, 2017, at Great Meadow. *Id.* at 5, 9. Thereafter, he was also seriously assaulted on October 28, 2017, when he was "cut by an unknown inmate from behind with a dangerous object." *Id.* at 3, 8. Plaintiff was sent to Albany Medical Center for treatment of the cut "from ear to chin." (Dkt. Nos. 1 at 3-4; 1-1 at 4, 6-11.) Plaintiff received twenty-two stitches to close the cut, which was eight centimeters long. *Id.*

At this juncture, the Court finds Plaintiff has plausibly alleged he was incarcerated under "conditions posing a substantial risk of serious harm." *Farmer*, 511 U.S. at 834; *see, e.g.*, *Coronado v. Goord*, No. 99 CIV. 1674 (RWS), 2000 WL 1372834, at *3 (S.D.N.Y. Sept. 25, 2000) (finding inmate satisfied objective prong by alleging he suffered stab wounds "serious enough to justify transporting [plaintiff] to an off-site hospital"); *King v. Dep't of Corr.*, No. 95 Civ. 3057 (JGK), 1998 WL 67669, at *5 (S.D.N.Y. Feb. 18, 1998) (finding inmate satisfied objective prong where he received at the hands of another inmate "a cut to his face, neck, and shoulder requiring 12-13 stitches"); *Warren v. Goord*, 476 F. Supp. 2d 407, 410-11 (S.D.N.Y. 2007) (finding inmate satisfied objective prong where he was attacked by other inmates,

resulting in a "wound requiring twelve stitches across his left cheek"); *Knowles v. New York City Dep't of Corr.*, 904 F. Supp. 217, 221 (S.D.N.Y. 1995) (finding inmate "easily" satisfied objective prong where he sustained a deep cut to the face requiring sixty stitches and where he was "suddenly and unexpectedly slashed with a sharp instrument possessed by a fellow inmate").

Defendants primarily argue that "verbal statements alone do not indicate a substantial threat of serious harm." (Dkt. No. 28-1 at 9 (quoting *Desulma v. City of New York*, No. 98Civ.2078 (RMB)(RLE), 2001 WL 798002, at *7 (S.D.N.Y. July 6, 2001)).) However, Plaintiff alleges more than verbal threats. Plaintiff alleges he was "seriously assaulted" on five occasions and targeted by known gang members for being an informant. (Dkt. No. 1 at 3, 6.) He does not allege a one-time attack after an inmate verbally threatened him, nor does he allege a one-time surprise attack. *Cf. Desulma*, 2001 WL 798002, at *6-7 (granting summary judgment for defendants where inmates unknown to plaintiff verbally threatened him and then beat him); *Green v. City of New York Dep't of Corr.*, No. 06 Civ. 4978 (LTS)(KNF), 2008 WL 2485402, at *6 (S.D.N.Y. June 19, 2008) (dismissing failure to protect claim where plaintiff alleged threats "without any allegation that physical harm actually existed or was imminent"). Rather, construed liberally, Plaintiff's complaint alleges a series of assaults all related to prison gang members and his reputation as an informant. (*See* Dkt. No. 1 at 3, 6); *see also Watson v. McGinnis*, 964 F. Supp. 127, 131 (S.D.N.Y. 1997) ("Judicial decisions have recognized the serious implications of being labelled a 'snitch' in prison.").

The cases Defendants cite, most of which were decided at the summary judgment stage, are inapposite. (*See* Dkt. No. 28-1 at 8-13.) For example, Defendants cite *Dublin v. New York City Law Dep't*, 2012 WL 4471306, at *5, for the proposition that a substantial risk of harm "can *only* be demonstrated where there is evidence of a previous altercation between a plaintiff and

his attacker, coupled with a complaint by plaintiff regarding the altercation or a request by plaintiff to be separated from the attacker." (Dkt. No. 28-1 at 8-9 (emphasis added).) However, such evidence is only one way to satisfy the objective prong. *See, e.g.*, *Hopkins v. Allard*, No. 9:08-CV-0001 (DNH/DEP), 2010 U.S. Dist. LEXIS 114368, at *74 (N.D.N.Y. Aug. 23, 2010) (noting the objective prong "*can* be shown" by evidence of a previous altercation and a complaint or request for separation (emphasis added)), *report-recommendation adopted by* 2010 WL 3825650 (N.D.N.Y. Sept. 24, 2010). In other words, Plaintiff here was not required to allege a substantial risk of serious harm attributable to one *specific* attacker.

In sum, the Court finds Plaintiff has adequately pled the objective prong and dismissal is not warranted on this basis.

### 2.    Subjective Prong and Personal Involvement

To satisfy the subjective prong, the prison official must "know[] of and disregard[] an excessive risk to inmate health or safety; the official must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and he must also draw the inference." *Farmer*, 511 U.S. at 837. This element "entails something more than mere negligence . . . [but] is satisfied by something less than acts or omissions for the very purpose of causing harm or with knowledge that harm will result." *Id*. at 835. "Plaintiff need not show actual knowledge of the risk of harm, but rather can 'present [ ] evidence showing that a substantial risk . . . was longstanding, pervasive, well-documented, or expressly noted by prison officials in the past, and the circumstances suggest that the defendant-official being sued had been exposed to information concerning the risk and thus must have known about it.'" *Jackson v. Goord*, 664 F. Supp. 2d 307, 317 (S.D.N.Y. 2009) (quoting *Farmer*, 511 U.S. at 842) (alterations in original).

a. *Defendants McGrath, Grey, and Bernard*

The Court finds Plaintiff has adequately alleged facts which, if proved, would satisfy the subjective prong of his failure to protect claims against McGrath, Grey, and Bernard.

As an initial matter, Defendants contend Plaintiff has not plausibly alleged the subjective prong of the failure to protect claim because the assaults were "surprise attacks against Plaintiff perpetrated by different inmates" and Plaintiff "never warned" Defendants "he would be attacked by these *specific* inmates." (Dkt. No. 28-1 at 14.) This argument is unavailing. A prison official need not know the plaintiff "was especially likely to be assaulted by the specific prisoner who eventually committed the assault" to establish deliberate indifference. *Farmer*, 511 U.S. at 843; *see also Hayes*, 84 F.3d at 621 ("[T]he issue is not whether [the plaintiff] identified his enemies by name to prison officials, but whether they were aware of a substantial risk of harm to [him]. Although a prisoner's identification of his enemies is certainly relevant to the question of knowledge, it is not, necessarily, outcome determinative."). Rather, a prison official need only be aware of and disregard an "excessive risk" to the inmate. *Celestin*, 2014 WL 272443, at *5.

As discussed further below, at this early juncture, the Court finds Plaintiff's complaint adequately alleges McGrath, Grey, and Bernard knew of and disregarded an excessive risk to his safety. Moreover, these allegations of deliberate indifference establish each defendant was personally involved in the constitutional violation.

With respect to McGrath, Plaintiff alleges she received Plaintiff's correspondence "regarding transfer and safety concerns" wherein Plaintiff related his status as an informant and that gang members were targeting him. (Dkt. Nos. 1 at 3, 7; 1-1 at 1-2.) McGrath noted Plaintiff's "extensive transfer histor[y]" but did not grant Plaintiff's request for protective custody. (Dkt. No. 1-1 at 1.) McGrath continued responding to Plaintiff's correspondence and

"reviewed [his] record" after his transfer to Great Meadow. *Id.* at 2. Thus, Plaintiff plausibly alleges McGrath knew of and disregarded an excessive risk to his safety, *i.e.*, she was aware Plaintiff was a target for gang violence on account of his status as an informant and failed to act. *See, e.g.*, *Hutchinson v. McCabee*, No. 95 CIV. 5449 (JFK), 1999 WL 147712, at *5 (S.D.N.Y. Mar. 15, 1999) (denying motion to dismiss where defendant had "actual notice" of a request for transfer but denied the request).

Similarly, Plaintiff alleges he informed his therapist Grey of the September 13, 2017, attack where he was struck in the back of his head by a "known gang member." (Dkt. No. 1 at 8.) He also told Grey he was "being extorted by gang members." *Id.* Although Grey informed Jackson of Plaintiff's report, the complaint, construed liberally, alleges Grey failed to report this information to the proper authorities and thus failed to assist Plaintiff in any way. *Id.* Plaintiff was seriously assaulted only a few weeks later. *Id.* Thus, Plaintiff plausibly asserts Grey knew he was vulnerable to future attacks yet failed to act. *See, e.g.*, *B. Braxton/Obed-Edom v. City of New York*, 368 F. Supp. 3d 729, 737-38 (S.D.N.Y. 2019) (denying motion to dismiss where plaintiff put defendants on notice of risks faced if not placed in protective custody and where defendants failed to place plaintiff in protective custody).

Finally, Plaintiff plausibly alleges deliberate indifference on the part of Bernard. As Plaintiff's guidance counselor, Bernard "reviewed" Plaintiff's inmate history and "was aware Plaintiff had a history of being assaulted and placed in protective custody." (Dkt. No. 1 at 9.) Bernard also met with Plaintiff on June 27, 2017, to discuss concerns about Plaintiff's safety and security. *Id.* Despite awareness of Plaintiff's problematic history, Bernard encouraged Plaintiff to sign a protective custody refusal. *Id.* The Court thus finds the complaint states a failure to protect claim against Bernard. *See, e.g.*, *Hutchinson*, 1999 WL 147712, at *5.

15

In sum, the Court recommends Defendants McGrath, Grey, and Bernard's motion to dismiss be denied.

### b.    Defendants Annucci, Jackson, and Miller

However, the Court finds Plaintiff has not adequately alleged facts which, if proved, would satisfy the subjective prong—or, consequently, the personal involvement required for supervisory defendants—of his failure to protect claims against Annucci, Jackson, and Miller.

In his complaint, Plaintiff alleges he forwarded letters and court documents "numerous" times to Acting Commissioner Annucci over a four-year period. (Dkt. No. 1 at 3, 6-7.) This correspondence noted there was a contract on Plaintiff's life by known gang members and requested that he be placed in special housing. *Id.* at 3. As Plaintiff alleges, and as is supported by the exhibits attached to the complaint, Annucci "at all times" forwarded Plaintiff's correspondence to McGrath. (Dkt. Nos. 1 at 3, 7; 1-1 at 1-3.)

As Defendants argue, "[c]ourts in this District have held that letters to supervisors and his responses (via his subordinates) do not satisfy the personal involvement requirement." *Hamilton v. New York State Dep't of Corr. & Cmty. Supervision*, No. 9:18-CV-1312 (MAD/CFH), 2019 WL 2352981, at *8 (N.D.N.Y. June 4, 2019) (collecting cases). Indeed, the "general rule is that if an official receives a letter from an inmate and passes it on to a subordinate for response or investigation, the official will not be deemed personally involved with respect to the subject matter of the letter." *Rivera v. Fischer*, 655 F. Supp. 2d 235, 238 (W.D.N.Y. 2009). Only if the official "personally look[s] into the matters raised in the letter, or otherwise acts on the prisoner's complaint or request," may the official be found to be personally involved. *Id.*

Here, Plaintiff has not alleged Annucci personally investigated the matters raised in his correspondence or otherwise acted on the letters. (*See generally* Dkt. No. 1.) Rather, Plaintiff

alleges Annucci forwarded his correspondence to McGrath, one of his subordinates, for response.  (Dkt. No. 1 at 3, 7; *see also* Dkt. No. 1-1 at 1-3.)  Plaintiff, thus, has failed to plausibly allege personal involvement on the part of Annucci or that Annucci both knew of and disregarded an excessive risk to Plaintiff's health or safety.  *See Farmer*, 511 U.S. at 837.

Similarly, the only allegation against Jackson is that Grey informed Jackson of Plaintiff's report of being attacked and extorted.  (Dkt. Nos. 1 at 8; 32-1 at 4.)  Though, Grey's notes indicate she was to email Jackson about Plaintiff's "concerns" there is no allegation Jackson ever received such an email.  (Dkt. No. 32-1 at 4.).  Thus, the Court finds Plaintiff fails to assert deliberate indifference on the part of Jackson and consequently, cannot show Jackson was personally involved in any constitutional violation.  *See Bennett v. Columbe*, No. 9:16-CV-653 (BKS/CFH), 2017 WL 6049238, at *4 (N.D.N.Y. Oct. 17, 2017) (noting personal involvement will be found only where a supervisory official "receives and acts on" or otherwise "reviews and responds" to correspondence), *report-recommendation adopted by* 2017 WL 6062904.

Likewise, the complaint alleges Miller received an email regarding concerns about Plaintiff's safety and security "due to the Plaintiff having a history of being assaulted."  (Dkt. No. 1 at 9-10.)  Miller forwarded this email to Bernard to handle, and Plaintiff does not allege Miller personally investigated or took further action with regards to the contents of the email. *See id.*  While Plaintiff does not allege who sent the email to Miller (*see generally id.*), the Court finds Miller's receipt of the email and delegation to Bernard inadequate to establish Miller's personal involvement.  *Rivera*, 655 F. Supp. 2d at 238.  Plaintiff's allegation that Miller should have followed up with Bernard once he learned a protective custody refusal was signed (Dkt. Nos. 1 at 10; 32 at 8) is too conclusory to establish Miller's personal involvement.  *See Iqbal*, 556 U.S. at 678.

In sum, because Plaintiff has failed to plausibly allege personal involvement of Annucci, Jackson, and Miller or that they knew of and disregarded an excessive risk to Plaintiff's safety, the Court recommends Plaintiff's claim against Annucci, Jackson, and Miller be dismissed, with leave to amend in deference to Plaintiff's *pro se* status.

## III.    CONCLUSION

For the reasons set forth above, the Court recommends Defendants' motion to dismiss (Dkt. No. 28) be granted in part and denied in part.  If the District Court accepts this Report and Recommendation, the claims remaining in this action will be Plaintiff's failure to protect claims against Defendants McGrath, Grey, and Bernard.

**ACCORDINGLY**, it is hereby

**RECOMMENDED** that Defendants' Rule 12(b)(6) motion to dismiss (Dkt. No. 28) be **GRANTED*, without prejudice,*** with respect to Defendants Annucci, Jackson, and Miller; and it is further

**RECOMMENDED** that Defendants' Rule 12(b)(6) motion to dismiss (Dkt. No. 28) be **DENIED** with respect to Defendants McGrath, Grey, and Bernard; and it is further

**ORDERED** that the Clerk provide to Plaintiff a copy of this Order and Report-Recommendation, along with copies of the unpublished decisions cited herein in accordance with the Second Circuit decision in *Lebron v. Sanders*, 557 F.3d 76 (2d Cir. 2009) (*per curiam*).

Pursuant to 28 U.S.C. § 636(b)(1), the parties have fourteen (14) days within which to file written objections to the foregoing report.[8]  Such objections shall be filed with the Clerk of

---

[8]  If you are proceeding *pro se* and are served with this Order and Report-Recommendation by mail, three additional days will be added to the fourteen-day period, meaning that you have seventeen days from the date the Order and Report-Recommendation was mailed to you to serve and file objections.  Fed. R. Civ. P. 6(d).  If the last day of that prescribed period falls on a

the Court.  **FAILURE TO OBJECT TO THIS REPORT WITHIN FOURTEEN (14) DAYS**

**WILL PRECLUDE APPELLATE REVIEW**.  *Roldan v. Racette*, 984 F.2d 85 (2d Cir. 1993)

(citing *Small v. Sec'y of Health and Human Servs.*, 892 F.2d 15 (2d Cir. 1989)); 28 U.S.C.

§ 636(b)(1); Fed. R. Civ. P. 72.

Dated: November 25, 2019
      Syracuse, New York

Thérèse Wiley Dancks
United States Magistrate Judge

---

Saturday, Sunday, or legal holiday, then the deadline is extended until the end of the next day
that is not a Saturday, Sunday, or legal holiday.  Fed. R. Civ. P. 6(a)(1)(C).

2012 WL 4471306
Only the Westlaw citation is currently available.
United States District Court,
S.D. New York.

Standish DUBLIN, Plaintiff,

v.

NEW YORK CITY LAW
DEPARTMENT, N.Y.C.D.O.C., Officer
Rodriguez # 18480, Defendants.

No. 10 Civ. 2971(LAP).
|
Sept. 26, 2012.

*MEMORANDUM AND ORDER*

LORETTA A. PRESKA, Chief Judge.

**\*1** Plaintiff Standish Dublin ("Plaintiff") filed a complaint against the New York City Law Department (the "City Law Department"), the New York City Department of Correction ("D.O.C."), and Officer Rodriguez (collectively "Defendants") for an alleged deprivation of his constitutional rights. Defendants move for summary judgment pursuant to Rule 56 of the Federal Rules of Civil Procedure on the grounds that: (1) the City Law Department and D.O.C. are non-suable entities; (2) Plaintiff fails to state a claim for municipal liability; (3) Plaintiff fails to state a failure to protect claim against Officer Rodriguez; and (4) Defendant Rodriguez is entitled to qualified immunity. The Court will address each argument in turn. For the reasons set forth below, Defendants' motion for summary judgment [dkt. no. 23] is GRANTED.

I. *BACKGROUND* [1]

Plaintiff is an inmate who was housed in the G.R.V.C. correctional facility in Elmhurst, New York, housing area 7B, beginning on January 17, 2009. (Defs.' 56.1 ¶¶ 5–6.) There were approximately forty-seven inmates in housing area 7B on February 9, 2009. (*Id.* ¶ 7.) On February 9, 2009, Correction Officer Rodriguez was at the officer station in housing area 7B at the time of the incident in question. (*Id.* ¶ 4.)

On February 9, 2009, Plaintiff was involved in an altercation with other inmates. (*Id.* ¶ 8.) While standing in the food line, another inmate, previously unknown to the Plaintiff, offered Plaintiff the choice of eating with a fork or a spoon. (*Id.* ¶ 9, 11.) Plaintiff responded, "What are you guys, police?" (*Id.* ¶ 10.) During this exchange, Plaintiff testified that Officer Rodriguez was approximately fifteen feet away. (*Id.* ¶ 12.) Following this verbal exchange, Plaintiff was approached by two inmates, also previously unknown to him, whom he identified as part of the same "crew" as the first inmate he spoke to in the food line. (*Id.* ¶ 14, 15.) One of the inmates told Plaintiff that he needed to watch his mouth, to which Plaintiff responded "I don't have to do anything." (*Id.* ¶¶ 16, 17.) The two inmates walked away, only to return a few minutes later. (*Id.* ¶¶ 18, 19.) One of the inmates told Plaintiff to "pack his shit," and a brief altercation [2] ensued among Plaintiff, the two inmates, and possibly other inmates. (*Id.* ¶¶ 20, 21, 23; Pl. 56.1 ¶ 23.) Plaintiff was hit on the right side of his face and pushed to the floor. (Dublin Dep. Tr. at 45:20–47:25.) He tried to defend himself during the course of what he describes as "more than a fight." (*Id.* at 39:9–12.)

Plaintiff did not know where Officer Rodriguez was when the altercation began. (*Id.* ¶ 21.) After the altercation, Plaintiff went to the shower area, remained there for a few seconds, and when he emerged, Officer Rodriguez directed Plaintiff to "go out into the vestibule area." (*Id.* ¶¶ 24–26.)

**\*2** Plaintiff received a laceration on the inside and outside of the right side of his mouth. (*Id.* ¶ 27.) He received treatment for those injuries on Rikers Island. (*Id.* ¶ 28.) While at Urgent Care on Rikers Island, Plaintiff received more than twenty-five stitches. (Dublin Dep. Tr. at 59:15–16, 60:13–14.) Plaintiff received an infraction for the incident and thirty days of punitive segregation. (Defs.' 56.1 ¶ 33.) Following the incident, Plaintiff returned to the G.R.V.C. but was moved to housing area 15A. (*Id.* ¶ 34.)

II. *DISCUSSION*

A. *Legal Standard for Summary Judgment*

Summary judgment is appropriate when no genuine dispute as to any material fact exists and the moving party is entitled to judgment as a matter of law. *See* Fed.R.Civ.P. 56(a); *see also Celotex Corp. v. Catrett,* 477 U.S. 317, 322–23, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). The substantive law governing the suit identifies the essential elements of the claims asserted and therefore indicates whether a fact is material; a fact is material if it "might affect the outcome of the suit under the

governing law." *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). "[T]he dispute about a material fact is 'genuine' ... if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Id.*

In considering a motion for summary judgment, the Court resolves all ambiguities and draws all reasonable inferences against the moving party. *Lindsay v. Ass'n of Prof'l Flight Attendants,* 581 F.3d 47, 50 (2d Cir.2009). To survive summary judgment "the nonmoving party must come forward with 'specific facts showing that there is a *genuine issue for trial.*' " *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.,* 475 U.S. 574, 587, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986) (quoting Fed.R.Civ.P. 56(e)). "Conclusory allegations, conjecture, and speculation, however, are insufficient to create a genuine issue of fact." *Kerzer v. Kingly Mfg.,* 156 F.3d 396, 400 (2d Cir.1998). Rule 56 mandates summary judgment "against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex,* 477 U.S. at 322.

Where a litigant is pro se, his pleadings should be read liberally and interpreted "to raise the strongest arguments that they suggest." *McPherson v. Coombe,* 174 F.3d 276, 280 (2d Cir.1999) (quoting *Burgos v. Hopkins,* 14 F.3d 787, 790 (2d Cir.1994)). "Nevertheless, proceeding pro se does not relieve a litigant from the usual requirements of summary judgment. *Garcia v. Rodriguez,* 05 Civ. 5915(RCC)(JCF) 2007 U.S. Dist. LEXIS 15844, at *11 (S.D.N.Y. Jan. 26, 2007).

### 1. *Plaintiff's Claims Against the City Law Department and D.O.C.*

Chapter 17, § 396 of the New York City Charter provides, "[a]ll actions and proceedings for the recovery of penalties for the violation of any laws shall be brought in the name of the City of New York and not in that of any agency, except where otherwise provided by law." No exception exists for either the Law Department or the Department of Corrections. In *Bogart v. New York City Law Dep't,* 00 Civ. 7417(DLC), 2001 U.S. Dist. LEXIS 21919, at *8, 2001 WL 1631986 (S.D.N.Y. Dec. 20, 2001), this Court held that the Law Department is not a suable entity. In *White v. Vance,* 10 Civ. 6142(NRB), 2011 U.S. Dist. LEXIS 67799, at *14, 2011 WL 2565476 (S.D.N.Y. June 21, 2011), this Court held that "as an agency of the City of New York, the D.O.C. is not a suable entity." Accordingly, Plaintiff's claims against the New

York City Law Department and City of New York Department of Correction are dismissed.

**\*3** In his original complaint, Plaintiff included the City of New York as a defendant. Plaintiff did not include the City as a defendant in his amended complaint. (*See* Richardson Decl. Ex. A .) Even if the Court were to interpret Plaintiff's claims against the City Law Department and the D.O.C. as claims against the City, his claims would fail.

In order to hold a municipality liable as a "person" within the meaning of Section 1983, a plaintiff must establish that the municipality itself was somehow at fault. *See Monell v. Dep't of Social Services,* 436 U.S. 658, 690–91, 98 S.Ct. 2018, 56 L.Ed.2d 611 (1978). "The plaintiff must first prove the existence of a municipal policy or custom in order to show that the municipality took some action that caused him injuries.... Second, the plaintiff must establish a causal connection-an affirmative link-between the policy and the deprivation of [defendant's] constitutional rights." *Vippolis v. Vill. Of Haverstraw,* 768 F.2d 40, 44 (2d Cir.1985) (internal quotation marks omitted). The "moving force [behind] the constitutional violation" must be an identified municipal policy or practice. *Monell,* 436 U.S. at 694.

The Court of Appeals held that "the simple recitation that there was a failure to train municipal employees does not suffice to allege that a municipal custom or policy caused the plaintiff's injury ... in the absence of allegations of fact tending to support, at least circumstantially, such an inference." *Dwares v. City of New York,* 985 F.2d 94, 100 (2d Cir.1993). "It is well settled that a municipality cannot be held liable under § 1983 on a *respondeat superior* theory." *Monell,* 436 U.S. at 691.

Plaintiff's allegations regarding policies and practices diverge. On the one hand, Plaintiff alleges that the D.O.C. has an unwritten policy designed by the officers of the D.O.C. that allows officers to relax instead of protect inmates. (Dublin Aff. in Opp.) On the other hand, Plaintiff seeks the enforcement of the established rules and regulations to the D.O.C. officers. (Compl.V.) The Court will address both possible interpretations of Plaintiff's claims.

In *Overhoff v. Ginsberg Dev. ("Overhoff"),* 143 F.Supp.2d 379, 389 (S.D.N.Y.2001), the Court dismissed plaintiff's claim against the municipality where plaintiff failed to allege that her constitutional rights were violated pursuant to any municipal policy or custom. Plaintiff's argument was

"premised on the idea that existing Village policies were not enforced." *Id.* In his amended complaint, Plaintiff states that he would "like for D.O.C. to enforce the rules and regulations to these officers." (Compl. V .) Accordingly, if Plaintiff's intent is for the Court to enforce policies and procedures that are currently in place, that is precisely the situation in *Overhoff,* and "the antithesis of a *Monell* claim." *Monell,* 436 U.S. at 389.

In his Affidavit in Opposition, Plaintiff alternatively alleges that D.O.C. has an unwritten policy that is utilized to allow officers to relax instead of protect inmates and empowers other "groups" within the facility. (Dublin Aff. in Opp.) According to Plaintiff, this unwritten policy allows officers to relax instead of protect inmates and places other dominant groups, such as the Bloods, in command. (*Id.*) Plaintiff goes on to state that the dominant groups are allowed to "direct the other inmates to their cells, deprive other inmate[s of] their full meals, smoke as long as they cover the smell, to receive personal favors from officers." (*Id.*) Plaintiff infers that this unwritten policy is what led to his injuries caused by other inmates. (*Id.* 10.)

 **\*4** Plaintiff's claim against the City for the conduct of Officer Rodriguez is based on a single, isolated incident, the altercation that took place on February 9, 2009. "A municipal agency may not be held liable under § 1983 simply for the isolated unconstitutional acts of its employees." *Sorlucco v. New York City Police Dep't,* 971 F.2d 864, 870 (2d Cir.1992). "A single incident of unconstitutional activity is insufficient to infer a custom, policy or practice as required by *Monell* to impose municipal liability." *Santiago v. Campisi,* 91 F.Supp.2d 665, 675–76 (S.D.N.Y.2000). Here, Plaintiff only provides the single incident of February 9, 2009 to support his claim that there is an unwritten policy whereby Defendant agencies and the City deprive individual prisoners of their Constitutional rights. Accordingly, Plaintiff's claims against the City are dismissed.

### 2. *Plaintiff's Claims Against Officer Rodriguez*

#### i. *Failure to Protect*

"The Eighth Amendment, which applies to the States through the Due Process Clause of the Fourteenth Amendment prohibits the infliction of 'cruel and unusual punishments' on those convicted of crimes." *Wilson v. Seiter,* 501 U.S. 294, 298, 111 S.Ct. 2321, 115 L.Ed.2d 271 (1991). To establish a violation of the Eight Amendment for failure to protect an individual in custody, a plaintiff must show that the

deprivation is so sufficiently serious that it results in a denial of "the minimal civilized measure of life's necessities." *Id.* A plaintiff must also show that the prison officials acted with a "sufficiently culpable state of mind." *Hathaway v. Coughlin,* 99 F.3d 550, 553 (2d Cir.1996). Prison officials may not deprive a prisoner of "basic human needs, *e.g.,* food, clothing, shelter, medical care, and reasonable safety" or expose an inmate to conditions that "pose an unreasonable risk of serious damage to his future health." *Helling v. McKinney,* 509 U.S. 25, 32, 35, 113 S.Ct. 2475, 125 L.Ed.2d 22 (1993) (citation omitted).

Under the Eighth Amendment, "prison officials have a duty ... to protect prisoners from violence at the hands of other prisoners." *Farmer v. Brennan,* 511 U.S. 825, 833, 114 S.Ct. 1970, 128 L.Ed.2d 811 (1994) (internal quotations omitted). "In *Farmer,* the Supreme Court set out a two-pronged test that determines when a failure to protect a prison inmate from assault by other inmates rises to the level of a constitutional violation." *Hines v. Lacy,* 189 F.3d 460 (2d Cir.1999). The first prong requires that the inmate must have been "incarcerated under conditions posing a substantial risk of serious harm." *Farmer,* 511 U.S. at 834. The second prong requires that the prison official must have shown "deliberate indifference" to the prisoner's safety. *Id.* A prison official acts with deliberate indifference when he or she "knows of and disregards an excessive risk to inmate health or safety; the official must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and he must also draw the inference." *Id.* at 837.

#### 1. *Prong One*

 **\*5** To satisfy prong one, the objective prong, a plaintiff must show that the "alleged deprivation ... in objective terms, [was] sufficiently serious." *Hathaway v. Coughlin,* 37 F.3d 63, 66 (2d Cir.1994). The Court of Appeals has defined sufficiently serious as "a condition of urgency, one that may produce death, degeneration, or extreme pain." *Braxton v. Nichols,* 2010 U.S. Dist. Lexis 25652, at \*11, 2010 WL 1010001 (S.D.N.Y. Mar. 18, 2010). Under the Eighth Amendment standard, a plaintiff must demonstrate that this grave harm was "actual or imminent." *Benjamin v. Fraser,* 343 F.3d 35, 51 (2d Cir.2003). Courts have found that a substantial risk of harm can only be demonstrated where there is evidence of a previous altercation between a plaintiff and his attacker, coupled with a complaint by plaintiff regarding the altercation or a request by plaintiff to be separated from the attacker. *See Desulma v. City of New York,* 2001 U.S. Dist. Lexis 9678, at \*19–20, 2001 WL 798002.

In *Desulma,* the Court held that the Plaintiff did not demonstrate that he was incarcerated under conditions posing a substantial risk of serious harm and therefore did not satisfy prong one. There, the Plaintiff had no prior altercations with the inmates who attacked him, he had not complained about them before, and he did not request separation from them. *Id.* at *20. Plaintiff testified that the attackers threatened him and said he was "going to pay a price" and to get away because "he smelled." *Id.* The Court held that those verbal statements alone did not indicate a substantial threat of serious harm.

Similarly, Dublin was previously unaware of his attackers until he spoke to them in the food line. In fact, the verbal exchange in the food line between Dublin and the inmate did not include any verbal threats of the sort Desulma experienced. Accordingly, the Court finds that Plaintiff has not satisfied his burden with respect to prong one.

### 2. *Prong Two*

Even if the Court were to find that Plaintiff satisfied prong one, it is abundantly clear that Plaintiff has not satisfied prong two, which requires a showing that Officer Rodriguez was "sufficiently culpable." To be found sufficiently culpable, the prison official must "know[ ] of and disregard[ ] an excessive risk to inmate health and safety; the official must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and he must also draw the inference." *Farmer,* 511 U.S. at 834, 837. "Direct evidence that prison officials knew of and disregarded a serious risk of harm to a prison inmate will rarely be available," and therefore an inmate may rely on circumstantial evidence. *Desulma,* 2001 U.S. Dist. Lexis 9678, at *17, 2001 WL 798002 (quoting *Matthews v. Armitage,* 36 F.Supp.2d 121, 125 (N.D.N.Y.1999). The "subjective element of deliberate indifference 'entails something more than mere negligence ... [but] something less than acts or omissions for the very purpose of causing harm or with knowledge that harm will result.' " *Hathaway,* 99 F.3d at 553 (quoting *Farmer,* 511 U.S. at 835).

**\*6** Whether Officer Rodriguez was approximately fifteen feet away when the verbal exchange took place in the food line is a disputed fact. [3] (Defs.' 56.1 ¶ 12.) In any event, Plaintiff does not allege that Officer Rodriguez overheard the conversation that took place in the food line. Also, Plaintiff did not notify any correction officer of the verbal exchange. (*Id.* ¶ 13.) At most, Plaintiff alleges that Officer Rodriguez

should have known about the Bloods and should have been present during the altercation if she had been at her post. The record supports the conclusion that Officer Rodriguez was unaware of Plaintiff's fear of his attackers because the verbal exchange preceding the altercation was never brought to Officer Rodriguez's attention and Plaintiff does not allege that she was herself a witness to the verbal exchange or the altercation.

Plaintiff was injured when he was attacked by two fellow inmates. In the Complaint, Plaintiff alleges that he could see Officer Rodriguez in the housing area around the time of the altercation. (Compl.II.D.) Plaintiff also stated "[i]f the officer was at the post she saw it all along with the rest of the inmates that were present that night.... The officer was nowhere to be found when I looked for her assistance when I was approached the second time because I was in danger as well as any person who gets in an altercation with the Bloods. And she's been working here long enough to know the danger I was in ..." (*Id.*) Plaintiff's statements seem to indicate that he was in danger because of the presence of the Bloods in the area he was housed in. It was not until after the altercation that Plaintiff realized one of his attackers was a member of the Bloods. (Am.Compl.¶ II.D.) Plaintiff had no hostile or threatening exchanges with any of the inmates he identifies as Bloods prior to the altercation. Plaintiff did not know any of the attackers at all prior to the events on February 9, 2009. (Defs.' 56.1 ¶¶ 11, 15.)

At his deposition, Plaintiff testified "I didn't see no correction officer, when it was going down at the beginning. I didn't see no correction officer till I came back out the shower area, from trying to wipe off me-clean off the blood from my face." (Dublin Dep. Tr. at 52:3–7.) Plaintiff's account of events is unclear with respect to the presence of Officer Rodriguez. [4] Drawing all reasonable inferences in favor of the Plaintiff, for purposes of this motion the Court assumes that Plaintiff saw Officer Rodriguez in the vicinity during the altercation. The circumstances suggest that Plaintiff was in actual or imminent harm as he sustained serious injuries to his lip as a result of the altercation.

Officer Rodriguez's failure to intervene in the attack is not, by itself, a basis for liability. Because "[a] correctional officer's presence at an attack of an inmate, where he does nothing to stop an assault, may be sufficient to establish a claim under Section 1983, an isolated omission to act by a state prison guard must be accompanied by evil intent, recklessness or at least deliberate indifference to the consequences of the

conduct." *Desulma,* 2001 U.S. Dist. Lexis 9678, at *22–23, 2001 WL 798002 (internal citations omitted). It must also be shown that Defendant had "an extended opportunity to stop the attack but failed to take any action to do so." *Rucco v. Howard,* 1993 WL 299296 (S.D.N.Y. Aug.4, 1993) (citing *Williams v. Vincent,* 508 F.2d 541, 546 (2d Cir.1974)).

*7 Here, there is no evidence suggesting that Officer Rodriguez deliberately disregarded Dublin's safety or had an opportunity to intervene in the attack, that is, that Officer Rodriguez knew of and disregarded a substantial risk of serious harm to Plaintiff. Accordingly, Plaintiff has not satisfied prong two. Plaintiff's claims against Officer Rodriguez are dismissed.

### ii. *Qualified Immunity*

The question of qualified immunity is independent of the merits of the underlying action and must be examined independent of the underlying claims. *Saucier v. Katz,* 533 U.S. 194, 204, 121 S.Ct. 2151, 150 L.Ed.2d 272 (2001). Qualified immunity protects "all but the plainly incompetent or those who knowingly violate the law." *Id.* at 202 (quoting *Malley v. Briggs,* 475 U.S. 335, 341, 106 S.Ct. 1092, 89 L.Ed.2d 271 (1986)). "Under 42 U.S.C. § 1983, a public official is entitled to qualified immunity if her acts did not violate clearly established rights of which a reasonable officer would have known, or if she reasonably believed that her conduct did not violate those rights." *Desulma,* at *24 (citing *Harlow v. Fitzgerald,* 457 U.S. 800, 818, 102 S.Ct. 2727, 73 L.Ed.2d 396 (1982)). Government officials performing discretionary functions are "shielded from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Harlow v. Fitzgerald,* 457 U.S. 800, 818, 102 S.Ct. 2727, 73 L.Ed.2d 396 (1982). The defense of qualified immunity protects a government official if it was "objectively reasonable" for him or her to believe that his or her actions were lawful at the time of the challenged act. *See Garcia,* 2007 U.S. Dist. LEXIS 15844, at *22. A government official's actions are objectively reasonable, thus entitling a defendant to qualified immunity, if "officers of reasonable competence could disagree" on the legality of defendant's action. *Malley,* 475 U.S. at 341.

"It is clearly established that inmates have the right to be free from harm inflicted by fellow prisoners and that corrections officers have an obligation to protect inmates from a known and substantial risk of serious harm." *Garcia,* 2007 U.S. Dist. LEXIS 15844, at *23. An officer is entitled to qualified immunity only if his or her actions were objectively reasonable. "Thus, if the court determines that the only conclusion a rational jury could reach is that reasonable officers would disagree about the legality of the defendant's conduct under the circumstances, summary judgment is appropriate. *Lennon v. Miller,* 66 F.3d 416, 420 (2d Cir.1995). "Disputes over reasonableness are usually fact questions for juries." But, "[i]f there is no material question of fact, the court decides the qualified immunity issue as a matter of law." *Green v. City of New York,* 465 F.3d 65, 83 (2d Cir.2006).

Plaintiff testified that Officer Rodriguez was approximately fifteen feet away from him when the first verbal exchange occurred. (Defs.' 56.1 ¶ 12.) At the time, there were approximately forty-five other inmates that Officer Rodriguez was monitoring. (*Id.* ¶ 17.) Plaintiff was unaware of the physical location of Officer Rodriguez at the time the altercation began. (*Id.* ¶ 22.) Plaintiff admits that he never told Officer Rodriguez about the verbal exchange in the food line. (*Id.* ¶ 13.) Plaintiff did not testify that he even thought Officer Rodriguez was aware of the situation between him and the inmates who attacked him. It is clear from the facts here that no reasonable jury could conclude that Officer Rodriguez's actions were anything but objectively reasonable. Therefore, Officer Rodriguez is entitled to qualified immunity.

### III. *CONCLUSION*

*8 For the foregoing reasons, Defendants' motion for summary judgment [dkt. no. 23] is GRANTED.

SO ORDERED.

**All Citations**

Not Reported in F.Supp.2d, 2012 WL 4471306

---

Footnotes

1    The facts herein are taken from Defendants' Rule 56.1 Statement ("Defs.' 56.1"), the affidavits submitted thereto, the transcript of the May 20, 2011 Deposition of Standish Dublin, and Plaintiff's 56.1 Statement ("Pl.'s 56.1"). On July 13, 2012, Plaintiff filed a response to Defendants' 56.1 Statement ("Pl.'s Reply"). The Court notes that Plaintiff's 56.1 Statement

admits all but four of Defendants' facts as set forth in Defendants' 56.1 Statement. The Court also notes that of those four points opposed, Plaintiff does not actually oppose the statement of fact, rather he clarifies the points by providing additional details.

2    Plaintiff opposes paragraph 23 of Defendants' 56.1 statement where it states that the altercation lasted for approximately one minute. Plaintiff's 56.1 statement states that it lasted for one or two minutes. (Pl. 56.1 ¶ 23.) At his deposition, Plaintiff stated that the event lasted "[m]aybe minute or so, two minutes." (*See* Richardson Decl. Ex. B, Depsition of Standish Dubli ("Dublin Dep. Tr.") at 49:18.)

3    In his 56.1 Statement, Plaintiff opposes the fact that Officer Rodriguez was fifteen feet away and clarifies "the officer's station is approximately fifteen feet away from the chow line." (Pl. 56.1 ¶ 12.)

4    If Plaintiff is merely asserting that Plaintiff was in the housing area but not present during the altercation, his claim against Officer Rodriguez is a *respondeat superior* claim, which is not cognizable under § 1983. *See Hines v. Lacy,* 189 F.3d 460, n. 1. Drawing all inferences in favor of the Plaintiff, the Court will assume that Plaintiff did see Officer Rodriguez at the time of the incident.

---

**End of Document**                                                    © 2019 Thomson Reuters. No claim to original U.S. Government Works.

2014 WL 272443
Only the Westlaw citation is currently available.
United States District Court,
N.D. New York.

Clives CELESTIN, Plaintiff,

v.

Jeffrey PREMO, Correction Officer, Upstate
Correctional Facility, et al., Defendants.

Civil Action No. 9:12–cv–301 (GLS/RFT).
|
Jan. 24, 2014.

**Attorneys and Law Firms**

Clives Celestin, Attica, NY, pro se.

Hon. Eric Schneiderman, Office of the Attorney General,
State of New York, Michael G. McCartin, Esq., Assistant
Attorney General, of Counsel, Albany, NY, for the Defendant.

### *ORDER*

GARY L. SHARPE, Chief Judge.

 **\*1** The above-captioned matter comes to this court
following a Report–Recommendation by Magistrate Judge
Randolph F. Treece, duly filed December 9, 2013. Following
fourteen (14) days from the service thereof, the Clerk has sent
the file, including any and all objections filed by the parties
herein.

No objections having been filed and the court having
reviewed the Magistrate Judge's Report–Recommendation
for clear error, it is hereby

ORDERED that the Report–Recommendation of Magistrate
Judge Randolph F. Treece filed December 9, 2013 (Dkt. No.
68) is ACCEPTED in its entirety for the reasons state therein;
and it is further

ORDERED that defendants' motion for partial summary
judgment (Dkt. No. 62) is GRANTED; and it is further

ORDERED that defendants Rock, Fischer and Carver are
DISMISSED; and it is further

ORDERED that the case is deemed trial ready as to plaintiff's
claims against defendants Premo, Tulip and Traux; and it is
further

ORDERED that the case has been moved to the court's trial
ready list; and it is further

ORDERED that the Clerk of the Court is to mail copies of the
Order to the parties in accordance with the court's local rules.

IT IS SO ORDERED.

**CLIVENS CELESTIN,**

Plaintiff,

-v-

**JEFFREY PREMO,** *Correction Officer, Upstate
Correctional Facility,* **STANLEY TULIP,** *Correction
Officer, Upstate Correctional Facility,* **BRUCE TRAUX,**
*Correction Officer, Upstate Correctional Facility,* **D. ROCK,**
*Prison Superintendent, Upstate Correctional Facility*
**BRIAN FISCHER,** *Commissioner of Dept. of Corrections,*
**MRS. J. CARVER,** *Director of Inmate Classification and
Movement, New York State Dept. of Corrections,*

Defendants.

### *REPORT–RECOMMENDATION and ORDER*

RANDOLPH F. TREECE, United States Magistrate Judge.

*Pro se* Plaintiff Clivens Celestin brings this civil rights action,
pursuant to 42 U.S.C. § 1983, alleging that Defendants
used excessive force, tampered with his grievances, failed to
provide adequate medical care, and failed to protect him from
other officers in contravention of the Eighth and Fourteenth
Amendments. *See generally* Dkt. No. 1, Compl. Defendants
move for Partial Summary Judgment seeking the dismissal of
Defendants Rock, Fischer, and Carver. Dkt. No. 62. Plaintiff
opposes the Motion. Dkt. No. 67. For the reasons that follow,
we recommend that Defendants' Motion be **GRANTED**.

### I. STANDARD OF REVIEW

Pursuant to FED. R. CIV. P. 56(a), summary judgment is
appropriate only where "there is no genuine dispute as to any
material fact and the movant is entitled to judgment as a matter

WESTLAW   © 2019 Thomson Reuters. No claim to original U.S. Government Works.

of law." The moving party bears the burden to demonstrate through "pleadings, depositions, answers to interrogatories, and admissions on file, together with [ ] affidavits, if any," that there is no genuine issue of material fact. *F.D.I. C. v. Giammettei,* 34 F.3d 51, 54 (2d Cir.1994) (quoting *Celotex Corp. v. Catrett,* 477 U.S. 317, 323, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986)). "When a party has moved for summary judgment on the basis of asserted facts supported as required by [Federal Rule of Civil Procedure 56(e) ] and has, in accordance with local court rules, served a concise statement of the material facts as to which it contends there exist no genuine issues to be tried, those facts will be deemed admitted unless properly controverted by the nonmoving party." *Glazer v. Formica Corp.,* 964 F.2d 149, 154 (2d Cir.1992).

**\*2** To defeat a motion for summary judgment, the non-movant must set out specific facts showing that there is a genuine issue for trial, and cannot rest merely on allegations or denials of the facts submitted by the movant. FED. R. CIV. P. 56(c); *see also Scott v. Coughlin,* 344 F.3d 282, 287 (2d Cir.2003) ("Conclusory allegations or denials are ordinarily not sufficient to defeat a motion for summary judgment when the moving party has set out a documentary case."); *Rexnord Holdings, Inc. v. Bidermann,* 21 F.3d 522, 525–26 (2d Cir.1994). To that end, sworn statements are "more than mere conclusory allegations subject to disregard ... they are specific and detailed allegations of fact, made under penalty of perjury, and should be treated as evidence in deciding a summary judgment motion" and the credibility of such statements is better left to a trier of fact. *Scott v. Coughlin,* 344 F.3d at 289 (citing *Flaherty v. Coughlin,* 713 F.2d 10, 13 (2d Cir.1983) and *Colon v. Coughlin,* 58 F.3d 865, 872 (2d Cir.1995)).

When considering a motion for summary judgment, the court must resolve all ambiguities and draw all reasonable inferences in favor of the non-movant. *Nora Beverages, Inc. v. Perrier Group of Am., Inc.,* 164 F.3d 736, 742 (2d Cir.1998). "[T]he trial court's task at the summary judgment motion stage of the litigation is carefully limited to discerning whether there are any genuine issues of material fact to be tried, not to deciding them. Its duty, in short, is confined at this point to issue-finding; it does not extend to issue-resolution." *Gallo v. Prudential Residential Servs., Ltd. P'ship,* 22 F.3d 1219, 1224 (2d Cir.1994). Furthermore, where a party is proceeding *pro se,* the court must "read [his or her] supporting papers liberally, and ... interpret them to raise the strongest arguments that they suggest." *Burgos v. Hopkins,* 14 F.3d 787, 790 (2d Cir.1994), *accord, Soto v. Walker,* 44 F.3d 169,

173 (2d Cir.1995). Nonetheless, mere conclusory allegations, unsupported by the record, are insufficient to defeat a motion for summary judgment. *See Carey v. Crescenzi,* 923 F.2d 18, 21 (2d Cir.1991).

## II. DISCUSSION

### A. Background

According to Plaintiff, on October 26, 1999, while incarcerated at Upstate Correctional Facility ("UCF"), Plaintiff stabbed Corrections Officer Defendant Premo in the arm with a pen. Dkt. No. 62–3, Ex. A, Clivens Celestin Dep., dated Mar. 11, 2013, at pp. 34–38; Dkt. No. 67–1, Pl.'s Opp'n at ¶ G. Disciplinary charges were filed, and after a hearing was held, Plaintiff was found guilty and transferred to Clinton Correctional Facility. Celestin Dep. at pp. 36–38. Over the next several years, Plaintiff was transferred to various correctional facilities throughout New York State. *Id.* at pp. 38–40.

In April or May of 2009, Plaintiff was transferred back to UCF from Green Haven.[1] *Id.* at ¶ 40. Plaintiff alleges that on October 29, 2010, while awaiting transportation from UCF to an outside hospital for a minor surgical procedure, he was attacked and beaten by multiple guards, including Defendant Premo who was still employed as a corrections officer at UCF. Plaintiff claims that as a result of the assault he was sore and swollen and suffered bruises on his shoulder, lower back, knee, and thigh, as well as bruised and fractured ribs. *Id.* at pp. 7, 17, 24–26, & 30; *see also* Compl. at pp. 6–7.[2] Plaintiff further alleges that during the altercation, Defendant Premo called him a "nigger," told him it was "payback time," and asked him if he remembered Defendant Premo "from ten years ago." Celestin Dep. at pp. 33–34.

### B. Interference with Grievances

**\*3** Plaintiff alleges that Defendant Rock, UCF's Superintendent:

CONCEAL[ED]          SERIOUS FACILITY    COMPLAINTS    BY EXPLOITING    [THE    PRISON LITIGATION    AND    REFORM

ACT] AND DISCARDING MY GRIEVANCES AND APPEALS BY FINDING THE RELEVANT FACTS WITHOUT MERIT. THE SUPERINTENDENT AND EXECUTIVE TEAM ENGAGES IN NON–INVESTIGATIVE TECH[NIQUES] THAT ULTIMATELY GETS GRIEVANCES DISMISSED. AT TIMES GRIEVANCES AGAINST OFFICERS FOR SERIOUS VIOLATIONS ARE NOT FILED PROPERLY & WITHOUT IMPLEMENTATION OF A RECEIPT SYSTEM IT FURTHER COMPLICATES INMATES ABILITY TO REMAIN DILIGENT ON THEIR ISSUES. WHICH ALSO CONTRADICTS THE FOURTEENTH AMENDMENT, AND A RIGHT TO SUBSTANTIVE DUE PROCESS FOR INMATES. NOT TO MENTION NEW YORK STATE LAWS WITHIN THE FACILITY LEVEL.

Compl. at pp. 8–9.

Defendants move to dismiss this claim on the grounds that it does not state a claim under § 1983. Dkt. No. 62–8, Defs.' Mem. of Law, at p. 9.

Even when construed liberally, complaints that prison officials tampered with, failed to investigate, or improperly processed grievances, without more, do not give rise to liability under § 1983. *See Irvis v. Seally*, 2011 WL 454792, at *2 (N.D.N.Y. Feb.4, 2011) (Sharpe, J.) ("Thus, regardless of whether and to what extent defendants followed their grievance procedures in investigating or failing to investigate Irvis's complaints, his claims must fail as a matter of law as they are not actionable under § 1983."). Therefore, we recommend Defendants' Motion be **GRANTED** and Plaintiff's claim that Defendant Rock tampered with or failed to follow proper grievance procedures be dismissed.

## C. Supervisory Liability

Defendants have not moved for Summary Judgment on Plaintiff's excessive force claims; therefore, we do not discuss the merits of this claim. However, Defendants move for Summary Judgment as against Plaintiff's allegations that Defendant Fischer, the Commissioner of the Department of Corrections and Community Supervision ("DOCCS"), and Defendant Rock, UCF's Superintendent, were liable in their supervisory capacities for the alleged excessive use of force perpetrated by Defendant Premo and other corrections officers at UCF. The entirety of Plaintiff's allegations in this regard are as follows:

THE AFOREMENTIONED ASSAULT AND BATTERY AND FAILURE TO PROTECT WAS A PRODUCT PROXIMATE CAUSE OF CUSTOMARY WIDE SPREAD [SIC][ ]ABUSE THROUGHOUT THE NEW YORK STATE DEPARTMENT OF CORRECTIONS AND THE UPSTATE CORRECTIONAL FACILITY IN CONJUNCTION WITH GROSS NEGLIGENCE AND OR DELIBERATE INDIFFERENCE. NEW YORK STATE HAS GAPING HOLES REG[ ]ARDING TRAINING, MONITORING, SUPERVISING, SURV [EILLANCE], INVESTIGATING, AND DISCIPLINING/FIRING THEIR PERSON[N]EL FOR WRONGFUL ACTS [DEFENDANTS FISCHER AND ROCK] KNOWS OF [SIC], AND SHOULD KNOW OF OR CONDONES OR FAIL TO INTERVENE.

Compl. at pp. 10–11.

An individual cannot be held liable for damages under § 1983 merely because he holds a position of authority, but he can

be held liable if he was personally involved in the alleged deprivation.

> **\*4** The personal involvement of a supervisory defendant may be shown by evidence that: (1) the defendant participated directly in the alleged constitutional violation, (2) the defendant, after being informed of the violation through a report or appeal, failed to remedy the wrong, (3) the defendant created a policy or custom under which unconstitutional practices occurred, or allowed the continuance of such a policy or custom, (4) the defendant was grossly negligent in supervising subordinates who committed the wrongful acts, or (5) the defendant exhibited deliberate indifference to the rights of inmates by failing to act on information indicating that unconstitutional acts were occurring.

*Colon v. Coughlin,* 58 F.3d 865, 873 (2d Cir.1995) (citations omitted); *see also Selah v. Fischer,* 2013 WL 5603866, at *2 (N.D.N.Y. Oct.11, 2013) (Sharpe, C.J.) (citing *Colon v. Coughlin).*

Even if we assume for the sake of argument that excessive force was used on October 29, 2010, Plaintiff's claim that Defendants Rock and Fischer were liable in their supervisory capacity must fail. Beyond conclusory allegations, Plaintiff fails to allege, much less provide any documentary or record evidence to support, a single fact from which it could be inferred that either Defendant was personally involved in the alleged assault at UCF. Indeed, Plaintiff conceded as much in his Deposition. When asked why he sued Defendant Rock, Plaintiff responded that "I added him to the suit because [ ] he is the head of it, I mean, he runs the stuff, so I figured I would put him in there." Celestin. Dep. at pp. 45–46. When asked if that was the only reason that he named Defendant Rock Plaintiff responded, "[y]es; I felt he was responsible, too, even though he wasn't at the incident." *Id.* at p.. 46. When asked if "the only reason that you sued [Defendant Fischer] is because he is the boss of the entire department," Plaintiff responded in the affirmative. *Id.* And, he further admitted that Defendant

Fischer was neither at the facility at the time of the assault nor physically involved in any way. *Id.* Although Plaintiff alluded, in his Complaint and Deposition, that Defendant Fischer was liable in his capacity as DOCCS' chief policy maker, he fails to identify, with any specificity, which, if any, of the policies he purportedly created or countenanced was responsible for the alleged use of excessive force which spurred the instant action. *Id.*

It is clear that mere linkage in the chain of command is insufficient to establish liability under § 1983. *Richardson v. Goord,* 347 F.3d 431, 435 (2d Cir.2003). Likewise, given Plaintiff's failure to identify any particular policy as having caused the alleged assault, Plaintiff cannot raise a triable issue of material fact as to whether either Defendant had "actual or constructive notice of the unconstitutional practices ..., [or that they] demonstrate[d] gross negligence or deliberate indifference by failing to act" in response to that knowledge. *Meriwether v. Coughlin,* 879 F.2d 1037, 1048 (2d Cir.1989) (internal quotation omitted). Thus, Plaintiff has failed to raise a triable issue of fact with regard to whether Defendants Fisher and Rock were personally involved in the alleged excessive use of force on October 26, 2010.

**\*5** Therefore, we recommend that Defendants' Motion be **GRANTED** with regard to Plaintiff's claim that Defendants Fischer and Rock were personally involved, *via* a theory of supervisory liability, in the alleged excessive use of force perpetrated by Defendant Premo and others.

### D. Failure to Protect

"The Eighth Amendment requires prison officials to take reasonable measures to guarantee the safety of inmates in their custody." *Hayes v. New York City Dep't of Corr.,* 84 F.3d 614, 620 (2d Cir.1996) (citing *Farmer v. Brennan,* 511 U.S. 825, 832–33, 114 S.Ct. 1970, 128 L.Ed.2d 811 (1994)); *Heisler v. Kralik,* 981 F.Supp. 830, 837 (S.D.N.Y.1997) ("[P]rison officials have a constitutional duty to act reasonably to ensure a safe environment for a prisoner when they are aware that there is a significant risk of serious injury to that prisoner."); *see also Avincola v. New York State Dep't of Corr. Servs.,* 1998 WL 146280, at *3 (N.D.N.Y. Mar.27, 1998).

In order to state such a claim, the prisoner must demonstrate that the prison officials "acted with deliberate indifference with respect to his safety or with an intent to cause harm to him[.]" *Hendricks v. Coughlin,* 942 F.2d 109, 113 (2d

Cir.1991). A showing of mere negligence on behalf of the defendants is not enough to state a constitutional claim. *Whitley v. Albers,* 475 U.S. 312, 319, 106 S.Ct. 1078, 89 L.Ed.2d 251 (1986) (cited in *Hendricks v. Coughlin,* 942 F.2d at 113). The key element of a failure to protect claim is the existence or potential existence of a substantial risk of serious harm and not the actual harm which may or may not ensue. *Farmer v. Brennan,* 511 U.S. at 836. To prove deliberate indifference, the plaintiff must show that the "official [knew] of and disregard[ed] an excessive risk to inmate health or safety." *Id.* at 837 (cited in *Ramirez v. Mantello,* 1998 WL 146246, at *2 (N.D.N.Y. Mar.24, 1998)). "[T]he official must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, *and* he must also draw the inference." *Id.* (emphasis added); *see also Rigano v. Cnty. of Sullivan,* 486 F.Supp.2d 244, 255 (S.D.N.Y.2007) (citing *Farmer v. Brennan,* 511 U.S. at 842–43 n. 8; *Salahuddin v. Goord,* 467 F.3d 263, 280 (2d Cir.2006); & *Candelaria v. Coughlin,* 1997 WL 171256, at *10–11 (S.D.N.Y. Apr.10, 1997) for the proposition that "[b]y now, it is well-established that to defeat a motion for summary judgment on an Eighth Amendment claim, there must be genuine issues as to whether the corrections officers were aware that the plaintiff faced a substantial risk of serious danger.").

Evidence that " 'a substantial risk of inmate attacks [which were] 'longstanding, pervasive, well-documented, or expressly noted by prison officials in the past' " is sufficient to establish the existence of a significant risk of harm. *Walters v. Gardner,* 2012 WL 1029658, at *4 (N.D.N.Y. Feb.15, 2012) (quoting *Coronov. Le Fevre,* 886 F.Supp. 220, 224 (N.D.N.Y.1995)).

**\*6** Plaintiff claims that Defendant J. Carver, the Director of Inmate Classification and Movement for the New York State Department of Corrections and Community Supervision ("DOCCS"), and her subordinates are

> RESPONSIBLE TO ASSURE THE PROTECTION OF INMATE FROM DOCUMENTED CIRCUMSTANCES AGAINST OTHER INMATES OR SECURITY STAFF ... [HOWEVER, HERE THEY] FAILED TO PROPERLY SCREEN OR DELIBERATELY TRANSFERRED PLAINTIFF TO

> UPSTATE FACILITY WHILE HAVING DIRECT KNOWLEDGE OF THE INCIDENT BETWEEN OFFICER (PREMO) AND PLAINTIFF IN (OCTOBER 26, 1999)[ ] FILES. MRS CARVER AND SUBORDINATE FAILED IN THEIR DUTY TO REASONABLY PROTECT THE PLAINTIFF BY TRANSFER[R]ING THE PLAINTIFF BACK TO UPSTATE CORRECTION FACILITY ... [WHERE] A SERIOUS INMATE/ OFFICER INCIDENT OCCUR [R]ED CREAT[ING] A HIGH PERCENTAGE [RISK THAT] ASSAULT AND BATTERY RETALIATION ... [WOULD] OCCUR BETWEEN THE OFFICERS AND INMATE.

Pl.'s Opp'n at ¶ G; *see also* Compl. at pp. 9–10.

Here, the record is devoid of any evidence, direct or circumstantial, that Defendant Carver was or should have been aware that by transferring Plaintiff to UCF in April or May of 2009 he faced a specific threat of harm from Defendant Premo or any other significant risk of being harmed personally.

To begin with, it is uncontroverted [3] that in her capacity as Director of Movement and Classification, Defendant Carver was responsible for overseeing nine subordinates, and the movement and classification of 50,000 inmates amongst sixty different correctional facilities. Dkt. No. 62–6, Joyce Carver Decl., dated Aug. 1, 2013, at ¶ 2. Defendant Carver was not personaly involved "in determining where Plaintiff Clivens Celestin ... would have been housed in the 2009 and 2010 time period. This would have been decided by one of [her] subordinates." *Id.* at ¶¶ 3–4. Moreover, nothing in the record indicates that Defendant Carver was aware of the fact that Plaintiff had stabbed Defendant Premo in October of 1999, nor that he was subsequently found guilty of the same at a disciplinary hearing. *See id.* at ¶ 5. For one thing, Defendant Carver did not become the Director of Classification and Movement until December of 2007; thus, there is no indication that she would have learned of Plaintiff's

initial transfer out of UCF in 1999 or the circumstances surrounding that transfer when it occurred. *See id.* at ¶ 1.

Likewise, the record lacks any indication that Defendant Carver should have known Plaintiff would be subjected to a significant risk of harm. Critically, more than a year transpired between the time Plaintiff was transferred to UCF in April or May of 2009 and when Plaintiff was allegedly assaulted by Defendant Premo in October of 2010. Yet, there is no evidence that Plaintiff ever complained of any risk to his safety, either before being transferred back to UCF, or during the year between being transferred and the alleged assault. Nor has Plaintiff provided any evidence that such attacks were widespread or commonplace at UCF. Plaintiff's wholly conclusory and unsupported allegations to the contrary are insufficient as a matter of law to raise a genuine issue of material fact as to the issue of whether Defendant Carver knew or should have known that transferring Plaintiff to UCF placed him at a significant risk of harm. *See Carey v. Crescenzi,* 923 F.2d 18, 21 (2d Cir.1991).

**\*7** Moreover, to the extent that Plaintiff has alleged that Defendant Carver should be held liable because she negligently failed to screen for inmate/guard conflicts before transferring him to UCF in 2009, such a claim, even if true, does not state a cause of action under *§ 1983. See Whitley v. Albers,* 475 U.S. at 319; *see also Shell v. Brun,* 585 F.Supp.2d 465, 470 (W.D.N.Y.2008); *cf. Abdul–Matiyn v. New York State Dep't of Corr. Servs.,* 871 F.Supp. 1542, 1547 (N.D.N.Y.1994) (citing *Morales v. New York State Dep't of Corr.,* 842 F.2d 27, 30 (2d Cir.1988) for the proposition that "section 1983 does not provide [a] cause of action for negligent failure of prison officials to protect an inmate from injury at hands of another inmate").

Likewise, Plaintiff's conclusory and unsupported allegation that one of Defendant Carver's subordinates was responsible for the alleged constitutional deprivation is also insufficient to raise a genuine issue of material fact as to whether Defendant Carver could be found liable in her supervisory capacity. *See Bennett v. Fischer,* 2010 U.S. Dist. LEXIS 139587, at \*35–36, 2010 WL 5525368 (N.D.N.Y Aug. 17, 2010) (citing *Pettus v. Morgenthau,* 554 F.3d 293, 300 (2d Cir.2009) for the proposition that "[i]t is well settled that vague and conclusory allegations that a supervisor has failed to properly manage a subordinate do not suffice to establish the requisite personal involvement and support a finding of liability."). Indeed, nothing in the record suggests that Defendant Carver had any reason to suspect that one of her subordinates would violate

Plaintiff's rights. *See Pettus v. Morgenthau,* 554 F.3d at 300 citing *Poe v. Leonard,* 282 F.3d 123, 140 (2d. Cir.2002) & *Iqbal v. Hasty,* 490 F.3d 143, 166 (2d Cir.) *cert. granted sub nom. Ashcroft v. Iqbal,* 554U.S. 902 (2008), for the proposition that "[t]o the extent that the complaint attempts to assert a failure-to-supervise claim, ... it lacks any hint that [defendant] acted with deliberate indifference to the possibility that his subordinates would violate [plaintiff's] constitutional rights."); *see also Poe v. Leonard,* 282 F.3d at 140 n. 14 ("We have often equated gross negligence with recklessness, and have defined it as the 'kind of conduct [ ] where [the] defendant has reason to know of facts creating a high degree of risk of physical harm to another and deliberately acts or fails to act in conscious disregard or indifference to that risk.' ") (quoting *Bryant v. Maffucci,* 923 F.2d 979, 985 (2d Cir.1991)).

Therefore, we recommend that Defendants' Motion be **GRANTED** as to Plaintiff's failure to protect claim against Defendant Carver and she be **DISMISSED** from this action.

### E. Qualified Immunity

Defendants have also argued that Defendant Carver was entitled to qualified immunity. Defs.' Mem. of Law at p. 15. However, as we have found no evidence that Defendant Carver was personally involved in any constitutional wrongdoing, the issue of qualified immunity is moot. *See Cathedral Church of The Intercessor v. Inc. Vill. of Malverne,* 353 F.Supp.2d 375, 391 (E.D.N.Y.2005) (citing *Saucier v. Katz,* 533 U.S. 194, 201, 121 S.Ct. 2151, 150 L.Ed.2d 272 (2001)).

### III. CONCLUSION

**\*8** For the reasons stated herein, it is hereby

**RECOMMENDED,** that Defendants' Motion for Partial Summary Judgment (Dkt. No. 62) be **GRANTED;** and it is further

**RECOMMENDED,** that Defendants Rock, Fischer, and Carver be **DISMISSED;** and it is further

**ORDERED,** that if the above Recommendation is adopted, this case be deemed trial ready as to Plaintiff's claims against Defendants Premo, Tulip, and Traux; and it is further

**ORDERED,** that the Clerk of the Court serve a copy of this Report–Recommendation and Order upon the parties to this action.

Pursuant to 28 U.S.C. § 636(b)(1), the parties have fourteen (14) days within which to file written objections to the foregoing report. Such objections shall be filed with the Clerk of the Court. **FAILURE TO OBJECT TO THIS REPORT**

**WITHIN FOURTEEN (14) DAYS WILL PRECLUDE APPELLATE REVIEW.** *Roldan v. Racette,* 984 F.2d 85, 89 (2d Cir.1993) (citing *Small v. Sec'y of Health and Human Servs. .,* 892 F.2d 15 (2d Cir.1989)); *see also* 28 U.S.C. § 636(b) (1); FED. R. CIV. P. 72 & 6(a).

**All Citations**

Not Reported in F.Supp.3d, 2014 WL 272443

Footnotes

1   The exact date Plaintiff was transferred back to UCF in 2009 is unclear.

2   The pages of Plaintiff's Complaint are unnumbered; therefore, all references to Plaintiff's Complaint are to the page numbers automatically assigned by the Court's Electronic Case Filing system.

3   Despite receiving Notice of the potential consequences of failing to properly respond to Defendants' Motion for Partial Summary Judgment, including the potential that his claims might be dismissed, Plaintiff provided only terse single sentence admissions or denials in response to Defendants' Statement of Material Fact Pursuant to Local Rule 7.1 ("7.1 Statement"). Moreover, despite having had the benefit of engaging in discovery, Plaintiff failed to submit a single document, affidavit, or declaration in support of his claims. *See* Dkt. Nos. 62–1, Notice of Consequences, & 67, Pl.'s 7.1 Statement; *see also* Pl.'s Opp'n. Defendants, on the other hand, submitted a proper 7.1 Statement supported, in pertinent part, by the sworn Declaration of Defendant Carver, and Plaintiff's Deposition. Dkt. No. 62–6, Joyce Carver Decl., dated Aug. 1, 2013; Celestin Dep. Consequently, given Plaintiff's lapse, we apply Local Rule 7.1(a)(3), and accept as true Defendants' version of the facts as established in their 7.1 Statement. *See Van Loan v. Hartford Acc. & Indent. Co.,* 2006 WL 3782709, at *2–3 (N.D.N.Y. Dec.22, 2006) (reaching a similar conclusion and citing cases to support that holding).

---

**End of Document**                                      © 2019 Thomson Reuters. No claim to original U.S. Government Works.

KeyCite Yellow Flag - Negative Treatment
Distinguished by Warren v. Goord, S.D.N.Y., March 6, 2007

2000 WL 1372834
Only the Westlaw citation is currently available.
United States District Court, S.D. New York.

Rolando CORONADO, Plaintiff,

v.

Gleen S. GOORD, et al., Defendants.

No. 99 CIV. 1674(RWS).
|
Sept. 25, 2000.

**Attorneys and Law Firms**

Rolando Coronado, Sullivan Correctional Facility, Fallsburg,
Plaintiff Pro Se.

Honorable Eliot Spitzer, Attorney General of the State of
New York, New York, By Efrem Z. Fischer, Esq., Assistant
Attorney General, Of Counsel, for Defendants.

OPINION

SWEET, D.J.

**\*1** Plaintiff Rolando Coronado ("Coronado") moves to
reinstate his 42 U.S.C. § 1983 "failure to protect" complaint
now that he has exhausted his administrative remedies
pursuant to the Prisoner Litigation Reform Act, 42 U.S.C. §
1997e (a) ("PLRA"). Defendants Glenn S. Goord ("Goord"),
Christopher P. Artuz ("Artuz"), and George Schneider
("Schneider") (the "Green Haven Defendants") and George
E. Pataki ("Pataki"), (collectively "Defendants"), move that
Plaintiff be required to refile this action under a new index
number. If the complaint is refiled or reinstated, Defendants
move pursuant to Rule 12(b)(6), Fed.R.Civ.P., to dismiss for
failure to state a claim, lack of personal involvement on the
part of the defendants, Eleventh Amendment and qualified
immunity.

For the reasons stated below, Plaintiff's complaint is
reinstated, and the Defendants' motions to dismiss are granted
in part and denied in part.

*The Parties*

Plaintiff Coronado is a prisoner of the New York State
Department of Correctional Services ("DOCS"). At the time
of the incident giving rise to this complaint, Coronado was
housed at the Green Haven Correctional Facility ("GHCF")
in Stormville, New York. Coronado has since been moved to
the Attica Correctional Facility ("Attica") and most recently,
to the Sullivan Correctional Facility ("Sullivan") in Fallsburg,
New York.

Defendant Goord is the Commissioner of DOCS.

Defendant Artuz is the Superintendent of DOCS.

Defendant Schneider is the Deputy of Security of GHCF.

Defendant Pataki is the Governor of New York.

*Prior Proceedings*

The prior proceedings in this case were set forth in a former
opinion of this Court, which dismissed Coronado's complaint
without prejudice for failure to exhaust his administrative
remedies. *See Coronado v. Goord,* No. 99 Civ. 1674(RWS),
2000 WL 52488 (S.D.N.Y. Jan. 24, 2000).

*Background*

The complaint alleges that on June 30, 1997, while Coronado
was in the recreation yard at GHCF in Stormville, New York,
he was attacked by several inmates while two corrections
officers did nothing to prevent the attack. As a result,
Coronado was stabbed in the back seven times, sustaining
a punctured lung which required hospitalization for several
weeks.

Coronado alleges that because the sergeant of security failed
to supervise the door to the recreation yard, prisoners were
able to smuggle weapons into the yard. Coronado further
alleges that the Superintendent and Deputy Superintendent
of Security should have installed metal detectors because of
alleged ongoing threats of violence. Coronado also claims
that Defendants should have classified him as "vulnerable to
attacks" because he had been stabbed on October 1, 1986, July
18, 1988, and September 8, 1988. Finally, Coronado claims
that Governor George Pataki allowed the prisons in New York
State to become overcrowded with prisoners and understaffed
by guards.

Coronado seeks declaratory and injunctive relief and damages
for violation of his Eighth and Fourteenth Amendment rights.

**\*2** Defendants' motion to dismiss was filed on July 13, 1999. Answer and reply papers were received through October 13, 1999, at which point the motion was deemed fully submitted. The Court granted Defendants' motion to dismiss on January 24, 2000 for Coronado's failure to exhaust administrative remedies. *Coronado v. Goord,* No. 99 Civ. 1674(RWS), 2000 WL 52488 (S.D.N.Y. Jan. 24, 2000).

Coronado filed a motion to reinstate the complaint on June 9, 2000, and Defendants moved by letter of June 21, 2000 to bar reinstatement, require refiling, and dismiss the complaint on all the grounds not reached in the Court's January 24, 2000 opinion. The current motions were deemed fully submitted upon the filing of the Defendants' June 21, 2000 letter.

*Discussion*

I. *The Complaint is Reinstated*

After the complaint was dismissed pursuant to 42 U.S.C. § 1997e(a) and (e) for failure to exhaust administrative remedies, Coronado sought and was granted leave for an extension of time within which to file a grievance. On February 4, 2000, Coronado filed Inmate Grievance Complaint No. A-40326-00, which was denied. Coronado appealed that decision to the Superintendent of Attica, where he was then housed, and was denied relief on February 25, 2000. Coronado then appealed to the Central Office Resolution Committee of the DOCS ("CORC"), which denied Coronado's grievance on March 29, 2000. (*See* Motion to Reinstate Complaint Ex. A.) There is no longer any avenue of relief open to Coronado in the prison system, so he has now exhausted his administrative remedies pursuant to § 1997e(a).

As Coronado has complied with the terms of this Court's dismissal without prejudice, the complaint is hereby reinstated.

II. *Legal Standard for Motion to Dismiss*

In reviewing a motion to dismiss under Rule 12(b)(6), a court must "accept as true the factual allegations of the complaint, and draw all inferences in favor of the pleader." *Mills v. Polar Molecular Corp.,* 12 F.3d 1170, 1174 (2d Cir.1993) (citing *IUE AFL-CIO Pension Fund v. Hermann,* 9 F.3d 1049, 1052 (2d Cir.1993)). A *pro se* complaint is given liberal construction, particularly where civil rights violations are alleged. *See George v. Lorenzo,* No. 98 Civ. 0769(LAP), 1999 WL 397473, at \*1 (S.D.N.Y. June 15, 1999); *Cruz v. Jackson,*

No. 94 Civ. 2600(RWS), 1997 WL 45348, at \*3 (S.D.N.Y. Feb. 5, 1997) (citing *Haines v. Kerner,* 404 U.S. 519, 520 (1972); *Morgan v. LaVallee,* 526 F.2d 221, 224 (2d Cir.1975)). Dismissal is warranted only when "it appears beyond doubt that the plaintiff can prove no set of facts in support of his claim which would entitle him to relief." *Conley v. Gibson,* 355 U.S. 41, 45-46 (1957) (footnote omitted). *See also Bass v. Jackson,* 790 F.2d 260, 262 (2d Cir.1986).

III. *The Complaint Fails to State a Claim under the Eighth Amendment*

A. *Legal Standard for § 1983 Failure to Protect Claim*

To state a claim under 42 U.S.C. § 1983, a plaintiff must allege conduct, under color of state law, amounting to a deprivation of rights guaranteed by the Constitution or laws of the United States. *Katz v. Klehammer,* 902 F.2d 204, 206 (2d Cir.1990). A § 1983 complaint "must contain specific allegations of fact which indicate a deprivation of constitutional rights; allegations which are nothing more than broad, simple and conclusory statements are insufficient to state a claim under § 1983." *Alfaro Motors, Inc. v. Ward,* 814 F.2d 883, 887 (2d Cir.1987). *See also Koch v. Yunich,* 533 F.2d 80, 85 (2d Cir.1976); *Powell v. Jarvis,* 460 F.2d 551 (2d Cir.1972).

**\*3** Coronado claims that the Defendants violated his Eighth Amendment right to be free from cruel and unusual punishment by virtue of the fact that Defendants failed to protect him from serious harm at the hands of other inmates. The Eighth Amendment protects against the unnecessary and wanton infliction of pain, *Whitley v. Albers,* 475 U.S. 312, 320 (1986), and requires prison officials to take "reasonable measures to guarantee the safety of inmates in their custody," *Hayes v. New York City Department of Corrections,* 84 F.3d 614, 620 (2d Cir.1996). A prison official's negligence alone does not give rise to a § 1983 claim. *Id.; Morales v. New York State Dep't of Correctional Services,* 842 F.2d 27, 30 (2d Cir.1988); *Williams v. Vincent,* 508 F.2d 541, 546 (2d Cir.1974); *Knowles v. New York City Dep't of Corrections,* 904 F.Supp. 217, 220 (S.D.N.Y.1995).

Failure to provide an inmate with adequate security may be the basis for a § 1983 claim. In *Farmer v. Brennan,* 511 U.S. 825 (1994), the Supreme Court has established that a prison official's failure to protect an inmate violates the Eighth Amendment when two requirements are satisfied: "First, the deprivation [of rights] alleged must be, objectively, 'sufficiently serious.' " *Farmer,* 511 U.S. at 834 (quoting *Wilson v. Seiter,* 501 U.S. 294, 298 (1991)). Second, there

must be an "unnecessary and wanton infliction of pain," which, in the prison failure-to-protect context, is defined as the defendant's subjective "deliberate indifference" to an inmate's safety. *Wilson,* 501 U.S. at 297. *See Hayes,* 84 F.3d at 620-21.

A claim for money damages under § 1983 may not lie unless the defendants were personally involved in the constitutional violation. *See Colon v. Coughlin,* 58 F.3d 865, 873 (2d Cir.1995) ("[i]t is well-settled in this circuit that 'personal involvement of defendants in alleged constitutional deprivations is a prerequisite to an award of damages under § 1983'") (*quoting Williams v. Smith,* 781 F.2d 319, 323 (2d Cir.1986) (internal citations omitted); *Gill v. Mooney,* 824 F.2d 192, 196 (2d Cir.1987). Supervisory officials cannot be held liable under § 1983 solely for the acts of their subordinates. *Johnson v. Glick,* 481 F.2d 1028, 1034 (2d Cir.) (*respondeat superior* does not show personal involvement under § 1983), *cert. denied,* 414 U.S. 1033 (1973).

### B. *Serious Harm*

Although the Supreme Court did not determine in *Farmer* the specific level of risk to an inmate that is significant enough to constitute a deprivation of Eighth Amendment rights, *see Farmer,* 511 U.S. at 834 n. 3, the Court did state that "[f]or a claim based on a failure to prevent harm, the inmate must show that he is incarcerated under conditions posing a substantial risk of serious harm." *Id.*

In this case, Coronado alleges that he suffered seven stab wounds in the back, which punctured his lung and hospitalized him for weeks. The DOC's denial of Coronado's grievance reports that Coronado was eventually transported to a hospital outside the prison for treatment. (*See* Motion to Reinstate Complaint Ex. A (March 29, 2000 letter).)[1] The documentation of several stab wounds serious enough to justify transporting Coronado to an off-site hospital is evidence that there was a risk of sufficiently serious harm to state a claim for the deprivation of Coronado's Eighth Amendment rights.

### C. *Deliberate Indifference*

**\*4** "An isolated omission to act by a state prison guard does not support a claim under section 1983 absent special circumstances indicating evil intent, recklessness, or at least deliberate indifference to the consequences of his conduct for those under his control and dependent on him." *Avers v. Coughlin,* 780 F.3d 205, 209 (2d Cir.1985) (per curiam)

(*citing Williams v. Vincent,* 508 F.2d 541, 546 (2d Cir.1974)). "Deliberate indifference" requires a showing that "the official [knew] of and disregard[ed] an excessive risk to inmate safety; the official must both [have been] aware of facts from which the inference could be drawn and that a substantial risk of serious harm exist[ed], and he must also [have] draw[n] the inference." *Farmer,* 511 U.S. at 837. *See Villante v. Dep't of Corr. of City of N.Y.,* 786 F.2d 516, 519 (2d Cir.1986); *Heisler v. Kralik,* 981 F.Supp. 830, 837 (S.D.N.Y.1997). One way to make out such a claim is to allege that "a substantial risk of inmate attacks was longstanding, pervasive, well-documented, or expressly noted by prison officials in the past, and the circumstances suggest that the defendant official being sued had been exposed to information concerning the risk and thus must have known about it." *Id.,* 511 U.S. at 842-43 (quotations and internal citation omitted).

Coronado's complaint alleges the following omissions by Defendants: (1) the Green Haven Defendants failed to take the precautions of searching prisoners for weapons or installing metal detectors at the entrance to the yard, or assigning guards to "each post" in the recreation area, despite their knowledge of the "constant threat of violence" in that area; (2) the Green Haven Defendants failed to classify Coronado as "vulnerable to attacks" (which would presumably have qualified him for a more protected status) after he was victimized in three prior stabbing incidents; and (3) Governor Pataki failed to alleviate the chronic overcrowding and understaffing of state prisons, which significantly increased the risk of assaults against Coronado. (Statement of Claim at ¶ 2.) In sum, Coronado alleges that in light of prior attacks against him and the general level of violence in the yard, Defendants' failure to stop this most recent attack evidences their "callous disregard" for his safety in violation of his Eighth Amendment right to be free of cruel and unusual punishment. (Id.)

### 1. *The GHCF Defendants*

The constitutional gravity of the omissions alleged in the complaint depends entirely on whether or not the Green Haven Defendants knew that Coronado was at risk of serious harm in the yard and consciously disregarded it. *See Farmer,* 511 U.S. at 837; *Hathaway v. Coughlin,* 37 F.3d at 66. As the Supreme Court has stated, "it does not matter ... whether a prisoner faces an excessive risk of attack for reasons personal to him or because all prisoners in his situation face such a risk." *Farmer,* 511 U.S. at 843. If Defendants did not know of the risk to Coronado-either by receiving notice of prior attacks and a lingering threat against him personally or by their awareness that a substantial risk of attacks in the yard

was pervasive and well-documented-then they cannot be held liable for failure to protect him under the Eighth Amendment standard. *See Ayers,* 780 F.2d at 209.

### a. *Knowledge of a Risk to Coronado in Particular*

**\*5**  Although he does not allege that he notified any of the Defendants of a specific threat posed to him, Coronado argues that the "pattern of attacks" against him should have put the Defendants on notice that he was at risk of serious harm. *See* Statement of Claim at ¶ 2. The attacks Coronado cites took place on 10/1/86, 7/18/88 and 9/8/88, approximately nine and eleven years before the stabbing in question here. The significant amount of time that has passed since these prior attack lessens the imminence of the threat of their being repeated. Furthermore, Coronado has failed to allege where the prior attacks took place [2] and whether the same attackers were in custody at GHCF and had access to him at the time of the 1997 attack. *See Hayes,* 84 F.3d at 621.

Most importantly, Coronado has failed to allege that any of the Defendants-who were either employed in supervisory positions at GHCF or in state-level administrative positions-actually knew of the prior attacks on him at Clinton. For example, he has introduced nothing to suggest that he either sought protection from any of the Defendants while at GHCF or notified them of the Clinton attacks. The mere fact that Coronado had been attacked 10 years before at another correctional facility is not sufficient to prove that the Defendants knew he was at risk at Green Haven. If the Green Haven Defendants did not know that Coronado was in fact "vulnerable to attack" in 1998, they cannot be held responsible for failing to so classify him. *See, e.g., Pippion v. Peters,* 1994 WL 530801, \*3 (N.D.Ill. Sept. 29, 1994).

Furthermore, even if Coronado could allege facts showing that correctional officers working in the yard on June 30, 1997 had knowledge of the risk to him, this knowledge would not be attributable to any of the named Defendants under a *respondeat superior* theory. *Al-Jundi v. Estate of Rockefeller,* 885 F.2d 1060, 1065 (2d Cir.1989); *Ayers,* 780 F.2d at 210. Coronado must allege "a tangible connection between the acts of [each] defendant and the injuries suffered." *Bass,* 790 F.2d at 263. That the Defendants "should have known" is not enough. Absent a showing that Defendants Goord, Artuz and Schneider actually knew of a substantial risk of serious harm to Coronado in 1998, he cannot make out a § 1983 claim against them for failure to protect. *See, e.g., Hazelwood v.*

*Monroe, et al.,* No. 95 Civ. 3648, 1996 WL 312355, at \*2 (S.D.N.Y. June 11, 1996).

### b. *Knowledge of a High Level of Risk to Inmates in the GHCF Yard in General*

Coronado also claims that the Green Haven Defendants had "knowledge of the level of violence and of the numerous attacks in the GHCF recreation area." Statement of Claim at ¶ 2. As stated above, Coronado need not show a particularized risk to him personally; it is sufficient under *Farmer* that prison conditions posed a generalized threat to the safety of all inmates. However, "allegations which are nothing more than broad, simple and conclusory statements are insufficient to state a claim under § 1983 ." *Alfaro Motors,* 814 F.2d at 887. *See Yunich,* 533 F.2d at 85 (2d Cir.1976).

**\*6**  In order to make out a claim under the theory of failure to protect against the general threat of harm, Coronado must plead facts stating every one of the following elements: (1) there were numerous other inmate-on-inmate attacks in the GHCF yard; (2) these attacks posed a substantial risk of serious harm to inmates; (3) the Defendants knew about these prior attacks; (3) despite their knowledge of the prior attacks, Defendants failed to take steps to reduce the risk of harm to inmates; (4) the prior attacks and the stabbing of Coronado were similar enough that any steps Defendants could have taken to alleviate the danger posed by the other attacks would also have reduced the risk to Coronado; and (5) if Defendant had taken such steps, Coronado would not have been stabbed in the yard on June 30, 1997.

The complaint is missing several links in this logical chain. Coronado has not alleged the nature of the other attacks in the GHCF yard, for example whether they were perpetrated with knives or fists, by individuals or gangs, or provided any estimate as to the number of such incidents during the period he was incarcerated at Green Haven. This information is necessary to determine what the level of violence was, and whether it was similar enough to the attack on Coronado to put the Defendants on notice that he was at risk of being stabbed. For example, if the other attacks did not involve sharp weapons, then Defendants would have had no reason to install metal detectors, the prior attacks would not have given the Defendants notice that Coronado was in danger of being stabbed, and any remedial measures that might in fact have been taken might not have protected Coronado.

### 2. *Governor Pataki*

The thrust of the claim against Governor Pataki is apparently that he knew that New York state prisons were overcrowded but failed to alleviate the problem, which heightened the generalized risk to the prison population and "caused and subjected" Coronado to the 1998 attack. (Statement of Claim at ¶ 2.) Prison overcrowding is properly the subject of an Eighth Amendment claim only if the plaintiff can show that overcrowding caused the infliction of cruel and unusual punishment against him personally. *See Rhodes v. Chapman,* 452 U.S. 337, 348 (1981); 18 U.S.C. § 3626(a)(1) ("A Federal court shall not hold prison or jail crowding unconstitutional under the eighth amendment except to the extent that an individual plaintiff inmate proves that the crowding causes the infliction of cruel and unusual punishment of that inmate.").

As alleged, the overcrowding allegation against Governor Pataki fails to state a claim. Coronado has failed to allege-in more than a conclusory fashion-a causal relationship between overcrowding/understaffing and the attack against him. Even if Coronado made this showing, he would still have to address the subjective knowledge element discussed above, in this context whether Governor Pataki knew that the combination of overcrowding and understaffing posed a risk to inmate safety, and was deliberately indifferent to it. *See, e.g., Houston v. Sheahan,* 62 F.2d 902 (7th Cir.1995); *Morgan v. District of Columbia,* 824 F.2d 1049, 1058 (D.C.Cir.1987).

**\*7** It is the rare case when a plaintiff can make out a claim that his injuries were caused by overcrowding. *See, e.g., Bert v. Essex County, N.J. Hall of Records,* 986 F.2d 54 (3d Cir.1993) (jail officials not responsible for attack by one prisoner on another based on fact that jail overcrowded); *Marsh v. Barry,* 824 F.2d 1139, 1146 (D.C.Cir.1987) ("The underlying rate of ... random acts of violence may rise with overcrowding, to be sure, but it would still be the unusual case in which a specific act could be attributed to the effects of overcrowding."); *Waldo v. Goord,* No. 97-CV-1385 LEK DRH, 1998 WL 713809, at \*4 (N.D.N.Y. Oct. 1, 1998). Based upon a liberal construction of the facts alleged, this is not one of those rare cases.

The Court finds that there is no set of facts by which Coronado could prove that Governor Pataki knew of and deliberately disregarded a substantial risk of serious harm to inmates that may have been caused by the combination of overcrowding and understaffing at GHCF. The complaint fails to state an Eighth Amendment claim on these grounds and will be dismissed as against Governor Pataki.

## IV. *Failure to State a Claim under the Fourteenth Amendment*

Coronado also claims that the Green Haven Defendants' "gross negligence" and "callous disregard" in failing to protect him deprived him of his Fourteenth Amendment liberty and due process rights. (See Plaintiff's Reply Mem. at 11.) The Supreme Court has not yet established a specific standard for level of culpability required to find a deprivation of Fourteenth Amendment rights in the context of failure to protect inmates. *City of Canton, Ohio v. Harris,* 489 U.S. 378, 388 n. 8 (1989); *Whitley v. Albers,* 475 U .S. 312, 327 (1986); *Daniels v. Williams,* 474 U.S. at 334 n. 3.

The Court has specified that "the Due Process Clause is simply not implicated by a negligent act of an official causing unintended loss of or injury to life, liberty, or property." *Daniels v. Williams,* 474 U.S. 327, 328 (1986). *See Davidson v. Cannon,* 474 U.S. 344, 348 (1986) (holding that prison officials did not violate prisoner's due process rights where the prisoner alleged only that the officials "negligently failed to protect him from another inmate"); *Bryant v. Maffuci,* 923 F.2d 979, 984 (2d Cir.) ("simple negligence is not enough"), *cert. denied,* 502 U .S. 849 (1991).

This Circuit recognizes that the same standard for proving an Eighth Amendment claim also applies to the Fourteenth: "[a]n inmate who is injured as a result of a prison official's deliberate indifference to his safety may maintain a damage action for the deprivation of his civil rights under the ... Fourteenth Amendment[ ]." *Snider v. Dylag,* 188 F.3d 51, 54 (2d Cir.1999) (*citing Stubbs v. Dudley,* 849 F.2d 83, 85 (2d Cir.1988)). In *Dylag,* the Second Circuit reversed a district court's dismissal of an inmate's complaint alleging that a prison guard had acted with "deliberate indifference" and violated the plaintiff inmate's Fourteenth Amendment rights by declaring "open season" on the plaintiff in front of other inmates. 188 F.3d at 56.

**\*8** As discussed above with regard to the Eighth Amendment claim, Coronado has not alleged facts to suggest that the Green Haven Defendants knew of a substantial risk of serious harm to inmates and deliberately disregarded it. Coronado has therefore failed to state a claim for deprivation of Fourteenth Amendment rights.

## V. *Defendants' Personal Involvement*

A claim for money damages under § 1983 may not lie unless the Defendants were personally involved in the constitutional

violation. *Colon,* 58 F.3d at 873. A supervisory official's personal involvement in a constitutional violation may be shown in any one of five ways: (1) direct participation, (2) failure to remedy a wrong after learning of it, (3) creation or maintenance of a policy under which unconstitutional violations occurred, (4) gross negligence in managing subordinates who committed the unconstitutional acts, and (5) deliberate indifference by failing to act on information indicating that unconstitutional violations were occurring. *Colon,* 58 F.3d at 873. "The bare fact that [a defendant] occupies a high position in the New York prison hierarchy is insufficient to sustain [a] claim." *Id.,* 58 F.3d at 874. *See also* Gill, 824 F.2d at 196 ("[d]ismissal of a section 1983 claim is proper where, as here, the plaintiff 'does no more than allege that [defendant] was in charge of the prison" ') (citation omitted).

Coronado does not allege that the Defendants were actively involved in the attack against him, but rather claims that they deliberately disregarded the high risk of harm to him, which qualifies as "personal involvement" under the fifth approach described above. *See id.* As discussed above, however, Coronado's allegation that the Green Haven Defendants knew of "numerous attacks" in the GHCF yard is not sufficient to support a finding of deliberate indifference. As such, Coronado has not shown that the Green Haven Defendants were personally involved in causing his injuries.

In addition, there is no allegation that Governor Pataki had any knowledge of the risk to inmates due to overcrowding. Coronado has therefore not shown Pataki's personal involvement either.

## VI. *Immunity*

Although the complaint will be dismissed for failure to state a constitutional claim against all of the Defendants, the question of immunity will be addressed here for purposes of judicial economy in the event that plaintiff seeks and the Court grants permission to refile or reinstate the complaint.

All of the Defendants are employees of the State of New York. The complaint does not specify whether the Defendants are charged in their personal or official capacities. Allowing this *pro se* Plaintiff some latitude in pleading, the Court will construe his complaint as pleading a cause of action against Defendants in both their official and personal capacities.

### A. *Eleventh Amendment*

The Eleventh Amendment bars suit in federal court against an unconsenting state. *See* Pennhurst State School and Hospital v. Halderman, 465 U.S. 89, 100 (1984). To the extent that this action brings claims against Defendants in their official capacities, the State is the "real party in interest." *Id.,* 465 U.S. at 101. Under the Eleventh Amendment, this Court is without jurisdiction to hear claims for money damages against a state that would require the payment of funds from the state treasury. *Papasan v. Allain,* 478 U.S. 265, 278 (1986) (Eleventh Amendment prohibits the award of damages against state officials sued in their official capacity); *Severino v. Negron,* 996 F.2d 1439, 1441 (2d Cir.1993) (Eleventh Amendment prohibits suits for monetary damages against DOCS officials sued in their official capacities).

**\*9** Furthermore, state officials acting in their official capacities are not "persons" for the purpose of § 1983 actions, "and thus are not subject to liability for deprivations of constitutional rights thereunder." *Dube v. State University of New York,* 900 F .2d 587, 595 (2d Cir.1990), *cert. denied,* 501 U.S. 1211 (1991) (*citing* Will v. Michigan Department of State Police, 491 U.S. 58, 64 (1990)); *Young v. Patrice,* 832 F.Supp. 721, 724 (S.D.N.Y.1993). To the extent that the Defendants are sued in their official capacities, then, are not "persons" as defined by § 1983. *Kentucky v. Graham,* 473 U.S. 159, 163 (1985); *see* Papasan, 478 U.S. at 278.

Accordingly, the cause of action against the Defendants in their official capacities cannot be sustained. Furthermore, because only state authorities acting in their official capacities have the power to implement forward-looking equitable relief, Coronado's claims for injunctive and declaratory relief also fail.

### B. *Qualified Immunity*

Defendants claim that they are subject to qualified immunity from liability for civil damages because "their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person should have known." *Harlow v. Fitzgerald,* 457 U.S. 800, 818 (1982); *Anderson v. Creighton,* 483 U.S. 635 (1987); *Ceccere v. City of New York,* 967 F.2d 826, 829 (2d Cir.1992).

Defendants argue that their actions (or omissions) were not "clearly established" to constitute deprivations of Coronado's constitutional rights. The test in this Circuit is whether "in light of pre-existing law the unlawfulness [of defendants' actions] was apparent." *Piesco v. City of New York,* 933 F.2d 1149, 1160 (2d Cir.1992). It is well established that the failure

to protect an inmate from attacks at the hands of another inmate is a deprivation of the victim's constitutional rights if prison authorities knew of and deliberately disregarded the substantial risk of serious harm. *Farmer,* 511 U.S. at 837. There is no doubt that "having stripped [prisoners] of virtually every means of self-protection and foreclosed their access to outside aid, the government and its officials are not free to let the state of nature take its course." *Id.,* 511 U.S. at 833.

However, Defendants argue that the Court must also decide that a constitutional violation in fact occurred before deciding whether they are entitled to qualified immunity. *Seigert v. Gilley,* 500 U.S. 226, 232 (1991); *Calhoun v. New York State Div. of Parole,* 999 F.2d 647, 652 (2d Cir.1993). However, given the procedural posture of this case, this inquiry is premature. There has been no discovery, and whether or not a constitutional violation took place in this case would be a fact-dependent determination. At this juncture, Coronado has not pleaded facts sufficient to state a claim against the Green Haven Defendants for depriving him of his Eighth Amendment right to be free of "unnecessary and wanton

infliction of pain," *Albers,* 475 U.S. at 320, by deliberately disregarding a serious risk of harm to him.

**\*10** Accordingly, the Court will not decide the hypothetical question of whether or not qualified immunity would apply to the Defendants if Coronado were able to state a constitutional claim.

*Conclusion*

For the foregoing reasons, Coronado's motion to reinstate the complaint is granted. Defendants' motion to dismiss the complaint is granted for failure to state a claim and upon Eleventh Amendment immunity for Defendants in their official capacities. However, Coronado is granted leave to replead in accordance with this opinion.

It is so ordered.

**All Citations**

Not Reported in F.Supp.2d, 2000 WL 1372834

Footnotes

1    Coronado submitted three color photographs of his wounds with his Complaint. Although the date on two of the photographs is cut off, one of them is dated June 30, 1997, the date of the attack at issue here. This photograph shows several long red scars running lengthwise down Coronado's lower back.

2    *Coronado v. LeFevre, et al.,* 886 F.Supp. 220 (N.D.N.Y.1995), addressed the two prior attacks, both of which took place at the Clinton Correctional Facility ("Clinton"). *LeFevre,* 886 F.Supp. at 222. Coronado claims that in *LeFevre,* the court held that he was at substantial risk of serious harm in a case brought on identical claims for attacks on Coronado while he was housed at Clinton Correctional Facility. In fact, that opinion held that Coronado had failed to allege that prison authorities knew of a substantial risk of serious harm to him, and dismissed his complaint for failure to state a claim. *Id.,* 886 F.Supp. at 224. In any case, the *LeFevre* court's holding with regard to Coronado's ability to state a deliberate indifference claim for those attacks has no bearing on this Court's determination of the allegations pleaded in the instant complaint.

**End of Document**                                    © 2019 Thomson Reuters. No claim to original U.S. Government Works.

Case 9:18-cv-01203-DNH-TWD    Document 43    Filed 11/25/19    Page 40 of 112

King v. Department of Correction, Not Reported in F.Supp. (1998)

1998 WL 67669
Only the Westlaw citation is currently available.
United States District Court, S.D. New York.

Jamel KING, Plaintiff,
v.
DEPARTMENT OF CORRECTION and
Captain J. Shipmen # 1208, Defendants.

No. 95 Civ. 3057(JGK).
|
Feb. 18, 1998.

**Attorneys and Law Firms**

Jamel King, Comstock, New York, pro se.

Kathleen A. Handke, Assistant Corporation Counsel, Corporation Counsel for the City of New York, New York City, for the defendants.

**OPINION AND ORDER**

KOELTL, J.

 *1 Plaintiff Jamel King, an inmate currently incarcerated at Great Meadow Correctional Facility, filed this pro se action against the New York City Department of Correction and Captain Jerome Shipman ("Shipman," sued as "Shipmen"). The plaintiff brought this action pursuant to 42 U.S.C. § 1983, alleging that Shipman coordinated an attack on the plaintiff by another inmate and that he failed to protect him from the attack.

The defendants have moved for judgment on the pleadings pursuant to Federal Rule of Civil Procedure 12(c), or, alternatively, for summary judgment pursuant to Federal Rule of Civil Procedure 56. The defendants argue that the claim against the Department of Correction should be dismissed because the Department of Correction is not a suable entity and because the plaintiff has failed to demonstrate that a municipal custom or policy caused his injury. With respect to the claim against Captain Shipman, the defendants argue that the plaintiff has offered no evidence to support his claim that Shipman conspired to attack him. In addition, the defendants contend that to the extent that the plaintiff has alleged a failure to protect, he has offered no evidence to support that claim as well.

After the defendants filed their motion, the plaintiff subsequently moved for judgment on the pleadings or for summary judgment as well. The plaintiff asserts that the evidence offered by him, alone or in conjunction with the evidence the plaintiff has sought but failed to obtain from the defendants, shows that his injury resulted from the defendants' intentional actions or inactions.

**I.**

The plaintiff's claim arises from events occurring while the plaintiff was incarcerated in the Central Punitive Segregation Unit ("CPSU") on Rikers Island. (Pl.'s Reply to Def.'s Summ. J. Mot. ("Response") at 2.) The following facts are undisputed.

On January 21, 1995, the plaintiff had an altercation with another inmate while in the recreation yard. (Compl. at 3; Shipman Aff. ¶ 3.) Following the fight, and under the direction of Captain Shipman, the plaintiff was transferred to a new cell. (Compl. at 3–4; Shipman Aff. ¶ 4.) Shortly thereafter, the plaintiff was slashed by another inmate, suffering injuries to his face, neck and shoulder that required twelve stitches. (Compl. at 4; Shipman Aff. ¶ 5.)

The plaintiff alleges that Shipman orchestrated the attack on the plaintiff. (Response at 2.) The plaintiff states that following the fight in the yard, Shipman came to the plaintiff's cell and indicated that the plaintiff would be charged for having a razor during the fight, despite the plaintiff's protestations to the contrary. (King Dep. at 18.) The plaintiff alleges that Shipman threatened him by saying, "[m]atter of fact, pack up your bags, my boys are going to handle you." (Id. at 19.) The plaintiff states that when he refused to pack, Shipman told him to, "pack up or my boys will come in and get you." (Id.) In accordance with this order, the plaintiff allegedly packed his belongings and walked with Shipman to a new cell. (Id. at 20.) The plaintiff states that Shipman preceded him down the gallery, entered the new cell momentarily, then exited and walked off the gallery. (Id.) After entering the cell and depositing his belongings in it, the plaintiff walked back through the gallery, at which point he was slashed with a razor. (Id. at 37–38.) The plaintiff believes the attacker to be one of Shipman's "Boys." (Response at 2.) A team under Shipman's supervision subsequently identified the inmate who slashed the plaintiff and discovered the razor that had been used. The second inmate was disciplined for the

Case 9:18-cv-01203-DNH-TWD   Document 43   Filed 11/25/19   Page 41 of 112

King v. Department of Correction, Not Reported in F.Supp. (1998)

attack on the plaintiff and was transferred to another tier in the prison. (Shipman Aff. ¶ 5.)

## II.

**\*2** While both parties have moved for judgment on the pleadings or, alternatively, for summary judgment, both parties have also submitted additional evidentiary materials.[1] The Court has considered those materials, and, pursuant to Federal Rule of Civil Procedure 12(c), this motion will be treated as a motion for summary judgment.

The standard for granting summary judgment is well established. Summary judgment may not be granted unless "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that the moving party is entitled to a judgment as a matter of law." Fed.R.Civ.P. 56(c); *see also Celotex Corp. v. Catrett,* 477 U.S. 317, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986); *Gallo v. Prudential Residential Servs. Ltd. Partnership,* 22 F.3d 1219, 1223 (2d Cir.1994). "The trial court's task at the summary judgment motion stage of the litigation is carefully limited to discerning whether there are genuine issues of material fact to be tried, not to deciding them. Its duty, in short, is confined at this point to issue-finding; it does not extend to issue-resolution." *Id.* at 1224.

The moving party bears the initial burden of "informing the district court of the basis for its motion" and identifying the matter that "it believes demonstrate[s] the absence of a genuine issue of material fact." *Celotex,* 477 U.S. at 323. The substantive law governing the case will identify those facts which are material and "only disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment." *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). In determining whether summary judgment is appropriate, a court must resolve all ambiguities and draw all reasonable inferences against the moving party. *See Matsushita Elec. Indus. Co. v. Zenith Radio Corp.,* 475 U.S. 574, 587, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986) (citing *United States v. Diebold, Inc.,* 369 U.S. 654, 655, 82 S.Ct. 993, 8 L.Ed.2d 176 (1962)); *see also Gallo,* 22 F.3d at 1223; *Knowles v. New York City Dep't of Corrections,* 904 F.Supp. 217, 220 (S.D.N.Y.1995).

If the moving party meets its burden, the burden shifts to the nonmoving party to come forward with "specific facts showing that there is a genuine issue for trial." Fed.R.Civ.P. 56(e). With respect to the issues on which summary judgment is sought, if there is any evidence in the record from any source from which a reasonable inference could be drawn in favor of the nonmoving party, summary judgment is improper. *See Chambers v. TRM Copy Ctrs. Corp.,* 43 F.3d 29, 37 (2d Cir.1994); *Knowles,* 904 F.Supp. at 220.

When a pro se litigant is involved, although the same standards for summary judgment apply, the pro se litigant "should be given special latitude in responding to a summary judgment motion." *Gonzalez v. Long,* 889 F.Supp. 639, 642 (E.D.N.Y.1995); see also *Graham v. Lewinski,* 848 F.2d 342, 344 (2d Cir.1988) ("special solicitude should be afforded pro se litigants generally, when confronted with motions for summary judgment"); *Ruotolo v. Internal Revenue Serv.,* 28 F.3d 6, 8 (2d Cir.1994); *Knowles,* 904 F.Supp. at 220.

## III.

**\*3** The plaintiff has named the Department of Correction as a defendant in this suit. The Department of Correction argues that the complaint should be dismissed against it because it is not a suable entity. In this context, the New York City Charter provides that "[a]ll actions and proceedings for the recovery of penalties for the violation of any law shall be brought in the name of the city of New York and not in that of any agency, except where otherwise provided by law." N.Y. City Charter Ch. 17 § 396. Thus, where a plaintiff has named the Department of Correction as a defendant, he has sued a non-suable entity. *See Adams v. Galletta,* 966 F.Supp. 210, 212 (S.D.N.Y.1997); Campbell v. Dept. of Correction of New York City, No. 95 Civ. 3242, 1996 WL 79869, at \*1 (S.D.N.Y. Feb.26, 1996); *see also East Coast Novelty Co., Inc. v. City of New York,* 781 F.Supp. 999, 1010 (S.D.N.Y.1992); *Wilson v. City of New York,* 800 F.Supp. 1098, 1101 (E.D.N.Y.1992); *Martin v. City of New York,* 627 F.Supp. 892, 894 n. 2 (E.D.N.Y.1985).

Furthermore, the Department of Correction also argues that even if the plaintiff had named the City of New York as a defendant, the plaintiff's claim must still fail as a matter of law since the plaintiff has not made the necessary allegations for municipal liability under 42 U.S.C. § 1983. The plaintiff asserts that the Department of Correction negligently failed to protect him from the assault and that the Department of Correction is "liable for the wrongful actions of the DOC's employees." (Response at 3.) It is well established that a

Case 9:18-cv-01203-DNH-TWD   Document 43   Filed 11/25/19   Page 42 of 112

King v. Department of Correction, Not Reported in F.Supp. (1998)

municipality may not be held liable under § 1983 simply because it employs a tortfeasor—or, in other words, that a municipality cannot be held liable under § 1983 on a respondeat superior basis. *See Monell v. New York City Dept. Of Social Servs.,* 436 U.S. 658, 691, 98 S.Ct. 2018, 56 L.Ed.2d 611 (1978); *Board of the County Comm'rs of Bryan County, Oklahoma v. Brown,* 520 U.S. 397, ——, 117 S.Ct. 1382, 1388, 137 L.Ed.2d 626 (1997). Instead, after Monell and its progeny, a plaintiff seeking to impose liability on a municipality under § 1983 must identify a municipal "policy" or "custom" that caused the plaintiff's injury. *See Monell,* 436 U.S. at 694; *Brown,* 520 U.S. at ——, 117 S.Ct. at 1388. The plaintiff must demonstrate that the municipality was the "moving force" behind the injury alleged. *See Brown,* 520 U.S. at ——, 117 S.Ct. at 1388; *Monell,* 436 U.S. at 692. "That is, a plaintiff must show that the municipal action was taken with the requisite degree of culpability and must demonstrate a direct causal link between the municipal action and the deprivation of federal rights." *Brown,* 520 U.S. at ——, 117 S.Ct. at 1388.

Here, the plaintiff has not indicated or even alleged a municipal policy or custom which caused his injury. Rather, he has indicated only a single injurious event from which he asserts the Department of Correction negligently failed to protect him. Even if all of the plaintiff's allegations are true, he has failed to identify any municipal policy or custom, pursued with the requisite degree of culpability, which caused the plaintiff's injury. Moreover, the plaintiff's allegations that the Department of Correction is liable for the acts of its employees demonstrates that he is attempting to assert liability against the Department of Correction on a respondeat superior basis, which is clearly insufficient under *Monell. See Monell,* 436 U.S. at 691; *Brown,* 520 U.S. at ——, 117 S.Ct. at 1388. Thus, the plaintiff's § 1983 claim against the City of New York would fail, even had the City been named as a defendant.

**\*4** Accordingly, the Department of Correction's motion for summary judgment is granted.

### IV.

#### A.

The plaintiff claims that his Eighth Amendment right to be free from cruel and unusual punishment was violated because defendant Shipman organized and planned the assault against him. Shipman argues that the plaintiff has failed to make the required showing that Shipman was personally involved in the alleged constitutional violation. "In this Circuit personal involvement of defendants in alleged constitutional deprivations is a prerequisite to an award of damages under § 1983." *Moffitt v. Town of Brookfield,* 950 F.2d 880, 886 (2d Cir.1991) (citing *McKinnon v. Patterson,* 568 F.2d 930, 934 (2d Cir.1977), *cert. denied* 434 U.S. 1087, 98 S.Ct. 1282, 55 L.Ed.2d 792 (1978)); *see also Koehl v. Dalsheim,* 85 F.3d 86, 89 (2d Cir.1996); *Champion v. Artuz,* 76 F.3d 483, 487 (2d Cir.1996); *Fry v. McCall,* 945 F.Supp. 655, 661 (S.D.N.Y.1996). "Personal involvement includes, but is not limited to, direct participation in the infraction." *Fry,* 945 F.Supp. at 661; *Moffitt,* 950 F.2d at 886.[2]

Here, the plaintiff has failed to show that Shipman was in any way involved in the attack. Significantly, the plaintiff has not provided any evidence to contradict Shipman's statement in his affidavit that he neither conspired with the plaintiff's attacker nor knew an attack was imminent. (Shipman Aff. ¶ 5.) The plaintiff did not see or hear Shipman speak to other inmates prior to the attack, (King Dep. At 36, 38), and he does not even have any second-hand information from other inmates or officers that Shipman was responsible for the attack. (*Id.* at 54.)

Instead, the plaintiff testified at his deposition that he "feel[s] that Captain Shipman set [him] up ... because it was no more than two minutes—five minutes apart that he made that threat—between the time of the threat and when I got slashed." (*Id.* at 53.) The plaintiff reiterated this "feeling" as the basis for his claim:

Q: Did anyone ever tell you that [Shipman] set you up?

A: No, it was just that—you know that feeling you get when you know someone did dirty to you.

(*Id.* at 54.) However, this "feeling," without more, would be plainly insufficient evidence to support Shipman's personal involvement in the attack.[3] The plaintiff's allegations of Shipman's collusion with his attacker are no greater than other conclusory allegations of conspiracy which have often been held insufficient to sustain a claim. *See, e.g., Sykes v. James,* 13 F.3d 515, 521 (2d Cir.1993), *cert. denied,* 512 U.S. 1240, 114 S.Ct. 2749, 129 L.Ed.2d 867 (1994); *Sommer v. Dixon,* 709 F.2d 173, 175 (2d Cir.) ("A complaint containing only conclusory, vague, or general allegations of conspiracy to deprive a person of constitutional rights cannot withstand a motion to dismiss."), *cert. denied,* 464 U.S. 857, 104 S.Ct.

Case 9:18-cv-01203-DNH-TWD    Document 43    Filed 11/25/19    Page 43 of 112

King v. Department of Correction, Not Reported in F.Supp. (1998)

177, 78 L.Ed.2d 158 (1983); *Malsh v. Garcia,* 971 F.Supp. 133, 139 (S.D.N.Y.1997).

Nor do the alleged threats that the plaintiff testified to provide the necessary connection between Shipman and the slashing incident to demonstrate personal involvement. Shipman's alleged statement shortly after the prison yard fight to "put a razor on King's ticket" was understood by the plaintiff to mean that he would receive an infraction for having a razor, not that he was being set up to be slashed. (*Id.* at 20). Likewise, Shipman's alleged order that the plaintiff should "pack up or my boys will come in and get you" actually bolsters Shipman's assertion that he intended to move the plaintiff to separate him from the inmate with whom the plaintiff had fought in the recreation yard. (Shipman Aff. ¶ 4.) Thus, the plaintiff has presented no competent evidence that defendant Shipman was directly involved in the attack against the plaintiff by orchestrating it.

**B.**

**\*5** The plaintiff also claims that Shipman violated his Eighth Amendment right to be free from cruel and unusual punishment by failing to protect him for harm. The Eighth Amendment "places restraints on prison officials who may not, for example, use excessive physical force against prisoners." *Farmer v. Brennan,* 511 U.S. 825, 832, 114 S.Ct. 1970, 128 L.Ed.2d 811 (1994) (citations omitted); *Knowles,* 904 F.Supp. at 221. The Eighth Amendment also "requires prison officials to take reasonable measures to guarantee the safety of inmates in their custody." *Hayes v. New York City Dep't Of Corrections,* 84 F.3d 614, 620 (2d Cir.1996); *see also Farmer,* 511 U.S. at 832; *Knowles,* 904 F.Supp. at 221. Prison officials have a duty to protect prisoners from violence at the hands of other inmates since being violently assaulted in prison is "simply not part of the penalty that criminal offenders pay for their offenses against society." *Farmer,* 511 U.S. at 833–34 (citation omitted).

However, "not ... every injury suffered by one prisoner at the hands of another ... translates into constitutional liability for prison officials responsible for the victim's safety. *Id.* at 834. To establish that a prison official violated the Eighth Amendment, a plaintiff must satisfy a two-part test. First, there must be a "sufficiently serious" deprivation resulting in the denial of the "minimal civilized measure of life's necessities." *Id.; Knowles,* 904 F.Supp. at 221. This objective test requires that the plaintiff be subjected to a "substantial

risk of serious harm." *Farmer,* 511 U.S. at 834; *Fischl v. Armitage,* 128 F.3d 50, 55 (2d Cir.1997). Second, the charged prison officials must have acted with a sufficiently culpable state of mind by being deliberately indifferent to the health or safety of the inmate. *See Farmer,* 511 U.S. at 834; *Knowles,* 904 F.Supp. at 221. Thus, "a prison official may be held liable under the Eighth Amendment for denying humane conditions of confinement only if he knows that inmates face a substantial risk of serious harm and disregards that risk by failing to take reasonable measures to abate it." *Farmer,* 511 U.S. at 847.

As explained above, to the extent the plaintiff contends that Shipman orchestrated the attack against him, there is no credible evidence to support the claim. Even if the plaintiff's claim is construed as one based upon a failure to protect him, the plaintiff has failed to present sufficient evidence to withstand the motion for summary judgment. With respect to the first part of the Eighth Amendment test, the injury sustained by the plaintiff, a cut to his face, neck, and shoulder requiring 12–13 stitches, and the manner in which he received the injury, are sufficient to satisfy the objective requirement of the Eighth Amendment claim. *Knowles,* 904 F.Supp. at 221; *see also Heisler v. Kralik,* 981 F.Supp. 830, 837 (S.D.N.Y.1997).

However, to satisfy the second, subjective element of his Eighth Amendment claim, the plaintiff must demonstrate a sufficiently culpable state of mind of the prison official. While "the failure of prison guards to employ reasonable measures to protect an inmate from violence by other prison inmates has been considered cruel and unusual punishment," *Knowles,* 904 F.Supp. at 221, "[a]n isolated omission to act by a ... prison guard does not support a claim under § 1983 absent circumstances indicating an evil intent, or recklessness, or at least deliberate indifference to the consequences of his conduct for those under his control and dependent upon him." *Ayers v. Coughlin,* 780 F.2d 205, 209 (2d Cir.1985) (per curiam) (citing *Williams v. Vincent,* 508 F.2d 541, 546 (2d Cir.1974)). In Eighth Amendment cases dealing with the failure to prevent harm, "[r]eckless disregard of plaintiff['s] right to be free from attacks by other inmates may be shown by the existence of a 'pervasive risk of harm to inmates from other prisoners and a failure by prison officials to reasonably respond to that risk.' " *Rucco v. Howard,* No. 91 Civ. 6762, 1993 WL 299296, at \*4 (S.D.N.Y. Aug.4, 1993) (quoting *Martin v. White,* 742 F.2d 469, 474 (8th Cir.1984); *see Ayers,* 780 F.2d at 209 (risk of harm to plaintiff due to repeated threats by fellow inmates of which prison guard was aware

supports a claim under § 1983); *Knowles,* 904 F.Supp. at 221–222. Mere negligence, however, on the part of a prison official will not give rise to a claim under § 1983. *Williams v. Vincent,* 508 F.2d 541, 546 (2d Cir.1974); *Knowles,* 904 F.Supp. at 222.

**\*6** The plaintiff is this case has failed to present any evidence to rebut Shipman's insistence in his affidavit that he had no knowledge of any impending attack on the plaintiff. (Shipman Aff. ¶ 5.) The record shows that Shipman attempted to protect the plaintiff by transferring him to another cell away from his recreation yard co-combatant. And, as the plaintiff describes the incident, the plaintiff was injured when he walked along the gallery outside his cell and was attacked by a second inmate. The plaintiff has no information from other inmates or prison guards to substantiate his belief that Shipman orchestrated the attack against him. Moreover, the plaintiff has no evidence that Shipman had orchestrated attacks against other inmates or that Shipman knew an attack on the plaintiff was imminent. (King Dep. at 65.) Thus, the plaintiff has failed to provide any facts showing that Shipman intentionally subjected him to a "substantial risk of serious harm," or was deliberately indifferent to such risk. *See Fischl,* 128 F.3d at 55.

## V.

Finally, the plaintiff urges that the Court should deny the defendants' motion for summary judgment or should grant his cross-motion for summary judgment because the defendants have failed to provide him with copies of the shower log for January 21, 1995. He believes that the logs would contradict a statement made by a corrections officer in an incident report that he had escorted the plaintiff to take a shower at the time of the incident. (King Dep. at 34.) The Court construes this as a request pursuant to Fed.R.Civ.P. 56(f) to grant further discovery to oppose the motion. Pursuant to Rule 56(f), a party must make a four-part showing before further discovery should be granted prior to resolution of a pending motion for summary judgment: (1) the party must specify the nature of the uncompleted discovery; (2) the party must demonstrate

how the facts sought are reasonably expected to create a genuine issue of fact; (3) the party must explain what efforts he has made to obtain those facts; and (4) the party must explain why those efforts were unsuccessful. *Askir v. Brown & Root Servs. Corp.,* No. 95 Civ. 11008, 1997 WL 598587, at \*7 (S.D.N.Y. Sept.23, 1997); *see also Paddington Partners v. Bouchard,* 34 F.3d 1132, 1138 (2d Cir.1994); *Contemporary Mission, Inc. v. United States Postal Serv.,* 648 F.2d 97, 107 (2d Cir.1981).

In this case, the plaintiff's request for further discovery presents no basis to deny the defendants' motion for summary judgment. The discovery could not reasonably be expected to create a genuine issue of material fact, even if the plaintiff had timely pursued this discovery. Even if the shower logs would contradict the officer's incident report, this would not provide any connection between Shipman and the assault. At most, the plaintiff seeks to contradict another officer's incident report, but that does not suggest any evidence to support liability against Captain Shipman.

**\*7** Accordingly, the plaintiff's request for additional discovery is denied.

## CONCLUSION

For the reasons explained above, the plaintiff's motion for summary judgment or for additional discovery pursuant to Fed.R.Civ.P. 56(f) is **denied.** The defendants' motion for summary judgment dismissing the complaint is **granted.** The Clerk of the Court is directed to enter judgment dismissing the complaint and closing the case.

**SO ORDERED.**

**All Citations**

Not Reported in F.Supp., 1998 WL 67669

## Footnotes

1   The plaintiff has presented a sworn statement in his response brief. The defendants have submitted an affidavit, a deposition, and other evidence.

2   Personal involvement for purposes of a § 1983 action may be established by showing "direct participation, or failure to remedy the alleged wrong after learning of it, or creation of a policy or custom under which unconstitutional practices occurred, or gross negligence in managing subordinates." *Black v. Coughlin,* 76 F.3d 72, 74 (2d Cir.1996); *see also Williams v. Smith,* 781 F.2d 319, 323–24 (2d Cir.1986). The plaintiff has alleged only the first type of personal involvement, direct participation, by Shipman.

King v. Department of Correction, Not Reported in F.Supp. (1998)

Case 9:18-cv-01203-DNH-TWD    Document 43    Filed 11/25/19    Page 45 of 112

3    The plaintiff had alleged in his complaint that after his stay in the clinic, Shipman said, "My boys work fast." (Compl. at 4.) But this claim is not reiterated in the plaintiff's response to the present motion, is not reflected in the plaintiff's deposition, and is contradicted by the plaintiff's sworn statements that no one told him Shipman set him up and that he refused to speak with Shipman after the attack. (King Dep. at 22, 54, 60.)

---

**End of Document**                                    © 2019 Thomson Reuters. No claim to original U.S. Government Works.

KeyCite Yellow Flag - Negative Treatment

Distinguished by Blake v. Israel Sexton, Sergeant, New York City Police
Department, S.D.N.Y., March 24, 2016

2001 WL 798002

United States District Court, S.D. New York.

Chrisner DESULMA, Plaintiff,

v.

THE CITY OF NEW YORK, et al., Defendants.

No. 98Civ.2078(RMB)(RLE).
|
July 6, 2001.

REPORT AND RECOMMENDATION

ELLIS, Magistrate J.

## I. INTRODUCTION

**\*1** *Pro se* incarcerated plaintiff Chrisner Desulma
("Desulma") sued the City of New York and two Department
of Corrections officers alleging violation of his Eighth and
Fourteenth Amendment rights while he was an inmate on
Rikers Island. Compl. [1] His claims were thereafter dismissed
except as against defendant Goolsby, who has brought the
instant motion for summary judgment. For the reasons
which follow, I respectfully recommend Goolsby's motion be
GRANTED.

## II. BACKGROUND

### A. Factual Background

The following account is based on Desulma's complaint and
deposition testimony. The events which give rise to this cause
of action occurred on December 27, 1996, when Desulma
was incarcerated in the Adolescent Detention and Reception
Center ("ADRC") at Rikers Island Compl.¶ 8. At midday,
Desulma and approximately fifty other inmates from his
housing unit were escorted in a line to the mess hall by officers
Goolsby and an unidentified officer, "Jane Doe." *Id.* ¶ 9;
Tr. at 83. Two inmates standing near Desulma in the line
began "menacing" him by making unspecified threats and
racial insinuations. Tr. at 58–59, 75–77. Desulma testified
that officer Goolsby witnessed these threats. Tr. at 63, 79–80.

Desulma requested protection, but Goolsby told him to defend
himself. Tr. at 81.

During the meal, Desulma sat away from the inmates who
bothered him. Tr. at 85. After the meal, as the group was
preparing to leave the mess hall, Desulma attempted to ask
Goolsby for protective measures against these inmates, whom
he feared. Tr. at 134, 138. Although he did not find Goolsby,
Desulma succeeded in speaking to Doe. *Id.* at 133–35.
Desulma claims that Doe ignored his request for protective
measures and instructed him to get into the line. Tr. at 134–
135.

The inmates who had earlier threatened Desulma were again
standing near him in line. *Id.* at 138. They began to "bother"
Desulma, telling him that he "smell [ed]." Tr. at 141. Desulma
later submitted changes to his deposition in which he claims
the inmates said, "kill this negro, get you, we are going to
get you stinky." Tr. Ch. 6. [2] Following their verbal abuse,
the inmates attacked Desulma using their fists and a sharp
weapon. Tr. at 141–43. They beat Desulma all over his body
and slashed his face with the weapon, leaving a permanent
scar. *Id.* at 143.

Desulma called for help during the attack, but the escorting
officers did not intervene. *Id.* at 145. As Desulma attempted
to run away from his attackers, he fell onto the floor near
Doe's feet. *Id.* Desulma alleges that no correctional officer
sought medical assistance until he "fell to the floor in a pool of
blood," Compl. ¶ 18, at which point Doe called for emergency
assistance over her radio transmitter. *Id.* at ¶ 21. Desulma
originally testified that Goolsby was not on the scene until
Doe called for help, Tr. at 134, 138, 149, but later asserted
that he had seen Goolsby "a few seconds" before and after the
incident. Tr. Ch. at 6.

**\*2** Approximately twenty-five officers responded to Doe's
call. Tr. at 147–49. The officers transported Desulma to
the facility's medical clinic, Tr. at 150, where he received
treatment requiring a total of twelve stitches. Com pl. ¶ 19–
20. Desulma was subsequently transferred to live in a separate
housing unit. Glass. Decl. ¶ 22. [3]

### B. Procedural Background

Desulma filed the instant complaint on January 5, 1998,
against the City of New York and correctional officers
Goolsby and Jane Doe, in their individual and official
capacities, for failure to protect Desulma from other inmates

50 Fed.R.Serv.3d 865

during an incident at Riker's Island. He alleges violation of his Eighth and Fourteenth Amendment rights, *see* Compl. ¶ 32, and various tort violations under New York state law. *Id.* ¶ 34. Specifically, he alleges that Goolsby, "with deliberate indifference," failed to separate him from a group of inmates who had threatened him and "deliberately refused" to grant his request for protection. *Id.* ¶ 29–30.

At a status conference before Judge Shira A. Sheindlin on November 5, 1998, the complaint was dismissed with respect to all defendants except officer Goolsby. The ruling was confirmed in a written order issued by Judge Richard M. Berman on December 21, 1998. On December 3, 1998, Goolsby served an answer to the complaint, and discovery progressed as ordered. Desulma was deposed on April 23, 1999 and May 17, 1999.

In January 1999, Desulma requested that discovery materials be translated into Creole and that counsel be appointed to assist him. The Court denied those requests by order dated March 16, 1999. On October 13, 1999, after the close of discovery, Goolsby filed the present motion. Desulma requested and received an extension of time, until January 14, 2000, in which to respond to Goolsby's motion. On December 24, 1999, Desulma requested an audiotape recording of his deposition. *See* Glass Decl., Exh. C. In an Order dated February 25, 2000, the Court denied the request, as no tapes existed, but granted Desulma permission to submit corrections to his deposition transcripts by April 21, 2000. *Id.,* Exh. D.

On April 20, 2000, Desulma filed, and served Goolsby with, fourteen pages of changes to the deposition. *Id.,* Exh. A. Goolsby objected and, on June 1, 2000, moved to have the changes declared null and void for failure to comply with Rule 30(e) of the Federal Rules of Civil Procedure. Goolsby argued that the changes were "a deliberate attempt by plaintiff to tailor his testimony to defeat defendant's previously served summary judgment motion." *See* Glass Decl.

On June 19, 2000, the Court ordered Desulma to have his changes signed and sworn, to fully explain each change, and to respond to Goolsby's motion by July 19, 2000. Desulma responded on July 11, 2000, by submitting to the Court the same fourteen pages of deposition transcript changes he had originally filed, along with a sworn affidavit and a declaration of service. He did not, however, submit explanations for his changes or respond to Goolsby's motion. Instead, Desulma requested, and was granted, extensions of time in which

to comply with the court's Order of June 19, 2000, and in which to respond to Goolsby's motion for summary judgment. Desulma filed his response on November 16, 2000. The case was referred to the undersigned on December 28, 2000, and the motion was fully submitted when Goolsby filed reply papers on January 5, 2001.

## C. The Instant Motion

**\*3** Goolsby argues that Desulma did not establish the elements of an Eighth Amendment "failure to protect" claim under § 1983 for three reasons: (1) he failed to show he was incarcerated under conditions posing a substantial risk of serious harm; (2) he failed to show Goolsby acted with a sufficiently culpable state of mind; and (3) Goolsby is immune from liability under the doctrine of qualified immunity. *See* Def. Mem. [4]

Relying primarily on the deposition transcript changes he filed, Desulma contends that officer Goolsby acted with deliberate indifference to his safety and well-being by disregarding his requests for protective measures and by failing to intervene in the attack. Pl. Resp. at 11, 19, 22, 25. [5] Desulma also contends that Goolsby is not immune under the doctrine of qualified immunity. *Id* . at 17–18. Goolsby argues that Desulma should not be permitted to rely on the deposition transcript changes, and that, even if the changes were accepted into the record, Desulma cannot establish that Goolsby was deliberately indifferent to a substantial risk of serious harm to plaintiff. *See* Def. Rep. [6]

## III. DISCUSSION

### A. Standards for Motion for Summary Judgment
A court shall grant a motion for summary judgment if it determines that "there is no genuine issue of material fact and that the moving party is entitled to a judgment as a matter of law." Fed.R.Civ.P. 56(c). Under this standard, summary judgment is proper if "viewing the record in the light most favorable to the nonmoving party, the evidence offered demonstrates that there is no genuine issue of fact and that the moving party is entitled to judgment as a matter of law." *Pension Benefit Guar. Corp. v. LTV Corp.,* 875 F.2d 1008, 1015 (2d Cir.1989) (internal quotations omitted), *rev'd on other grounds,* 496 U.S. 633 (1990). In making this determination, the court does not resolve disputed factual issues, but reaches a conclusion as to whether there exists "a genuine and material issue for trial." *Hudson Hotels Corp. v.*

*Choice Hotels Int'l,* 995 F.2d 1173, 1175 (2d Cir.1993). An issue of fact is "genuine" if it provides a basis for "a rational trier of fact to find for the non-moving party." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.,* 475 U.S. 574, 587 (1986). If the record contains evidence which supports a reasonable inference in favor of the nonmoving party on the issues presented in the motion, summary judgment is not appropriate. *See Knowles v. New York City Dept. of Corrections,* 904 F.Supp. 217, 220 (S.D.N.Y.1995).

The moving party bears the initial burden of demonstrating the absence of any genuine issue of material fact. *See Consarc Corp. v. Marine Midland Bank, N.A.,* 996 F.2d 568 (2d Cir.1993) (citing *Adickes v. S.H. Kress & Co.,* 398 U.S. 144, 157 (1970)). This burden may be met by demonstrating that there is a lack of evidence to support the nonmoving party's claim. *See Celotex Corp. v. Catrett,* 477 U.S. 317, 325 (1986). The nonmoving party must then set forth "specific facts showing that there is a genuine issue for a trial." *Fed.R.Civ.P.* 56(e); *Celotex Corp.,* 477 U.S. at 321–22. A nonmoving party may not rely on conclusory allegations or conjecture to create disputed fact issues. *Lipton v. Nature Co.,* 71 F.3d 464, 469 (2d cir.1995); *Thomas v. Keane,* 2001 WL 410095 (April 23, 2001). Even in cases involving *pro se* plaintiffs, where the court has an obligation to construe the plaintiff's papers liberally, *Graham v. Lewinski,* 848 F.2d 342, 344 (2d Cir.1988), these same standards for dismissal apply. *Thomas,* 2001 WL 410095, at *3 (citing *Lee v. Artuz,* 2000 WL 231083, at *2 (S.D.N.Y. Feb. 29, 2000)).

B. Deposition Transcript Changes

**\*4** Rule 30(e) of the Rules of Federal Procedure permits a witness to review the transcript of her deposition and make changes "in form or in substance" within thirty days of notification by the court reporter that the transcript is ready for review, and requires that the deponent sign a statement setting forth the reasons for each change. Rule 30(e), Fed.R.Civ.P. Courts have construed the Rule broadly, even accepting changes which contradict original testimony. *Hlinko v. Virgin Atlantic Airways,* 1997 WL 68563 (S.D.N.Y. Feb. 19, 1997) (citing, *inter alia, Podell v. Citicorp Diners Club, Inc.,* 914 F.Supp. 1025, 1034 (S.D.N.Y.1996). Original answers remain admissible at trial as admissions of a party. *Podell.,* 914 F.Supp. at 1034.

Desulma's submission of transcript changes include the following material changes to his initial testimony: (1) the two inmates who attacked him had harassed him the day before

the incident, Tr. Ch. at 2; (2) he alerted Goolsby about the harassment the day before the incident, *id.;* (3) Goolsby was actually on the scene during the incident, Tr. Ch. at 6; (4) the two inmates threatened him with a knife when they verbally harassed him prior to the incident, Tr. Ch. at 4; (5) and the attackers said "kill this negro, get you, we are going to get you stinky," before attacking him. Tr. Ch. at 6.

Goolsby argues that the Desulma's changes should be rejected because they were tailored to oppose Goolsby's motion for summary judgment and do not comply with Rule 30(e). *See* Def. Rep. Desulma never submitted explanations as ordered by this Court on July 19, 2000, but maintains that the transcript changes were warranted because his interpreter had not translated his answers accurately. Pl. Resp. at 13. Although Rule 30(e) "does not require a judge to examine the sufficiency, reasonableness, or legitimacy of the reasons for the changes," *Podell v. Citicorp Diners Club, Inc .,* 914 F.Supp. at 1035, a court is free to reject changes in certain situations. *See, e.g., Baker v. Ace Advertiser's Service,* 134 F.R.D. 65 (S.D.N.Y.1991) (changes rejected where they were so far-reaching as to render the transcript a nullity). A court may reopen deposition if the changes to the transcript are made without adequate reasons, or if they are so substantial as to render the transcript incomplete or useless. *See Hlinko v. Virgin Atlantic Airways,* 1997 WL 68563, *1 (citing *Allen & Co. v. Occidental Petroleum Corp.,* 49 F.R.D. 337, 341 (S.D.N.Y.1970).

Here, although Desulma's changes are not so substantial as to render the transcript incomplete or useless, Desulma never submitted explanations for his changes as required by Rule 30(e) and as ordered by this Court on July 19, 2000. The explanation Desulma offers in his opposition papers to the instant motion (that his changes were made to correct the mistranslations of his Creole interpreter, *see* Pl. Resp. at 13) does not constitute "a statement reciting such changes and the reasons given by the deponent for making them." Fed.R.Civ.P. Rule 30(e). Furthermore, Desulma's explanation does not satisfy this Court's July 19, 2000 order instructing plaintiff to "fully explain each and every change made to the transcript." Desulma's changes are therefore unacceptable.

**\*5** Moreover, to allow Desulma's changes under these circumstances would permit him to tailor his testimony to meet specific deficiencies in his evidence. As a general proposition, a party may not rely on an affidavit that contradicts his deposition testimony in order to defeat a pending motion for summary judgment. *See, e.g ., Hale v.*

*Mann,* 219 F.3d 61, 74 (2d Cir.2000) ( "[I]t is well settled in this circuit that a party's affidavit which contradicts his own prior deposition testimony should be disregarded on a motion for summary judgment.") (*quoting Mack v. United States,* 814 F.2d 120, 124 (2d Cir.1987)). Similarly, Desulma's contradictory deposition changes, submitted to the Court six months after Goolsby filed her motion for summary judgment, should not provide a basis for avoiding summary judgment. The Court finds that, even if Desulma's changes did conform to the requirements of Rule 30(e), Desulma would not be permitted to rely upon them in opposing the instant motion.

C. 42 U.S.C. § 1983

In order to maintain a claim under Section 1983, a plaintiff must allege that (1) the challenged conduct was attributable at least in part to a person who was acting under color of state law, and (2) the conduct deprived the plaintiff of a right guaranteed under the Constitution of the United States. *Mendez v. Walker,* 110 F.Supp.2d 209, 213 (*citing Dwares v. City of New York,* 985 F.2d 94, 98 (2d Cir.1993)). Desulma has properly alleged that Goolsby, as a correctional officer, was acting under color of state law and that her conduct resulted in a violation of his Eighth Amendment rights.

As a prerequisite to bringing suit, a plaintiff must also show a defendant's direct or personal involvement in the alleged Constitutional deprivation. *Colon v. Coughlin,* 58 F.3d 865, 873 (2d Cir.1995); *Wright v. Smith,* 21 F.3d 496, 501 (2d Cir.1994). Personal involvement may take one of four forms: (1) direct participation in the infractions; (2) failure of a supervisory official to remedy wrong after learning of violation; (3) creation or sanction by a supervisory official of policy or custom under which unconstitutional practices occur; or, (4) gross negligence in managing subordinates. *Williams v. Smith,* 781 F.2d 319, 323 (2d Cir.1986).

Goolsby maintains that she is not liable because she was not present at the time of the slashing. Def. Mem. at 16–17. In fact, the record does not establish Goolsby's location during the slashing. Desulma testified that he was unable to locate Goolsby as the inmates were leaving the mess hall, Tr. 134, and did not see her again until after the incident when Doe called for assistance. Tr. 138, 149. In his reply papers, Desulma claims he "was assaulted in [the] presence of the same two corrections officers, Goolsby and Doe ." Pl. Rep. at 22. And in his changes to the transcript, Desulma claims that he saw Goolsby "before and after" the slashing. Tr. Ch. at 6. Whether Desulma saw Goolsby is not dispositive. Goolsby

may have been present even if Desulma did not see her. Defendant has not offered any evidence to suggest that she was not there. Moreover, Desulma need not prove Goolsby's presence at the scene to prevail on his claim that she was deliberately indifferent to a substantial risk of serious harm to him. Construing all pleadings and evidence in Desulma's favor, Goolsby's knowledge of the events leading up to the attack would be enough to establish personal involvement for the purposes of 42 U.S.C. § 1983.

C. Eighth Amendment

 **\*6** The Eighth Amendment, applicable to the states through the Fourteenth Amendment, prohibits the infliction of cruel and unusual punishment. Failure-to-protect claims, because they are treated as challenges to conditions of confinement, are analyzed under the Eighth Amendment. *See, e.g., Farmer v. Brennan,* 511 U.S. 826 (1994); *Fischl v. Armitage,* 128 F.3d 50, 55 (2d Cir.1997) (stating that Eighth Amendment imposes on prison officials "a duty to protect prisoners from violence at the hands of other prisoners"); *Edney v. Karringan,* 69 F.Supp.2d 540, 544 n. 1 (S.D.N.Y.1999).

To prevail in a failure-to-protect case, a prisoner must establish that (1) he is incarcerated under conditions posing a "substantial risk of serious harm," *Farmer,* 511 U.S. at 834 (*citing Helling v. McKinney,* 509 U.S. 25 (1993)), and that (2) the prison official acted with "deliberate indifference" to the prisoner's health or safety. *Farmer,* 511 U.S. at 828 (*citing Helling,* 509 U.S. 25; *Wilson v. Seiter,* 501 U.S. 294 (1991); *Estelle v. Gamble,* 429 U.S. 97 (1976)).

While the first part of the test is an objective determination about the severity of the conditions under which plaintiff is incarcerated, *see Farmer,* 511 U.S. at 834, the second part of the test invokes a subjective standard akin to criminal recklessness such that the defendant must "consciously disregard" a substantial risk of serious harm. *Id.* at 839–40. The official "has sufficient culpable intent if he has knowledge that an inmate faces a substantial risk of serious harm and he disregards that risk by failing to take reasonable measures to abate the harm." *Hayes,* 84 F.3d at 620. The official must be aware of the risk or aware of facts from which the inference of risk could be drawn, and she must also draw the inference. *Farmer,* 511 U.S. at 837; *Hemmings v. Gorczyk,* 134 F.3d 104, 108 (2d Cir.1998) (*quoting Hathaway v. Coughlin,* 99 F.3d 550, 553 (2d Cir.1996)).

1. Objective Test: Conditions of Plaintiff's Incarceration

Case 9:18-cv-01203-DNH-TWD   Document 43   Filed 11/25/19   Page 50 of 112
Desulma v. City of New York, Not Reported in F.Supp.2d (2001)
50 Fed.R.Serv.3d 865

Desulma does not succeed in showing that he was incarcerated under conditions posing a substantial risk of serious harm, a standard which "contemplates 'a condition of urgency, one that may produce death, degeneration, or extreme pain,'" *Hathaway,* 37 F.3d at 66 (quoting *Nance v. Kelly,* 912 F.2d 605, 607 (2d Cir.1990) (Pratt, J., dissenting)), for two reasons. First, Desulma does not show that the risk he faced was *substantial.* Second, he fails to show that the risk —to the extent that one existed—was one of *serious* harm.

Desulma had no prior altercations with the inmates who attacked him. He testified that he had never complained about them or requested separation from them before, *id.* at 160; that he did not know his attackers at the time of the incident, Tr. 52; and that he only became "enemies" with them en route to the mess hall. Tr. at 60. Desulma later asserts, by changing "no" answers to "yes" answers in the deposition transcript, that he did have an altercation with the same inmates previously, Tr. Ch. 2–3, 8, and adds that he had previously asked Goolsby for protection from the inmates. *Id.* at 8–9. Desulma does not describe the prior altercation.

 **\*7** Nothing on the record or in the revisions shows that the inmates posed a substantial threat. By Desulma's account, the inmates told him he was "going to pay a price" and told him to get away from them because "he smell[ed]." Tr. at 59–60. These verbal statements alone do not indicate a substantial threat of serious harm. Indeed, Desulma even surmised that "the officers thought that was just words; they didn't believe anything could happen." Tr. at 63, 80. Finally, although Desulma changed his testimony to reflect that the inmates had actually threatened him with a knife, Tr. Ch. at 4, that fact alone would not be enough to establish a substantial risk.

   2. Subjective Test: Defendant's Mental State
Desulma is also unable to show that Goolsby acted with the state of mind necessary to establish an Eighth Amendment violation. Desulma may properly rely on circumstantial evidence to prove Goolsby acted with the requisite mental state, because "[d]irect evidence that prison officials knew of and disregarded a serious risk of harm to a prison inmate will rarely be available," *Matthews v. Armitage,* 36 F.Supp. 121, 125 (N.D.N.Y.1999) (citing *Coppage v. Mann,* 906 F.Supp. 1025, 1036 (E.D.Va.1995)). The evidence he submits, however, fails to support the conclusion he argues before this Court. The record supports the conclusion that Goolsby was aware that Desulma feared his attackers because Desulma

requested protective measures en route to the mess hall, [7] and because Goolsby witnessed the verbal altercation. However, given the lack of a prior history of violence between Desulma and those inmates, and the nature of the inmates' verbal threats against Desulma, Goolsby had no reason to infer the existence of a threat of harm, much less a life-threatening danger, as Desulma claims. Pl. Rep. at 21.

Goolsby's failure to intervene in the attack is not, by itself, a basis for liability. Although "[a] correctional officer's presence at an attack of an inmate, where he does nothing to stop an assault, may be sufficient to establish a claim under Section 1983," *Dresdner v. Brockton* (citing *Morales v. New York State Department of Corrections,* 842 F.2d 27 (2d Cir.1988)), an isolated omission to act by a state prison guard must be accompanied by evil intent, recklessness, or at least deliberate indifference to the consequences of the conduct. *Bass v. Jackson,* 790 F.2d 260, 262–63 (2d Cir.1986) (quoting *Ayers v. Coughlin,* 780 F.2d 205, 209 (2d Cir.1985); *Williams v. Vincent,* 508 F.2d 541, 546 (2d Cir.1974)). The defendant must also be shown to have had "an extended opportunity to stop the attack but failed to take any action to do so." *Rucco v. Howard,* 1993 WL 299296 (S.D.N.Y. Aug. 4, 1993) (citing *Williams,* 508 F.2d at 546).

Here, there is no evidence that Goolsby deliberately disregarded Desulma's safety or had an opportunity to intervene in the attack. The fact that Doe called for help and Goolsby appeared shortly thereafter suggests that both officers responded immediately to the attack. At most, Goolsby's failure to heed Desulma's initial request for protection was negligent, and negligence is not a sufficiently culpable mental state for liability to attach in a failure-to-protect cases. *See Davidson v. Cannon,* 474 U.S. 344 (1986); *Hayes v. New York City Dep't of Corrections,* 84 F.3d 614, 620 (2d Cir.1996).

C. Qualified Immunity
 **\*8** Under 42 U.S.C. § 1983, a public official is entitled to qualified immunity if her acts did not violate clearly established rights of which a reasonable officer would have known, or if she reasonably believed that her conduct did not violate those rights. *See Harlow v. Fitzgerald,* 457, U.S. 800, 818 (1982); *Young v. County of Fulton,* 160 F.3d 899, 903 (2d Cir.1998); *Brown v City of Oneonta, N.Y., Police Dept.,* 106 F.3d 1125, 1130–31 (2d Cir.1997). The test is whether, in light of the clearly established federal right, it was objectively reasonable for the official to believe that his or her actions

were constitutional. *Warren v. Dwyer,* 906 F.2d 70, 74 (2d Cir.), *cert. denied,* 498 U.S. 967 (1990).

An official is entitled to qualified immunity "if reasonable officials could disagree regarding whether the actions at issue violated the Constitution." Def. Mem. at 14. However, summary judgment will be granted on the basis of qualified immunity only if "no reasonable jury, looking at the evidence in the light most favorable to, and drawing all inferences most favorable to, the plaintiff, could conclude that it was objectively reasonable for the defendant to believe that he was acting in a fashion that did not clearly violate an established federally protected right." *Lennon v. Miller,* 66 F.3d 416, 420 (2d Cir.1995) (*quoting Robison v. Via,* 821 F.2d 913, 921 (2d Cir.1987)). *See also Williams v. Greifinger,* 97 F.3d 699, 706 (2d Cir.1996); *Noguera v. Hasty,* 2000 WL 1011563, [*] 18 (S.D.N.Y. July 21, 2000). Thus, "[i]f any reasonable trier of fact could find that the defendants' actions were objectively unreasonable, then the defendants are not entitled to summary judgment." *Lennon,* 66 F.3d at 420.

Goolsby argues that she and Doe acted in an objectively reasonable manner. Def. Mem. at 15. Based on the verbal harassment which preceded the attack, Goolsby argues, "reasonable correction officers at least could differ as to whether these comments alone were concrete enough to create a substantial risk of harm to plaintiff of imminent physical attack." *Id.* On summary judgment it is necessary to show that *no* reasonable trier of fact could find that the defendants' actions were objectively unreasonable. In this case, where the only notice of potential harm to Desulma was a request for protection and an incident of verbal harassment, Goolsby was, at most, merely negligent in failing to protect Desulma from the inmates who attacked him. She responded quickly to the

attack, separating the inmates and transporting Desulma to the medical unit. On these facts, no reasonable jury could conclude that it was anything but objectively reasonable for Goolsby to believe her acts did not clearly violate an established federally protected right. She is therefore entitled to qualified immunity.

### IV. CONCLUSION

Because no genuine issue of material fact exists with respect to Desulma's claims, I respectfully recommend that defendant's motion for summary judgment be GRANTED.

**\*9** Pursuant to Rule 72, Federal Rules of Civil Procedure, the parties shall have ten (10) days after being served with a copy of the recommended disposition to file written objections to this Report and Recommendation. Such objections shall be filed with the Clerk of the Court and served on all adversaries, with extra copies delivered to the chambers of the Honorable Richard M. Berman, 40 Centre Street, Room 201, and to the chambers of the undersigned, 500 Pearl Street, Room 1970. Failure to file timely objections shall constitute a waiver of those objections both in the District Court and on later appeal to the United States Court of Appeals. *See Thomas v. Arn,* 474 U.S. 140, 150 (1985); *Small v. Secretary of Health and Human Services,* 892 F.2d 15, 16 (2d Cir.1989) (*per curiam* ); 28 U.S.C. § 636(b)(1) (West Supp.1995); Fed.R.Civ.P. 72, 6(a), 6(e).

### All Citations

Not Reported in F.Supp.2d, 2001 WL 798002, 50 Fed.R.Serv.3d 865

Footnotes

1    "Compl." refers to plaintiff's complaint, dated January 5, 1998.
2    "Tr. Ch." refers to Desulma's April 20, 2000, changes to his deposition transcript.
3    "Glass Decl." refers to the declaration of Bryan D. Glass in support of defendant's motion to declare plaintiff's deposition transcript changes null and void.
4    "Def. Mem." refers to Goolsby's memorandum of law in support of the motion for summary judgment, dated October 13, 1999.
5    "Pl. Resp." refers to Desulma's "motion for summary judgment and in opposition to defendant's motion for summary judgment," dated November 16, 2000.
6    "Def. Rep." refers to Goolsby's reply to Desulma's response to the instant motion.
7    Desulma testified that he asked Goolsby for protection during a prior, unrelated altercation with two other inmates over the use of a telephone. *Id.* at 163–64. However, that testimony does not bolster Desulma's case because the request would not have put Goolsby on notice that Desulma risked harm from the two inmates involved in *this* case.

Desulma v. City of New York, Not Reported in F.Supp.2d (2001)

50 Fed.R.Serv.3d 865

---

**End of Document**

© 2019 Thomson Reuters. No claim to original U.S. Government Works.

---

KeyCite Yellow Flag - Negative Treatment

Distinguished by Walker v. Shaw, S.D.N.Y., June 23, 2010

2008 WL 2485402
Only the Westlaw citation is currently available.
United States District Court,
S.D. New York.

Timothy GREEN, Plaintiff,

v.

CITY OF NEW YORK DEPARTMENT
OF CORRECTIONS, Officer Bee,
Captain Gaselle, Officer Braxton and
Warden Frank Squillante, Defendants.

No. 06 Civ. 4978(LTS)(KNF).
|
June 19, 2008.

### OPINION AND ORDER

LAURA TAYLOR SWAIN, District Judge.

**\*1** *Pro se* Plaintiff Timothy Green ("Plaintiff"), brings this action pursuant to 42 U.S.C. § 1983. Plaintiff asserts that, while he was in the custody of the Defendant New York City Department of Corrections ("NYC DOC"), Defendants Officer Bee ("Bee"), Captain Gaselle ("Gaselle"), Officer Braxton ("Braxton") and Warden Frank Squillante ("Squillante") (collectively, "Defendants") violated his constitutional rights when, after he discovered that he had erroneously been designated as gang-affiliated and brought the error to Defendants' attention, the designation was not corrected. Defendants move pursuant to Rule 12(b)(6) of the Federal Rules of Civil Procedure to dismiss Plaintiff's Amended Complaint. [1] The Court has jurisdiction of this action pursuant to 28 U.S.C. § 1331.

Two Defendants, Bee and Gaselle, have not yet been served with the summons and original complaint and it is not always clear in Defendants' papers whether the motion is made on behalf of all Defendants or only the served Defendants, but it is not necessary to resolve whether the motion to dismiss is interposed on behalf of Bee and Gaselle as well, since Defendants' arguments are equally applicable to Bee and Gaselle. Therefore, for the sake of simplicity, the Court uses the term "Defendants" to apply to all Defendants.

The Court has considered thoroughly all of the parties' submissions. For the following reasons, Defendants' motion to dismiss the Amended Complaint is granted.

### BACKGROUND

The following relevant facts are alleged in Plaintiff's Amended Complaint unless otherwise stated, and are taken as true for purposes of this motion practice. [2] Plaintiff is not and was never affiliated with a gang called "the Netas." However, on or about January 2, 2006, while Plaintiff was incarcerated at Otis Bantum Correctional Center ("Otis Bantum"), a facility run by NYC DOC, a prison officer informed Plaintiff that the prison had classified him as "Security Risk Gang-Related" ("SRG status"), because of his supposed affiliation with the Netas. The officer directed Plaintiff to speak with Defendant Officer Bee, who was in charge of security at Otis Bantum, in order to correct the mistake.

After Plaintiff met with Bee [3] and told Bee that he was not a gang member and had never been affiliated with the Netas, Bee accessed the prison's computer system and discovered that Plaintiff's name and identification number were erroneously associated with a picture of another inmate. Bee explained that Plaintiff had been under SRG status since 1995, that there was a mistake and that she would "take care of" the problem.

For the next three weeks, Plaintiff did not receive word from Bee, and his SRG status remained unchanged. He then spoke with the grievance coordinator at Otis Bantum, who advised Plaintiff to speak to Defendant Captain Gaselle, who also worked in security. Plaintiff then met with Gaselle, who had already learned of Plaintiff's situation from Bee. Gaselle informed Plaintiff that the problem would "be taken care of." The SRG status was not removed.

**\*2** On April 11, 2006, Plaintiff filed a complaint with the City of New York Department of Investigations ("DOI") concerning his erroneous SRG status. Soon after, Bee informed Plaintiff that a commissioner with the DOI had notified Bee of Plaintiff's complaint, and Bee again assured Plaintiff that she would "take care of" the issue, but she did not correct the error.

During the time that these alleged interactions took place at Otis Bantum, Plaintiff resided in "higher classification" housing. [4]

On April 26, 2006, Plaintiff was transferred from Otis Bantum to Eric M. Taylor Center ("Eric M. Taylor"), another NYC DOC facility. Upon arrival, Plaintiff inquired as to whether he was designated with SRG status and was told that he was not. He was also cleared to work outdoors.

However, on May 8, 2006, Plaintiff's outdoor work clearance was revoked and he was moved to "higher classification" housing and prevented from working altogether. He was then informed that he was classified as SRG status. On May 11, 2006, Plaintiff explained his situation to Defendant Officer Braxton, who worked in security at Eric M. Taylor. Braxton ran a computer check and found, as Bee had several months previously, that Plaintiff's name and identification number were erroneously associated with the picture of another inmate. Braxton informed Plaintiff that she would "take care of this," and Plaintiff gave her some paperwork containing documentation of Plaintiffs attempts to resolve his SRG situation. On May 18, 2006, Braxton informed Plaintiff that Defendant Warden Squillante had received the paperwork. Furthermore, she confirmed that Plaintiff had been erroneously under SRG classification since 1995, and told him that the SRG status would be removed on May 24, 2006. At the time of Plaintiff's filing of the Amended Complaint, August 29, 2006, his SRG status remained the same. [5]

According to the Amended Complaint, because of Plaintiff's SRG status at Otis Bantum, and for most of the time at Eric M. Taylor, Plaintiff was "harassed," subjected to random strip searches, and prevented from working. Plaintiff also complains of emotional distress and harm to his reputation. Plaintiff further alleges generally that his safety was put in jeopardy because of the SRG classification, though there is no allegation that Plaintiff, or any other person classified as SRG, has suffered physical harm as a result of such a classification or alleged gang affiliation. [6]

In an affidavit submitted with his opposition papers Plaintiff avers that, as a result of his widely-known SRG status- specifically, the belief that he is a member of the Netas-he has been subjected to threats on his life from gang members as well as from prison staff. (Aff. of Timothy Green dated Nov. 2006 ("Green Aff") ¶ 5.) Plaintiff alleges that he has been approached on more than one occasion with "life threatening

[g]estures" and that, on one occasion, an inmate member of another gang told Plaintiff to move off of Rikers Island (where the facilities are located) because, no matter where Plaintiff went, his life would be threatened. (*Id.*) As an example of how others might easily associate Plaintiff with the Netas, Plaintiff avers that, at church services, inmates alleged to be Neta members are visibly segregated from other inmates. (*Id.*) Plaintiff further alleges in his affidavit that the SRG status of any inmate may be ascertained through "FOIL," to which staff members have access, and that staff members with allegiances to various gangs will perform FOIL inquiries on gang members' behalf to unearth the gang affiliations of other inmates in exchange for a fee or other favors. (*Id.* ¶ 6.) Plaintiff also asserts generally that inmates and staff who are made aware of Plaintiffs alleged Neta status freely spread the word, further jeopardizing his safety with respect to rival gang members and/or prison staff. (*Id.* ¶ 7.)

**\*3** The affidavit does not allege that any of the individual Defendants knew about or participated in any way in the alleged threats to Plaintiff by other inmates or prison staff. Plaintiff does not allege that he was ever physically harmed as a result of his perceived affiliation with the Netas, nor does he allege that others actually, or perceived to be, affiliated with the Netas have been harmed physically because of SRG status or perceived affiliation with the Netas.

Plaintiff seeks compensatory (pain, suffering and emotional distress) and punitive damages against the Department of Corrections, on the basis of the alleged reputational harm arising from the false identification as a Netas affiliate, the alleged threats and personal danger, work and housing conditions and strip searches. Because only the Department of Corrections is mentioned in Plaintiff's demand for relief, the nature of the claims he is seeking to assert against the individual Defendants is unclear.

## DISCUSSION

In considering a motion to dismiss a complaint under Rule 12(b) (6) of the Federal Rules of Civil Procedure, the court must accept as true the material facts alleged in the complaint and draw all reasonable inferences in the plaintiffs favor. *Grandon v. Merrill Lynch & Co., Inc.,* 147 F.3d 184, 188 (2d Cir.1998); *Torres v. Mazzuca,* 246 F.Supp.2d 334, 338 (S.D.N.Y.2003). This rule "applies with particular force where the plaintiff alleges civil rights violations or where the complaint is submitted *pro se.*" *Fernandez v. Chertoff,* 471

F.3d 45, 52 (2d Cir.2006). Moreover, complaints prepared by *pro se* plaintiffs should be construed liberally, held to "less stringent standards than formal pleadings drafted by lawyers," *Erickson v. Pardus,* 127 S.Ct. 2197, 2200 (2007), and interpreted "to raise the strongest arguments that they suggest." *Knight v. Keane,* 247 F.Supp.2d 379, 383 (S.D.N.Y.2002) (quoting *Burgos v. Hopkins,* 14 F.3d 787, 790 (2d Cir.1994)). Specific facts are not necessary so long as the pleading "give[s] the defendants fair notice of what the claim is and the grounds upon which it rests." *Erickson,* 127 S.Ct. at 2200 (citing *Bell Atl. Corp. v. Twombly,* 127 S.Ct. 1955 (2007) and Fed. R Civ. P. 8(a)(2)).

Nonetheless, a pleader must also "amplify a claim with some factual allegations in those contexts where such amplification is needed to render the claim *plausible." Iqbal v. Hasty,* 490 F.3d 143, 157-58 (2d Cir.2007) (citing *Bell Atl. Corp. v. Twombly,* 127 S.Ct. 1955 (2007)). The complaint "must contain specific allegations of fact which indicate a deprivation of constitutional rights; allegations which are nothing more than broad, simple and conclusory statements are insufficient to state a claim under § 1983." *Torres,* 246 F.Supp.2d at 338 (quoting *Alfaro Motors, Inc. v. Ward,* 814 F.2d 883, 887 (2d Cir.1987)).

Defendants argue that the Amended Complaint must be dismissed insofar as it asserts claims against NYC DOC because NYC DOC is not a separately suable entity. Defendants also assert that the Amended Complaint should be dismissed in its entirety for failure to state a claim upon which relief can be granted, and that Defendants Squillante and Braxton are entitled to qualified immunity.

**\*4** The Amended Complaint is titled, "Amended Complaint under the Civil Rights Act, 42 U.S.C. § 1983," and no other federal statutory or constitutional provisions are mentioned in the body of Plaintiff's Amended Complaint. Plaintiff refers to "defamation of Character[,] Slander, Libel, Negligence and Harrassment [sic]" in connection with Plaintiff's demand for money damages from the Department of Corrections. Construing its allegations liberally, the Court interprets the Amended Complaint as asserting claims pursuant to 42 U.S.C. section 1983 for (1) violation of Plaintiff's Fourteenth Amendment right to freedom from the deprivation of liberty without due process of law, based on his complaints regarding his conditions of confinement, and (2) violation of his Eighth Amendment right to freedom from cruel and unusual punishment insofar as he appears to claim that the defendant officers were deliberately indifferent to the threats and other deprivations he allegedly suffered as a result of the erroneous SRG designation, in addition to various state common law claims. In so construing the Amended Complaint, the Court has considered the facts alleged within the body of the complaint as well as the additional facts proffered in the affidavit Plaintiff submitted with his opposition papers.

### New York City Department of Correction is not a suable entity

Plaintiff's action must be dismissed in its entirety as to Defendant NYC DOC. Pursuant to Rule 17(b) of the Federal Rules of Civil Procedure, a city agency's capacity to be sued is determined by the law of the state where the court is located. Section 396 of the New York City Charter provides that "all actions and proceedings for the recovery of penalties for the violation of any law shall be brought in the name of the City of New York and not in that of any agency, except where otherwise provided by law." N.Y.C. Charter § 396. As an agency of the City of New York, the Department of Corrections thus is not a suable entity. *See Maurice v. New York City Dep't of Corrections,* No. 93 Civ. 6008(JFK), 1997 WL 431078, \*2 (S.D.N.Y. July 30, 1997); *Romano v. New York City Dep't of Corrections,* No. 95 Civ. 0302(CSH), 1996 WL 233689, \*1 (S.D.N.Y. May 7, 1996).

The complaint must, accordingly, be dismissed as against Defendant NYC DOC. Plaintiff will, however, be granted leave to reassert his Fourteenth Amendment claim as against New York City itself, since his complaint clearly reflects an effort to assert a claim against the governmental entity in addition to the individual Defendants. While Plaintiff's allegations of repeated failures by different individuals at different institutions to correct the SRG designation might conceivably be read to suggest an allegation of harm due to a policy or practice, Plaintiff is cautioned that he must make clear the factual basis of any federal claim he is asserting against the City of New York, because the municipality can only be held liable if the violation complained of is the product of a municipal policy, custom or practice. *See generally Monell v. New York City Dept. of Soc. Servs.,* 436 U.S. 658, 690-91 (1978).

### Fourteenth Amendment Claim

### Nature of Claim

**\*5** Plaintiff alleges that, because of his SRG designation, he suffered deprivations of liberty with respect to his assignment to "higher classification" housing, revocation of

work privileges and subjection to random strip searches. His allegations further suggest that his Neta/SRG designation operated as a stigma and harmed his reputation, resulting in threats to his life from other inmates as well as prison staff. Plaintiff claims that, by acknowledging the erroneous gang designation yet failing to correct it, Defendants have deprived Plaintiff of his liberty without due process of law.

To succeed on a Fourteenth Amendment procedural due process claim, a plaintiff must establish (1) that he possessed a liberty interest and (2) that the defendants deprived him of that interest as a result of insufficient process. *Giano v. Selsky,* 238 F.3d 223, 225 (2d Cir.2001) (citation and quotation omitted). To determine whether a plaintiff prisoner alleging a deprivation of liberty as a result of conditions of confinement has identified a protected liberty interest, the Court must examine whether the state has created the liberty interest by statute or regulation and whether the alleged deprivation constitutes an atypical and significant hardship. *Sandin v. Connor,* 515 U.S. 472, 484 (1995); *Iqbal v. Hasty,* 490 F.3d 143, 161 (2d Cir.2007) (quoting *Tellier v. Fields,* 280 F.3d 69, 80 (2d Cir.2000) (citing and quoting *Sandin* 515 U.S. at 484; *Sealey v. Giltner,* 116 F.3d 47 (2d Cir.1997))).

The Court finds that Plaintiffs allegations concerning the official SRG designation, the attendant prison-imposed deprivations flowing from that designation, and the hardships suffered in the form of regular death threats from staff and other inmates sufficiently plead the plausible existence of a liberty interest of which he was deprived without due process. *Cf. Neal v. Shimoda,* 131 F.3d 818, 829-30 (9th Cir.1997) (noting that the "classification of an inmate as a sex offender is precisely the type of 'atypical and significant hardship' ... that the Supreme Court held created a protected liberty interest," because of "the stigmatizing consequences of the attachment of the 'sex offender' label"). Plaintiff's Fourteenth Amendment claims as against the individual Defendants are, however, barred by the doctrine of qualified immunity.

### Qualified Immunity
"Qualified immunity is an immunity from suit and not just a defense to liability." *Iqbal,* 490 F.3d at 152 (citing *Saucier v. Katz,* 533 U.S. 194, 200 (2001)). If the alleged facts, taken as true, plausibly plead a violation of a constitutional right, as is the case here, the Court must determine whether that right was clearly established at the time of the challenged action, *id.,* that is, whether "the contours of the right [were] sufficiently clear in the context of the alleged violation such that a reasonable official would understand that what he [was]

doing violate[d] that right." *Id.* (quoting *Saucier,* 533 U.S. at 250-51). "Only Supreme Court and Second Circuit precedent existing at the time of the alleged violation is relevant in deciding whether a right is clearly established." *Moore v. Vega,* 371 F.3d 110, 114 (2d Cir.2004).

**\*6** The notion that stigmatic harm, especially to the extent that it does not involve any showing of actual physical harm, can rise to the level of "atypical and significant hardship" in the prison context has been raised in other circuits, *see, e.g., Kirby v. Siegelman,* 195 F.3d 1285, 1289-92 (11th Cir.1999); *Chambers v. Colorado Dep't of Corrections,* 205 F.3d 1237, 1243 (10th Cir.2000), but has not been recognized by the Second Circuit or the Supreme Court, *see Tinsley v. Goord,* No. 05 Civ. 3921(NRB), 2006 WL 2707324, *5 (S.D.N.Y. Sept. 20, 2006); *Vega v. Lantz,* No. 3:03-cv-2248 (PCD), 2007 WL 3025285, *2 (D.Conn. Oct. 16, 2007). Nor has the Court's research disclosed any Supreme Court or Second Circuit opinion existing at the time of the alleged deprivations of liberty (or at anytime thereafter) that would clearly foreshadow a particular ruling that the facts pleaded by Plaintiff would establish a constitutional violation, *see Tellier,* 280 F.3d at 83 (law is "clearly established" so long as this "circuit's decisions clearly foreshadow a particular ruling on the issue") (quotations and citations omitted), especially given that most Second Circuit opinions applying *Sandin* have dealt with administrative segregation, *see Onwuazombe v. Dodrill,* No. 07 Civ. 873(DLC), 2008 WL 1758641, *4 (S.D.N.Y. Apr. 16, 2008) ("most of the Second Circuit cases that rely on *Sandin* concern segregated confinement"), and have not involved any allegation of stigmatic harm. *See also Neal,* 131 F.3d at 832 (granting qualified immunity because holding that stigmatic harm arising from sex offender label could rise to level of atypical and significant hardship was not clearly established in Ninth Circuit prior to *Neal* itself); *Chambers,* 205 F.3d at 1244 (to same effect with respect to Tenth Circuit). Because the individual Defendants are entitled to qualified immunity on Plaintiff's Fourteenth Amendment claim, Defendants' motion to dismiss Plaintiff's Amended Complaint to the extent that it asserts a procedural due process claim against them is granted.

### Eighth Amendment Claim
The Court has also construed Plaintiff's submissions to be asserting a violation of his Eighth Amendment right to freedom from cruel and unusual punishment, insofar as he appears to claim that Defendants were deliberately indifferent to the threats and other deprivations he allegedly suffered as a result of the erroneous SRG designation.

A prison official's failure to prevent harm to a prisoner violates the Eighth Amendment if the official is deliberately indifferent to a substantial risk of serious harm posed by the conditions faced by the prisoner. *Farmer v. Brennan,* 511 U.S.825, 834 (1994). Although the death threats alleged by Plaintiff were sufficiently *atypical and significant* for purposes of implicating Plaintiff's liberty interests under the Fourteenth Amendment, the mere existence of such threats, without any allegation that physical harm actually existed or was imminent during the entire six or seven month period in which he was allegedly subjected to such threats, or without any allegation that any inmate perceived to be a Neta member was physically harmed, do not render plausible Plaintiff's claim that he was subject to a *substantial risk of serious harm. See Chalif v. Spitzer,* No. 9:05-CV-1355 (LEK/DEP), 2008 WL 1848650, *9 (N.D.N.Y. Apr. 23, 2008) (plaintiff did not allege a substantial risk of serious harm, where plaintiff alleged "credible threats" and subjection to "psychological torture by imminent threat of death" by defendants, without any allegation that "he was assaulted by any fellow inmates, or that such an assault was threatened and imminent"). Not "every injury suffered by one prisoner at the hands of another ... translates into constitutional liability for prison officials responsible for the victim's safety," *Farmer,* 511 U.S. at 834, and this is especially the case with respect to verbal threats unaccompanied by any physical act or any indication that the threat will be carried out. *See generally Richardson v. Castro,* No. 97 CV 3772(SJ), 1998 WL 205414, *5 (E.D.N.Y. Apr. 24, 1998) ("verbal threats or abuse are insufficient to state a constitutional violation pursuant to 42 U.S.C. § 1983. Moreover, verbal threats do not violate the constitution 'unless accompanied by physical force or the present ability to effectuate the threat' ") (quoting *Jermosen v. Coughlin,* 989 F.Supp. 444, 449 (N.D.N.Y.1995)); *Davis v. Sancegraw,* 850 F.Supp. 809, 813 (E.D.Mo.1993) ("Verbal insults or threats generally do not rise to the level of a constitutional violation. The only exception to this rule is when the verbal threat rises to the level of a 'wanton act of cruelty' such that the inmate is in fear of 'instant and unexpected death at the whim of his ... custodians' ") (quoting *Burton v. Livingston,* 791 F.2d 97, 99-100 (8th Cir.1986) (complaint stated Eighth Amendment claim where prison official allegedly pointed a lethal weapon at plaintiff, cocked it, and threatened him with instant death)). Nor do Plaintiff's allegations of general "harassment," strip searches, or the revocation of work privileges render plausible any claim that Plaintiff faced a "substantial risk of serious harm" as a result of his SRG designation. *See Merritt v. Hawk,* 153 F.Supp.2d 1216, 1222 (D.Colo.2001) ("allegations

of removal of property from his cell by defendants, strip searches, deprivation of fresh air and exercise, deprivation of medical care, and verbal threats and acts of harassment such as coughing on or spitting in his food ... not ... sufficient to state a conditions of confinement claim under the Eighth Amendment"). Therefore, Plaintiff has failed to set forth any plausible claim that he was subjected to a substantial risk of serious harm. Absent the requisite substantial risk of serious harm, Plaintiff cannot prove a deliberate indifference claim.

**\*7** Plaintiff cites several cases acknowledging the risks that some prisoners face when they are labeled as "snitches," and argues by analogy that he faced a similar risk of harm resulting from his false affiliation with the Netas. Plaintiff, however, has alleged no fact from which a factfinder could infer that the risk of harm faced by Plaintiff or those NYC DOC inmates thought to be members of a particular gang is equivalent to the risk faced by inmates labeled "snitches" as described in the cases upon which Plaintiff relies. In the cases cited by Plaintiff in which courts found viable Eighth Amendment claims premised on being labeled a "snitch," there were allegations or proffered evidence of actual physical harm. *See Hendrickson v. Emergency Med. Servs.,* No. CIVA. 95-4392, 1996 WL 472418, *5 ("Plaintiff alleges that prison employees have called him a 'snitch' in front of other inmates and that this has resulted in assaults and threats from other inmates"); *Northington v. Jackson,* 973 F.2d 1518, 1525 (10th Cir.1992) (reversing dismissal of Eighth Amendment claim where inmate alleged that "he was severely beaten on two occasions by groups of inmates" because he was labeled a snitch); *Harmon v. Berry,* 728 F.2d 1407, 1408 (11th Cir.1984) (claim not frivolous where attack was alleged). Therefore, Plaintiffs "snitch" analogy is not sufficient to frame a plausible pleading of a substantial risk of serious harm, and Defendants' motion to dismiss is granted to the extent that the Amended Complaint asserts an Eighth Amendment claim under Section 1983.

Because the Court finds that the individual Defendants are entitled to qualified immunity on Plaintiff's Fourteenth Amendment claim and that Plaintiff has failed to state a viable Eighth Amendment claim, the Court does not need to address Defendants' arguments regarding dismissal on the basis of 28 U.S.C. § 1997e(e) or the failure to allege personal involvement. To the extent that Plaintiff's suit asserts state law claims against the individual Defendants for negligence, defamation or any other state common law claim, the Court declines to exercise supplemental jurisdiction of such claims pursuant to 28 U.S.C. § 1367(c)(3).

Plaintiff has not requested leave to amend either in his opposition papers or in his sur-reply. Given the allegations in the Amended Complaint and the additional allegations set forth in Plaintiff's opposition papers, in light of the nature of relief requested, the Court finds that any attempt by Plaintiff to amend his Amended Complaint in an attempt to raise claims against the individual Defendants would be futile. Accordingly, Plaintiff's claims against Defendants Bee, Gaselle, Braxton, and Squillante are dismissed with prejudice.

However, as explained above, because Plaintiff states a plausible Fourteenth Amendment claim and appears to raise allegations suggesting that the individual Defendants' actions were the result of municipal policy or custom, and because the doctrine of qualified immunity does not apply to municipalities, Plaintiff will be granted leave to replead his Fourteenth Amendment claim, along with related state common law claims, *only* against the City of New York. Any such Second Amended Complaint must include the allegations sworn to in the affidavit Plaintiff submitted with his opposition papers, in addition to specific facts identifying the basis of his claim against the City of New York.

*CONCLUSION*

**\*8** For the foregoing reasons, Defendants' motion to dismiss the Amended Complaint is granted. All of Plaintiff's claims against all of the named Defendants are dismissed with prejudice, but Plaintiff is granted leave to replead his Fourteenth Amendment claim, as well as related state common law claims, as against the City of New York only, incorporating the allegations contained in Plaintiff's affidavit accompanying his opposition papers, in a Second Amended Complaint. The Court's Pro Se office is requested to issue Plaintiff an Amended Summons and to provide Plaintiff all the necessary paperwork so that service of both the Amended Summons and the Second Amended Complaint may be effected on the City of New York should Plaintiff choose to do so. Should Plaintiff have any questions concerning service, he may contact the Pro Se office at 212-805-0177.

If a Second Amended Complaint is not filed and served within **60 days** of the issuance of this Opinion and Order, Plaintiff's entire suit will be dismissed with prejudice and the case will be closed with no further advance notice to Plaintiff. The Clerk of Court is respectfully requested to terminate Docket Entries Nos. 15 and 17.

SO ORDERED.

**All Citations**

Not Reported in F.Supp.2d, 2008 WL 2485402

---

Footnotes

1   Plaintiff's opposition papers purport to assert a cross-motion for summary judgment. Because his motion is not accompanied by evidence sufficient to demonstrate his entitlement to relief as a matter of law and because, as explained below, his complaint fails to state a claim upon which relief can be granted, Plaintiff's cross-motion is denied.

2   The relevant allegations contained in the Amended Complaint are set forth in a "Statement of Facts" section which has been inserted between pages 3 and 4 of the printed form sections of the Amended Complaint.

3   It is not clear when this meeting with Bee allegedly occurred but, based on the other dates mentioned in the Amended Complaint, it appears to have occurred sometime between January and March 2006.

4   Plaintiff does not specifically allege when he was placed in "higher classification" housing at Otis Bantum, stating only that he was in such housing at least from January to April 2006. It is not clear whether he was placed in "higher classification" housing in 1995, when he was allegedly first designated with SRG status.

5   After describing the second conversation between Plaintiff and Bee, which took place sometime between April 11 and April 26, 2006, the Amended Complaint asserts, "However this matter was never corrected or resolved and it had [sic] now been 4 months later." (Am.Compl.II.D.) Documents annexed to Defendants' motion papers indicate that the designation was removed in June 2006. (Decl. of Basil C. Sitaras dated Oct. 19, 2006, Ex. B.)

6   In Part III of the complaint form, where the heading reads: "If you sustained injuries related to the events alleged above, describe them and state what medical treatment, if any, you required and received," Plaintiff typed: "none".

---

**End of Document**                                                                    © 2019 Thomson Reuters. No claim to original U.S. Government Works.

2010 WL 3825650
Only the Westlaw citation is currently available.
United States District Court,
N.D. New York.

John D. HOPKINS, III, Plaintiff,
v.
Michael ALLARD, Superintendent; Sgt.
Gardner; John Doe, Sergeant; M. Titus,
Correction Officer; Johnson, Correction Officer;
John Doe # 1, Correction Officer; John Doe
# 2, Correction Officer; B. Brue, Nurse; C.
Volpe, Nurse; and Jane Doe, Nurse; All of
Franklin Correctional Facility, Defendants.

No. 9:08–CV–01.
|
Sept. 24, 2010.

**Attorneys and Law Firms**

John D. Hopkins, III, Wallkill, NY, pro se.

Hon. Andrew M. Cuomo, Attorney General of the State of
New York, Aaron M. Baldwin, Esq., Asst. Attorney General,
Albany, NY, for Defendants.

### *DECISION and ORDER*

DAVID N. HURD, District Judge.

 **\*1** Plaintiff, John D. Hopkins, III, commenced this civil
rights action in January 2008, pursuant to 42 U.S.C. § 1983.
By Report–Recommendation dated August 23, 2010, the
Honorable David E. Peebles, United States Magistrate Judge,
recommended that defendant's motion for summary judgment
(Docket No. 58) be granted in its entirety, and that all claims
in plaintiff's complaint, except those relating to excessive use
of force against defendants Titus and Gardner be dismissed
with prejudice. The Magistrate Judge further recommended
that all claims against the John and Jane Doe defendants be
dismissed without prejudice. No objections to the Report–
Recommendation have been filed.

Based upon a careful review of the file, and the
recommendations of Magistrate Judge Peebles, the Report–
Recommendation is accepted and adopted in all respects. *See*
28 U.S.C. 636(b)(1).

Accordingly, it is

ORDERED that

1. Defendant's motion for summary judgment (Docket No.
58) is GRANTED in its entirety, except that;

2. All claims in plaintiff's complaint, except those relating to
excessive use of force against defendants M. Titus and Sgt.
Gardner are DISMISSED with prejudice;

3. All claims against the John and Jane Doe defendants are
DISMISSED without prejudice; and

3. The Clerk is directed to return the file to the Magistrate
Judge for any further pretrial proceedings.

IT IS SO ORDERED.

**All Citations**

Not Reported in F.Supp.2d, 2010 WL 3825650

---

**End of Document**                    © 2019 Thomson Reuters. No claim to original U.S. Government Works.

1999 WL 147712
Only the Westlaw citation is currently available.
United States District Court, S.D. New York.

Wayne HUTCHINSON, Plaintiff,

v.

Sgt. Richard W. MCCABEE, Capt. Thomas G. Goff, Warden Anthony Amicucci, Commissioner Norwood E. Jackson and County Exec. Andrew P. O'Rourke, each individually and in their official capacities, and Westchester County, Defendants.

No. 95 CIV. 5449(JFK).
|
March 15, 1999.

**Attorneys and Law Firms**

Winthrop, Stimson, Putnam & Roberts, New York, Of Counsel: David R. Lagasse, John E. Davis, for Plaintiff.

Alan D. Scheinkman, Westchester County Attorney, White Plains, Of Counsel: Lori A. Alesio, for Defendants.

*OPINION and ORDER*

KEENAN, District J.

 **\*1** Plaintiff brought this action under 42 U.S.C. § 1983, claiming that Defendants failed to protect him while he was an inmate in the Westchester County Jail from two assaults by fellow inmates in violation of the Eighth Amendment's proscription of cruel and unusual punishment. Before the Court is Defendants' motion to dismiss this action in its entirety for failure to state a claim upon which relief can be granted, pursuant to Fed.R.Civ.P. 12(b)(6). For the reasons discussed below, the motion is granted in part and denied in part.

*The Parties*

Plaintiff was an inmate in the Westchester County Jail at the time of the events complained of in this action.

Defendant Westchester County is a political subdivision of the State of New York.

Defendant Andrew P. O'Rourke was the Chief County Executive of Westchester County at all times relevant to this Complaint.

Defendant Norwood E. Jackson was the Commissioner of the Westchester Department of Corrections at all times relevant to this Complaint.

Defendant Anthony Amicucci was the Assistant Warden of the Westchester County Jail at all times relevant to this Complaint.

Defendant Thomas G. Goff was a corrections officer with the rank of Captain at all times relevant to this Complaint.

Defendant Richard W. McCabee was a corrections officer with the rank of Sergeant at all times relevant to this Complaint.

*Background*

The Amended Complaint alleges the following facts, which the Court presumes to be true for purposes of this motion.

Plaintiff was an inmate in the federal prison system from August 1992 until February 11, 1998. Pursuant to a contract dated May 1, 1991, the federal government and the County of Westchester agreed that Westchester County would temporarily house federal inmates in the Westchester County Jail. In July 1994, Plaintiff became a federal inmate at the Westchester County Jail. Plaintiff was housed in the maximum-security wing, referred to as "2 West." In October 1994, Plaintiff allegedly had a conversation with Defendant Amicucci, the assistant warden, and requested a transfer to a different prison wing. Plaintiff allegedly informed Amicucci that there was an excessive amount of inmate-on-inmate violence in 2 West and that Plaintiff feared for his safety. Amicucci allegedly advised Plaintiff to request a transfer from Defendant Captain Goff, the corrections officer responsible for inmate housing assignments and overall prison security. Plaintiff wrote to Goff requesting a transfer, but Goff denied his request on October 26, 1994.

On November 6, 1994, two inmates assaulted Plaintiff on his cellblock in 2 West. Following the attack, Defendant Sergeant McCabee and other corrections officers removed Plaintiff from his cell on 2 West and brought him to Westchester County Jail's medical clinic. Plaintiff requested that he be

placed in protective custody rather than returned to 2 West. Under the Westchester County Department of Corrections's Standard Operating Procedure, protective custody is available to inmates who require protection from other inmates to ensure their safety. If an inmate requests protective custody, the on-duty Sergeant must decide whether to grant it and, if the Sergeant decides against protective custody, he or she must inform the inmate of the decision and why it was made. The Standard Operating Procedure also provides that an inmate is not to be housed in the general population when the inmate requires separation for the inmate's protection and that inmates involved in inmate-on-inmate violence should be removed to separate areas immediately.

 **\*2** McCabee was the on-duty Sergeant at the time of the aforementioned assault on Plaintiff. McCabee allegedly refused to grant Plaintiff's request for protective custody unless Plaintiff identified the inmates who attacked him and signed an official statement to that end. Plaintiff, however, allegedly told McCabee that he would not identify his assailants because he feared he would be identified as an informant and subject to further violence. Plaintiff was subsequently returned to his cell in 2 West. Plaintiff alleges that McCabee consulted with another corrections officer before returning Plaintiff to his cell. Plaintiff also alleges that it was the policy of the Department of Corrections to require inmates involved in inmate-on-inmate violence to identify participants prior to taking measures to protect the inmate, including granting requests for cellblock reassignment and protective custody.

After Plaintiff was returned to 2 West, one of Plaintiff's assailants was removed from the cellblock in front of the other prisoners on the cellblock. Later that evening, the inmates on Plaintiff's cellblock were released from their cells for recreational time. Plaintiff remained in his cell. Two inmates approached Plaintiff in his cell during the recreation period, accused him of being an informant, and assaulted him. Plaintiff was then taken back to Westchester County Jail's medical clinic and from there transported to Westchester County Medical Center. Plaintiff was hospitalized at the Medical Center for approximately eight days due to the severity of his injuries. Those injuries allegedly included a collapsed right nostril, an injured shoulder depriving him of all mobility in that shoulder, a large lump on his left temple measuring approximately four by two inches, and other cuts, swelling and bruises. Plaintiff underwent arthroscopic bone surgery on January 3, 1996 to repair the damage to his shoulder incurred in the second attack. Plaintiff apparently

still has only limited mobility in that shoulder. After Plaintiff was released from the hospital, he was transferred to Ottisville Federal Correctional Institute, then to Fort Dix Federal Correctional Institute, and finally to Ray Brook Federal Correctional Institute. Plaintiff was released from prison on February 11, 1998.

*Procedural History*

Plaintiff instituted this action by filing a Complaint on July 21, 1995, alleging claims pursuant to 42 U.S.C. § 1983 for violations of Plaintiff's Eighth Amendment rights, Fourteenth and Fifth Amendment Due Process rights, and Plaintiff's right to Equal Protection under the law. Defendants moved for summary judgment on June 30, 1997, and in an Opinion dated March 31, 1998, the Court granted Defendants' motion for summary judgment on Plaintiff's due process and equal protection claims, but denied Defendants' motion for summary judgment on the Eighth Amendment claim. The Court granted Plaintiff's motion to take additional discovery on the Eighth Amendment claim for reasons discussed in the March 31 Opinion. The Court also directed Plaintiff to file an amended complaint by April 20, 1998, proceeding solely on Plaintiff's Eighth Amendment failure to protect claim.

 **\*3** Plaintiff filed an Amended Complaint on April 20, 1998, asserting two claims: (1) a claim that Defendants were deliberately indifferent to the risk of harm to Plaintiff and failed to take reasonable preventive measures to protect him from a second inmate assault in violation of the Eighth Amendment's proscription of cruel and unusual punishment; and (2) a claim that Defendants Goff, Amicucci, Jackson, and O'Rourke were policy making officials of Westchester County and, in that role, failed to provide adequate training, supervision or discipline of municipal employees charged with protecting inmates in the custody of Westchester County and preventing inmate-on-inmate violence in 2 West in violation of the Eighth Amendment. Plaintiff seeks compensatory damages, reasonable costs, and attorneys' fees. On June 22, 1998, Defendants filed this motion to dismiss Plaintiff's claims, pursuant to Fed.R.Civ.P. 12(b)(6). In their motion to dismiss, Defendants argue that: (1) Defendants are entitled to Qualified Immunity; (2) Punitive Damages are not recoverable against Defendants; and (3) Plaintiff fails to state § 1983 claims against Defendants O'Rourke, Jackson, Amicucci, and Goff.

*Discussion*

A motion to dismiss for failure to state a claim pursuant to Rule 12(b)(6) should be granted only if it "appears beyond doubt that the plaintiff can prove no set of facts in support of his claim that would entitle him to relief." *Cooper v. Parsky,* 140 F.3d 433, 440 (2d Cir.1998) (quoting *Conley v. Gibson,* 355 U.S. 41, 45–46, 78 S.Ct. 99, 102 (1957)). The factual allegations set forth in the complaint must be accepted as true, *see Leatherman v. Tarrant County Narcotics Intelligence and Coordination Unit,* 507 U .S. 163, 164, 113 S.Ct. 1160, 1161, 122 L.E.2d 517 (1993), and the court must draw all reasonable inferences in favor of plaintiff. *See Thomas v. City of New York,* 143 F.3d 31, 36 (2d Cir.1998). The issue on a motion to dismiss "is not whether ... plaintiff will ultimately prevail but whether the claimant is entitled to offer evidence to support the claims." *Villager Pond, Inc. v. Town of Darien,* 56 F.3d 375, 378 (2d Cir.1995) (citation omitted). Nevertheless, the complaint must contain allegations concerning each of the material elements necessary to sustain recovery under a viable legal theory. *See Connolly v. Havens,* 763 F.Supp. 6, 9 (S.D.N.Y.1991).

1. Qualified Immunity

Defendants contend that Plaintiff's claims asserted against them individually should be dismissed because Defendants are entitled to qualified immunity. For the reasons discussed below, this argument must fail.

The privilege of qualified immunity protects government officials sued in their individual capacity from liability for their performance of discretionary official functions "insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Harlow v. Fitzgerald,* 457 U.S. 800, 818, 102 S.Ct. 2727, 2738, 73 L.E.2d 396 (1982); *Ying Jing Gan v. The City of New York,* 996 F.2d 522, 531 (2d Cir.1993). Qualified immunity cannot be decided on a motion to dismiss, however: "qualified immunity is an affirmative defense that the defendants have the burden of raising in their answer and establishing at trial or in a motion for summary judgment, a plaintiff, in order to state a claim of constitutional violation, need not plead facts showing the absence of such a defense." *Black v. Coughlin,* 76 F.3d 72, 75 (2d Cir.1996) (citing *Gomez v. Toledo,* 446 U.S. 635, 640, 100 S.Ct. 1920, 1923–24, 64 L.E.2d 572 (1980); *Oliver Schools, Inc. v. Foley,* 930 F.2d 248, 253 (2d Cir.1991)). As a result, Defendants' argument

that they are entitled to qualified immunity and that Plaintiff's claims should therefore be dismissed, is premature and must be denied at this time.

2. Punitive Damages

**\*4** Defendants argue that punitive damages are not recoverable against them. Plaintiff's Amended Complaint, however, does not assert a claim for punitive damages.[1] Thus, the Court need not address this argument.

3. Plaintiff's § 1983 Claim

Section 1983 imposes liability for the actions of a person "who, under color of any statute, ordinance, regulation, custom, or usage, of any State ... subjects, or causes to be subjected" the complainant "to a deprivation of any rights ... secured by the Constitution and laws." *See* 42 U.S.C. § 1983; *Rizzo v. Goode,* 423 U.S. 362, 370–71, 96 S.Ct. 598, 604, 46 L.E.2d 561 (1976). The doctrine of respondeat superior is not sufficient to impose liability under § 1983. *See Monell v. Dept. Of Social Serv. of New York City,* 436 U.S. 658, 691, 98 S.Ct. 2018, 2036, 56 L.E.2d 611 (1978); *Al–Jundi v. Estate of Rockefeller,* 885 F.2d 1060, 1065 (2d Cir.1989); *Johnson v. Glick,* 481 F.2d 1028, 1034 (2d Cir.1973). Rather, a defendant in a § 1983 action must be personally involved in the alleged constitutional violation to be liable for damages. *See Black v. Coughlin,* 76 F.3d 72, 74 (2d Cir.1996); *Wright v. Smith,* 21 F.3d 496, 501 (2d Cir.1994); *Moffitt v. Town of Brookfield,* 950 F.2d 880, 885 (2d Cir.1991). A defendant who occupies a supervisory position may be found personally involved in a constitutional violation in several ways: "direct participation, or failure to remedy the alleged wrong after learning of it, or creation of a policy or custom under which unconstitutional practices occurred, or gross negligence in managing subordinates." *See Black,* 76 F.3d at 74; *see also Williams v. Smith,* 781 F.2d 319, 323–24 (2d Cir.1986). Supervisory liability may also be imposed "where an official demonstrates 'gross negligence' or 'deliberate indifference' to the constitutional rights of inmates by failing to act on information indicating that unconstitutional practices are taking place." *See Wright,* 21 F.3d at 501 (citing *Meriwether v. Coughlin,* 879 F.2d 1037, 1048 (2d Cir.1989); *McCann v. Coughlin,* 698 F.2d 112, 121 (2d Cir.1983)).

Defendants now argue that Plaintiff fails to allege that Defendants O'Rourke, Jackson, Amicucci, and Goff were personally involved in the alleged violation of Plaintiff's Eighth Amendment right to be free from cruel and unusual punishment. Defendants contend that Plaintiff's § 1983

claims must therefore be dismissed against these Defendants. The Court agrees as to Defendants O'Rourke and Jackson and hereby dismisses the claims asserted against them but disagrees as to Defendants Amicucci and Goff.

The Amended Complaint fails to allege any personal involvement of Defendants O'Rourke and Jackson. The Amended Complaint does not allege that either O'Rourke or Jackson was directly involved in the claimed Eighth Amendment violation or that either had knowledge of the violation and failed to remedy the wrong. Although Plaintiff argues that O'Rourke and Jackson should be liable as policy making officials of Westchester County, the Amended Complaint acknowledges that the policy of Westchester County's Department of Corrections, as set out in its Standard Operating Procedure, provides that protective custody is available to inmates who require protection, that an inmate is not to be housed in the general population when the inmate requires separation for the inmate's protection, that inmates involved in inmate-on-inmate violence should be removed to separate areas immediately, and that the on-duty Sergeant must inform an inmate whose request for protective custody is denied why the request was denied. Thus, the Amended Complaint fails to allege that O'Rourke and Jackson created a policy or custom under which unconstitutional practices occurred. As a result, Plaintiff has not alleged that either O'Rourke or Jackson were personally involved in the claimed Eighth Amendment violation. Because liability cannot be imposed based on the doctrine of respondeat superior, the claims against O'Rourke and Jackson are dismissed.

 *5  The Amended Complaint alleges that Defendants Amicucci and Goff failed to provide adequate training and supervision of municipal employees charged with protecting inmates in the Westchester County Jail. To support this contention, Plaintiff alleges that McCabee and other county employees returned Plaintiff to 2 West following the initial assault and refused to place him in protective custody, even though Plaintiff informed them that he feared future assaults and contrary to the Department of Corrections's Standard Operating Procedure set out above. The Amended Complaint additionally alleges that McCabee consulted with another officer, presumably a superior, before returning Plaintiff to 2 West. The Amended Complaint also alleges that Amicucci and Goff had actual notice of the excessive violence on 2 West

and Plaintiff's request for a transfer prior to the initial assault of Plaintiff, but were deliberately indifferent to the risk of harm to Plaintiff because Goff denied Plaintiff's request for a cellblock transfer. Based on the above factual allegations, and drawing all reasonable inferences in favor of Plaintiff—as the Court is required to do on a motion to dismiss, the Court finds that the Amended Complaint sufficiently alleges personal involvement of Defendants Amicucci and Goff in the claimed Eighth Amendment violation to survive the motion to dismiss.

Finally, Plaintiff is not granted leave to replead the § 1983 claims asserted against Defendants O'Rourke and Jackson. Although leave to amend should be liberally granted, the "liberal rules of pleading in the federal system are not without limits." *Levitch v. Columbia Broadcasting Sys., Inc.,* 94 F.R.D. 292, 295 (S.D.N.Y.1982), *aff'd,* 697 F.2d (2d Cir.1983). The decision regarding whether to grant leave to amend is within the discretion of the Court, and the Court may deny leave for reasons such as "undue delay, bad faith, ... [or] futility of amendment." *Foman v. Davis,* 371 U.S. 178, 182 (1962). Plaintiff has had two opportunities to plead violations of § 1983 against these Defendants, but has failed to do so. In the present case, granting leave to amend would be futile.

*Conclusion*

For the reasons discussed above, the Court grants the motion to dismiss all claims asserted against Defendants O'Rourke and Jackson but denies the motion to dismiss all claims asserted against the remaining Defendants. Plaintiff is not granted leave to replead the claims asserted against O'Rourke and Jackson. Defendants McCabee, Amicucci, Goff, and Westchester County are directed to answer the Amended Complaint within 30 days of the date of this Opinion. Both parties are directed to attend a conference in Courtroom 20C at 500 Pearl Street on April 15, 1999 at 9:30 a.m.

SO ORDERED.

**All Citations**

Not Reported in F.Supp.2d, 1999 WL 147712

Footnotes

1    In the Court's March 31, 1998 Opinion and Order, the Court granted summary judgment on Plaintiff's claims for punitive damages against Westchester County and the named Defendants in their official capacities. The Court found that punitive damages were not recoverable against municipalities or the named Defendants in their official capacity, pursuant to *City of Newport v. Fact Concerns, Inc.,* 453 U.S. 247 (1981).

---

**End of Document**                                    © 2019 Thomson Reuters. No claim to original U.S. Government Works.

2019 WL 2352981
Only the Westlaw citation is currently available.
United States District Court, N.D. New York.

Derrick M. HAMILTON, Plaintiff,

v.

NEW YORK STATE DEPARTMENT OF
CORRECTIONS AND COMMUNITY
SUPERVISION, et al., Defendants.

9:18-CV-1312 (MAD/CFH)
|
Signed 06/04/2019

**Attorneys and Law Firms**

DERRICK M. HAMILTON, 89-A-5202, Plaintiff, pro se,
Auburn Correctional Facility, P.O. Box 618, Auburn, NY
13021.

**DECISION AND ORDER**

MAE A. D'AGOSTINO, United States District Judge

**I. INTRODUCTION**

**\*1**  Pro se plaintiff Derrick M. Hamilton ("Plaintiff")
commenced this action by filing a Complaint asserting
claims arising out of his confinement in the custody of the
New York State Department of Corrections and Community
Supervision ("DOCCS") at Auburn Correctional Facility
("Auburn C.F."). Dkt. No. 1 ("Compl."). In the original
Complaint, Plaintiff identified the following individuals as
defendants: Commissioner Anthony J. Annucci ("Annucci"),
Superintendent Harold Graham ("Graham"), Prison Guard
A. Venditti ("Venditti"), and Prison Guard Delfavero
("Delfavero"). *Id.* at 1-3. Plaintiff also named DOCCS as a
defendant. *Id.*

By Decision and Order filed December 17, 2018 (the
"December Order"), this Court reviewed the sufficiency of
the Complaint in accordance with 28 U.S.C. § 1915(e) and
28 U.S.C. § 1915A and dismissed the following claims,
with prejudice: (1) claims pursuant to 42 U.S.C. § 1983
("Section 1983") for monetary damages against DOCCS and
defendants in their official capacity; (2) claims pursuant to the
Religious Land Use and Institutionalized Persons Act of 2000
("RLUIPA") against defendants in their individual capacity
and RLUIPA claims for monetary damages and declaratory

judgment against defendants in their official capacities; and
(3) claims asserted pursuant to various United States Treaties.
Dkt. No. 4. The Court also dismissed the following claims,
without prejudice: (1) First Amendment religious claims; (2)
equal protection claims; (3) retaliation claims; (4) claims
for injunctive relief; and (5) New York State Constitutional
claims. *Id.* In light of his pro se status, Plaintiff was afforded
an opportunity to submit an amended pleading with respect to
the claims that were dismissed without prejudice. *Id.* at 24.

Currently before the Court is Plaintiff's Amended Complaint.
Dkt. No. 15 ("Am. Compl.").

**II. LEGAL STANDARD**

The legal standard governing the dismissal of a pleading for
failure to state a claim pursuant to 28 U.S.C. § 1915(e)(2)
(B) and 28 U.S.C. § 1915A(b) was discussed at length in the
December Order and will not be restated here. *See* Dkt. No. 4
at 2-4. Taking into account Plaintiff's pro se status, the Court
construes the allegations in the Amended Complaint with the
utmost leniency. *See, e.g., Haines v. Kerner,* 404 U.S. 519,
521 (1972) (holding that a pro se litigant's complaint is to be
held "to less stringent standards than formal pleadings drafted
by lawyers.").

**III. SUMMARY OF AMENDED COMPLAINT** [1]

**\*2**  In the Amended Complaint, Plaintiff asserts new
claims and realleges previously dismissed claims against
Annucci, Graham, Venditti, and Delfavero. Plaintiff also
asserts claims against the following new defendants:
Deputy Commissioner of Program Services Jeff McKoy
("McKoy"), Director of Division of Ministerial, Family, and
Volunteer Services ("DMFVS") Cheryl Morris ("Morris"),
Assistant Director of DMFVS Paul Guenette ("Guenette"),
Chaplain Marcia Stewart ("Stewart"), Chaplain Wayne
Rose ("Rose"), Director of Inmate Grievance Program
("IGP") Karen Bellamy ("Bellamy"), Director of IGP Shelly
Mallozzi ("Mallozzi"), Superintendent Timothy McCarthy
("McCarthy"), Deputy Superintendent of Program Services
G. Schenk ("Schenk"), Steward D. Vanni ("Vanni"), Assistant
Food Service Administrator, A. Bertonica ("Bertonica"),
Lieutenant Kelsey ("Kelsey"), Watch Commander John Doe
#1 ("WC John Doe #1"), Watch Commander John Doe #2
("WC John Doe #2"), Watch Commander John Doe #3
("WC John Doe #3"), Senior Chaplain Deacon John Tomandl
("Tomandl"), Prison Guard S. Pino ("Pino"), Prison Guard
John Doe #1 ("PG John Doe #1"), Sergeant Porten ("Porten"),
Sergeant Doe ("Sgt. Doe"), North Yard Supervisor Jay

Doe ("Yard Supervisor Jay Doe"), Prison Guard James Doe ("PG James Doe"), Inmate Organization Coordinator ("IOC") Dave Porter ("Porter"), Recreation Program Leader ("RPL") Ron Pitoniak ("Pitoniak"), and RPL Travis Silcox ("Silcox").[2] *See* Am. Compl. at 1, 6-10. The Amended Complaint does not include any claims against DOCCS.[3] The facts are set forth as alleged by Plaintiff in his Amended Complaint.

### A. Background

Pursuant to DOCCS' Directive #4202, the DMFVS is responsible for ensuring that all religious programs are carried out in accordance with the established tenets and practices of the faith. Am. Compl. at 26.

In 1991 or 1992, DOCCS hired Ascento Fox ("Fox") as the Senior Rastafari Chaplain. Am. Compl. at 11. While Fox was employed as the Chaplain, DOCCS aligned its policies with the "Lived Tenets Rastafari Ecclesiastical Order." *Id.* at 51-52. Specifically, with respect to the blessing, handling, preparation, and distribution of food, DOCCS' policy provided that "food is to be prepared by a faith group member and people who are not initiates of the faith should not be allowed to handle, prepare, or distribute the food." *Id.* at 52. After Fox departed, Annucci "rewrote" the policy to "exclude the sanctity of [Rastafari] food preparation, handling, and distribution."[4] *Id.*

In 2012 and 2013, Annucci, McKoy, Morris, and Guenette began rewriting the tenets of Rastafari order. Am. Compl. at 13-14. Defendants implemented a policy that prevented inmates with "significant knowledge" of the Rastafari tenets and beliefs from acting as "clerks." *Id.* at 12. By eliminating clerks, Annucci, McKoy, Morris, and Guenette assumed "authority" over the community and assigned chaplains of other denominations to advise the Rastafari community. *Id.* at 12-14. Defendants allowed "cultural vultures" or "undesirables" such as gang members, homosexuals, and mentally challenged individuals into the "sacred order." *Id.* at 14. These "cultural vultures" were only interested in receiving special meals and avoiding DOCCS' rules related to the length of their hair. Am. Compl. at 11-12. Annucci also hired Stewart and Rose as Rastafari chaplains in an effort to introduce the "state's pro-homosexual" views into the Rastafari order. *Id.* at 15. Additionally, Annucci, McKoy, Morris, and Guenette removed "Negust Day" from the Rastafari practice.[5] *Id.* at 14.

Plaintiff, a practicing Rastafari since birth, filed grievances claiming that Annucci, McKoy, Morris, and Guenette violated the Establishment Clause and unconstitutionally rewrote and created tenets for Rastrafarians.[6] Am. Compl. at 14-15, 16. Plaintiff also filed grievances challenging the decision to remove Negust Day as a High Holy Day.[7] *Id.* at 15. In 2013, Plaintiff filed an Article 78 petition in New York State Supreme Court, Albany County, challenging the removal of Negust Day from the Rastafari practice. *Id.* at 14. The matter was declared "moot" and Annucci was compelled to reintegrate Negust Day into the practice. *Id.*

### B. Facts Related to Plaintiff's Confinement at Auburn C.F. from November 2015 through March 2016

**\*3**  On October 21, 2015, Plaintiff was transferred from the Special Housing Unit ("SHU") at Great Meadow Correctional Facility to the SHU at Auburn C.F. Am. Compl. at 15. Upon arriving at Auburn C.F., Plaintiff wrote to Graham advising that his disciplinary sanctions ended on October 30, 2015. *Id.* Plaintiff also wrote to Tomandl, the Rastafari staff advisor, and asked to be placed on all Rastafari call-outs, classes, and services[8] (including Transfiguration Day). *Id.* at 16. Plaintiff expected other members of his community to commemorate Transfiguration Day on November 2, 2015. *Id.* at 11-16. Plaintiff did not receive any response to his correspondence. Am. Compl. at 16-17.

On October 30, 2015, Plaintiff informed SHU staff that his SHU time was complete and presented his disposition sheet as evidence. Am. Compl. at 17. The supervisor informed Plaintiff, "you've pissed somebody off" and, pursuant to Graham's order, Plaintiff would not be released until the next day. *Id.* On October 31, 2015, Plaintiff was released from the SHU and transferred to cell D-3-11. *Id.*

On November 2, 2015, Plaintiff asked Delfavero for permission to attend Transfiguration Day. Am. Compl. at 17. Delfavero and Venditti refused to allow Plaintiff to attend because he was listed "as a Jew" on the D-Block census. *Id.* at 18. Plaintiff objected to being "branded Jewish," claiming that it endangered Plaintiff's life, health, and well-being.[9] *Id.* at 21. Plaintiff also attempted to explain to Defendants the importance of Transfiguration Day to the practice of his sincerely held Rastafari beliefs. *Id.* at 19. Plaintiff asked Defendants to contact the Chaplain's Office, but Defendants threatened Plaintiff with a misbehavior report. Am. Compl. at 19. As a result of Defendants' actions, Plaintiff was deprived of the opportunity to practice the highest form of

Rastafari worship. *Id.* at 19-20. Additionally, Defendants' interceded and prevented other inmates from delivering the Transfiguration Day sacramental meal to Plaintiff. *Id.* at 20; Compl. at 21.

On November 20, 2015, Plaintiff filed a grievance (AUB-68310-15) complaining that Graham retaliated against him and violated his First Amendment religious rights. Am. Compl. at 22; Compl. at 16-19. Specifically, Plaintiff complained that Graham's decision to retain Plaintiff in the SHU for an extra day resulted in Plaintiff being falsely identified as a "Jew" and prevented Plaintiff from observing Transfiguration Day. *Id.* Graham denied the grievance and Plaintiff appealed to the Central Office Review Committee ("CORC"). Compl. at 24, 27. On March 2, 2016, CORC issued a decision "unanimously" accepting the grievance, in part. *Id.* at 28. CORC noted that Plaintiff completed his disciplinary sanctions on October 30, 2015 and was moved to another cell on October 31, 2015, "when it became available." *Id.* CORC also noted that Plaintiff's religion of record was Rastafarian. *Id.*

On December 27, 2015, at 10:00 a.m., Graham ordered WC John Doe #1 to escort Plaintiff to the "penalty box" in the North Yard to await Rastafari services. Am. Compl. at 22. At 10:20 a.m., Plaintiff was released and permitted to enter the chapel for services but was advised that his "time was up at 10:25 a.m." *Id.* On the same day, prisoners belonging to the Nation of Gods and Earths ("NOGE") and Protestant inmates were allowed to study from 1:00 p.m. until 2:45 p.m. and to attend services from 7:00 p.m. until 9:30 a.m. *Id.* at 22-23. Plaintiff filed a grievance (AUB 68521-15) related to the incident. *Id.* at 23.

 *4 On February 14, 2016, Graham ordered WC John Doe #2 and Yard Supervisor Jay Doe to detain Plaintiff in the "penalty box" to await Rastafari services. Am. Compl. at 23, 31-32. Plaintiff, who suffers from asthma, was forced to endure sub-zero temperatures, for approximately one hour. *Id.* Plaintiff began to experience difficulty breathing and tried to use his inhaler but, the aerosol was frozen. *Id.* Eventually, guards allowed only five Rastafari inmates to enter the chapel at one time while Protestants inmates were sent to the chapel "en masse." *Id.* When Plaintiff finally entered the chapel, Pino questioned Plaintiff's religious beliefs. Am. Compl. at 23.

On February 21, 2016, PG John Doe questioned Plaintiff's religious beliefs regarding gay marriage and homosexuality. Am. Compl. at 24. PG John Doe told Plaintiff that Graham intended to charge Plaintiff with "hate speech and unauthorized religious speech" because Plaintiff was not the "chosen facilitator." *Id.* Plaintiff was compelled to explain his religious beliefs to PG John Doe. *Id.* at 25. PG John Doe responded, "[s]ince this is not going to stop on its own, I'm going to report it." Am. Compl. at 25.

On February 25, 2016, Tomandl, PG John Doe, and Porten, acting upon Graham's order, attempted to remove Plaintiff from all Rastafari call outs by threatening the assigned Inmate Facilitator. Am. Compl. at 25. Plaintiff filed a grievance (AUB 68944-16) claiming that Defendants were attempting to "silence" him. *Id.* While investigating the grievance, Porten prepared a false report claiming that the Inmate Facilitator was unaware of any problems and that services were "running smoothly." *Id.* at 26-27. Porten also threatened Plaintiff, on Graham's behalf, with SHU confinement if he attempted to participate in Rastafari services. *Id.* at 27. As a result of Porten's threat, Plaintiff's "once close Brethren," abandoned him. Am. Compl. at 27.

### C. Christmas Day - December 2016

On December 25, 2016, at 8:45 a.m., Plaintiff asked PG James Doe if Rastafari services would be held at the usual time. Am. Compl. at 39. PG James Doe laughed and responded that only Christian services were being held that day. *Id.* At 10:45 a.m., Plaintiff was released from his cell for a meal and made an attempt to discuss the issue with WC John Doe #3 and Sgt. Doe. *Id.* Sgt. Doe responded, "You're about the fourth one to ask. It's a holiday, where's your Christmas spirit? It's a white Christmas! Have a happy jolly one enjoy your lunch." *Id.* From 7:00 p.m. until 9:30 p.m, Plaintiff witnessed Protestant inmates released from the same cell block to attend services in the chapel. Am. Compl. at 41.

On December 30, 2016, Plaintiff filed a grievance (AUB 70769-17) related to the incident. Am. Compl. at 41. Graham issued a decision conceding that Rastafari services were on the "callout" and should have been held as scheduled. *Id.* Plaintiff appealed Graham's decision to CORC. *Id.* One year and nineteen days after receipt of the appeal, Mallozzi issued a fraudulent decision and noted that, "Rastafari services were not held on 12/25/16 due to a staff shortage on the holiday." *Id.* at 41-42.

### D. Caribbean African Unity

During the relevant time, Plaintiff was the president of the Caribbean African Unity ("CAU"), a cultural organization

that addressed the needs of Auburn C.F. inmates of African, Carribean, Central, and South American ancestry. Am. Compl. at 66. Pursuant to DOCCS' Directive #4760, all cultural organizations must contribute a minimum of fifty percent of any profit to the Inmate Occupational Therapy Fund ("IOTF"). *Id.* Pursuant to the Directive, the formula for profit is the income generated from any fund raising event less the expense of the event. *Id.* Membership dues were not included in the profit analysis. *Id.* Schenk, who was responsible for supervising all cultural organizations at Auburn C.F., implemented new guidelines that contradicted Directive #4760. Am. Compl. at 66-67. For example, Schenk demanded that membership dues be included in the profit calculation and that organizations make quarterly contributions rather than one fiscal year contribution. *Id.*

**\*5** In August 2017, Plaintiff began to notice accounting errors in the CAU account and "question[ed] the illegal siphoning of funds[.]" Am. Compl. at 67. Shortly thereafter, Plaintiff received a memorandum from Pitoniak stating that the CAU was not in compliance with DOCCS' directives related to membership quotas. *Id.* at 67-68. As a result, Pitoniak placed the CAU on a 60-day probationary period. *Id.*

In September 2017 and October 2017, Plaintiff discovered discrepancies in the CAU's trust account and addressed the matter with Pitoniak and Porter. Am. Compl. at 68. Plaintiff was advised "not to make a big stink." *Id.*

In October 2017, Pitoniak approached members of the CAU and attempted to enlist them in a plan to remove Plaintiff as President of the CAU. Am. Compl. at 69-70. Pitoniak told the members that Plaintiff "wrote up a bunch of [expletive] on us" and that Porter and Schenk "want him out" because he questioned how much money the CAU paid to the Inmate Liaison Committee. *Id.* at 70. When the members refused, Pitoniak responded, "That doesn't matter, I already have Morris ready to do it for me." *Id.* Plaintiff filed a grievance (AUB 74417-18) related to the incident. *Id.*

On December 4, 2017, Plaintiff wrote to Schenk and explained that the CAU had not received monthly financial statements and was unable to account for transactions. Am. Compl. at 69.

On January 4, 2018, at approximately 2:10 p.m., Plaintiff and Pitoniak met in the staff office in the gymnasium to discuss the goals of the cultural organizations. Am. Compl. at 69. Pitoniak began screaming racial slurs at Plaintiff. *Id.* Plaintiff

filed a grievance (AUB 73415-18) against Pitoniak. *Id.* Porter was assigned to investigate the grievance and filed a perjured statement in favor of Pitoniak. *Id.* As a result, Plaintiff filed a grievance against Porter (AUB 73649-18). Am. Compl. at 69.

In February 2018, Plaintiff wrote to Vanni requesting an audit of the CAU account. Am. Compl. at 69. In a "face to face conversation," Vanni promised to conduct the audit, "as soon as possible." *Id.* The audit was never conducted. *Id.*

On June 5, 2018, Plaintiff sent a memorandum to Vanni after discovering that $ 91.00 in membership dues was counted as sales and subjected to Defendants' "illegal profit tanking." Am. Compl. at 70. Vanni did not respond. *Id.*

In June 2018, Plaintiff made repeated verbal and written complaints to Vanni, Porter, Silcox, and Pitoniak claiming that money was illegally withdrawn from the CAU account and reported that food purchased for membership meetings was stolen. Am. Compl. at 71-72. Throughout June 2018, Plaintiff's regularly scheduled weekly meetings with Pitoniak were canceled, orders for fund raisers were not processed or fulfilled, and membership dues were not collected. *Id.* at 72. Effectively, the CAU was administratively "stifled." *Id.* at 73.

On September 6, 2018, Silcox issued a memorandum announcing that the CAU was suspended. Am. Compl. at 73. On October 3, 2018, Plaintiff filed a grievance (AUB 75138-18) claiming that the staff retaliated against the CAU and misappropriated funds. *Id.* Silcox fabricated a report related to his investigation of AUB 75138-18. Am. Compl. at 74-75.

On October 4, 2018, Silcox threatened Plaintiff with SHU confinement if he continued to correspond on behalf of the CAU. Am. Compl. at 74. On October 7, 2018, Plaintiff wrote to Annucci and recounted the recent events surrounding the CAU. *Id.* On October 28, 2018, Shenk responded to the "packet of letters" sent to "Acting Commissioner Annucci" and advised that the organization would be reimbursed for items that were not received. *Id.* Because the CAU was suspended however, the money was transferred to Schenk's IOTF purse and available for use by employees. *Id.*

### E. Food Preparation and Service

**\*6** On October 2, 2017, when Plaintiff entered the messhall to receive his "medical diet,"[10] he noticed an "openly homosexual inmate" serving the diet meals. Am. Compl. at

47. The tenets of Rastafari law prohibit the consumption of food prepared, distributed, or served by homosexuals. *Id.* Following his religious beliefs, Plaintiff opted not to eat or receive any meal prepared by a known homosexual. *Id.* On October 4, 2017, Plaintiff wrote to Bertonica and explained that Rastafaris are prohibited from eating food prepared and served by a homosexual. *Id.* at 48. Plaintiff advised that he would not "sign for" or eat the medical diet meal. Am. Comp. at 48. Bertonica responded in a written memorandum and stated that all servers are "properly trained in the safe and hygiene [sic] handling of foods and serving areas." *Id.*

On October 16, 2017, Plaintiff wrote to Bertonica and reiterated his sincerely held beliefs and right not to "buy into the state-mandated perception of homosexuality as normal generative human behavior." Am. Compl. at 48. On October 19, 2017, Bertonica issued a misbehavior report charging Plaintiff with missing meals. *Id.* at 48. In total, Plaintiff was deprived of twenty "medically significant meals." *Id.* at 49.

On October 25, 2017, Plaintiff filed a grievance (AUB 73025-17) against Annucci and Bertonica accusing them of "nefarious use of despicable means ... to coerce me into accepting and participating in the state's homosexual agenda." Am. Compl. at 49. After the grievance was denied, Plaintiff appealed to CORC. *Id.* at 53. Mallozzi falsified the record and denied the appeal. *Id.*

On November 2, 2017, Plaintiff attended a disciplinary hearing related to the misbehavior report. Am. Compl. at 49. Kelsey presided over the hearing however, Plaintiff's guilt was "predetermined." *Id.* Plaintiff asserted that the misbehavior report was issued in retaliation for Plaintiff exercising his sincerely held Rastafari beliefs. *Id.* at 50. Plaintiff asked Kelsey to call Stewart as a witness, but Kelsey denied the request as "immaterial." *Id.* As Plaintiff began to testify in his defense, Kelsey stopped the hearing and directed Plaintiff to leave the room so that he could place a telephone call to McCarthy. Am. Compl. at 50. When Plaintiff was recalled, the hearing resumed and he was found guilty of all charges. *Id.* at 51. Plaintiff appealed the determination to Graham and Graham's designee, McCarthy, affirmed. *Id.* Plaintiff was directed to pay at "$ 5.00 surcharge and $ 10.35 for missed meals." *Id.*

### F. Causes of Action

Construing the Amended Complaint liberally,[11] Plaintiff asserts the following: (1) First Amendment retaliation claims;

(2) First Amendment claims related to the free speech and the right to petition; (3) First Amendment free exercise claims; (4) First Amendment claims related to violations of the Establishment Clause; (5) Fourth Amendment claims; (6) Eighth Amendment claims; (7) Ninth Amendment claims; (8) Fourteenth Amendment equal protection and due process claims[12]; (9) constitutional claims based upon violations of DOCCS' directives; and (10) New York State Law and Constitutional claims. *See generally,* Am. Compl. Plaintiff seeks declaratory relief and monetary damages. *See id.* at 33-38. Plaintiff also seeks prospective and preliminary injunctive relief. *See id.* at 37-38; 61-64; 87-88.

## IV. ANALYSIS

### A. Eleventh Amendment

**\*7** The law related to Eleventh Amendment was discussed in the December Order and will not be restated herein. *See* Dkt. No. 4 at 9-10. To the extent that Plaintiff attempts to reassert section 1983 claims for monetary damages against Defendants in their official capacity in the Amended Complaint, those claims are dismissed for the reasons set forth in the December Order.

### B. Defendants Stewart, Rose, and Pino

Plaintiff names Stewart, Rose, and Pino as defendants in the caption and list of parties. *See* Am. Compl. at 1, 6, 8-9. Plaintiff claims that Stewart and Rose were hired by Annucci as Rastafari Chaplains as "duplicitious conduits" to introduce the "state's pro-homosexual" policy into the Rastafari order. *See id.* at 15. Plaintiff claims that Pino "questioned why [he] was playing so active a role in [ ] '[r]easoning' amount the Brethren[.]" *See id.* at 23. Plaintiff however, did not attribute any of the alleged constitutional violations to Stewart, Rose, or Pino. In the absence of factual allegations sufficient to plausibly suggest that Defendants were personally involved in conduct that violated Plaintiff's constitutional rights, the Amended Complaint fails to state a cognizable claim against them. *See Cipriani v. Buffardi,* No. 06–CV–0889 (GTS/DRH), 2007 WL 607341, *1 (N.D.N.Y. Feb. 20, 2007) ("Dismissal is appropriate where a defendant is listed in the caption, but the body of the complaint fails to indicate what the defendant did to the plaintiff.") (citation omitted); *see also Casino v. Rohl,* No. 14-CV-2175, 2014 WL 5425501, at *6 (E.D.N.Y. Oct. 23, 2014) (dismissing complaint since the plaintiff had not adequately pled the defendant's personal involvement in any of the constitutional deprivations alleged in the amended complaint). Accordingly, Plaintiff's claims

against Stewart, Rose, and Pino are dismissed pursuant to 28 U.S.C. § 1915(e)(2)(B) and 28 U.S.C. § 1915A(b) for failure to state a claim upon which relief can be granted.

### C. First Amendment

#### 1. Retaliation

The law related to First Amendment retaliation claims was discussed in the December Order and will not be restated herein. *See* Dkt. No. 4 at 16-17. In the Amended Complaint, Plaintiff asserts retaliation claims against Graham, Bertonica, Pitoniak, Schenk, Vanni, Porter, and Silcox, and Annucci. [13] *See generally*, Am. Compl.

#### a. Graham

In the Complaint, Plaintiff alleged that Graham retaliated against him "on behalf of his colleagues at Great Meadow" when he detained Plaintiff for an additional day in the SHU without a valid "detention hold." Compl. at 4, 17, 25. In the December Order, the Court dismissed Plaintiff's retaliation claims against Graham holding:

> To the extent that Plaintiff claims that the retaliatory conduct was in response to grievances previously filed at Great Meadow C.F., the claims are nonetheless subject to dismissal. Plaintiff has failed to identify the grievances he filed which allegedly motivated Graham to retaliate against him. *See Flaherty v. Coughlin*, 713 F.2d 10, 13 (2d Cir. 1983) ("[A] complaint which alleges retaliation in wholly conclusory terms may safely be dismissed on the pleadings alone."); *Edwards v. Bezio*, No. 9:08-CV-256(LEK/RFT), 2010 WL 681369, at *3 (N.D.N.Y. Feb. 24, 2010) (dismissing retaliation claim based on allegation that plaintiff suffered adverse action for "past and present" grievances and lawsuits, noting that plaintiff's "general references to grievances and lawsuits he allegedly filed are not sufficient to establish that he was engaged in protected conduct"). "As a general matter, it is difficult to establish one defendant's retaliation for complaints against another defendant." *Hare v. Hayden*, No. 09 Civ. 3135, 2011 WL 1453789, at *4 (S.D.N.Y. Apr. 14, 2011); *see also Roseboro v. Gillespie*, 791 F. Supp. 2d 353, 369 (S.D.N.Y. 2011) (collecting cases).

**\*8** Here, Plaintiff did not file any grievances or complaints against Graham or any staff member at Auburn C.F. prior to the alleged retaliatory conduct. As Plaintiff has not sufficiently alleged any causal connection between any protected activity and retaliatory conduct, Plaintiff has not stated a plausible claim for retaliation against Graham in violation of the First Amendment and this claim is dismissed without prejudice pursuant to 28 U.S.C. § 1915(e)(2)(B) and 28 U.S.C. § 1915A(b) for failure to state a claim upon which relief may be granted.

Dkt. No. 4 at 18-19.

In the Amended Complaint, Plaintiff alleges that Graham ordered Plaintiff held in the SHU for an extra day in retaliation for grievances Plaintiff filed against Morris, Guenette, McKoy, and Annucci and in response to his "exercise of [his] constitutional protected right" to speak against Annucci's violation of the Establishment Clause. *See* Am. Compl. at 15, 29. Despite the fact that Plaintiff was afforded the opportunity to amend his Complaint, the amended pleading does not cure the deficiencies in the original pleading related to this claim. For the reasons set forth in the December Order, Plaintiff's retaliation claim against Graham is dismissed pursuant to 28 U.S.C. § 1915(e)(2)(B) and 28 U.S.C. § 1915A(b) for failure to state a claim upon which relief may be granted.

#### b. Bertonica

Plaintiff claims that Bertonica issued a false misbehavior report in retaliation for Plaintiff's free exercise of his Rastafari beliefs. *See* Am. Compl. at 50. At this juncture, Plaintiff has sufficiently plead a First Amendment retaliation claim against Bertonica to warrant a response. *See Parks v. Smith*, No. 908-CV-0586 (TJM/GHL), 2009 WL 3055278, at *1 (N.D.N.Y. Sept. 23, 2009) (finding that the exercise of religion could constitute protected conduct). In so ruling, the Court expresses no opinion as to whether these claims can withstand a properly filed dispositive motion.

#### c. Pitoniak, Schenk, Vanni, Porter, Silcox, and Annucci

Plaintiff claims that Pitoniak suspended the CAU because Plaintiff "questioned the illegal taking of 50% of [CAU] sales." *See* Am. Compl. at 75. Plaintiff also alleges that Vanni, Porter, and Silcox, refused to process purchase

orders, membership dues, and callouts and that Schenk authorized the suspension of the CAU because Plaintiff filed grievances related to the "illegal seizure of [his] property" and grievances "necessary to safeguard CAU's funds." *See id.* at 75-79. Plaintiff also claims that Annucci retaliated against him because Annucci failed to remedy the constitutional violations after being informed of Defendants' "embezzlement scam." *See id.* at 80.

At this juncture, Plaintiff has sufficiently plead a retaliation claim against Pitoniak, Schenk, Vanni, Porter, and Silcox to require a response. *See Barnes v. Cty. of Monroe*, 85 F. Supp. 3d 696, 731 (W.D.N.Y. 2015) (theft of the plaintiff's commissary may be construed as an adverse action). In so ruling, the Court expresses no opinion as to whether these claims can withstand a properly filed dispositive motion.

A different conclusion is reached however, with respect to the retaliation claim against Annucci. Courts in this District have held that letters to supervisors and his responses (via his subordinates) do not satisfy the personal involvement requirement. *DeMeo v. Koenigsmann*, No. 11 Civ. 7099, 2015 WL 1283660, at *16 (S.D.N.Y. Mar. 20, 2015) (holding that prisoner letters sent to Dr. Koenigsmann, which were referred to and responded to by subordinates, did not establish Koenigsmann's personal involvement); *see also Yearney v. Sidorowicz*, No. 13 Civ. 3604, 2014 WL 2616801, at *9 (S.D.N.Y. June 10, 2014) (reasoning that Dr. Koenigsmann's subordinate, writing on his behalf, was insufficient to establish Dr. Koenigsmann's personal involvement); *see also Brantley v. Fischer*, No. 12-CV-1051, 2013 WL 5466790, at *9 (N.D.N.Y. Sept. 30, 2013) (holding that the receipt of a letter by Koenigsmann's subordinate which stated that, "Dr. Koenigsmann, Chief Medical Officer, has asked me to respond to your recent letter concerning your health care issue," was insufficient to establish supervisory liability).

**\*9** Accordingly, Plaintiff's retaliation claim against Annucci is dismissed pursuant to 28 U.S.C. § 1915(e)(2)(B) and 28 U.S.C. § 1915A(b) for failure to state a claim upon which relief may be granted.

## 2. Free Speech

Plaintiff claims that Porten and Kelsey violated his right to freely speak against "DOCCS' pro-homosexual agenda." *See* Am. Compl. at 25, 56. Plaintiff also contends that Vanni violated his right to speak on behalf of the CAU and that

Silcox "undermind[ed] his right to speak out against the unlawful and unreasonable seizure of [his] property." *See id.* at 78-79.

"[A] prison inmate retains those First Amendment rights that are not inconsistent with his status as a prisoner or with the legitimate penological objectives of the corrections system." *Pell v. Procunier*, 417 U.S. 817, 822 (1974). "Because of security concerns inherent in correctional facilities, the First Amendment's protection of communication is not without restriction." *Pitsley v. Ricks*, No. 9:96–CV–0372 (NAM/DRH), 2000 WL 362023, at *4 (N.D.N.Y. March 31, 2000) (citing *Morgan v. LaVallee*, 526 F.2d 221, 225 (2d Cir. 1975)). A prisoner's right to free speech is more limited than the right of a non-prisoner, but still any restrictions on the prisoner's First Amendment rights must be "reasonably related to legitimate penological interests." *Turner v. Safley*, 482 U.S. 78, 89 (1987).

"In order to state a claim for deprivation of a constitutional right to communication, an inmate must make some showing of prejudice or actual injury as a result of the prison officials' conduct." *Pitsley*, 2000 WL 362023, at *3 (citation omitted). "[P]laintiffs who allege a violation of their right to free speech must prove that (1) defendants silenced him or (2) 'defendant[s'] actions had some actual, non-speculative chilling effect' on his speech." *Williams v. Town of Greenburgh*, 535 F.3d 71, 78 (2d Cir. 2008) (citing *inter alia, Colombo v. O'Connell*, 310 F.3d 115, 117 (2d Cir. 2002)).

Here, Plaintiff has not plead that he suffered "prejudice or actual injury." Indeed, throughout the Amended Complaint, Plaintiff claims that he repeatedly and continually voiced his objections to DOCCS' policies and filed several complaints regarding staff behavior with numerous grievances and written correspondence. Thus, as presently plead, the Amended Complaint does not suggest that Defendants "chilled his speech or otherwise prevented him from speaking." *See Williams*, 535 F.3d at 78; *see also Curley v. Vill. of Suffern*, 268 F.3d 65, 73 (2d Cir. 2001) ("[w]here a party can show no change in his behavior, he has quite plainly shown no chilling of his First Amendment right to free speech.") (citation omitted).

Accordingly, Plaintiff's First Amendment free speech claims are dismissed pursuant to 28 U.S.C. § 1915(e)(2)(B) and 28 U.S.C. § 1915A(b) for failure to state a claim upon which relief may be granted.

### 3. Freedom to Petition

Plaintiff alleges that Annucci, Bellamy, and Mallozzi violated his First Amendment right to petition the government because the grievance process is "corrupt," "irreparably biased," and "operated as a dead end." *See* Am. Compl. at 27-28, 33, 45-46, 53, 60-61.

**\*10** It is well-established that a prison inmate has no constitutional right of access to an internal grievance process. *Rhodes v. Hoy*, No. 9:05-CV-0836 (FJS/DEP), 2007 WL 1343649, at \*6 (N.D.N.Y. May 5, 2007); *Davis v. Buffardi*, No. 9:01-CV-0285 (PAM/GJD), 2005 WL 1174088, at \*3 (N.D.N.Y. May 4, 2005) ("[P]articipation in an inmate grievance process is not a constitutionally protected right."); *Cancel v. Goord*, No. 00-CV-2042, 2001 WL 303713, at \*3 (S.D.N.Y. Mar. 29, 2001) (holding that "inmate grievance procedures are not required by the Constitution" and therefore failure to see to it that grievances are properly processed does not create a claim under Section 1983). Simply stated, there is no underlying constitutional obligation to afford an inmate meaningful access to the internal grievance procedure, or to investigate and properly determine any such grievance.

Accordingly, Plaintiff's First Amendment freedom to petition claims are dismissed pursuant to 28 U.S.C. § 1915(e)(2)(B) and 28 U.S.C. § 1915A(b) for failure to state a claim upon which relief may be granted.

### 4. Free Exercise of Religion

The law related to First Amendment Free Exercise Clause was discussed in the December Order and will not be restated herein. *See* Dkt. No. 4 at 11-12. In the December Order, the Court dismissed Plaintiff's First Amendment claims holding:

> Plaintiff [ ] alleges that Venditti and Delfavero refused to allow Plaintiff to attend a religious service and denied Plaintiff a religious meal on November 2, 2015 violating Plaintiff's First Amendment rights. Compl. at 4-6. As presently plead, the Complaint lacks facts suggesting that Plaintiff's religious beliefs were "sincerely held." Moreover, Plaintiff has not plead facts establishing that defendants created a substantial burden on his religion or prevented him, in other ways, from practicing his religion. The Complaint was filed in November 2018, nearly three years after the alleged incidents, and is conspicuously

devoid of references to any other violations to Plaintiff's religious freedoms before or after the incidents in November 2015. The isolated incidents on November 2, 2015 "are not representative of larger, systematic deprivations [and] are constitutionally de minimis and do not rise to a level sufficient to support a First Amendment claim." *Skates v. Shusda*, No. 9:14-CV-1092 (TJM/DEP), 2016 WL 3882530, at \*4 (N.D.N.Y. May 31, 2016) (citation omitted); *see also Williams v. Weaver*, No. 9:03-CV-0912 (LEK/GHL), 2006 WL 2794417, at \*5, n. 29 (N.D.N.Y. Sept. 26, 2006) (granting the defendant's motion for judgment on the pleadings with respect to prisoner's First Amendment free-exercise claim that defendant caused prisoner to miss two weekly religious services); *Cancel v. Mazzuca*, 205 F.Supp.2d 128, 142 (S.D.N.Y. 2002) (granting defendant's Rule 12(b)(6) motion to dismiss prisoner's First Amendment free-exercise claim that defendant "prevented him, on one occasion, from attending a religious service"); *Gill v. DeFrank*, 8 Fed. App'x 35, 37 (2d Cir. 2001) (affirming lower court dismissal of First Amendment claim holding "missing one religious service does not constitute a substantial burden on an inmate's right to the free exercise of his religion."); *see Butler v. Hogue*, No. 9:08-CV-0264 (GLS/DRH), 2010 WL 4025893, at \*4 (N.D.N.Y. Feb. 4, 2010) (dismissing First Amendment claim based upon allegations that the plaintiff missed two of six meals in a two day period, with no other complaints of prior problems "before, or after, during his tenure at Upstate.").[14]

Dkt. No. 4 at 14-15.

**\*11** In the Amended Complaint, Plaintiff, a Rastafari "since birth," clearly identifies and explains his religious beliefs. *See generally*, Am. Compl. Accordingly, at this juncture, Plaintiff has sufficiently alleged that he held a sincere religious belief.

### a. Graham, Tomandl, Venditti, Delfavero, WC Doe #1, and Porten

"[P]risoners have a constitutional right to participate in congregate religious services." *Salahuddin v. Coughlin*, 993 F.2d 306, 308 (2d Cir. 1993) (citations omitted). While the Second Circuit has accorded prison officials great deference in the administration and "responsibility of maintaining order in prisons, ... prisoners should be afforded every reasonable opportunity to attend religious services, whenever possible."

*Young v. Coughlin*, 866 F.2d 567, 570 (2d Cir. 1989) (citations omitted).

In the Amended Complaint, Plaintiff asserts the following Free Exercise claims related to incidents that occurred in November 2015 and December 2015:

- Graham's failure to release Plaintiff from the SHU on October 30, 2015 resulted in Plaintiff being falsely identified as a "Jew" and a violation of Plaintiff's constitutional right to practice his religion;

- Tomandl, Venditti, and Delfavero refused to allow Plaintiff to attend the Transfiguration Day service and denied him the opportunity to partake in the Transfiguration Day meal, as an alternative means of observing the holiday;

- Plaintiff claims that Graham and WC John Doe #1 violated his right to the free exercise on December 27, 2015 because he was afforded only five minutes to worship in the chapel; and

- Graham and Porten threatened Plaintiff with SHU confinement if he participated in Rastafari services or answered questions from the "Brethren."

*See* Am. Compl. at 16, 18-20, 22-23, 27, 31; Compl. at 17-18.

At this juncture, Plaintiff has sufficiently plead facts suggesting that a pattern and policy of discrimination and interference with his religious rights was prevalent at Auburn C.F. in November and December 2015. *See Bass v. Grottoli*, No. 94 CIV. 3220, 1995 WL 565979, at *4 (S.D.N.Y. Sept. 25, 1995) (allowing the plaintiff to proceed with First Amendment claim that alleged a pattern of anti-Semitic harassment and deliberate interference with religious services or instruction). Accordingly, Graham, Venditti, Delfavero, WC John Doe #1, and Porten are directed to respond to Plaintiff's First Amendment Free Exercise claims. In so ruling, the Court expresses no opinion as to whether these claims can withstand a properly filed dispositive motion.

A different conclusion is reached however, with regard to Plaintiff's First Amendment Free Exercise claims against Tomandl. Plaintiff summarily states that he wrote to Tomandl and that he did not receive a response. *See* Am. Compl. at 16-17. The Second Circuit has cautioned against dismissing claims for failure to allege personal involvement without granting leave to amend where the plaintiff may allege that an official failed to respond to a letter of complaint. *Grullon*

*v. City of New Haven*, 720 F.3d 133, 141 (2d Cir. 2013) (holding that a prisoner's letter of complaint sent to a prison warden "at an appropriate address and by appropriate means" would suffice to state facts plausibly suggesting personal involvement). While cognizant of *Grullon*, the Court finds that, as presently plead, Plaintiff has failed to establish that Tomandl was personally involved in any constitutional deprivation. The Amended Complaint lacks facts suggesting where the letter to Tomandl was sent or by what means the letters were forwarded. Without more, the allegations are not enough to allege that the Tomandl was personally involved in violations of Plaintiff's First Amendment rights. *See Bridgewater v. Taylor*, 698 F.Supp.2d 351, 359 (S.D.N.Y. 2010); *Guillory v. Cuomo*, 616 Fed. App'x 12, 14 (2d Cir. 2015) (summary order).

### b. PG James Doe, Sgt. Doe, and WC Doe #3

 **\*12** Plaintiff claims PG James Doe, Sgt. Doe and WC Doe #3 violated his First Amendment rights when they refused to allow him to attend Rastafari services on December 25, 2016. *See* Am. Compl. at 43. Generally, the inability to attend religious services, for one day, does not result in a constitutional violation. *See Scott v. Uhler*, No. 9:16-CV-403 (TJM/CFH), 2017 WL 9511167, at *3–4 (N.D.N.Y. Feb. 8, 2017) (citing *Boomer v. Irvin*, 963 F.Supp. 227, 230-31 (W.D.N.Y. 1997)) (holding that the inability to attend Jumm'ah service on one day did not violate the plaintiff's constitutional rights). While Plaintiff sufficiently plead that other Defendants engaged in a pattern of First Amendment violations in November and December of 2015, as presently plead, the Amended Complaint lacks facts connecting PG James Doe, Sgt. Doe and/or WC Doe #3 to the aforementioned "pattern and practice" of interference with Plaintiff's religious rights. Moreover, the gap between the Christmas Day incident and the prior pattern is too tenuous to suggest that the conduct is associated. Indeed, the Amended Complaint lacks facts related to violations of Plaintiff's free exercise rights between December 2015 and December 2016. Because Plaintiff has not plead facts suggesting that Defendants prevented him, in other ways, from practicing his religion on December 25, 2016, the isolated incident does not give rise to a constitutional violation.

Accordingly, Plaintiff's First Amendment free exercise claims against PG James Doe, Sgt. Doe, and WC Doe #3 are dismissed pursuant to 28 U.S.C. § 1915(e)(2)(B) and 28

U.S.C. § 1915A(b) for failure to state a claim upon which relief may be granted.

### c. Bertonica

Plaintiff claims that he wrote to Bertonica, on two occasions, explaining that he could not eat any food known to be prepared or served by homosexuals and that Bertonica "failed to act" on his complaints. *See* Am. Compl. at 48, 55. "Prison authorities must accommodate the right of prisoners to receive diets consistent with their religious scruples." *Ford*, 352 F.3d at 597. "Courts have generally found that to deny prison inmates the provision of food that satisfies the dictates of their faith does unconstitutionally burden their free exercise rights." *McEachin v. McGuinnis*, 357 F.3d 204-05 (2d Cir. 2004).

At this juncture, Plaintiff has sufficiently plead a First Amendment Free Exercise claim against Bertonica to warrant a response. In so ruling, the Court expresses no opinion as to whether these claims can withstand a properly filed dispositive motion. *See Lewis v. Zon*, 920 F. Supp. 2d 379, 385 (W.D.N.Y. 2013) (holding that "it is the sincerity of plaintiff's beliefs and not their objective reasonableness that is relevant") (citing *Ford*, 352 F.3d at 588 (holding that " 'an individual claiming violation of free exercise rights need only demonstrate that the beliefs professed are sincerely held and in the individual's own scheme of things, religious,' regardless of whether the belief is unorthodox, irrational or even demonstrably false")).

### d. Kelsey and McCarthy

Plaintiff makes conclusory allegations against Kelsey and McCarthy related to his First Amendment right to the free exercise of his religious beliefs. *See* Am. Compl. at 56-57, 59. Because the Amended Complaint lacks facts suggesting how Plaintiff's sincerely held religious beliefs were burdened by Kelsey or McCarthy, Plaintiff's First Amendment free exercise claims against Kelsey and McCarthy are dismissed pursuant to 28 U.S.C. § 1915(e)(2)(B) and 28 U.S.C. § 1915A(b) for failure to state a claim upon which relief may be granted.

### e. Annucci, McKoy, Morris, and Guenette

Plaintiff claims that Annucci, McKoy, Morris, and Guenette violated his First Amendment religious rights because they "rewrote the Rastafari ecclesiastical doctrine" related to food preparation, handling, and distribution to "accommodate DOCCS' pro-homosexual doctrine." *See* Am. Compl. at 52, 57.

"It is well settled that, in order to establish a defendant's individual liability in a suit brought under § 1983, a plaintiff must show, *inter alia*, the defendant's personal involvement in the alleged constitutional deprivation." *Grullon v. City of New Haven*, 720 F.3d 133, 138 (2d Cir. 2013). Thus, "a Section 1983 plaintiff must 'allege a tangible connection between the acts of the defendant and the injuries suffered.' " *Austin v. Pappas*, No. 04-CV-7263, 2008 WL 857528, at *2 (S.D.N.Y. Mar. 31, 2008) (quoting *Bass v. Jackson*, 790 F.2d 260, 263 (2d Cir. 1986)) (other citation omitted).

**\*13** If the defendant is a supervisory official, a mere "linkage" to the unlawful conduct through "the prison chain of command" (i.e., under the doctrine of respondeat superior) is insufficient to show his or her personal involvement in that unlawful conduct. *See Polk Cnty. v. Dodson*, 454 U.S. 312, 325 (1981); *Richardson v. Goord*, 347 F.3d 431, 435 (2d Cir. 2003); *Wright*, 21 F.3d at 501. In other words, supervisory officials may not be held liable merely because they held a position of authority. *Black v. Coughlin*, 76 F.3d 72, 74 (2d Cir. 1996). Prior to *Iqbal*, the Second Circuit held that supervisory personnel may be considered "personally involved" only if they (1) directly participated in the alleged constitutional violation, (2) failed to remedy that violation after learning of it through a report or appeal, (3) created, or allowed to continue, a policy or custom under which the violation occurred, (4) had been grossly negligent in managing subordinates who caused the violation, or (5) exhibited deliberate indifference to the rights of inmates by failing to act on information indicating that the violation was occurring. *Colon v. Coughlin*, 58 F.3d 865, 873 (2d Cir. 1995) (citing *Williams v. Smith*, 781 F.2d 319, 323-24 (2d Cir. 1986)). [15]

The third *Colon* category provides for personal involvement where "the defendant created a policy or custom under which unconstitutional practices occurred, or allowed the continuance of such a policy or custom." *Colon*, 58 F.3d at 873. With respect to the third *Colon* factor, "[a] policy or custom can be explicitly established in an adopted rule or regulation, or may exist if the 'violative practice is persistent and widespread,' and if the acts of subordinate employees

'imply the constructive acquiescence of senior policy-making officials.' " *Lipton v. Cty. of Orange*, 315 F. Supp. 2d 434, 453 (S.D.N.Y. 2004).

Liberally construing the pleading, particularly at this early juncture, Plaintiff's allegations clearly fall into the third *Colon* category. Plaintiff alleges that Defendants promulgated policies that rewrote "Rastafari Ecclesiastical doctrine and Divine Laws to exclude the sanctity of our food preparation, handling, and distribution" and, thus, violated his right to practice his chosen religion. *See Selah v. Fischer*, No. 9:09-CV-1363 (GLS/DEP), 2013 WL 5603866, at *2 (N.D.N.Y. Oct. 11, 2013) (allowing First Amendment claim against Morris with allegations that she promulgated the policies that allegedly infringed upon the plaintiff's right to practice his chosen religion); *see also Jones v. Annucci*, No. 16-CV-3516, 2018 WL 910594, at *9 (S.D.N.Y. Feb. 14, 2018) (allowing the plaintiff to proceed with First Amendment claim against the Deputy Superintendent of Program Services under third *Colon* factor because the plaintiff alleged that the Deputy instituted the policy requiring Shia inmates to change their religion from "Islam" to "Shia") (citations omitted). At this juncture, Plaintiff has sufficiently plead a First Amendment Free Exercise claim against Defendants to warrant a response. In so ruling, the Court expresses no opinion as to whether this claim can withstand a properly filed dispositive motion.

### 5. Establishment Clause

**\*14** In addition to the free exercise claim, Plaintiff also claims that Defendants violated the Establishment Clause. The First Amendment's Establishment Clause provides that "Congress shall make no law respecting an establishment of religion." *U.S. Const. amend. I.* The Establishment Clause guarantees that the government may not "coerce anyone to support or participate in religion or its exercise, or otherwise act in a way which establishes a [state] religion." *Muhammad v. City of New York Dep't of Corrs.*, 904 F.Supp. 161, 197 (S.D.N.Y. 1995). "The clearest command of the Establishment Clause is that one religious denomination cannot be officially preferred over another." *Skoros v. City of New York*, 437 F.3d at 1, 39 (2d Cir. 2006) (citation omitted). A government practice satisfies the Establishment Clause, if it (1) has a secular purpose; (2) neither advances nor inhibits religion; and (3) avoids excessive entanglement between the state and religion. *Lemon v. Kurtzman*, 403 U.S. 602, 612-13, *reh'g denied*, 404 U.S. 876 (1971). However, in the prison setting, this test is tempered by an inmate's free exercise rights

and legitimate penological interests. *See Pugh v. Goord*, 571 F. Supp. 2d 477, 494 (S.D.N.Y. 2008) (citing *Turner v. Safley*, 482 U.S. 78 (1987)).

Plaintiff claims that Annucci, Graham, McKoy, Morris, and Guenette imposed "pro-homosexual policies" on the Rastafari community and that PG John Doe was an advocate for those policies. *See* Am. Compl. at 25, 26, 32-33, 37, 52. To wit, under Defendants' policies, homosexuals were permitted to handle, prepare, and distribute meals to Rastafarians during religious commemorations in violation of Rastafari tenets and the Establishment Clause. *See id.* at 32, 52.

At this stage of the proceeding, and mindful of the Second Circuit's direction that a pro se plaintiff's pleadings must be liberally construed, the Court finds that Plaintiff's Establishment Clause claims against Annucci, McKoy, Morris, Guenette, Graham, and PG John Doe survive sua sponte review and require a response. In so ruling, the Court expresses no opinion as to whether these claims can withstand a properly filed dispositive motion.

### D. Fourth Amendment

Plaintiff claims that Schenk, Vanni, Porter, Silcox, Annucci, and McCarthy illegally seized his property in violation of the Fourth Amendment. *See* Am. Compl. at 77, 79, 80, 81.

While inmates do not retain the full range of constitutional rights that unincarcerated individuals enjoy, they do retain "some Fourth Amendment rights upon commitment to a correctional facility." *Bell v. Wolfish*, 441 U.S. 520, 558–60 (1979). "Since the exigencies of prison life authorize officials indefinitely to dispossess inmates of their possessions without specific reason, any losses that occur while the property is in official custody are simply not redressable by Fourth Amendment litigation." *Hudson v. Palmer*, 468 U.S. 517, 539 (1984). Personal effects of inmates are routinely searched, seized, and placed in official custody. *Id.* at 540 (holding that claims related to missing property "have long been redressable in tort" and whether those remedies are "adequate" is a question for the "Takings and Due Process Clauses.")

Plaintiff's claim that his "membership dues" were unreasonably seized by Defendants does not give rise to a Fourth Amendment claim. *See Jackson v. SCI Camp Hill*, No. 1:11-CV-1135, 2012 WL 3990888, at *6 (M.D. Pa. Sept. 11, 2012), *aff'd sub nom. Jackson v. SCI Camp Hill*, 530 F. App'x 150 (3d Cir. 2013) ("[C]ourts have [ ] refused

to recognize an inmate's claim that the seizure of money from his inmate account violated the Fourth Amendment[.]") (collecting cases); *see also Gardner v. Rogers State Prison, No. CIV. A. CV608-016, 2009 WL 29572, at \*5 (S.D. Ga. Jan. 5, 2009)* ("Even accepting as true Plaintiff's allegation that $ 1 was taken from his inmate reserve account, he does not state a valid Fourth Amendment cause of action.").

Accordingly, Plaintiff's Fourth Amendment claims are dismissed pursuant to 28 U.S.C. § 1915(e)(2)(B) and 28 U.S.C. § 1915A(b) for failure to state a claim upon which relief may be granted.

### E. Eighth Amendment

**\*15** The Second Circuit, in addressing the needs protected by the Eighth Amendment, has stated that sentenced prisoners are entitled to "adequate food, clothing, shelter, sanitation, medical care and personal safety." *Wolfish v. Levi, 573 F.2d 118, 125 (2d Cir. 1978), rev'd on other grounds sub nom. Bell v. Wolfish, 441 U.S. 520 (1979); Lareau v. Manson, 651 F.2d 96, 106 (2d Cir. 1981).* "To demonstrate that the conditions of his confinement constitute cruel and unusual punishment, the plaintiff must satisfy both an objective test and a subjective test." *Jolly v. Coughlin, 76 F.3d 468, 480 (2d Cir. 1996)* (citation omitted). To satisfy the objective element, "the plaintiff must demonstrate that the conditions of his confinement result 'in unquestioned and serious deprivations of basic human needs.' " *Id.* (citation omitted). "[The inmate must show that the conditions, either alone or in combination, pose an unreasonable risk of serious damage to his health." *Walker v. Schult, 717 F.3d 119, 125 (2d Cir. 2013)* (citation omitted).

With respect to the subjective element, plaintiff must "demonstrate that the defendants imposed those conditions with 'deliberate indifference.' " *Jolly, 76 F.3d at 480* (citation omitted). "To constitute deliberate indifference, '[t]he prison official must know of, and disregard, an excessive risk to inmate health or safety.' " *Walker, 717 F.3d at 125* (quoting *Jabbar v. Fischer, 683 F.3d 54, 57 (2d Cir. 2012)*).

### a. Venditti and Delfavero

Plaintiff claims that Venditti and Delfavero placed him at "unreasonable risk of substantial harm" when they intentionally mislabeled Plaintiff as "Jewish." *See* Am. Compl. at 30. While Plaintiff alleges that being "branded"

Jewish endangered his life, health and well being "in a way no less significant than if they had called me an informer," *see* Am. Compl. at 21, he fails to allege that he suffered any actual physical injury, i.e., that he was actually attacked or assaulted. Fear of danger, without more, is insufficient to establish a "sufficiently serious" injury. *See Best v. City of N.Y., No. 11 CIV. 4475, 2012 WL 5458054, at \*7 (S.D.N.Y. Nov. 8, 2012)* (dismissing the complaint where the plaintiff alleged that he feared his life was in danger because he was not held in protective custody, but did not allege that he was attacked or injured as a result of being denied protective custody status); *see also Newman v. Duncan, No. 04-CV-395 (TJM/DRH), 2007 WL 2847304, at \*5 (N.D.N.Y. Sept. 26, 2007)* ("The law is clear that an inmate must demonstrate an 'actual injury' when alleging a constitutional violation."); *Cruz v. Hillman, No. 01 CIV. 4169, 2002 WL 31045864, at \*8 (S.D.N.Y. May 16, 2002)* (citations omitted) ("Under the relevant case law, fear of assault does not constitute a 'sufficiently serious' injury sufficient to state a claim under the Eighth Amendment."). "A general, conclusory statement that an inmate fears for his safety, without more, is insufficient information from which an inference can be drawn that such inmate's safety is actually at risk." *Wilson v. Campbell, No. 06-CV-0175 (GLS/RFT), 2008 WL 902187, at \*5 (N.D.N.Y. Mar. 31, 2008)* (citation omitted). For the reasons set forth herein, Plaintiff's Eighth Amendment claims against Venditti and Delfavero are dismissed pursuant to 28 U.S.C. § 1915(e) (2)(B) and 28 U.S.C. § 1915A(b) for failure to state a claim upon which relief may be granted.

### b. Graham, Yard Supervisor Jay Doe, WC Doe #2

The Second Circuit has found that prisoners claiming detention under very cold temperatures may establish an Eighth Amendment claim of cruel and unusual punishment. *See, e.g., Gaston v. Coughlin, 249 F.3d 156, 166 (2d Cir. 2001)* (reinstating Eighth Amendment claims of frigid temperatures dismissed by district court); *Channer v. Mitchell, 43 F.3d 786, 788 (2d Cir. 1994)* (denying motion to dismiss where prisoner alleged that officer had required him to spend two nights in a holding cell without bedding). Exposure to the "bitter cold of winter in northern-New York State" for "a substantial period of time" may constitute an Eighth Amendment punishment. *See Corseli v. Coughlin, 842 F.2d 23, 27 (2d Cir. 1988); Ifill v. Goord, No. 03-CV-355, 2012 WL 176492, at \*3 (W.D.N.Y. Jan. 20, 2012)* (holding that "freezing temperatures can constitute the basis of an inhumane conditions of confinement claim."). "It is true that some district courts in this circuit

have found that allegations of exposure to cold temperatures for short periods of time, in conjunction with a deprivation of clothing and/or bedding, are insufficient to state a claim under the Eighth Amendment." *Nelson v. Plumley*, No. 9:12-CV-0422 (TJM/DEP), 2013 WL 1121362, at *10 (N.D.N.Y. Jan. 24, 2013) (collecting cases).

**\*16** Here, Plaintiff claims that Defendants forced him to remain outside for one hour in "minus twenty degrees below zero." *See* Am. Compl. at 23. The Amended Complaint however, lacks any facts suggesting that Plaintiff suffered any physical injury or that he sought or required medical treatment. Further, while he states that he was exposed to "bone chilling cold," Plaintiff does not contend that he was forced outside without proper clothing or that he was deprived of a jacket or coat.

For the reasons set forth herein, Plaintiff's Eighth Amendment claims against Graham, Yard Supervisor Jay Doe, and WC Doe #2 are dismissed pursuant to 28 U.S.C. § 1915(e)(2)(B) and 28 U.S.C. § 1915A(b) for failure to state a claim upon which relief may be granted.

### c. Bertonica

Plaintiff claims that Bertonica "forced" him to miss twenty medical meals causing "unknown damages." *See* Am. Compl. at 55. The Eighth Amendment requires that prisoners be provided with "nutritionally adequate food that is prepared and served under conditions which do not present an immediate danger to the health and well being of the inmates who consume it." *Robles v. Coughlin*, 725 F.2d 12, 15 (2d Cir. 1983) (citation omitted); *Brown v. Eagen*, No. 08–CV–0009 (TJM/DRH), 2009 WL 815724, at *10 (N.D.N.Y. Mar. 26, 2009) (citations omitted); *Midalgo v. Bass*, No. 03–CV–1128 (NAM/RFT), 2006 WL 2795332, at *11 (N.D.N.Y. Sept. 26, 2006) (citations omitted). "Depriving an inmate of food or serving him contaminated food may constitute a violation of the Eighth Amendment." *Moncrieffe v. Witbeck*, No. 86-CV-253 (NAM), 2000 WL 949457, at *6 (N.D.N.Y. June 29, 2000) (citing *Robles*, 725 F.2d at 15). Where a particular diet may be sufficient in some circumstances. *See Abdush-Shahid v. Coughlin*, 933 F. Supp. 168, 180 (N.D.N.Y. 1996) (citing *Robles*, 725 F.2d at 15-16).

Here, Plaintiff does not allege that his decision to refuse medical meals caused any adverse impact upon his health.

Rather, Plaintiff asserts, in conclusory terms, that the condition caused "unknown damage." Moreover, Plaintiff has not plead that he was denied any food or meals. Accordingly, Plaintiff's Eighth Amendment claims against Bertonica are dismissed pursuant to 28 U.S.C. § 1915(e)(2)(B) and 28 U.S.C. § 1915A(b) for failure to state a claim upon which relief may be granted.

### F. Ninth Amendment

Plaintiff claims that Annucci, Stewart, Rose, Bertonica, and Pitoniak violated the Ninth Amendment. *See* Am. Compl. at 76. The Ninth Amendment to the United States Constitution provides, "[t]he enumeration in the Constitution, of certain rights, shall not be construed to deny or disparage others retained by the people." U.S. Const., amend. IX. Courts from within the Second Circuit have recognized the inapplicability of the Ninth Amendment to prisoner Section 1983 claims. *Muniz v. Goord*, No. 9:04-CV-0479 (TJM/GHL), 2007 WL 2027912, at *9 (N.D.N.Y. July 11, 2007) (citations omitted); *Newman v. Annucci*, No. 3:17-CV-0918 (LEK/DEP), 2018 WL 4554494, at *8 (N.D.N.Y. Sept. 21, 2018) (holding that the Ninth Amendment "is not an independent source of constitutional rights that may be asserted in a civil rights action ... [and] cannot serve as the basis for a § 1983 claim because such a claim must be based on the violation of a right guaranteed by the U.S. Constitution or federal law.").

According, Plaintiff's Ninth Amendment claims are dismissed.

### G. Violations of DOCCS' Directives

Construing the Amended Complaint liberally, Plaintiff alleges that Annucci violated DOCCS' Directive #4202 because he "sought to establish tenets and practices of Rastafari." *See* Am. Compl. at 26. Plaintiff also claims that Venditti and Delfavero failed to adhere to DOCCS' procedures and that Pitoniak, Schenk, Vanni, Porter, Silcox, Annucci, and McCarthy violated DOCCS' Directive #4760. *See id.* at 19, 66-75.

**\*17** A Section 1983 claim brought in federal court is not the appropriate forum to raise violations of prison regulations. *See Hyman v. Holder*, No. 96 Civ. 7748, 2001 WL 262665, *6 (S.D.N.Y. Mar. 15, 2001) (holding that the failure to follow a New York State DOCCS Directive or prison regulation does not give rise to a federal constitutional claim) (citing *Fluent v. Salamanca Indian Lease Auth.*, 847 F.Supp. 1046, 1056 (W.D.N.Y. 1994)) (holding that section 1983 imposes

liability for violations of rights protected by the Constitution and laws of the United States, not for violations arising solely out of state or common-law principles); *see also McAllister v. Call*, No. 9:10-CV-610 (FJS/CFH), 2014 WL 5475293, at *11 (N.D.N.Y. Oct. 29, 2014) ("A section 1983 claim is not the appropriate forum in which to seek review of a violation of unspecified DOCCS rules, regulations and procedures.") (citation omitted).

Accordingly, Plaintiff's constitutional claims based upon the failure to adhere to DOCCS' directives are dismissed.

### H. Fourteenth Amendment

#### 1. Equal Protection

The law related to the Equal Protection Clause was discussed in the December Order and will not be restated herein. *See* Dkt. No. 4 at 15-16. In the December Order, the Court held:

> Here, Plaintiff claims that Rastafarians represent a "minority religious group" and are "viewed as primitive" and subjected to discrimination. Compl. at 6-7. Plaintiff failed to identify any similarly situated inmates who were treated differently based upon their religious beliefs. Indeed, the Complaint lacks any facts supporting this conclusion and thus, fails to state an equal protection claim. *See Lloyd v. City of New York*, 43 F. Supp. 3d 254, 265 (S.D.N.Y. 2014) (finding that the plaintiffs failed to plead an equal protection claim based upon religion because nothing in the complaint suggested that similarly-situated inmates of other faiths were treated more favorably than the plaintiffs, or that the plaintiffs were singled out for discriminatory treatment on account of their religion).

Dkt. No. 4 at 15-16.

#### a. Tomandl, Venditti, Delfavero, Graham, WC Doe #1, WC Doe #2, Yard Supervisor Jay Doe, PG James Doe, Sgt. Doe, and WC Doe #3

In the Amended Complaint, Plaintiff asserts the following equal protection claims:

- Tomandl allowed Christian and Muslim SHU inmates who wrote, pre-SHU release letters, to attend their religious services upon release;

- Venditti and Delfavero "added" similarly situated "new arrivals" of Protestant, Catholic, and Muslim faiths to the "Feed-up list of their faith" while Plaintiff's "Brethren" was prevented from delivering the Transfiguration Day sacramental meal;

- On December 27, 2015, Graham, WC Doe #1, and Tomandl allowed Protestant and NOGE groups to worship for over one hour and forty five minutes while Plaintiff was "walked in and out of the chapel;"

- On February 14, 2016, Graham, WC Doe #2, and Yard Supervisor Jay Doe allowed only five Rastafari inmates into the chapel at a time while Protestant inmates were allowed in the chapel "en masse;" and

- Similarly situated Protestant and NOGE prisoners were allowed to attend worship and study on December 25, 2016 while PG James Doe, Sgt. Doe, and WC Doe #3 deprived Plaintiff of the same opportunity.

*See* Am. Compl. at 17, 29, 30, 31, 32, 43, 44.

Mindful of the Second Circuit's instruction that a pro se plaintiff's pleadings must be liberally construed, *see, e.g., Sealed Plaintiff v. Sealed Defendant*, 537 F.3d 185, 191 (2d Cir. 2008), the Court will require a response to the aforementioned equal protection claims from Venditti, Delfavero, Graham, WC Doe #1, WC Doe #2, Yard Supervisor Jay Doe, PG James Doe, Sgt. Doe, and WC Doe #3. *See Scott v. Uhler*, No. 9:16-CV-403 (TJM/CFH), 2018 WL 3130670, at *5 (N.D.N.Y. May 24, 2018) (holding that the plaintiff sufficiently alleged a claim of discrimination in violation of the Equal Protection clause with facts suggesting that similarly-situated inmates were permitted to attend religious services on December 25, 2015 while Muslim inmates intentionally were denied the right to hold and attend services) (citing *Guillory v. Fischer*, No. 9:12-CV-00280 (LEK), 2013 WL 1294626, at *16 (N.D.N.Y. Mar. 7, 2013))

(finding that the plaintiff sufficiently pleaded an equal protection claim based upon the denial of Jewish services on one day because Jewish, Muslim, Catholic and Protestant inmates are similarly situated in that they are all religious groups seeking to utilize prison facilities to hold religious services, and Plaintiff alleges that the Defendants facilitated the use of prison facilities for all of the other religious groups except the Jewish inmates for purely discriminatory reasons). This is not a ruling on the merits and the Court expresses no opinion as to whether these claims can withstand a properly filed motion to dismiss or for summary judgment. For the reasons set forth in Part IV(C)(1)(4)(a) *supra*, the equal protection claim against Tomandl is dismissed.

### b. Pitoniak, Vanni, Porter, Annucci, and McCarthy

**\*18** Plaintiff claims that Pitoniak, Vanni, and Porter discriminated and treated the CAU differently than "similarly situated organizations." *See* Am. Compl. at 76-80. Plaintiff also asserts that Annucci and McCarthy failed to protect the CAU "on par with all other similarly situated organizations and individuals" from discrimination and unequal treatment. *See* Am. Compl. at 80-81. As discussed in the December Order, the failure to identify similarly situated individuals who were treated differently is fatal to an equal protection claim. Accordingly for the reasons set forth in the December Order, the equal protection claims against Pitoniak, Vanni, Porter, Annucci, and McCarthy are dismissed pursuant to 28 U.S.C. § 1915(e)(2)(B) and 28 U.S.C. § 1915A(b) for failure to state a claim upon which relief may be granted.

### 2. Due Process

To successfully state a claim under § 1983 for denial of due process, a plaintiff must show that he both (1) possessed an actual liberty interest, and (2) was deprived of that interest without being afforded sufficient process. *See Ortiz v. McBride*, 380 F.3d 649, 654 (2d Cir. 2004); *Tellier v. Fields*, 280 F.3d 69, 79–80 (2d Cir. 2000); *Hynes v. Squillace*, 143 F.3d 653, 658 (2d Cir. 1998); *Bedoya v. Coughlin*, 91 F.3d 349, 351–52 (2d Cir. 1996). "A prisoner's liberty interest is implicated by prison discipline," "only if the discipline 'imposes [an] atypical and significant hardship on the inmate in relation to the ordinary incidents of prison life' ...." *Davis v. Barrett*, 576 F.3d 129, 133 (2d Cir. 2009) (citations omitted).

### a. Mallozzi

Plaintiff claims that Mallozzi made false statements during the investigation into his grievances in violation of his due process rights. *See* Am. Compl. at 44, 60-61. It is well-established that prison grievance procedures do not create a due-process-protected liberty interest. *See, e.g., Mateo v. Fischer*, 682 F.Supp.2d 423, 431 n. 3 (S.D.N.Y. 2010); *Mastroianni v. Reilly*, 602 F.Supp.2d 425, 437 (E.D.N.Y. 2009); *Torres v. Mazzuca*, 246 F.Supp.2d 334, 342 (S.D.N.Y. 2003). Thus, Mallozzi's failure to properly respond to his grievances did not violate Plaintiff's constitutional rights. *See Mimms v. Carr*, No. 09-CV-5740, 2011 WL 2360059, at *10 (E.D.N.Y. June 9, 2011) ("It is well-established that prison grievance procedures do not create a due-process-protected liberty interest.") (citing cases).

Accordingly, Plaintiff's due process claims against Mallozzi are dismissed pursuant to 28 U.S.C. § 1915(e)(2)(B) and 28 U.S.C. § 1915A(b) for failure to state a claim upon which relief may be granted.

### b. Pitoniak, Schenk, Vanni, Porter, Silcox, Annucci, and McCarthy

Plaintiff claims that Pitoniak, Schenk, Vanni, Porter, Silcox, Annucci, and McCarthy failed to adhere to Directive #4760, in violation of his due process rights. *See* Am. Compl. at 82. As discussed *supra*, section 1983 claims based on violations of prison rules are subject to dismissal. Thus, to the extent that Plaintiff claims that his due process rights were violated because of a liberty interest created by DOCCS' directives, that claim is dismissed. *See Turner v. Sidorowicz*, No. 12-CV-7048, 2014 WL 641454, at *10 (S.D.N.Y. Feb. 18, 2014) (citing *Shakur v. Selsky*, 391 F.3d 106, 118 (2d Cir. 2004) ("[R]egardless of state procedural guarantees, the only process due an inmate is that minimal process guaranteed by the Constitution[.]")).

### c. Kelsey and McCarthy

After the disciplinary hearing, Kelsey found Plaintiff guilty of missing meals and ordered him to pay a $ 5.00 surcharge and $ 10.35 charge for the cost of the meals. *See* Am. Compl. at 49, 51. A "surcharge", without more, is not an atypical hardship. *See Edwards v. Horn*, No. 10 CIV. 6194, 2012

WL 473481, at *9 (S.D.N.Y. Feb. 14, 2012) (holding that a $ 25 fine implicates the requisite liberty interest to state a due process claim). Because Plaintiff has failed to plead that he was subjected to any disciplinary confinement or otherwise deprived a valid liberty interest, his Fourteenth Amendment Due Process claims related to the disciplinary hearing are dismissed pursuant to 28 U.S.C. § 1915(e)(2)(B) and 28 U.S.C. § 1915A(b) for failure state a claim upon which relief may be granted. *See id.* ("Because of the absence of any protected liberty interest [...] any failures by the hearing officer to conduct a thorough investigation [...] do not support a cause of action for the denial of due process.") (citation omitted).

### I. New York State Law and Constitutional Claims

#### 1. Corrections Law

 **\*19**  Plaintiff asserts state law claims, parallel to his free exercise claims, under New York Correction Law §§ 112 and 610. Section 610 guarantees inmates "the free exercise and enjoyment of religious profession and worship" while incarcerated. *See May v. Donneli,* No. 9:06-CV-437 (GLS/ RFT), 2009 WL 3049613, at *4 (N.D.N.Y. Sept. 18, 2009). Similarly, under Correction Law § 112, the Commissioner is empowered to promulgate regulations pertaining to religious service and ministrations. *See U. S. ex rel. Washington v. Fay,* 217 F. Supp. 931, 933, n. 1 (S.D.N.Y. 1963). Because the First Amendment free exercise and establishment law claims survive review, the Court shall exercise supplemental jurisdiction over the corresponding state law claims.

Plaintiff also claims that McCarthy and Annucci violated Correction Law § 116, which vests the Commissioner with the broad power to manage the fiscal affairs of correctional facilities, including inmate accounts. *See Nardi v. Le Fevre,* 235 A.D.2d 602, 603 (1997). Having dismissed all constitutional claims for monetary damages against Annucci and McCarthy, in their individual capacity, related to the CAU, the Court declines in its discretion to retain supplemental jurisdiction over Plaintiff's state law claims against McCarthy and Annucci related to the CAU. *See 28 U.S.C. § 1367(c)(3); Doyle v. Suffolk Cty.,* 786 F.2d 523, 525 (2d Cir. 1986) ("With the federal claim failing at the outset of the litigation, the District Judge properly declined to exercise pendent jurisdiction over the state law claims.").

#### 2. Constitutional Claims

Plaintiff contends that Defendants violated Article I, §§ 1,3, 5, 6, 8, 9, 11 of the New York State Constitution. In light of the dismissal of Plaintiff's federal claims for deliberate indifference, due process, freedom of speech, and freedom to petition, the Court declines to exercise supplemental jurisdiction over the claims related to violations of Article I, Sections 5, 6, 8, and 9 of the New York State Constitution. *See 28 U.S.C. § 1367(c)(3); Valencia v. Sung M. Lee,* 316 F.3d 299, 306 (2d Cir. 2003).

With respect to Plaintiff's claims pursuant to Article I, §§ 1, 3, and 11, while New York recognizes a private cause of action for violations of the New York State Constitution, *Brown v. State,* 89 N.Y.2d 172, 192, 652 N.Y.S.2d 223, 235 (1996), that cause of action is only available, however, "where the plaintiffs have no alternative remedies that would protect their interests." *Vilkhu v. City of New York,* No. 06-CV-2095, 2008 WL 1991099, at *8 (E.D.N.Y. May 5, 2008) (citations omitted). Thus, because Plaintiff has viable First and Fourteenth Amendment Equal Protection claims under section 1983, Plaintiff's state law claims are dismissed because there is no private right of action under the New York State Constitution where, as here, remedies are available under § 1983. *Flores v. City of Mount Vernon,* 41 F.Supp.2d 439, 446-47 (S.D.N.Y. 1999).

#### J. Prospective Injunctive Relief

*In Ex Parte Young,* 209 U.S. 123 (1908), the Supreme Court established an exception to state sovereign immunity in federal actions where an individual brings an action seeking injunctive relief against a state official for an ongoing violation of law or the Constitution. Under this doctrine, a suit may proceed against a state official in his or her official capacity, notwithstanding the Eleventh Amendment, when a plaintiff "(a) alleges an ongoing violation of federal law and (b) seeks relief properly characterized as prospective." *See In re Deposit Ins. Agency,* 482 F.3d 612, 618 (2d Cir. 2007) (quotations and citations omitted); *see also Santiago v. New York State Dep't of Corr. Servs.,* 945 F.2d 25, 32 (2d Cir. 1991) (holding that such claims, however, cannot be brought directly against the state, or a state agency, but only against state officials in their official capacities; *see also Inside Connect, Inc. v. Fischer,* No. 13-CV-1138, 2014 WL 2933221, at *7 (S.D.N.Y. June 30, 2014) (dismissing the plaintiff's requests for declaratory judgment related to

the defendants' policy of refusing delivery of Inmate News because the defendants were no longer refusing to deliver Inmate News) (citing *Green v. Mansour*, 474 U.S. 64, 68 (1985)). "[I]n order to warrant the court's consideration, the plaintiff must be seeking prospective relief from an 'ongoing violation of federal law' which affects him directly, as opposed to others." *Ruggiero v. Brian Fischer, Comm'r, No.* 15-CV-00962, 2017 WL 6999859, at *2 (W.D.N.Y. Aug. 25, 2017), *report and recommendation adopted sub nom.*, 2018 WL 488949 (W.D.N.Y. Jan. 20, 2018) (citations omitted).

**\*20** In the Amended Complaint, Plaintiff seeks an order directing Annucci and McKoy to provide at least one hour of worship and study. *See* Am. Compl. at 37. Because the Court has directed a response to Plaintiff's claim that his First Amendment right to the free exercise of his religion was violated on December 27, 2015 because he was afforded only five minutes to worship in the chapel, the corresponding claim for prospective injunctive relief survives as well.

A different conclusion is reached however, with respect to the remaining requests for prospective injunctive relief. Plaintiff also seeks an order preventing Auburn's administration from allowing "general callouts" of all registered Rastafaris. *See* Am. Compl. at 37-38. However, Plaintiff fails to explain how this injunction is necessary to prevent irreparable injury to his constitutional rights as alleged in the Amended Complaint. Because this claim for injunctive relief is unrelated to the constitutional claims set forth in the Amended Complaint, it is dismissed. *See Betlewicz v. Div. of New York State Police,* No. 1:12-CV-1158 (GLS/RFT), 2013 WL 2181248, at *3 (N.D.N.Y. May 20, 2013).

Finally, with respect to Plaintiff's request for an order preventing Auburn's administration from utilizing the "penalty box" for callouts in periods of inclement weather, as discussed *supra*, Plaintiff's Eighth Amendment claim related to the "penalty box," was dismissed. Accordingly, the corresponding claim for injunctive relief is also dismissed. *See Spiteri v. Russo,* No. 12-CV-2780, 2013 WL 4806960, at *44 (E.D.N.Y. Sept. 7, 2013), *aff'd sub nom. Spiteri v. Camacho,* 622 Fed. App'x 9 (2d Cir. 2015); *see also Rossi v. Fishcer,* No. 13-CV-3167, 2015 WL 769551, at *15 (S.D.N.Y. Feb. 24, 2015).

### K. Preliminary Injunctive Relief

In the Amended Complaint, Plaintiff also seeks preliminary injunctive relief. Preliminary injunctive relief "is an extraordinary and drastic remedy, one that should not be granted unless the movant, by a clear showing, carries the burden of persuasion." *Moore v. Consol. Edison Co. of N.Y.,* 409 F.3d 506, 510 (2d Cir. 2005) (quoting *Mazurek v. Armstrong,* 520 U.S. 968, 972 (1997)). "The district court has wide discretion in determining whether to grant a preliminary injunction." *Id.* at 511. To obtain preliminary injunctive relief, a plaintiff must demonstrate irreparable harm and either a substantial likelihood of success on the merits of the claim, or sufficiently serious questions going to the merits and a balance of hardships tipping decidedly in his favor. *Citigroup Global Markets, Inc. V. VCG Special Opportunities Master Fund Ltd.,* 598 F.3d 30, 35 (2d Cir. 2010). However, when the moving party seeks a "mandatory preliminary injunction that alters the status quo by commanding a positive act," the burden is even higher. *Cacchillo v. Insmed, Inc.,* 638 F.3d 401, 405-06 (2d Cir. 2011). "A mandatory preliminary injunction 'should issue only upon a clear showing that the moving party is entitled to the relief requested, or where extreme or very serious damage will result from a denial of preliminary relief.' " *Id.* (quoting *Citigroup,* 598 F.3d at 35 n.4).

Generally an alleged violation of a constitutional right creates a presumption of irreparable harm. *Jolly v. Coughlin,* 76 F.3d 468, 482 (2d Cir. 1996). However, speculative, remote or future injury is not the province of injunctive relief. *Los Angeles v. Lyons,* 461 U.S. 95, 111-12 (1983). Rather, a plaintiff seeking to satisfy the irreparable harm requirement must demonstrate that "absent a preliminary injunction [he or she] will suffer an injury that is neither remote nor speculative, but actual and imminent, and one that cannot be remedied if a court waits until the end of trial to resolve the harm." *Bisnews AFE (Thailand) Ltd. v. Aspen Research Group Ltd.,* 437 Fed. App'x 57, 58 (2d Cir. 2011) (quoting *Faiveley Transport Malmo AB v. Wabtec Corp.,* 559 F.3d 110, 118 (2d Cir. 2009)); *Garcia v. Arevalo,* No. 93-CV-8147, 1994 WL 383238, at *2 (S.D.N.Y. June 27, 1994) ("It is well settled that an allegation of the mere possibility of irreparable harm is insufficient to justify the drastic remedy of preliminary injunction.... A party who seeks the extraordinary remedy of a preliminary injunction must show the alleged irreparable harm to be imminent, not remote or speculative, and the alleged injury to constitute one that is incapable of being fully remedied by monetary damages." (citations omitted)). A finding of irreparable harm cannot be based solely on past conduct. *Haden v. Hellinger,* No. 9:14-CV-0318 (GLS), 2016 WL 589703 at *1 (N.D.N.Y. Feb. 11, 2016).

**\*21** Furthermore, the party seeking preliminary relief must establish a relationship between the alleged

irreparable harm claimed and the conduct giving rise to the complaint. *See Candelaria v. Baker,* No. 00-CV-0912, 2006 WL 618576, at \*3 (W.D.N.Y. Mar. 10, 2006) (citations omitted*); see also Allen v. Brown,* No. 96-CV-1599 (RSP/ GJD), 1998 WL 214418, at \*4 (N.D.N.Y. Apr. 28, 1998) (denying request for injunctive relief where allegations in application for such relief were unrelated to claims asserted in the complaint and thus plaintiff "failed to establish either a likelihood of succeeding on the merits of his underlying claim, or sufficiently serious questions going to the merits of such claim and a balance of hardships tipping decidedly toward" the plaintiff). "In the prison context, a request for injunctive relief must always be viewed with great caution so as not to immerse the federal judiciary in the management of state prisons." *Fisher v. Goord,* 981 F. Supp. 140, 167 (W.D.N.Y. 1997) (citing *Farmer v. Brennan,* 511 U.S. 825, 846-47 (1994)) (other citations omitted). Here, the injunction sought is mandatory, and thus the Court will use the "clear and substantial" showing of a likelihood of success standard.

Plaintiff requests the following preliminary injunctive relief: (1) an order directing Annucci to immediately reinstate DOCCS' policy mandating that food be prepared by a faith group member; (2) an order precluding Annucci from using disciplinary measures to "force" Plaintiff to consume food prepared or served by homosexuals; (3) an order directing Annucci to reinstate the policy requiring Rastafari "brethren" to serve as clerks to prepare callouts, etc.; (4) an order enjoining Annucci, McKoy, McCarthy, and Schenk from posting the Rastafari "Family Day Event" on the commissary buy sheet; (5) an order suspending all aspects of Annucci's and Mallozzi's IGP; (6) an order directing Annucci to reinstate the CAU; (7) an order preventing Annucci from collecting funds from the CAU pending a full and complete forensic audit; (8) an order preventing Annucci from dispersing the CAU funds; and (9) if Plaintiff should be transferred during the pendency of this lawsuit, an Order directing Annucci to transfer eight property bags containing Plaintiff's research, exhibits, books, and legal material with Plaintiff. *See* Am. Compl. at 61-64, 87-88.

The Court has thoroughly reviewed the Amended Complaint and requests for preliminary injunctive relief and finds that the requests are unrelated to the underlying claims that have survived this Court's review. Further, "the past allegations of misconduct stated in Plaintiff's Amended complaint, standing alone, are insufficient to support a finding of irreparable harm." *Ross v. Smith,* No. 9:18-CV-0039 (GLS/TWD), 2018 WL 5816301, at \*2 (N.D.N.Y. Nov. 7, 2018). Thus, Plaintiff

has not made any showing that he will suffer an injury that is neither remote nor speculative should the relief not be granted. Upon review, the Court finds that Plaintiff has failed to meet the heavy burden for a mandatory preliminary injunction. As a result, Plaintiff's requests for preliminary injunctive relief are dismissed.

### L. Doe Defendants

Because Plaintiff asserts First and Fourteenth Amendment claims against corrections officers and officials whose names are not known to Plaintiff, service of process cannot be effected on them unless and until these individuals have been identified by name. If Plaintiff wishes to pursue his claims against WC John Doe #1, WC John Doe #2, Yard Supervisor Jay Doe, PG John Doe, PG James Doe, Sgt. Doe and/or WC John Doe #3, he must take reasonable steps to ascertain through discovery the identity of those individuals. Upon learning the identities of the unnamed defendants, Plaintiff must amend the operative complaint to properly name those individuals as parties. If Plaintiff fails to ascertain the identity of the John Doe defendants so as to permit timely service of process, all claims against those individuals will be dismissed. [16]

### V. CONCLUSION

**\*22** **WHEREFORE**, it is hereby

**ORDERED**, that the Amended Complaint (Dkt. No. 15), and all exhibits annexed (Dkt. No. 1 at 15-28) thereto is accepted for filing and is deemed the operative pleading; and it is further

**ORDERED** that the Clerk of the Court shall amend the docket to add McKoy, Morris, Guenette, Stewart, Rose, Bellamy, Mallozzi, McCarthy, Schenk, Vanni, Bertonica, Kelsey, WC John Doe #1, WC John Doe #2, WC John Doe #3, Tomandl, Pino, PG John Doe, Porten, Sgt. Doe, Yard Supervisor Jay Doe, PG James Doe, Porter, Pitoniak, and Silcox as defendants herein; and it is further

**ORDERED** that the following claims are **DISMISSED** pursuant to 28 U.S.C. § 1915(e)(2)(B) and 28 U.S.C. § 1915A(b) for failure to state a claim upon which relief may be granted: (1) section 1983 claims for monetary damages against defendants in their official capacity; (2) claims against Rose, Stewart, and Pino (3) First Amendment retaliation claims against Graham and Annucci; (4) First Amendment claims related to freedom of speech and to petition; (5) First

Amendment claims related to the free exercise of religious freedom against Tomandl, PG James Doe, Sgt. Doe, WC Doe #3, Kelsey, and McCarthy; (6) Fourth Amendment claims; (7) Eighth Amendment claims; (8) Ninth Amendment claims; (9) constitutional claims related to violations of DOCCS' directives; (10) Fourteenth Amendment equal protection claims against Tomandl, Pitoniak, Vanni, Porter, Annucci, and McCarthy; (11) Fourteenth Amendment due process claims; (12) state law claims based upon Corrections Law § 116; and (13) New York State constitutional claims; it is further

**ORDERED** that the following claims survive the Court's sua sponte review under 28 U.S.C. § 1915(e)(2)(B) and 28 U.S.C. § 1915A(b) and require a response: (1) First Amendment retaliation claims against Bertonica, Pitoniak, Vanni, Porter, Schenk, and Silcox; (2) First Amendment claims related to the free exercise of religious freedom against Graham, Venditti, Delfavero, WC John Doe #1, Porten, Bertonica, Annucci, McKoy, Morris, and Guenette; (3) First Amendment Establishment Clause claims against Annucci, McKoy, Morris, Guenette, Graham, and PG John Doe; (4) Fourteenth Amendment equal protection claims against Venditti, Delfavero, Graham, WC Doe #1, WC Doe #2, Yard Supervisor Jay Doe, PG James Doe, Sgt. Doe, WC John Doe #3; and (5) corresponding state law claims; and it is further

**ORDERED** that DOCCS, Stewart, Rose, Bellamy, Mallozzi, McCarthy, Kelsey, Tomandl, and Pino are **DISMISSED** as defendants herein; and it is further

**ORDERED**, that upon receipt from Plaintiff of the documents required for service of process, the Clerk shall issue a summonses and forward them, along with copies of the Amended Complaint, to the United States Marshal for service upon the remaining defendants. The Clerk shall forward a copy of the summonses and Amended Complaint to the Office of the Attorney General, together with a copy of this Decision and Order; and it is further

**ORDERED**, that a response to the Amended Complaint be filed by the remaining defendants, or his counsel, as provided for in the Federal Rules of Civil Procedure; and it is further

**\*23 ORDERED**, that all pleadings, motions and other documents relating to this action must bear the case number assigned to this action and be filed with the Clerk of the United States District Court, Northern District of New York, 7th Floor, Federal Building, 100 S. Clinton St., Syracuse, New York 13261-7367. **Any paper sent by a party to the Court or the Clerk must be accompanied by a certificate showing that a true and correct copy of same was served on all opposing parties or their counsel. Any document received by the Clerk or the Court which does not include a proper certificate of service will be stricken from the docket.** Plaintiff must comply with any requests by the Clerk's Office for any documents that are necessary to maintain this action. All parties must comply with Local Rule 7.1 of the Northern District of New York in filing motions. **Plaintiff is also required to promptly notify the Clerk's Office and all parties or their counsel, in writing, of any change in his address; their failure to do so will result in the dismissal of his action**; and it is further

**ORDERED** that Plaintiff shall take reasonable steps through discovery to ascertain the identity of Defendants WC John Doe #1, WC Doe #2, Yard Supervisor Jay Doe, PG John Doe, PG James Doe, Sgt. Doe and WC John Doe #3. **Plaintiff's failure to timely serve those Defendants will result in dismissal** of the claims asserted against them and termination of those defendants from the action; and it is further

**ORDERED** that the Clerk of the Court shall serve a copy of this Decision and Order on Plaintiff in accordance with the Local Rules.

**IT IS SO ORDERED.**

**All Citations**

Slip Copy, 2019 WL 2352981

## Footnotes

1   The Amended Complaint includes exhibits. *See* Am. Compl. at 90-96. To the extent that the exhibits are relevant to the incidents described in the Amended Complaint, the Court will consider the Amended Complaint as well as any documents attached as exhibits. *See Cortec Indus., Inc. v. Sum Holding L.P.*, 949 F.2d 42, 47 (2d Cir. 1991) (the complaint is deemed to include any written instrument attached to it as an exhibit or any statements or documents incorporated in it by reference). Additionally, Plaintiff's original Complaint included exhibits. *See* Compl. at 15-28. In the Amended Complaint, Plaintiff incorporated, by reference, the same exhibits attached to the original Complaint, but failed to actually attach the

exhibits to the Amended Complaint. "Although it is well settled that an amended complaint supersedes a prior complaint in its entirety, it is clear to the court that plaintiff intended to attach the exhibits to his amended complaint." *Wellington v. Langendorf*, No. 12-CV-1019 (FJS/DEP), 2013 WL 3753978, at *3 (N.D.N.Y. July 15, 2013). To require Plaintiff to file an Amended Complaint that includes the original exhibits is, "an unnecessary procedural hoop that would waste resources and delay resolution of this action." *Alexander v. U.S.*, No. 13-CV-678, 2013 WL 4014539, at *4 (N.D. Cal. Aug. 5, 2013). Because Plaintiff is proceeding pro se, the Court will consider the exhibits and documentation attached to the original Complaint as incorporated by reference in the Amended Complaint.

2      The Clerk of the Court is directed to add these defendants to the docket report for this action.

3      The Clerk of the Court is directed to terminate DOCCS as a defendant.

4      Plaintiff has not plead when Fox departed.

5      Negust Day is a principle that is a "sincerely held Rastafari belief" and annually commemorated on October 7th. Am. Compl. at 14-15.

6      The Amended Complaint does not include facts related to where or when these grievances were filed.

7      *See* Footnote 5, *supra.*

8      Plaintiff describes services as "Nyahbinghi". Am. Compl. at 16.

9      According to DOCCS' block census, the inmate who previously occupied cell D-3-11 was Jewish. Am. Compl. at 28-29.

10     Plaintiff's diet was "drug-free medical therapy" as treatment for high cholesterol. Am. Compl. at 47.

11     The Court is mindful of the Second Circuit's instruction that a pleading by a pro se litigant must be construed liberally and interpreted to raise the strongest arguments that it suggests. *See, e.g., Sealed Plaintiff v. Sealed Defendant*, 537 F.3d 185, 191 (2d Cir. 2008) ("On occasions too numerous to count, we have reminded district courts" that a pro se plaintiff's pleadings must be construed liberally); *Phillips v. Girdich*, 408 F.3d 124, 130 (2d Cir. 2005) ("We leave it for the district court to determine what other claims, if any, [plaintiff] has raised. In so doing, the court's imagination should be limited only by [plaintiff's] factual allegations, not by the legal claims set out in his pleadings."); *Burgos v. Hopkins*, 14 F.3d 787, 790 (2d Cir. 1994) ("[W]e read [a pro se litigant's] supporting papers liberally, and will interpret them to raise the strongest arguments that they suggest.").

12     The Fifth Amendment is applicable to federal actors, not state actors. *Snow v. Vill. of Chatham*, 84 F. Supp. 2d 322, 326 (N.D.N.Y. 2000) (citing *Brock v. North Carolina*, 344 U.S. 424, 426 (1953)). To the extent that Plaintiff is attempting to raise the Fifth Amendment as against the state defendants, that claim must be dismissed with prejudice. *Horton v. Schneiderman*, No. 9:13–CV–742 (GLS/ATB), 2014 WL 2154538, at *7 (N.D.N.Y. 2014). Because Plaintiff is imprisoned in a state institution, the Fourteenth Amendment, and not the Fifth Amendment, applies to his due process violation claims. *See Pugliese v. Nelson*, 617 F.2d 916, 918 n.2 (2d Cir. 1980).

13     Plaintiff claims he was transferred to Auburn C.F. in retaliation for grievances against Annucci, McKoy, Guenette, and Morris related to their violations of the Establishment Clause. *See* Am. Compl. at 15. Plaintiff has not identified the person(s) responsible or personally involved in the decision to transfer him to Auburn C.F. Accordingly, this claim is not sufficiently plead.

14     The Court also dismissed the First Amendment religious claims against Graham for failure to plead personal involvement for purposes of § 1983. *See* Dkt. No. 4 at 13.

15     The Second Circuit has not yet addressed how the Supreme Court's decision in *Iqbal* affected the standards in *Colon* for establishing supervisory liability. *See Grullon v. City of New Haven*, 720 F.3d 133, 139 (2d Cir. 2013) (noting that Iqbal may have "heightened the requirements for showing a supervisor's personal involvement with respect to certain constitutional violations" but not reaching the impact of *Iqbal* on *Colon* because the complaint "did not adequately plead the Warden's personal involvement even under *Colon*"); *see also Hogan v. Fischer*, 738 F.3d 509, 519 n.3 (2d Cir. 2013) (expressing "no view on the extent to which [*Iqbal*] may have heightened the requirements for showing a supervisor's personal involvement with respect to certain constitutional violations[.]") (citing *Grullon*, 720 F.3d at 139).

16     Rule 4 of the Federal Rules of Civil Procedure require that a party be served within 90 days of issuance of the summons, absent a court order extending that period. Fed. R. Civ. P. 4(m). The Court's local rules shorten the time for service from 90 days under Rule 4(m) to 60 days. N.D.N.Y. L.R. 4.1(b).

---

**End of Document**                    © 2019 Thomson Reuters. No claim to original U.S. Government Works.

2017 WL 6049238
Only the Westlaw citation is currently available.
United States District Court, N.D. New York.

Donald Mack BENNETT, Plaintiff,

v.

Correction Officer C. COLUMBE; et al., Defendants.

No. 9:16-CV-653 (BKS/CFH)
|
Signed 10/17/2017

**Attorneys and Law Firms**

DONALD MACK BENNETT, 11-A-2997, Westchester County Jail, P.O. Box 10, Valhalla, New York 10595, Plaintiff pro se.

HON. ERIC T. SCHNEIDERMAN, Attorney General for the State of New York, The Capitol, OF COUNSEL: KATIE E. VALDER, ESQ., Assistant Attorney General, Albany, New York 12224-0341, Attorney for Defendant.

**REPORT-RECOMMENDATION AND ORDER** [1]

Christian F. Hummel, U.S. Magistrate Judge

**\*1** Plaintiff Donald Mack Bennett ("Bennett" or "Plaintiff"), an inmate who was, at all relevant times, in the custody of the New York Department of Corrections and Community Supervision ("DOCCS"), brings this action pursuant to 42 U.S.C. § 1983. Dkt. No. 19 ("Am. Compl."). Presently before the Court is defendant Anthony J. Annucci's ("Annucci") motion for judgment on the pleadings pursuant to Federal Rules of Civil Procedure ("Fed. R. Civ. P.") 12(c). Dkt. No. 55. Plaintiff opposed the motion. Dkt. No. 57. Defendant Annucci filed a reply. Dkt. No. 60. For the following reasons, it is recommended that defendant Annucci's motion for judgment on the pleadings be granted.

**I. BACKGROUND**

The facts are related herein in the light most favorable to Bennett as the non-moving party. See subsection II(A), infra. At all relevant times, Bennett was confined to Clinton Correctional Facility ("Clinton C.F."). Dkt. No. 19 ("3d Am. Compl.") at 2-4. In October 2015, defendant Correction

Officer C. Columbe ("Columbe") allegedly used excessive force against Bennett as he exited his cell for sick call. Id. at 2-3. Bennett claims that he wrote to Annucci complaining about ongoing misconduct and asserts that Annucci, in his capacity as "head administrator" of DOCCS, "failed to supervise personnel at Clinton [C.F.]" and "trian [sic]" subordinates to insure the safety and well-being of inmates. Id. at 2, 4. Specifically, Bennett alleges that: (1) Columbe used excessive force in violation of the Eighth Amendment; and (2) Annucci failed to supervise and train the staff at Clinton C.F. See 3d Am. Compl., generally. Bennett seeks compensatory and punitive relief. See id. at 5.

**II. DISCUSSION** [2]

As relevant here, defendant requests judgment on the pleadings, arguing that: (1) the Eleventh Amendment bars recovery from Annucci in his official capacity; and (2) Bennett failed to adequately allege that Annucci was personally involved in the alleged constitutional violations. [3]

**A. Legal Standard**

"The standard for addressing a Rule 12(c) motion for judgment on the pleadings is the same as that for a Rule 12(b)(6) motion to dismiss for failure to state a claim." Cleveland v. Caplaw, 448 F.3d 518, 521 (2d Cir. 2006) (citing Karedes v. Ackerley Group, Inc., 423 F.3d 107, 113 (2d Cir. 2005)). The Court is required to "accept[ ] as true the complaint's factual allegations and draw[ ] all inferences in the plaintiff's favor." Id. However, this "tenet ... is inapplicable to legal conclusions [; thus, t]hreadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice." Ashcroft v. Iqbal, 556 U.S. 662, 678 (2009) (citing Bell Atlantic Corp. v. Twombly, 550 U.S. 554, 555 (2007) (holding that "entitlement to relief requires more than labels and conclusions, and a formulaic recitation of the elements of a cause of action ... [as] courts are not bound to accept as true a legal conclusion couched as a factual allegation.")).

**\*2** To defeat a motion to dismiss or a motion for judgment on the pleadings, a claim must include "facial plausibility ... that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." Iqbal, 556 U.S. at 678 (citing Twombly, 550 U.S. at 556 (explaining that the plausibility test "does not impose a probability

requirement ... it simply calls for enough fact to raise a reasonable expectation that discovery will reveal evidence of illegal [conduct].")); see also Arar v. Ashcroft, 585 F.3d 559, 569 (2d Cir. 2009) (holding that, "[o]n a motion to dismiss, courts require enough facts to state a claim to relief that is plausible....") (citations omitted).

However, "Federal Rule of Civil Procedure 8(a)(2) requires only 'a short and plain statement of the claim showing that the pleader is entitled to relief,' in order to 'give the defendant fair notice of what the ... claim is and the grounds upon which it rests.' " Twombly, 550 U.S. at 555 (citations omitted). Although a complaint attacked under the standard set forth in Rule 12(b)(6) does not require detailed factual allegations, "a plaintiff's obligation to provide the grounds of his entitlement to relief requires more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do." Id. (citations omitted).

## B. Eleventh Amendment

Defendant argues that plaintiff's suit is barred by the Eleventh Amendment insofar as he seeks damages against defendant Annucci in his official capacity. Dkt. No. 55-2 at 9. The Eleventh Amendment provides that "[t]he Judicial power of the United States shall not be construed to extend to any suit in law or equity, commenced or prosecuted against one of the United States by Citizens of another State, or by Citizens or Subjects of any Foreign State." U.S. Const. amend. XI. "[D]espite the limited terms of the Eleventh Amendment, a federal court [cannot] entertain a suit brought by a citizen against his [or her] own State." Pennhurst State School & Hosp. v. Halderman, 465 U.S. 89, 98 (1984) (citing Hans v. Louisiana, 134 U.S. 1, 21 (1890)). Regardless of the nature of the relief sought, in the absence of the State's consent or waiver of immunity, a suit against the State or one of its agencies or departments is proscribed by the Eleventh Amendment. Halderman, 465 U.S. at 100. Section 1983 claims do not abrogate the Eleventh Amendment immunity of the states. See Quern v. Jordan, 440 U.S. 332, 340-41 (1979).

A suit against a state official in his or her official capacity is a suit against the entity that employs the official. Farid v. Smith, 850 F.2d 917, 921 (2d Cir. 1988) (citing Edelman v. Jordan, 415 U.S. 651, 663 (1974)). "Thus, while an award of damages against an official in his personal capacity can be executed only against the official's personal assets, a plaintiff seeking to recover on a damages judgment in an official-capacity suit

must look to the government entity itself," rendering the latter suit for money damages barred even though asserted against the individual officer. Kentucky v. Graham, 473 U.S. 159, 166 (1985).

Here, because Bennett seeks monetary damages against a defendant for acts occurring within the scope of his duties, the Eleventh Amendment bar applies and serves to prohibit claims for monetary damages against him in his official capacity. Graham, 473 U.S. at 166. Accordingly, it is recommended that defendant Annucci's motion on this ground be granted.

## C. Personal Involvement

Defendant Annucci contends that plaintiff has failed to demonstrate his personal involvement in the alleged constitutional violations as "[p]laintiff merely alleges that Commissioner Annucci is the 'head administrator' of DOCCS." Dkt. No. 55-2 at 6-7. "[P]ersonal involvement of defendants in alleged constitutional deprivations" is a prerequisite to an award of damages under § 1983." Wright v. Smith, 21 F.3d 496, 501 (2d Cir. 1994) (quoting Moffitt v. Town of Brookfield, 950 F.2d 880, 885 (2d Cir. 1991)). Thus, supervisory officials may not be held liable merely because they held a position of authority. Id.; Black v. Coughlin, 76 F.3d 72, 74 (2d Cir. 1996). However, supervisory personnel may be considered "personally involved" if:

**\*3** (1) [T]he defendant participated directly in the alleged constitutional violation[;]

(2) the defendant, after being informed of the violation through a report or appeal, failed to remedy the wrong[;]

(3) the defendant created a policy or custom under which unconstitutional practices occurred, or allowed the continuance of such a policy or custom[;]

(4) the defendant was grossly negligent in supervising subordinates who committed the wrongful acts[;] or

(5) the defendant exhibited deliberate indifference to the rights of inmates by failing to act on information indicating that unconstitutional acts were occurring.

Colon v. Coughlin, 58 F.3d 865, 873 (2d Cir. 1995) (spacing added) (citing Williams v. Smith, 781 F.2d 319, 323-24 (2d Cir. 1986)).[4] However, where a plaintiff's sole

Case 9:18-cv-01203-DNH-TWD Document 43 Filed 11/25/19 Page 87 of 112

Bennett v. Columbe, Not Reported in Fed. Supp. (2017)

claim involvement of the supervisory defendant is that a superintendent affirmed a denial of a grievance, such is not sufficient to establish personal involvement. Joyner v. Greiner, 195 F. Supp. 2d 500, 506 (S.D.N.Y. 2002). Moreover, a supervisor may delegate the responsibility to others, and personal involvement does not lie where the only allegation was that the defendant referred a complaint to the appropriate department or staff for investigation. Ortiz-Rodriguez v. N.Y. State Dep't of Corr. Servs., 491 F. Supp. 2d 342, 347 (W.D.N.Y. 2007). Finally, assertions of personal involvement that are merely speculative are insufficient to establish a triable issue of fact. See, e.g., Brown v. Artus, 647 F.Supp.2d 190, 200 (N.D.N.Y. 2009).

Bennett claims that Annucci was personally involved in his constitutional deprivations because he sent Annucci letters and grievances. See 3d Am Compl. at 4. To the extent that Bennett seeks to establish defendant's knowledge of Bennett's complaints through his sending letters and grievances, such argument must fail. Generally, mere assertions that a plaintiff forwarded letters or grievances to a supervisory defendant are insufficient to establish that defendant's' personal involvement. See Johnson v. Wright, 234 F.Supp.2d 352, 363 (S.D.N.Y. 2002) ("It is well-established that an allegation that an official ignored a prisoner's letter of protest and request for an investigation of allegations made therein is insufficient to hold the official liable for the alleged violation.") (quotations omitted). However, the Second Circuit has concluded that,

> **\*4** [a]t the pleading stage, even if [the plaintiff] had no knowledge or information as to what became of his Letter after he sent it, he would be entitled to have the court draw the reasonable inference—if his amended complaint contained factual allegations indicating that the Letter was sent to the [defendant] at an appropriate address and by appropriate means—that the [defendant] in fact received the Letter, read it, and thereby became aware of the alleged conditions of which [the plaintiff] complained.

Grullon v. City of New Haven, 720 F.3d 133, 141 (2d Cir. 2013); but see Bodie v. Morgenthau, 342 F.Supp.2d 193,

203 (S.D.N.Y. 2004) ("While mere receipt of a letter from a prisoner is insufficient to establish individual liability ... [p]ersonal involvement will be found ... where a supervisory official receives and acts on a prisoner's grievance or otherwise reviews and responds to a prisoner's complaint.").

Here, Bennett does not provide sufficient factual detail in his third amended complaint to support his claim that the grievances and letters he sent to Annucci establish personal involvement. See 3d Am. Compl. He "does not allege that he sent the letters to the proper addresses by appropriate means, or that the that defendant[ ] received the letters and read them," nor does he contend that Annucci personally took action to investigate his letters. Simpson v. Overbaugh, 9:15-CV-180 (DNH/CFH), 2015 WL 7444369, at *5 (N.D.N.Y. Sept. 25, 2015) (citing Grullon, 720 F.3d at 141); see Bodie, 342 F.Supp. 2d at 203; see also Ramos v. Artuz, 00 Civ. 0149 (LTS/HBP), 2001 WL 840131, at *8-10 (S.D.N.Y. July 25, 2001) (finding personal involvement where a defendant "sent plaintiff numerous letters containing some explanation or justification concerning the issues raised by plaintiff in his letters"). Bennett has failed to plausibly allege that Annucci had personal knowledge of the alleged constitutional violations. Thus, Bennett has not established defendant Annucci's personal involvement through the mere sending of letters or grievances. See Grullon, 720 F.3d 133 at 141-42. Further, Bennett may not hold Annucci liable merely because he is in a position of authority within the prison system. See Colon, 58 F.3d at 874 ("The bare fact that [the defendant] occupies a high position in the New York prison hierarchy is insufficient to sustain Colon's claim.").

Moreover, Bennett presents no factual allegations to support the conclusory claim that defendant was grossly negligent in his supervision of subordinates,[5] or exhibited deliberate indifference[6] to Bennett's constitutional rights. See Colon, 58 F.3d at 873. Bennett's conclusory claims, without more, do not suffice to defeat defendant Anucci's motion. See Twombly, 550 U.S. at 555; White v. Clark, No. 9:12-CV-986 (NAM/RFT), 2012 WL 5877160, at *9-10 (N.D.N.Y. Nov. 20, 2012) (dismissing a plaintiff's supervisory libaility claims when the complaint merely alleged "in wholly conclusory fashion that [the defendants] exhibited 'deliberate indifference' to the staff misconduct."); Liner v. Goord, 582 F. Supp. 2d 431, 433 (W.D.N.Y. 2008) (dismissing conclusory allegations of deliberate indifference and gross negligence).

**Bennett v. Columbe, Not Reported in Fed. Supp. (2017)**

Case 9:18-cv-01203-DNH-TWD    Document 43    Filed 11/25/19    Page 88 of 112

**\*5** Accordingly, it is recommended that Annucci's motion for judgment on the pleadings dismissing all claims against defendant Annucci be granted.

### III. Conclusion

**WHEREFORE**, based on the reasons set forth above, it is hereby:

**RECOMMENDED**, that defendant Annucci's motion for judgment on the pleadings (Dkt. No. 55) be **GRANTED** and that judgment be entered for Annucci on all claims;

**ORDERED**, that this Report-Recommendation and Order be served on the parties in accordance with the Local Rules.

Pursuant to 28 U.S.C. § 636(b)(1) and Local Rule 72.1( c), the parties have ten days within which to file written objections to the foregoing report. Such objections shall be filed with the Clerk of the Court. **FAILURE TO OBJECT TO THIS REPORT WITHIN FOURTEEN (14) DAYS WILL PRECLUDE APPELLATE REVIEW.** Roldan v. Racette, 984 F.2d 85, 89 (2d Cir. 1993) (citing Small v. Secretary of Health and Human Services, 892 F.2d 15 (2d Cir. 1989)); 28 U.S.C. § 636(b)(1); FED. R. CIV. P. 6(a), 6(e), 72.

**IT IS SO ORDERED.**

**All Citations**

Not Reported in Fed. Supp., 2017 WL 6049238

Footnotes

1    This matter was referred to the undersigned for Report-Recommendation and Order pursuant to 28 U.S.C. § 636(b) and N.D.N.Y.L.R. 72.3(c).

2    All unpublished opinions cited to by the Court in this Report–Recommendation and Order are, unless otherwise noted, have been provided to plaintiff pro se.

3    Defendants have not moved for judgment on the pleadings with respect to the excessive force claim against defendant Columbe.

4    Various courts in the Second Circuit have postulated how, if at all, the Iqbal decision has affected the five Colon factors which were traditionally used to determine personal involvement. Pearce v. Estate of Longo, 766 F.Supp. 2d 367, 376 (N.D.N.Y. 2011), rev'd in part on other grounds sub nom., Pearce v. Labella, 473 Fed.Appx. 16 (2d Cir. 2012) (summary order) (recognizing that several district courts in the Second Circuit have debated Iqbal's impact on the five Colon factors); Kleehammer v. Monroe Cnty., 743 F.Supp. 2d 175, 182 (W.D.N.Y. 2010) (holding that "[o]nly the first and part of the third Colon categories pass Iqbal's muster...."); D'Olimpio v. Crisafi, 718 F.Supp. 2d 340, 347 (S.D.N.Y. 2010) (disagreeing with the conclusion that Iqbal eliminated Colon's personal involvement standard).

5    To support a finding of personal involvement based on a failure to supervise, [the p]laintiff must show that [the defendant] " 'knew or should have known that there was a high degree of risk that [his subordinates] would behave inappropriately' " and " 'either deliberately or recklessly disregarded that risk by failing to take action that a reasonable supervisor would find necessary to prevent such a risk, and that failure caused a constitutional injury to [Plaintiff].' " Hoyt v. Prack, No. 13-CV-920S, 2016 WL 929336, at *6 (W.D.N.Y. Mar. 11, 2016) (internal citations omitted).

6    "In order to state a supervisory liability claim on the basis of deliberate indifference, a plaintiff must allege three elements: (1) that the supervisor had a duty to intervene and prevent the constitutional violation, (2) 'that the supervisor ha[d] actual or constructive notice of unconstitutional practices carried out by his supervisees—which notice triggered his duty to intervene—yet deliberately failed to take such action, thereby breaching this duty," and (3) that this failure proximately caused the plaintiff's injury. Fabian v. Bukowski, 9:16-CV-878 (LEK/DEP), 2017 WL 1483385, at *4 (quoting Murphy v. N.Y. Racing Ass'n, 76 F. Supp. 2d 489, 500 (S.D.N.Y. 1999) (additional citation and internal quotation marks omitted)).

End of Document    © 2019 Thomson Reuters. No claim to original U.S. Government Works.

2017 WL 6062904
Only the Westlaw citation is currently available.
United States District Court, N.D. New York.

Donald Mack BENNETT, Plaintiff,

v.

Correction Officer C. COLUMBE, et al., Defendants.

9:16-CV-0653 (BKS/CFH)
|
Signed 12/06/2017

**Attorneys and Law Firms**

Donald Mack Bennett, 11-A-2997, Bare Hill Correctional Facility, Caller Box 20, Malone, NY 12953, Plaintiff, pro se

Katie E. Valder, Esq., Hon. Eric T. Schneiderman, Office of New York State Attorney General, The Capitol, Albany, NY 12224, Attorney for Defendants

**MEMORANDUM-DECISION AND ORDER**

Brenda K. Sannes, United States District Judge

**\*1** Plaintiff Donald Mack Bennett, a New York State inmate, commenced this civil rights action asserting claims under 42 U.S.C. § 1983 arising out of his incarceration at Clinton Correctional Facility. Dkt. No. 19. On May 31, 2017, Defendant Annucci filed a motion for judgment on the pleadings under Fed. R. Civ. P. 12(c). Dkt. No. 55. Plaintiff filed a response on June 8, 2017. Dkt. No. 57. Defendant Annucci filed a reply on June 9, 2017. Dkt. No. 60. This matter was referred to United States Magistrate Judge Christian F. Hummel who, on October 17, 2017, issued a Report-Recommendation and Order recommending that Defendant Annucci's motion be granted. Magistrate Judge Hummel explained that any official capacity claims against Defendant Annucci for monetary damages are barred by the Eleventh Amendment and that as the Complaint fails to sufficiently allege that Defendant Annucci was personally involved in Plaintiff's constitutional deprivations, the individual capacity claims must be dismissed as well. Dkt. No. 76. Magistrate Judge Hummel advised the parties that under 28 U.S.C. § 636(b)(1), they had fourteen days within which to file written objections to the report, and that the failure to object to the report within fourteen days would preclude appellate review. Dkt. No. 76, pp. 9-10.

On November 1, 2017, Plaintiff filed a motion seeking leave to amend the complaint. Dkt. No. 77. Plaintiff did not specify on what ground he wishes to amend the Complaint and has not submitted a proposed amended complaint. Moreover, even viewed liberally, nothing in Plaintiff's filing can be construed as an objection to the Report-Recommendation.

As no objections to the Report-Recommendation have been filed, and the time for filing objections has expired, the Court reviews the Report-Recommendation for clear error. *See* Petersen v. Astrue, 2 F. Supp. 3d 223, 228-29 (N.D.N.Y. 2012); Fed. R. Civ. P. 72(b) advisory committee's note to 1983 amendment. Having reviewed the Report-Recommendation for clear error and found none, the Report-Recommendation is adopted in its entirety.

In recognition of Plaintiff's status as a pro se litigant, in view of his request to amend, and because it seems possible that Plaintiff may be able to assert cognizable claims with better pleading, leave to file an amended complaint as to Defendant Annucci, within thirty (30) days of the date of this Order, is granted. In any amended complaint, Plaintiff must clearly set forth the facts that give rise to the claims against Defendant Annucci, including the dates, times, and places of the alleged underlying acts. In addition, the revised pleading should allege facts demonstrating Defendant Annucci's specific involvement in the constitutional deprivations and with sufficient detail to establish that he was tangibly connected to those deprivations. *Bass v. Jackson*, 790 F.2d 260, 263 (2d Cir. 1986). Any such amended complaint will replace the existing complaint, and must be a wholly integrated and complete pleading that does not rely upon or incorporate by reference any pleading or document previously filed with the court. *See Shields v. Citytrust Bancorp, Inc.*, 25 F.3d 1124, 1128 (2d Cir. 1994) ("It is well established that an amended complaint ordinarily supersedes the original, and renders it of no legal effect." (quotation marks omitted)).

**\*2** For these reasons, it is

**ORDERED** that the Report-Recommendation (Dkt. No. 76) is **ADOPTED** in its entirety; and it is further

**ORDERED** that Defendant Annucci's motion for judgment on the pleadings (Dkt. No. 55) is **GRANTED;** and it is further

**ORDERED** that to the extent Plaintiff seeks to file an amended complaint as to Defendant Annucci (Dkt. No. 77), his motion is **GRANTED**; and it is further

**ORDERED** that Plaintiff is granted leave to file an amended complaint as to Defendant Annucci within thirty (30) days of the date of this Order; and it is further

**ORDERED** that the Clerk serve a copy of this Order upon the parties in accordance with the Local Rules.

**IT IS SO ORDERED.**

**All Citations**

Not Reported in Fed. Supp., 2017 WL 6062904

---

**End of Document**    © 2019 Thomson Reuters. No claim to original U.S. Government Works.

⚠ Caution
As of: November 25, 2019 3:33 PM Z

# *Hopkins v. Allard*

United States District Court for the Northern District of New York

August 23, 2010, Decided; August 23, 2010, Filed

Civ. Action No. 9:08-CV-0001 (DNH/DEP)

**Reporter**
2010 U.S. Dist. LEXIS 114368 *

JOHN D. HOPKINS, III., Plaintiff, v. MICHAEL ALLARD, Superintendent, GARDNER, Sergeant; JOHN DOE 1, Correction Officer; JOHN DOE 2, Correction Officer; B. BRUE, Nurse; C. VOLPE, Nurse; JANE DOE, Nurse, Defendants.

**Subsequent History:** Adopted by, Accepted by, Summary judgment granted by, in part, Claim dismissed by *Hopkins v. Allard, 2010 U.S. Dist. LEXIS 100675 (N.D.N.Y, Sept. 24, 2010)*

## Core Terms

Defendants', inmate, confinement, grievance, exhaust, prison, allegations, deprivation, misbehavior, disciplinary, conditions, conspiracy, retaliation, plaintiff's claim, assault, circumstances, days, administrative remedy, meal, injuries, corrections officer, prison official, indifference, citations, food, showers, deliberate indifference, the Eighth Amendment, asserting, courts

**Counsel:** [*1] JOHN D. HOPKINS, III, PLAINTIFF, Pro se, Wallkill, NY.

FOR DEFENDANTS: AARON M. BALDWIN, ESQ., Assistant Attorney General, OF COUNSEL: HON. ANDREW M. CUOMO, Attorney General of the State of New York, Albany, NY.

**Judges:** David E. Peebles, U.S. Magistrate Judge.

**Opinion by:** David E. Peebles

# Opinion

REPORT AND RECOMMENDATION

Plaintiff John D. Hopkins, III, a New York State prison inmate who is proceeding *pro se* and *in forma pauperis*, has commenced this action pursuant to *42 U.S.C. §*

*1983*, *inter alia*, complaining of civil rights violations allegedly occurring during the period of his confinement. The events giving rise to plaintiff's claims arose out of an incident involving a prison nurse, which later ripened into the issuance of an allegedly false misbehavior report, alleged beatings, and plaintiff's disciplinary confinement in a special housing unit ("SHU") under unsavory conditions which included his being deprived of meals, water, and showers. The plaintiff asserts that defendants' actions were in retaliation for his having engaged in constitutionally protected activity and resulted in his being subjected to cruel and unusual punishment and denied due process. As relief, plaintiff demands $5 million in compensatory [*2] damages plus an additional award of punitive damages.

Presently before the court is defendants' motion for partial summary judgment dismissing all of plaintiff's claims with the exception of those relating to the alleged assault. In their motion, defendants assert a variety of procedural and substantive arguments in support of their request for partial dismissal of plaintiff's claims, including failure to exhaust administrative remedies, lack of personal involvement, failure to state viable claims as a matter of law, and qualified immunity from suit. Having carefully considered the record now before the court, I recommend that defendants' motion, which plaintiff has opposed, be granted and that all claims, except those relating to the alleged assault including the claimed failure of certain of the defendants to protect him from the assault, be dismissed.

I. BACKGROUND[1]

Plaintiff is an inmate entrusted to the care and custody

---

[1] In light of the procedural posture of the case the following recitation is derived from the record now before the court with all inferences drawn and ambiguities resolved in favor of the plaintiff. *Terry v. Ashcroft, 336 F.3d 128, 137 (2d Cir. 2003)*. It should be noted, however, that many if not most of plaintiff's allegations [*3] are sharply contested by the defendants.

2010 U.S. Dist. LEXIS 114368, *3

of the New York State Department of Correctional Services ("DOCS"); although plaintiff is presently designated to another prison facility, at the times relevant to his claims, including between approximately October 22, 2003 through April 20, 2005, he was housed in the Franklin Correctional Facility ("Franklin"), located in Malone, New York. *See generally* Complaint (Dkt. No. 1); *see also* Allard Decl. (Dkt. No. 58-2) ¶ 8.

The events giving rise to plaintiff's claims were precipitated on February 10, 2005, when plaintiff was seen at the prison infirmary by defendant B. Brue, a prison nurse, complaining of a cough, sore throat, and "green phlegm". Complaint (Dkt. No. 1) ¶¶ 2-3. The parties' version of the events that followed differ markedly. According to the plaintiff, after Nurse Brue said that she would give him something for his symptoms, he asked her for some foot powder, to which she responded by firmly stating that his session was over. Defendants' Exh. L (Dkt. No. 58-21) p. 40. [2] Hopkins admits that at this point he did not immediately leave the infirmary, claiming that Nurse Brue did **[*4]** not end the conversation, but instead went on to tell him that he was asking for too many items. Hopkins Decl. (Dkt. No. 64) ¶ 5. Hopkins questioned Nurse Brue as to whether that was her normal procedure. Hopkins Tr. at p. 40. According to plaintiff, however, when Nurse Brue then instructed him to go wait in the hallway, he complied with that directive. *Id.* at p. 41.

Defendant Brue's description of the events that transpired is somewhat different. *See* Brue. Decl. (Dkt. No. 58-4). Nurse Brue states that when she saw plaintiff in the infirmary he demanded antibiotics, but after taking his temperature and determining that it was not elevated, she determined that antibiotics were not indicated. *Id.* at ¶¶ 4. Brue gave plaintiff throat lozenges and cough syrup, advised that the session was over, and instructed him to wait in the hall. *Id.* at ¶¶ 5-6. Ignoring several of Brue's direct orders to retreat to the hall, Hopkins instead remained, began demanding different medications, and became agitated, making arm gestures. *Id.* at ¶ 6-7. Feeling threatened, **[*5]** defendant Brue notified a corrections officer in the hallway, R. Johnston, who entered the infirmary and twice ordered Hopkins to exit the room. *Id.* at ¶¶ 7-8. After receiving Johnston's second order, Hopkins finally moved from the room into the hallway. *Id.* Nurse Brue then walked out into the hallway, at which time the

plaintiff approached her with his hands and arms raised outward, interfering with her duties and once again making her feel threatened. *Id.* at ¶ 9. The incident resulted in Nurse Brue's issuance of a misbehavior report, co-signed by Corrections Officer R. Johnston, charging Hopkins with three prison rule violations, including making threats, disobeying a direct order, and interference. [3] Brue Decl. (58-4) ¶ 10; *see also* Defendants' Exh. A (Dkt. No. 58-10).

While plaintiff stood in the hallway, he claims he heard Nurse Brue loudly state to Corrections Officer Johnston, "I don't like this black asshole! help [sic] me get him, [sic] he's a complainer," to which Johnston allegedly responded, "sure, no problem." Complaint (Dkt. No. 1) ¶¶ 24, 25; Hopkins Decl. (Dkt. No. 64) ¶¶ 12, 14. Plaintiff alleges that thereafter he was brutally and repeatedly beaten by defendants Gardner and Titus, in the presence of Johnston and two unidentified corrections officers, at various locations including at the infirmary, in draft processing, on the way to the **[*7]** SHU, and in the SHU, during which he was punched in the head and face and upper body, kicked in the head and in the side, and had his head slammed into the cinder block wall. *See* Complaint (Dkt. No. 64) Statement of Facts; Hopkins Decl. (Dkt. No. 64) ¶ 15. Plaintiff claims that during the assault Gardner threatened to kill him for "harassing Nurse Brue" and also said, "I'll kill your black ass, nigger, for harassing a white woman!" Complaint (Dkt. No. 64) ¶¶ 44, 46.

Following the incident in the infirmary plaintiff claims he was taken to the SHU reception room, bleeding profusely from his mouth, and was ordered to strip off all his clothing and beaten further. Complaint (Dkt. No. 1)

---

[2] Defendants' Exhibit L represents selected portions of the transcript of plaintiff's deposition and will be referred to herein as "Hopkins Tr.".

[3] Plaintiff's complaint names "Johnson, correction officer" as a defendant in the action and alleges that Johnson was the corrections officer that was involved in the events leading to issuance of the misbehavior report. *See* Complaint (Dkt. No. 1) Statement of Facts. In support of defendants' motion James Johnson, a corrections officer employed at Franklin and the defendant Johnson who was served and has appeared in **[*6]** the action, has submitted a declaration stating that he was named in the complaint in error because he is not the officer who co-signed the February 10, 2005 misbehavior report. *See generally* Johnson Decl. (Dkt. No. 58-5). Defendant Johnson states he was not on duty in the infirmary or involved in the misbehavior report or plaintiff's transfer to SHU on the day in question, and further that "R. Johnston" is the co-signer of the misbehavior report. *See id.* In response, plaintiff has stated that he has no objection to dismissal of his claims against Johnson. *See* Plaintiff's Memorandum (Dkt. No. 64) p. 13.

¶¶ 70-82. After the assault subsided, defendant Gardner ordered Hopkins to put on his underwear and threatened, "when medical see's [sic] you, you better not tell medical we did this to you, you will lose your teeth, eye or your life!" *Id.* at ¶ 83.

In accordance with the protocols for admission into SHU, *see* Volpe Decl. (Dkt. No. 58-6) ¶ 4, defendant Volpe, a registered nurse employed at the facility, was called into the SHU frisk examination area just after 6:00 p.m. on February 10, 2005 to conduct a visual **[*8]** inspection of the plaintiff. *Id.* ¶¶ 5-6. Upon her examination, defendant Volpe did not see any blood, areas of swelling, or other signs of injury to the plaintiff. *Id.* ¶ 6. Nurse Volpe then asked Hopkins if he had any injuries, which he denied, although he did report taking mediation for high blood pressure, and Volpe arranged for a prescription for the plaintiff while in SHU confinement. *Id.* ¶¶ 9-10; *see also* Defendants' Exh. N (Dkt. No. 58-23).

Plaintiff contends that he was thereafter placed in an SHU cell, still bleeding, and was not given any supper on that date, and further that on defendant Gardner's order, the water to his cell was turned off and he was deprived of showers and food until February 14, 2005. [4] Complaint (Dkt. No. 1) ¶¶ 91-98.

Once again, defendants deny plaintiff's allegations regarding any claimed deprivation of food and water. Defendant Titus, the supervising officer on duty in the SHU on February 10, 2005, explains that the dinner meal was **[*9]** served in the unit at 4:48 p.m. on February 10, 2005, the date of plaintiff's admission, and that because the plaintiff was not admitted until 5:55 p.m., and was not placed in his cell until 6:10 p.m., he did not receive his evening meal that day. Titus Decl. (Dkt. No. 58-3) ¶¶ 3, 5, and 8. The SHU log book, in which the delivery, inspection, and service of meals to inmates each day, among other things, are recorded also reflects that Hopkins also missed the lunch meal on February 12, 2005 because he was off unit on a visit at the time [5] and plaintiff refused the evening meal on that same date; the log book further shows, however, that plaintiff received every other meal served during the

period between February 11 and 14, 2005. *See generally id.*; *see also* Defendants' Exh. I (Dkt. No. 58-18).

Defendants also contest plaintiff's allegations regarding the unavailability of showers. The SHU log book reveals that plaintiff refused the opportunity to shower on February 13 and 14, 2005. *See* Defendants' Exh. I (Dkt. No. 58-18). In terms of the availability of water, after noting **[*10]** that every meal is served with a beverage defendant Titus, a corrections officer, indicates that due to the configuration of the plumbing in the SHU cells at Franklin it is not possible to turn off the water to an individual cell. Titus Decl. (Dkt. No. 58-3) ¶ 22; *see also* Defendants' Exh. I (Dkt. No. 58-18). Titus also states that Hopkins never complained to him that he had missed any meal or lacked running water, nor was Titus ever instructed by anyone to withhold food, water, or showers from plaintiff while he was in SHU confinement. [6] Titus Decl. (Dkt. No. 58-3) ¶¶ 19-20.

On February 14, 2005, a Tier III disciplinary hearing was conducted by Captain Phelix, who is not named as a defendant in this action, to address the charges set forth in the misbehavior report issued by Nurse Brue. [7] *See* Defendants' Exh. B (Dkt. No. 58-11). At the outset of the hearing, the plaintiff acknowledged on the record that he was served with a copy of the misbehavior report on February 11, 2005, that he was afforded an opportunity to select an assistant, which he did, and that before the

---

[4] Ordinarily, prisoners placed in SHU confinement are allowed two showers per week as well as one hour of outdoor exercise per day. *Husbands v. McClellan, 990 F. Supp. 214, 218 (W.D.N.Y. 1998)*; *see also* 7 N.Y.C.R.R. Pt. 304.

[5] Plaintiff admits that he was visiting with his fiancé, Willida Davis, on that date. Complaint (Dkt. No. 1) ¶ 111.

---

[6] The Deputy Superintendent of Security at Franklin, Steven Brown, describes the SHU at Franklin as comprised of thirty-six single occupancy cells, each of which is equipped with a sink with running water and a toilet. Brown Decl. (Dkt. No. 58-8) ¶ 10. The configuration of the cells at the time plaintiff was housed in the SHU did not permit independently shutting off a toilet and sink in a single cell without also turning off the water to the adjacent cell. *Id.* at ¶ 14. During the time that plaintiff was confined in the SHU, the adjacent cell was occupied, and at no time were complaints made by its occupants that **[*11]** there was a lack of running water. *Id.* at ¶¶ 15-16, 19.

[7] The DOCS conducts three types of inmate disciplinary hearings. Tier I hearings address the least serious infractions and can result in minor punishments such as the loss of recreation privileges. Tier II hearings involve more serious infractions and can result in penalties which include confinement for a period of time in the SHU. Tier III hearings concern the most serious violations, and could result in unlimited SHU confinement and the loss of "good time" credits. *See Hynes v. Squillace, 143 F.3d 653, 655 (2d Cir.)*, *cert. denied,* **525 U.S. 907, 119 S. Ct. 246, 142 L. Ed. 2d 202 (1998)**.

hearing he received the materials he had requested. *Id.* at p. 1; *see also* Defendants' Exh. A (Dkt. No. 58-10). While Hopkins initially denied all three charges, he later pleaded guilty to interference with a corrections employee and refusing a direct order, but persisted in his disclaimer of having made threats. *Id.* As a result of plaintiff's plea, the hearing officer imposed a sentence of two months of disciplinary confinement in SHU, with one month suspended and deferred for three months, together with a recommended loss of good time credit in the amount of thirty days, and a loss of package, commissary, and telephone privileges for **[*12]** two months. [8] *Id.* at p. 9; *see also* Defendants' Exh. A (Dkt. No. 58-10). Plaintiff was released from SHU confinement on March 11, 2005, after having served his one month disciplinary sentence. Allard Decl. (Dkt. No. 58-2) ¶ 16.

In his complaint, plaintiff maintains that following the multiple assaults of February 10, 2005 he was denied adequate medical treatment both for his injuries resulting from the incident and for other **[*13]** conditions. The record now before the court reveals that daily rounds are made by nursing staff at Franklin; if an inmate makes a complaint or requests medical attention while in the SHU, a note is made by the nurse in the inmate's ambulatory health record ("AHR") and also in the SHU log book. [9] Volpe Decl. (Dkt. No. 58-6) ¶ 14. Plaintiff's AHR reveals that on February 18, 2005, he was seen, and his high blood pressure medication was re-filled during rounds. *Id.* at ¶ 15; *see also* Defendants' Exh. N (Dkt. No. 58- 23). In addition, it is noted that during rounds on February 24, 2005 Hopkins complained to the nurse of a "sore mouth", which came "10 days ago", but which the nurse noted appeared "minimal to non-existent", and Orajel, a topical antiseptic, pain reliever and astringent, was administered. Volpe Decl. (Dkt. No. 58-6) ¶ 16; *see also* Defendants' Exh. N (Dkt. No. 58-23). The following day, plaintiff once again complained to the nurse conducting rounds that he had a sore mouth, and additionally claimed to having experienced dizziness upon changing positions. Volpe Decl. (Dkt. No. 58-6) ¶ 17; *see also*

Defendants' Exh. N (Dkt. No. 58-23). Plaintiff again was given Orajel and was **[*14]** also advised to change positions slowly to avoid dizziness. Hopkins' blood pressure medications were re-filled again on February 27, 2005 and March 7, 2005. Volpe Decl. (Dkt. No. 58-6) ¶ 18.

While at Franklin, plaintiff made no other complaints of injury or requests for medical treatment, except for treatment of a blister on his hand on April 6, 2005 and, upon his discharge from SHU confinement on March 11, 2005, making a request for assignment to a bottom bunk and threatening to "intentionally fall and take care of business" if the request was not granted. Volpe Decl. (Dkt. No. 58-6) ¶¶ 18-20; *see also* Defendants' Exh. N (Dkt. No. 58-23).

## II. PROCEDURAL HISTORY

Plaintiff commenced this action on January 2, 2008. Dkt. No. 1. Named as defendants in plaintiff's complaint are Michael Allard, the Superintendent at Franklin; Corrections Sergeant Gardner and a John Doe Sergeant; Corrections Officer Titus and two John Doe corrections officers; and Nurses Brue and Volpe, as well **[*15]** as a Jane Doe Nurse. *Id.* The complaint states eleven separate causes of action, alleging violations of the *First*, *Fifth*, *Eighth*, and *Fourteenth Amendments of the United States Constitution* as well as claims of retaliation, conspiracy in violation of *section 1983*, and a separate claim for conspiracy in violation of *42 U.S.C. § 1985(3)*. *Id.*

On September 28, 2009, following the completion of pretrial discovery, defendants filed a motion for summary judgment seeking dismissal of all of plaintiff's claims with the exception of those alleging the use of and failure to protect him from excessive force. Dkt. No. 58. In their motion, defendants argue that plaintiff's claims should be dismissed on the grounds that 1) he failed to exhaust his administrative remedies as to most of his claims; 2) his claim relating to the receipt of a false misbehavior report lacks merit; 3) plaintiff's retaliation claim fails under the doctrine of collateral estoppel, as well as on the merits; 4) plaintiff's due process claim is legally deficient because he cannot establish either the deprivation of a liberty interest or that he was denied due process; 5) the facts do not support a cognizable *Eighth Amendment* claim; **[*16]** 6) certain of the defendants were not personally involved in the conduct giving rise to plaintiff's constitutional claims; 7) plaintiff cannot demonstrate viable court access denial and conspiracy claims; 8) plaintiff's *Fifth Amendment* claim fails as a matter of law; and, 9) in any

---

[8] When asked at the close of the hearing whether he had any procedural objections to the way the hearing was conducted, Hopkins responded that he did not. Defendants' Exh. B (Dkt. No. 58-11) at p.10.

[9] Nurse Volpe saw plaintiff on occasion during rounds in the SHU; at no time during those visits did plaintiff complain to Volpe that he had not been fed or was deprived of running water. Volpe Decl. (Dkt. No. 58-6) ¶ 21.

event, defendants Volpe, Brue, Allard, and Johnston are entitled to qualified immunity. [10] On December 29, 2009, plaintiff responded in opposition to the defendants' motion, Dkt. No. 64, and defendants have since filed a reply. [11] Dkt. No. 67. Defendants' motion, which is now ripe for determination, has been referred to me for the issuance of a report and recommendation, pursuant to *28 U.S.C. § 636(b)(1)(B)* and *Northern District of New York Local Rules 72.3(c)*. *See also Fed. R. Civ. P. 72(b)*.

III. <u>DISCUSSION</u>

A. <u>Summary Judgment Standard</u>

Summary judgment motions are governed by *Rule 56 of the Federal Rules of Civil Procedure*. Under that provision, summary judgment is warranted when "the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as [*18] to any material fact and the movant is entitled to judgment as a matter of law." *Fed. R. Civ. P. 56(c)*; *see Celotex Corp. v. Catrett, 477 U.S. 317, 322, 106 S.Ct. 2548, 2552, 91 L. Ed. 2d 265 (1986)*; *Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 247, 106 S.Ct. 2505, 2509-10, 91 L. Ed. 2d 202 (1986)*; *Security Ins. Co. of Hartford v. Old Dominion Freight Line, Inc., 391 F.3d 77, 82-83 (2d Cir. 2004)*. A fact is "material", for purposes of this inquiry, if it "might affect the

---

[10] In response to defendants' motion, plaintiff has withdrawn his *Fifth Amendment* claim. Plaintiff's Memorandum (Dkt. No. 64) at p. 17.

[11] With their motion, defendants properly filed with the court a statement of materials facts alleged not to be in dispute, as required under *Northern District of New York Local Rule 7.1(a)(3)*. Under that rule, in opposition to defendants' motion plaintiff was required to submit a response [*17] mirroring defendants' Local Rule 7.1(a)(3) Statement and either admitting or denying each of the assertions contained within it, in matching numbered paragraphs. *N.D.N.Y.L.R. 7.1(a)(3)*. While plaintiff filed a response to Defendants' Rule 7.1(a)(3) Statement, his response only addresses paragraphs 1-37 of defendants' statement and completely fails to address the remaining paragraphs. In light of plaintiff's failure to provide such a statement, the assertions set forth in defendants' Local Rule 7.1(a)(3) Statement, paragraphs 38-96 of that statement are now deemed to have been admitted by him. *Id.*; *see, e.g., Elgamil v. Syracuse Univ., No. 99-CV-611, 2000 U.S. Dist. LEXIS 12598, 2000 WL 1264122, at *1 (Aug. 22, 2000)* (McCurn, S.J.) (listing cases); *see also Monahan v. New York City Dep't of Corr., 214 F.3d 275, 292 (2d Cir. 2000)* (discussing district courts' discretion to adopt local rules like *7.1(a)(3)*).

outcome of the suit under the governing law." *Anderson, 477 U.S. at 248, 106 S.Ct. at 2510*; *see also Jeffreys v. City of New York, 426 F.3d 549, 553 (2d Cir. 2005)* (citing *Anderson*). A material fact is genuinely in dispute "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson, 477 U.S. at 248, 106 S.Ct. at 2510*.

A party moving for summary judgment bears an initial burden of demonstrating that there is no genuine dispute of material fact to be decided with respect to any essential element of the claim in issue; the failure to meet this burden warrants denial of the motion. *Anderson, 477 U.S. at 250 n.4, 106 S.Ct. at 2511 n.4*; *Security Ins., 391 F.3d at 83*. In the event this initial burden is met, [*19] the opposing party must show, through affidavits or otherwise, that there is a material issue of fact for trial. *Fed. R. Civ. P. 56(e)*; *Celotex, 477 U.S. at 324, 106 S.Ct. at 2553*; *Anderson, 477 U.S. at 250, 106 S.Ct. at 2511*. Though *pro se* plaintiffs are entitled to special latitude when defending against summary judgment motions, they must establish more than mere "metaphysical doubt as to the material facts." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 586, 106 S.Ct. 1348, 1356, 89 L. Ed. 2d 538 (1986)*; *but see Vital v. Interfaith Med. Ctr., 168 F.3d 615, 620-21 (2d Cir. 1999)* (noting obligation of court to consider whether *pro se* plaintiff understood nature of summary judgment process).

When deciding a summary judgment motion, a court must resolve any ambiguities, and draw all inferences from the facts, in a light most favorable to the nonmoving party. *Jeffreys, 426 F.3d at 553*; *Wright v. Coughlin, 132 F.3d 133, 137-38 (2d Cir. 1998)*. The entry of summary judgment is warranted only in the event of a finding that no reasonable trier of fact could rule in favor of the non-moving party. *See Building Trades Employers' Educ. Ass'n v. McGowan, 311 F.3d 501, 507-08 (2d Cir. 2002)* (citation [*20] omitted); *see also Anderson, 477 U.S. at 250, 106 S.Ct. at 2511* (summary judgment is appropriate only when "there can be but one reasonable conclusion as to the verdict").

B. <u>Exhaustion</u>

In their motion defendants first contend that plaintiff has failed to pursue to completion his administrative remedies for all of his claims except those alleging that he was subjected to assault and denied food and water, and that the balance of plaintiff's claims must therefore be dismissed as unexhausted.

The Prison Litigation Reform Act of 1996 ("PLRA"), *Pub.*

2010 U.S. Dist. LEXIS 114368, *20

L. No. 104-134, 110 Stat. 1321 (1996), which imposes several restrictions on the ability of prisoners to maintain federal civil rights actions, expressly requires that "[n]o action shall be brought with respect to prison conditions under _section 1983_ of this title, or any other Federal law, by a prisoner confined in any jail, prison, or other correctional facility until such administrative remedies as are available are exhausted." _42 U.S.C. § 1997e(a)_; _see Woodford v. Ngo, 548 U.S. 81, 84, 126 S.Ct. 2378, 2382, 165 L. Ed. 2d 368 (2006)_; _Hargrove v. Riley, No. CV-04-4587, 2007 U.S. Dist. LEXIS 6899, 2007 WL 389003, at *5-6 (E.D.N.Y. Jan. 31, 2007)._ [12] "[T]he PLRA's exhaustion requirement applies **[*21]** to all inmate suits about prison life, whether they involve general circumstances or particular episodes, and whether they allege excessive force or some other wrong." _Porter v. Nussle, 534 U.S. 516, 532, 122 S.Ct. 983, 992, 152 L. Ed. 2d 12 (2002)_ (citation omitted).

The failure of a prisoner to satisfy the PLRA's exhaustion requirement is not jurisdictional, but instead gives rise to a defense which must affirmatively be raised by a defendant in response to an inmate suit. _Jones v. Bock, 549 U.S. 199, 212, 127 S.Ct. 910, 919, 166 L. Ed. 2d 798 (2007)._ In the event a defendant named in such an action establishes that the inmate plaintiff failed properly to exhaust available remedies prior to commencing the action, his or her complaint is subject to dismissal. _See Pettus v. McCoy, No. 04-CV-0471, 2006 U.S. Dist. LEXIS 65221, 2006 WL 2639369, at *1 (N.D.N.Y. Sept. 13, 2006)_ (McAvoy, J.); _see also Woodford, 548 U.S. at 94-95, 126 S.Ct. at 2387-88_ (holding that the PLRA requires "proper exhaustion" of available remedies). "Proper exhaustion" requires a plaintiff to procedurally exhaust his or her claims by "compl[ying] with the **[*22]** system's critical procedural rules." _Woodford, 548 U.S. at 95, 126 S.Ct. at 2388_; _see also Macias v. Zenk, 495 F.3d 37, 43 (2d Cir. 2007)_ (citing Woodford).

1. The _Hemphill_ Test

In a series of decisions rendered since the enactment of the PLRA, the Second Circuit has crafted a three-part test for determining whether dismissal of an inmate plaintiff's complaint is warranted for failure to satisfy the PLRA's exhaustion requirement. [13] _Macias, 495 F.3d at_ _41_; _see Hemphill v. New York, 380 F.3d 680, 686 (2d Cir. 2004)._ Under the prescribed algorithm, a court must first determine whether administrative remedies were available to the plaintiff at the relevant times. _Macias, 495 F.3d at 41_; _Hemphill, 380 F.3d at 686._ If such a remedy existed and was available, the court must next examine whether the defendants have forfeited the affirmative defense of non-exhaustion by failing to properly raise or preserve it or whether, through their own actions preventing the exhaustion of plaintiff's remedies, they should be estopped from asserting failure to exhaust as a defense. _Macias, 495 F.3d at 41_; _Hemphill, 380 F.3d at 686._ In the event the proffered defense survives these first two levels of scrutiny, **[*23]** the court lastly must examine whether special circumstances nonetheless exist and "have been plausibly alleged" to justify the plaintiff's failure to comply with the applicable administrative procedural requirements. [14] _Macias, 495 F.3d at 41_; _Hemphill, 380 F.3d at 686._

a) Availability of Remedy

New York prison inmates are subject to an Inmate Grievance Program ("IGP") established by the DOCS and recognized as an "available" remedy for purposes of the PLRA. _See Mingues v. Nelson, No. 96 CV 5396, 2004 U.S. Dist. LEXIS 2492, 2004 WL 324898, at *4 (S.D.N.Y. Feb. 20, 2004)_ (citing _Mojias v. Johnson, 351 F.3d 606 (2d Cir. 2003)_ and _Snider v. Melindez, 199 F.3d 108, 112-13 (2d Cir.1999))._ The IGP consists of **[*24]** a three-step review process. First, a written grievance is submitted to the Inmate Grievance Review Committee ("IGRC") within twenty-one days of the incident. [15] _7 N.Y.C.R.R. § 701.5(a)._ The IGRC, which is comprised of inmates and facility employees, then issues a determination regarding the grievance. _Id._ _§§ 701.4(b),_ _701.5(b)._ If an appeal is filed, the

---

the Supreme Court's decision in Woodford, has been a matter of some speculation. _See, e.g., Newman v. Duncan, No. 04-CV-395, 2007 U.S. Dist. LEXIS 98768, 2007 WL 2847304, at *2 n.4 (N.D.N.Y. Sept. 26, 2007)_ (McAvoy, S.J. and Homer, M.J.) .

[14] In practicality these three prongs of the prescribed test, though perhaps intellectually distinct, plainly admit of significant overlap. _See Hargrove, 2007 U.S. Dist. LEXIS 6899, 2007 WL 389003, at *8 n.14_; _see also Giano v. Goord, 380 F.3d 670, 677 n.6 (2d Cir. 2004)._

[15] The IGP supervisor may waive the grievance timeliness requirement due to "mitigating circumstances." _7 N.Y.C.R.R. § 701.6(g)(1)(i)(a)-(b)._

---

[12] Copies of all unreported decisions cited in this document have been appended for the convenience of the _pro se_ plaintiff.

[13] As will be seen, whether the _Hemphill_ test survives following

superintendent of the facility next reviews the IGRC's determination and issues a decision. Id. § 701.5(c). The third level of the process affords the inmate the right to appeal the superintendent's ruling to the Central Office Review Committee ("CORC"), which makes the final administrative decision. Id. § 701.5(d). Ordinarily, absent the finding of a basis to excuse non-compliance with this prescribed process, only upon exhaustion of these three levels of review may a prisoner seek relief pursuant to section 1983 in a federal court. Reyes v. Punzal, 206 F. Supp.2d 431, 432 (W.D.N.Y. 2002) (citing, inter alia, Sulton v. Greiner, No. 00 Civ. 0727, 2000 U.S. Dist. LEXIS 17887, 2000 WL 1809284, at *3 (S.D.N.Y. Dec. 11, 2000)).

Despite **[*25]** an inmate's entitlement in most instances to file and pursue a grievance in accordance with the IGP, there are circumstances under which the grievance procedure nonetheless is deemed not to have been available to an inmate plaintiff. See Hemphill, 380 F.3d at 687-88. Thus, for example, "[e]xhaustion may be considered unavailable in situations where plaintiff is unaware of the grievance procedures or did not understand it, . . . or where defendants' behavior prevents plaintiff from seeking administrative remedies." Hargrove, 2007 U.S. Dist. LEXIS 6899, 2007 WL 389003, at *8 (citations omitted) (noting, for example, that a defendant's failure to advance plaintiff's grievances or the issuance of threats against an inmate to deter the filing of a grievance may effectively render the administrative process unavailable). When testing the availability of administrative remedies in the face of claims that undue influence from prison workers has caused a plaintiff inmate to forego the formal grievance process, courts employ an objective test, examining whether "a similarly situated individual of ordinary firmness [would] have deemed them available." Hemphill, 380 F.3d at 688 (quotations and citations omitted); see Hargrove, 2007 U.S. Dist. LEXIS 6899, 2007 WL 389003, at *8.

b) **[*26]** Presentation of Defense/Estoppel

The second prong of the Hemphill analysis focuses upon "whether the defendants may have forfeited the affirmative defense of non-exhaustion by failing to raise or preserve it, or whether the defendants' own actions inhibiting the inmate's exhaustion of remedies may estop one or more of the defendants from raising the plaintiff's failure to exhaust as a defense." Hemphill, 380 F.3d at 686 (citations omitted).

c) Special Circumstances

The third, catchall factor to be considered under the Second Circuit's prescribed exhaustion rubric focuses upon whether special circumstances have been plausibly alleged which, if demonstrated, would justify excusing a plaintiff's failure to exhaust administrative remedies. Hemphill, 380 F.3d at 689; see also Giano, 380 F.3d at 676-77; Hargrove, 2007 U.S. Dist. LEXIS 6899, 2007 WL 389003, at *10. Among the circumstances potentially qualifying as "special" under this prong of the test include where a plaintiff's reasonable interpretation of applicable regulations regarding the grievance process differs from that of prison officials and leads him or her to conclude that the dispute is not grievable. Giano, 380 F.3d at 676-77; see also Hargrove, 2007 U.S. Dist. LEXIS 6899, 2007 WL 389003, at *10 **[*27]** (quoting and citing Giano).

2. Plaintiff's Exhaustion

In response to defendants' motion, plaintiff contends that he availed himself of all available avenues for registering his complaints with prison officials, including by filing an administrative appeal of his Tier III disciplinary determination. As an initial matter, it is well established that while placing prison officials on notice of a grievance through less formal channels may constitute claim exhaustion "in a substantive sense", an inmate plaintiff nonetheless must meet the procedural requirement of exhausting his or her available administrative remedies within the appropriate grievance construct in order to satisfy the PLRA. Macias, 495 F.3d at 43 (quoting Johnson v. Testman, 380 F.3d 691, 697-98 (2d Cir. 2004) (emphasis omitted). "An appeal from a disciplinary hearing does not satisfy the grievance exhaustion requirement for a [constitutional] claim, even if the hearing is based on the same set of facts underlying the grievance." Labounty v. Johnson, 253 F. Supp. 2d 496, 501-502 (W.D.N.Y. 2003) (citing McNair v. Sgt. Jones, No. 01 Civ. 3253, 2002 U.S. Dist. LEXIS 17409, 2002 WL 31082948, *7 (S.D.N.Y. Sept. 18, 2002) (dismissing § 1983 where plaintiff **[*28]** failed to exhaust administrative remedies despite having appealed from disciplinary hearing on the same facts alleged in support of his excessive force claim)); Benjamin v. Goord, No. 02 Civ. 1703, 2002 U.S. Dist. LEXIS 13054, 2002 WL 1586880, *2 (S.D.N.Y. July 17, 2002) ("exhausting appeals of a disciplinary hearing determination does not constitute exhausting administrative remedies for his grievance, even if the underlying facts are the same.") (other citation omitted)). Thus, to the extent that plaintiff claims to have exhausted his administrative remedies via his appeal of the disciplinary determination, his argument must fail.

Following his transfer into the Bare Hill Correctional Facility ("Bare Hill") on or about April 20, 2005, see Allard Decl. (Dkt. No. 58-2) ¶ 35, plaintiff filed grievance no. BR11-677-05, dated May 2, 2005, complaining of the issuance of a misbehavior report by Nurse Brue, the repeated assaults which he claims followed, and the denial of food and water in the ensuing days. Defendants' Exh. H (Dkt. No. 58-17). As relief, in the grievance Hopkins requested that he be afforded a safe environment free from retaliation, harassment, assault and battery. *Id.* Although filed late, on May 17, **[*29]** 2005 the grievance was accepted and forwarded to Franklin for investigation. *Id.* Following denial of the grievance by the superintendent at Bare Hill, plaintiff appealed to the CORC. Defendants' Exh. K (Dkt. No. 58-10). In that appeal, in addition to alleging that he was repeatedly beaten, and that Nurse Brue was confrontational and negligent in failing to examine him and report his injuries to authorities, plaintiff also alleged, for the first time, the existence of a conspiracy; like the original grievance, however, plaintiff's appeal of the superintendent's determination makes no reference to the alleged denial of access to the court or procedural due process, nor does it include the allegation that Nurse Brue and the correctional officers participating in the assault were acting in retaliation for plaintiff having exercised his *First Amendment* rights. [16] Upon close examination of plaintiff's grievance and appeal, therefore, it is at least arguable that plaintiff attempted to exhaust not just his claims relating to the assault and deprivation of food and water, as defendants now contend, but also the deprivation of medical treatment after the assault and an alleged conspiracy.

To combat defendants' exhaustion defense, plaintiff also alleges that on July 4, 2005, he filed a grievance complaining that **[*31]** Nurse Volpe ignored his injuries, and that "Nurse Jane Doe" similarly neglected his injuries when examining him on February 11, 2005. A copy of this grievance, stamped received July 8, 2005, is attached to plaintiff's declaration submitted in opposition to defendants' motion. [17] Hopkins Decl. (Dkt. No. 64) Exh. D. Defendants have completely failed to address this grievance, and the question of whether it was pursued to completion is not disclosed in the record now before the court. In view of the foregoing, I am unable to conclude on the record before me that Hopkins failed to exhaust his administrative remedies as to all of the matters alleged in the complaint, except as to his claims of assault and his contention that he was denied food and water. Instead, questions of fact remain as to whether plaintiff fully exhausted his complaints regarding medical indifference and conspiracy.

Accordingly, it seems **[*32]** evident that certain of plaintiff's claims in this action are exhausted, while others are not. Plaintiff's complaint is therefore properly regarded as a "mixed complaint". Under the circumstances thus presented, the Second Circuit has determined "that exhausted claims filed alongside unexhausted ones may proceed even though the unexhausted claims must be dismissed." *Giano, 380 F.3d at 675* (citing *Ortiz v. McBride, 380 F.3d 649 (2d Cir. 2004)).*

For these reasons, I recommend that defendants' motion for summary judgment dismissing plaintiff's claims alleging retaliation, denial of access to courts, [18]

_____

[16] As **[*30]** noted in *LaBounty*, there are exceptions to the general rule that for the purposes of the PLRA an appeal of a disciplinary determination does not serve to exhaust claims arising out of the same set of circumstances, such as when an inmate files a *section 1983* claim based on a violation of his due process rights in connection with the disciplinary hearing. An appeal from that hearing that raises the precise procedural infirmities may be sufficient to exhaust the grievance procedure as well. *253 F. Supp.2d at 502 n. 5* (citing and quoting *Flanagan v. Maly, 99 Civ. 12336, 2002 U.S. Dist. LEXIS 1373, 2002 WL 122921, *2 (S.D.N.Y. Jan. 29, 2002)* ("once the alleged deprivation of rights has been approved at the highest level of the state correctional department to which an appeal is authorized, resort to additional internal grievance mechanisms would be pointless."). Plaintiff did not raise any due process claims in his appeal of the disciplinary determination. For these reasons, plaintiff's allegation that he appealed to the Director of Special Housing Unit Appeals, Donald Selsky, is of no moment.

[17] In the grievance, plaintiff explains that he is filing "late because [he] contacted the I.G., the Inspector General's Office regarding this matter and believed that it was sufficient. I was also afraid of retaliation by the staff involved." Plaintiff's Exh. D. (Dkt. No. 64) at p. 3.

[18] Plaintiff's access to court claim seems to be premised upon his late grievance and the alleged loss of his appeal of his disciplinary determination. To establish a violation of the right of access to the courts, a plaintiff must demonstrate that defendants' interference caused him or her to suffer actual injury — that is, that a "nonfrivolous legal claim had been **[*33]** frustrated or was being impeded" as a result of defendants' conduct. *Lewis v. Casey, 518 U.S. 343, 353, 116 S.Ct. 2174, 2181, 135 L. Ed. 2d 606 (1996)*. To the extent that plaintiff is asserting a denial of access to courts claim, the record is devoid of any evidence showing that his efforts to bring a legal claim were thwarted by defendants' alleged interference, and this claim should also be dismissed on the

the filing of a false misbehavior report, failure to protect, denial of showers, and denial of due process be granted, and that these claims be dismissed as a result of plaintiff's failure to exhaust his administrative remedies.

### C. Retaliation/False Misbehavior Report

Even assuming that plaintiff had fully exhausted his administrative remedies with respect to his claims premised upon Nurse Brue's false misbehavior report and defendants' alleged retaliation, defendants contend additionally that those claims lack merit. [19]

As an initial matter, it should be noted that standing alone, the mere allegation that a false misbehavior report has been filed against an inmate does not implicate constitutional conduct. *Boddie v. Schnieder, 105 F.3d 857, 862 (2d Cir. 1997); Freeman v. Rideout, 808 F.2d 949, 951 (2d Cir. 1986)*, cert. denied, 485 U.S. 982, 108 S.Ct. 1273, 99 L. Ed. 2d 484 (1988)). The further assertion that the false misbehavior report has

---

merits. Even if defendants' interference with plaintiff's grievance and disciplinary appeal could support a claim for denial of access to courts, on the record before the court plaintiff has no such claim because it is undisputed that both his late grievance and disciplinary appeal were accepted and decided.

[19] In support of their quest for dismissal of this cause of action, defendants assert that it is precluded by the doctrine of collateral estoppel in light of a decision rendered by the New York State Supreme [*34] Court denying an Article 78 petition filed by Hopkins, in which he also alleged retaliation. Issue preclusion, often referred to as collateral estoppel, bars a party that has had a full and fair opportunity to litigate an issue of fact or law from relitigating the same issue once it has been decided against that party or its privy. *McKithen v. Brown, 481 F.3d 89, 105 (2d Cir. 2007); Marvel Characters, Inc. v. Simon, 310 F.3d 280, 288-89 (2d Cir. 2002)*. Under New York law, in order for issue preclusion to apply two elements must be established; first, the issue must both "actually and necessarily" have been decided in a prior proceeding, and secondly, the party against whom the doctrine is being urged must have been afforded a full and fair opportunity to litigate the issue in the first proceeding. *McKithen, 481 F.3d at 105;* see also *Giakoumelos v. Coughlin, 88 F.3d 56, 59 (2d Cir. 1996); Colon v. Coughlin, 58 F.3d 865, 869 (2d Cir. 1995)*. Although plaintiff raised retaliation in the context of the second of the two Article 78 proceedings he filed, on the record before the court it does not appear that the state court addressed and determined the issue of whether the defendants in this [*35] lawsuit retaliated against plaintiff in violation of his constitutional rights. *See* Defendants' Exh. F (Dkt. No. 58-15). As a result, it appears that collateral estoppel is inapplicable.

been prompted by retaliatory animus and relates to an inmate having engaged in protected activity, however, suffices to state a claim for retaliation. *Franco v. Kelly, 854 F.2d 584, 589 (2d Cir. 1988)*.

When adverse action is taken by prison officials against an inmate, motivated by the inmate's exercise of a right protected under the Constitution, including the free speech provisions of the *First Amendment*, a cognizable retaliation claim under *42 U.S.C. § 1983* lies. *See Franco, 854 F.2d at 588-90*. As the Second Circuit has repeatedly cautioned, however, such claims are easily incanted and inmates [*36] often attribute adverse action, including the issuance of misbehavior reports, to retaliatory animus; courts must therefore approach such claims "with skepticism and particular care." *Dawes v. Walker, 239 F.3d 489, 491 (2d Cir. 2001)* (citing *Flaherty v. Coughlin, 713 F.2d 10, 13 (2d Cir. 1983)), overruled on other grounds, Swierkiewicz v. Sorema N.A., 534 U.S. 506, 122 S. Ct. 992, 152 L. Ed. 2d 1 (2002); Davis v. Goord, 320 F.3d 346, 352 (2d Cir. 2003)* (same).

In order to state a *prima facie* claim under *section 1983* for retaliatory conduct, a plaintiff must advance non-conclusory allegations establishing that 1) the conduct at issue was protected; 2) the defendants took adverse action against the plaintiff; and 3) there was a causal connection between the protected activity and the adverse action — in other words, that the protected conduct was a "substantial or motivating factor" in the prison officials' decision to take action against the plaintiff. *Mount Healthy City Sch. Dist. Bd. of Educ. v. Doyle, 429 U.S. 274, 287, 97 S.Ct. 568, 576, 50 L. Ed. 2d 471 (1977); Dillon v. Morano, 497 F.3d 247, 251 (2d Cir. 2007); Dawes, 239 F.3d at 492 (2d Cir. 2001)*. If the plaintiff carries this burden, then to avoid liability the defendants must [*37] show by a preponderance of the evidence that they would have taken action against the plaintiff "even in the absence of the protected conduct." Mount *Healthy, 429 U.S. at 287, 97 S.Ct. at 576*. If taken for both proper and improper reasons, state action may be upheld if the action would have been taken based on the proper reasons alone. *Graham v. Henderson, 89 F.3d 75, 79 (2d Cir. 1996)* (citations omitted).

Analysis of retaliation claims thus requires careful consideration of the protected activity in which the inmate plaintiff has engaged, the adverse action taken against him or her, and the evidence tending to link the two. When such claims, which are exceedingly case specific, are alleged in only conclusory fashion, and are

2010 U.S. Dist. LEXIS 114368, *37

not supported by evidence establishing the requisite nexus between any protected activity and the adverse action complained of, a defendant is entitled to summary judgment dismissing plaintiff's retaliation claims. *Flaherty, 713 F.2d at 13*.

Here, although the grounds for plaintiff's retaliation claims are not entirely clear, broadly construing his opposition to defendants' motion it appears plaintiff is asserting that defendants retaliated against him for having  **[*38]** filed a 2004 appeal of a disciplinary determination and for filing an Article 78 proceeding in New York State Supreme Court in September of 2004. As to the former, plaintiff alleges that approximately four months before Nurse Brue issued her misbehavior report to him, he was involved in an incident with another nurse at the Franklin infirmary. According to plaintiff, he had complained of an earache and was accused of lying about his ear being an emergency, and was issued a misbehavior report by Nurse Mcintosh. Plaintiff states further that he was subsequently called back to the clinic where it was determined that plaintiff's ear required treatment by a specialist and that he was ultimately given a hearing aid upon a finding that he had suffered partial hearing loss. Submitted with his opposition papers is an appeal from an October 20, 2004 disciplinary determination wherein Hopkins disputes the hearing officer's finding of guilt, apparently on two of the charges included within Nurse Mcintosh's misbehavior report, including alleged interference with staff and making false statements. Plaintiff argues that this prior incident led to the acts of retaliation against him on February 10,  **[*39]** 2005.

Additionally, plaintiff suggests that the defendants' conduct was further motivated by plaintiff's September 2004 Article 78 proceeding, wherein he was successful in his challenge to the denial of his application for presumptive release; he also points out that he had received a notification dated March 22, 2005 again denying presumptive release, this time due to Captain Phelix's Tier III determination. [20]

At least with regard to the Article 78 proceeding, its is clear that plaintiff's resort to the state courts to challenge a DOCS determination constitutes protected activity. **[*41]** *Reid v. New York State Dep't of Corr., No.9:05-CV-0006, 2008 U.S. Dist. LEXIS 76173, 2008 WL 4279488, at * 54 (N.D.N.Y. Sept. 15, 2008)* (Kahn, D.J. and DiBianco, M.J.). Insofar as plaintiff claims that defendants retaliated for his attempts to redress the 2004 disciplinary determination by way of an appeal, it similarly would appear that plaintiff's allegations are sufficient to establish the first prong of a retaliation claim. *See Colon, 58 F.3d at 872* (holding that prison officials are prohibited from retaliating against prisoners who exercise the right to petition for redress of grievances). Accordingly, the first element of the retaliation test is satisfied.

The only retaliatory act that Nurse Brue is alleged to have committed was to issue a false misbehavior report. As District Judge David N. Hurd recognized in his decision in *Barclay v. New York, 477 F. Supp.2d 546 (N.D.N.Y. 2007)*, in cases involving allegations of retaliation based on the filing of allegedly false misbehavior reports, "[t]he difficulty lies in establishing a retaliatory motive." *Barclay, 477 F. Supp.2d at 558*. More than conclusory allegations are required to survive a summary judgment motion; the "types of circumstantial evidence that can show a causal connection  **[*42]** between the protected conduct and the alleged retaliation include temporal proximity, prior good discipline, finding of not guilty at the disciplinary hearing, and statements by defendants as to their

application for presumptive relief. *See* Dft's Exh. F (Dkt. No. 58-15) at p. 25 (unnumbered). Plaintiff was successful, and on March 14, 2005, the court (Teresi, J.S.C.) vacated the DOCS  **[*40]** determination of June 1, 2004 denying plaintiff presumptive release and directed the respondent to reconsider Hopkins' petition. *See id.* at p. 25 (unnumbered). On March 22, 2005, Hopkins was again denied presumptive release. Plaintiff brought a second Article 78 proceeding challenging the March 22, 2005 determination, this time asserting that after the court directed the DOCS to reconsider its earlier decisions, it was improper for the DOCS to consider the Tier III disciplinary action in its presumptive release decision because Justice Teresi's decision should have him placed his back to his original status of February 25, 2004 and June 2004, when he initially applied for presumptive release. *See* Defendants' Exh. F (Dkt. No. 58-15). Hopkins also claimed that the Tier III misbehavior report was retaliatory. *See id.* The court rejected Hopkins' claims, finding that they were without merit and that the retaliation claim was unsupported by any relevant evidence, and dismissed the petition. *See id.*

---

[20] On March 27, 2005, plaintiff wrote a letter to Superintendent Allard requesting that he review the Tier III disciplinary penalty imposed upon him, voicing concern that with a loss of thirty days of good time credit and the imposition of a thirty day disciplinary confinement period would preclude him from being presumptively released as scheduled. *See* Defendants' Exh. C (Dkt. No. 58-12). Six months earlier, on September 28, 2004, plaintiff had commenced a proceeding in New York State Supreme Court, pursuant to Article 78 of the New York Civil Practice Law and Rules, challenging the denial of his

motives." *Id.* (citations omitted); *see also Rivera v. Goord, 119 F. Supp.2d 327, 339 (S.D.N.Y. 2000)*.

In this instance, the first Article 78 proceeding preceded Nurse Brue's misbehavior report by several months, as did plaintiff's disciplinary appeal, which occurred four months before Nurse Brue issued her misbehavior report, and there is not a shred of evidence connecting Nurse Brue to either the presumptive release denial or the previous misbehavior report. To the contrary, Nurse Brue has unequivocally stated that she was unaware of any prior complaints by the plaintiff against her or any other nursing staff, and plaintiff has adduced no evidence contradicting this statement. Brue Decl. (Dkt. No. 58-4) ¶ 12. As a result, plaintiff's conclusory retaliation claim against Nurse Brue cannot be sustained.

Plaintiff's retaliation claims also extend to defendant Volpe, who is alleged to have denied him medical treatment, and to defendants Gardner and Titus, who allegedly retaliated against him **[*43]** by their repeated assaults and use of excessive force. Once again, however, there is no evidence in the record to link any of these defendants with plaintiff's prior protected activity. I therefore recommend that defendants' motion, to the extent that it seeks dismissal of plaintiff's retaliation claim, be granted.

D. Due Process

Plaintiff's second cause of action appears to assert a violation of his right to due process in connection with his disciplinary proceedings. Defendants make three separate arguments in support of their request for dismissal of this claim. Relying principally upon *Edwards v. Balisok, 520 U.S. 641, 117 S.Ct. 1584, 137 L. Ed. 2d 906 (1997)* and its progeny, defendants first contend that plaintiff's due process claim is subject to dismissal because it includes a challenge to his loss of good time credits, which affects the length of plaintiff's confinement, without a showing that the underlying determination has been set aside. Next, defendants contend that plaintiff was not deprived of a protected liberty interest, and finally, they argue for dismissal of the claim on the grounds that plaintiff received all of the process that he was due.

1. *Edwards v. Balisok*

In *Balisok*, the Supreme **[*44]** Court held that a claim for damages for a violation of procedural due process in the context of a prison disciplinary hearing is not cognizable under *section 1983* where the nature of the

challenge to the procedures followed necessarily implies the invalidity of the resulting judgment and/or punishment imposed, unless the disciplinary disposition has already been reversed through a state administrative or judicial proceeding or a habeas proceeding. *Balisok, 520 U.S. at 645, 117 S.Ct. at 1588-89*. If a prisoner, however, as a prerequisite for maintaining his *§ 1983* action, both agrees to and can successfully abandon once and for all the duration claim, then his success in the *§ 1983* action would have no effect on the sanctions that relate to the length of time he served in prison, and he can proceed on his due process claim. *Peralta v. Vasquez, 467 F.3d 98, 105 (2d Cir. 2006)*. "[B]ut . . . he can only do so if he is willing to forgo once and for all any challenge to any sanctions that affect the duration of his confinement. In other words, the prisoner must abandon, not just now, but also in any future proceeding, any claims he may have with respect to the duration of his confinement **[*45]** that arise out of the proceeding he is attacking in his current *§ 1983* suit." *Id. at 104* (emphasis in original).

In the face of defendants' motion, expressly citing *Peralta*, plaintiff has stated that he "hereby, once and for all, waives any future challenges affecting the duration of my confinement related to this matter" and requests that he be allowed to proceed on this issue. Plaintiff's Memorandum (Dkt. No. 64) p. 9. In view of plaintiff's waiver, the court will consider the merits of plaintiff's procedural due process claim.

2. Merits

To successfully state a claim under *42 U.S.C. § 1983* for the denial of procedural due process arising out of a disciplinary hearing, a plaintiff must show that he or she 1) possessed an actual liberty interest, and 2) was deprived of that interest without being afforded sufficient procedural safeguards. *See Tellier v. Fields, 280 F.3d 69, 79-80 (2d Cir. 2000)* (citations omitted); *Hynes, 143 F.3d at 658*; *Bedoya v. Coughlin, 91 F.3d 349, 351-52 (2d Cir. 1996)*.

From the record now before the court, it seems clear that plaintiff cannot demonstrate that he has suffered deprivation of a constitutionally protected liberty interest as a result of the allegedly **[*46]** flawed Tier III disciplinary hearing. The Second Circuit has interpreted the Supreme Court's decision in *Sandin v. Conner, 515 U.S. 472, 115 S.Ct. 2293, 132 L. Ed. 2d 418 (1995)*, to mean that "a prisoner's restricted confinement within a prison does not give rise to a liberty interest, warranting procedural due process protection, unless the conditions 'impose[ ] atypical and significant hardship on

2010 U.S. Dist. LEXIS 114368, *46

the inmate in relation to the ordinary incidents of prison life." *Sealey v. Giltner, 197 F.3d 578, 583 (2d Cir. 1999)* (quoting *Sandin, 515 U.S. at 484, 115 S.Ct. 2293*). Atypicality in a Sandin inquiry is normally a question of law. [21] *Colon v. Howard, 215 F.3d 227, 230-31 (2d Cir. 2000)*; *Sealey, 197 F.3d at 585*. When determining whether a plaintiff possesses a liberty interest, district courts must examine the specific circumstances of confinement, including analysis of both the length and conditions of confinement. *See Sealey, 197 F.3d at 586; Arce v. Walker, 139 F.3d 329, 335-36 (2d Cir. 1998); Brooks v. DiFasi, 112 F.3d 46, 48-49 (2d Cir. 1997); see also Williams v. Goord, 111 F.Supp.2d 280, 289 (S.D.N.Y. 2000)* (citations omitted) (SHU confinement in New York generally does not impose atypical and significant [*47] hardship because it remains within the normal range of prison custody).

While not the only factor to be considered, the duration of an inmate's disciplinary confinement remains paramount under *Sandin*. [22] *Colon, 215 F.3d at 231*. Specifically, while under certain circumstances confinement of less than 101 days in theory could be shown to meet the atypicality standard under *Sandin* (*see id. at 232 n.5*), the Second Circuit generally takes the position that SHU confinement under ordinary conditions of more than 305 days rises to the level of atypicality, whereas normal SHU confinement of 101 days or less does not. *Id. at 231-32*. [23]

Here, the record establishes that plaintiff was confined to the SHU from February 10, 2005 to March 11, 2005, a period of not more than thirty days. Nowhere does plaintiff allege, nor is there any evidence suggesting,

that the conditions to which he was exposed while in SHU confinement imposed an atypical and substantial hardship in relation to conditions experienced by inmates in the general population at Franklin. Plaintiff's confinement to SHU for a period of thirty days, without more, is insufficient to raise a constitutionally protected liberty interest. *Mortimer Excell v. Fischer, No. 08-CV-945, 2009 U.S. Dist. LEXIS 88334, 2009 WL 3111711, at *9 (N.D.N.Y. Sept. 24, 2009)* (Hurd, J.) ("[C]ourts have roundly rejected the notion that . . . a short period of confinement, without additional hardships, creates a liberty interest even when confinement is completely segregated, such as when an inmate [*49] is sent to . . .[SHU].") (citing *Sealey, 197 F.3d at 589-90*); *see also Borcsok v. Early*, No. 9:03-CV-395, 2007 WL 2454196, at *9 (N.D.N.Y. 2007) (Sharpe, J.) (finding that 90-day confinement in SHU alone with 90-day loss of packages, commissary and telephone privileges insufficient to raise a liberty interest without showing there as an atypical and significant hardship). Accordingly, in light of his failure to establish a deprivation of a constitutional cognizable liberty interest, plaintiff's due process claim is subject to dismissal on this basis. [24], [25]

---

[21] In cases where there is factual dispute concerning the conditions or duration of confinement, however, it may nonetheless be appropriate to submit those disputes to a jury for resolution. *Colon, 215 F.3d at 230-31*; *Sealey, 197 F.3d at 585*.

[22] Segregation for a period of thirty days was found by the Supreme Court in *Sandin* not to impose a significant hardship on an inmate. *515 U.S. at 485-86, 115 S.Ct. at 2301*. In explaining its reasoning, the Court found that the disciplinary confinement failed to present "a dramatic departure from the basic conditions" of an inmate's [*48] normal sentence. *Id.*

[23] In *Colon*, a Second Circuit panel split markedly on whether or not adoption of a 180-day "bright line" test for examining SHU confinement would be appropriate and helpful in resolving these types of cases. *215 F.3d at 232-34 (Newman, C.J.), 235-37* (Walker, C.J. and Sack, C.J., concurring in part).

---

[24] Even if plaintiff were able to prove the deprivation of a cognizable liberty interest, his procedural due process claim would nonetheless be subject to dismissal in light of the fact that the record establishes that the necessary procedures, including those articulated in *Wolff v. McDonnell, 418 U.S. 539, 563-67, 94 S.Ct. 2963, 2978-80, 41 L. Ed. 2d 935 (1974)*, were provided. The record establishes that plaintiff received a copy of the misbehavior report setting forth the charges against him in advance of the hearing. *See* Defendants' Exh. A (Dkt. No. 58-10). The disciplinary hearing was conducted and was recorded. *See generally* Defendants' Exh. [*50] B. (Dkt. No. 58-11). At the commencement of the hearing, the plaintiff confirmed that he was had requested and received assistance in advance of the hearing. *Id.* at pp. 1-2. Plaintiff was permitted to testify at the hearing and was afforded the opportunity to call witnesses, which he declined after deciding to enter a plea of guilty to two of the three charges. Plaintiff confirmed twice on the record that his plea was voluntarily entered. *Id.* at p. 8. After announcing his disposition, the hearing officer explained the implications of his decision to Hopkins, asked Hopkins if he had any procedural objections, to which plaintiff responded "no," and advised plaintiff of his right of appeal. *Id* at pp. 9-11. Plaintiff later sought review by the superintendent, and the hearing officer's decision was upheld on appeal. Defendants' Exh. C (Dkt. No. 58-12).

[25] Though not entirely clear, and it is not addressed by defendants, it appears that plaintiff may also be advancing a substantive due process cause of action. The *Due Process*

2010 U.S. Dist. LEXIS 114368, *50

E. Medical Indifference

In his third cause of action, plaintiff asserts that Nurses Brue and Volpe, as well as Superintendent Allard, were deliberately indifferent to his medical needs, by failing to provide him with treatment for his injuries suffered in the alleged assaults in violation of the constitutional protection of the *Eighth Amendment* against cruel and unusual punishment. In their motion, defendants seek dismissal of this claim on the basis that plaintiff's condition was not sufficiently serious to warrant constitutional protection, and because the defendants did not act with the requisite state of mind to support an *Eighth Amendment* violation.

Claims that prison officials have intentionally disregarded an inmate's medical needs fall under the umbrella of protection from the imposition of cruel and unusual punishment afforded by the *Eighth Amendment*. *Estelle v. Gamble, 429 U.S. 97, 102, 104, 97 S.Ct. 285, 290, 291, 50 L. Ed. 2d 251 (1976)*. The *Eighth Amendment* prohibits punishment that involves the "unnecessary and wanton infliction of pain" and is incompatible with "the evolving standards of decency **[*53]** that mark the progress of a maturing society." *Id.*; *see also Whitley v. Albers, 475 U.S. 312, 319, 106 S.Ct. 1078, 1084, 89 L. Ed. 2d 251 (1986)* (citing, *inter alia*, *Estelle*). While the *Eighth Amendment* does not

_____

*Clause of the Fourteenth Amendment* contains both a substantive and a procedural component. *Zinermon v. Burch, 494 U.S. 113, 125, 110 S.Ct. 975, 108 L. Ed. 2d 100 (1990)*. The substantive **[*51]** component "bars certain arbitrary and wrongful government action regardless of the fairness of the procedures used to implement them." *Id. at 125, 110 S.Ct. at 983* (internal quotations and citation omitted). "Substantive due process protects individuals against government action that is arbitrary, conscience-shocking, or oppressive in a constitutional sense, but not against government action that is incorrect or ill-advised." *Lowrance v. Achtyl, 20 F.3d 529, 537 (2d Cir. 1994)* (internal quotations and citations omitted) (citing cases). "The first step in a substantive due process analysis is to identify the constitutional right at stake." *Excell v. Woods, No. 9:07-CV-0305, 2009 U.S. Dist. LEXIS 90191, 2009 WL 3124424, at *23 (N.D.N.Y. Sept. 29, 2009)* (Suddaby, J. and Lowe, M. J.) (citing *Lowrance, 20 F.3d at 537*). There are few circumstances arising in the context of prison life that ascend to the level of shocking and suffice to state a substantive due process violation. *Shuler v. Brown, No. 07-CV-0937, 2009 U.S. Dist. LEXIS 124791, 2009 WL 790973, at *9 (N.D.N.Y. Mar. 23, 2009)* (McAvoy, S. J. and Lowe, M. J.). There is no evidence in the record before the court upon which a reasonable jury could conclude that defendants acted in such a shocking **[*52]** manner as to give rise to damages for violation of plaintiff's right to substantive due process.

mandate comfortable prisons, neither does it tolerate inhumane treatment of those in confinement. *Farmer v. Brennan, 511 U.S. 825, 832, 114 S.Ct. 1970, 1976, 128 L. Ed. 2d 811 (1994)* (citing *Rhodes v. Chapman, 452 U.S. 337, 349, 101 S.Ct. 2392, 2400, 69 L. Ed. 2d 59 (1981))*. To satisfy their obligations under the *Eighth Amendment*, prison officials must "ensure that inmates receive adequate food, shelter, and medical care, and must take reasonable measures to guarantee the safety of inmates." *Farmer, 511 U.S. at 832, 114 S.Ct. at 1976* (quoting *Hudson v. Palmer, 468 U.S. 517, 526-27, 104 S.Ct. 3194, 3200, 82 L. Ed. 2d 393 (1984))* (internal quotations omitted).

A claim alleging that prison officials have violated the *Eighth Amendment* by inflicting cruel and unusual punishment must satisfy both objective and subjective requirements. *Wright v. Goord, 554 F.3d 255, 268 (2d Cir. 2009)*; *Price v. Reilly, 697 F. Supp. 2d 344, 2010 WL 889787, at *7-8 (E.D.N.Y. 2010)*. Addressing the objective element, to prevail a plaintiff must demonstrate a violation **[*54]** sufficiently serious by objective terms, "in the sense that a condition of urgency, one that may produce death, degeneration, or extreme pain exists." *Hathaway v. Coughlin, 99 F.3d 550, 553 (2d Cir. 1996)*. With respect to the subjective element, a plaintiff must also demonstrate that the defendant had "the necessary level of culpability, shown by actions characterized by 'wantonness.'" *Blyden v. Mancusi, 186 F.3d 252, 262 (2d Cir. 1999)*. Claims of medical indifference are subject to analysis utilizing this *Eighth Amendment* paradigm. *See Salahuddin v. Goord, 467 F.3d 263, 279-81 (2d Cir. 2006)*.

1. Objective Requirement

Analysis of the objective, "sufficiently serious" requirement of an *Eighth Amendment* medical indifference claim begins with an inquiry into "whether the prisoner was actually deprived of adequate medical care . . .", and centers upon whether prison officials acted reasonably in treating the plaintiff. *Salahuddin, 467 F.3d at 279*. A second prong of the objective test addresses whether the inadequacy in medical treatment was sufficiently serious. *Id. at 280*. If there is a complete failure to provide treatment, the court must look to the seriousness of the inmate's medical **[*55]** condition. *Smith v. Carpenter, 316 F.3d 178, 185-86 (2d Cir. 2003)*. If, on the other hand, the complaint alleges that treatment was provided but was inadequate, the seriousness inquiry is more narrowly confined to that alleged inadequacy, rather than focusing upon the seriousness of the prisoner's medical condition.

*Salahuddin, 467 F.3d at 280*. "For example, if the prisoner is receiving on-going treatment and the offending conduct is an unreasonable delay or interruption in treatment. . . [the focus of] the inquiry is on the challenged delay or interruption, rather that the prisoner's underlying medical condition alone." *Id.* (quoting *Smith, 316 F.3d at 185*) (internal quotations omitted). In other words, at the heart of the relevant inquiry is the seriousness of the medical need, and whether from an objective viewpoint the temporary deprivation was sufficiently harmful to establish a constitutional violation. *Smith, 316 F.3d at 186*. Of course, "when medical treatment is denied for a prolonged period of time, or when a degenerative medical condition is neglected over sufficient time, the alleged deprivation of care can no longer be characterized as 'delayed treatment,' but may properly **[*56]** be viewed as a 'refusal' to provide medical treatment." *Id. at 186, n.10* (quoting *Harrison v. Barkley, 219 F.3d 132, 137 (2d Cir. 2000))*.

Since medical conditions vary in severity, a decision to leave a condition untreated may or may not raise constitutional concerns, depending on the circumstances. *Harrison, 219 F.3d at 136-37* (quoting, *inter alia, Chance v. Armstrong, 143 F.3d 698, 702 (2d Cir. 1998))*. Relevant factors informing this determination include whether the plaintiff suffers from an injury or condition that a "'reasonable doctor or patient would find important and worthy of comment or treatment'", a condition that " 'significantly affects'" a prisoner's daily activities, or "'the existence of chronic and substantial pain.'" *Chance, 143 F.3d at 702* (citation omitted); *LaFave v. Clinton County, No. CIV. 9:00CV774, 2002 U.S. Dist. LEXIS 19946, 2002 WL 31309244, at *3 (N.D.N.Y. Apr. 3, 2002)* (Sharpe, M.J.) (citation omitted).

The essence of plaintiff's claim in this regard appears to be that after he was subjected to beatings and when admitted into the SHU, Nurse Volpe intentionally ignored the obvious injuries that he had sustained. Additionally, plaintiff claims that on the following day, after the superintendent **[*57]** had ordered an investigation of plaintiff's complaint that he had been assaulted, Nurse Jane Doe, whom he has never identified or served but who appears to be Nurse Caban, see Volpe Decl. (Dkt. No. 58-6) ¶12, refused to acknowledge or treat his injuries. Because plaintiff alleges that these defendants completely failed to treat his injuries, the seriousness of the injuries sustained becomes an important consideration when evaluating the objective prong of the deliberate indifference test.

In this instance, plaintiff alleges that he sustained "a bleeding swollen and bruised lip, several lacerations about the inner and lower lip area, a swollen and bruised head underneath the hair portion, mental anguish, anxiety, post Traumatic Stress Disorder, [and] emotiional [sic] distress . . . ." A review of the pleadings and evidence before the court leads to the inescapable conclusion that plaintiff has offered no proof to sustain his burden of showing that his injuries were sufficiently serious.

At the outset, I note that plaintiff has offered nothing but conclusory assertions to support his claims. Nurse Volpe, on the other hand, has stated that she observed Hopkins in his undershorts at the time **[*58]** of his admission to SHU, and she did not see any blood, areas of redness or swelling, or any other sign of injury on plaintiff. Volpe Decl. (Dkt. No. 58-6) ¶ 6. Moreover, when questioned by Volpe regarding his injuries plaintiff denied that he had any. *Id.* ¶ 10; *see also* Defendants' Exh. N (Dkt. No. 58-23). Nurse Volpe has also stated that plaintiff was seen by Nurse Caban the following day, who noted in an injury report that she "viewed [Hopkins] in shorts, has mild lower back birthmark, no other bruises or injuries noted. Has slight discoloration noted to the bottom lip. No treatment indicated." Volpe Decl. (Dkt. No. 58-6) ¶¶12-13; *see also* Defendants' Exh. N (Dkt. No. 58-23). The next entry in plaintiff's AHR appears fourteen days later, on February 24, 2005, stating that during SHU rounds plaintiff complained of a "sore mouth", which started ten days earlier, but appeared to be "minimal to non-existent" and only subjective to the nurse doing rounds. On that day, as well as the next, plaintiff was given a topical antiseptic for the mouth pain. Plaintiff made no other complaints of injury or illness or requests for treatment while at Franklin, except for complaining of a blister on **[*59]** his hand from raking on April 6, 2005, which was treated by a nurse.

Even crediting plaintiff's claims that he sustained a bleeding swollen and bruised lip, several lacerations about the inner and lower lip area, a swollen and bruised head, it does not appear that plaintiff has shown a "sufficiently serious" condition to support a claim for medical indifference. [26] *See Tapp v. Tougas, No. 9:05-CV-0149, 2008 U.S. Dist. LEXIS 82973, 2008 WL 4371766, at * 9 (N.D.N.Y. Aug. 11, 2008)* (citing *Peterson v. Miller*, No. 9:04-CV-797, 2007 WL 2071743,

---

[26] Moreover, there is no evidence in the record to suggest that plaintiff sustained and sought treatment for post traumatic stress disorder.

2010 U.S. Dist. LEXIS 114368, *59

at *7 (N.D.N.Y. July 13, 2007) (noting that a "dull pain" in plaintiff's back and persistent rash on plaintiff's foot did not raise a constitutional issue) (citing *Hathaway, 37 F.3d at 66*; *Salaam v. Adams, No. 03-CV-0517, 2006 U.S. Dist. LEXIS 70963, 2006 WL 2827687 (N.D.N.Y. Sept. 29, 2006)), Report and Recommendation Adopted in Part, Rejected in Part, 2008 U.S. Dist. LEXIS 76170, 2008 WL 4371762 (N.D.N.Y. Sep 18, 2008)* (Mordue, C.J.); *see also Ford v. Phillips, No. 05 Civ. 6646, 2007 U.S. Dist. LEXIS 25226, 2007 WL 946703, at *12 & n.70 (S.D.N.Y. Mar. 27, 2007)* (finding that plaintiff's allegations of bruises, abrasions, and blood in his urine for a few weeks did not constitute a sufficiently serious condition giving rise to a medical indifference claim); *Sonds v. St. Barnabas Hosp. Corr. Health Servs., 151 F. Supp.2d 303, 311 (S.D.N.Y.2001)* [*60] (cut finger with "skin ripped off" is insufficiently serious); *Bonner v. N.Y. City Police Dep't, No. 99 Civ. 3207, 2000 U.S. Dist. LEXIS 11738, 2000 WL 1171150, at *4 (S.D.N.Y. Aug. 17, 2000)* (inability to close hand due to swelling insufficiently serious to constitute *Eighth Amendment* violation); *Gomez v. Zwillinger, 1998 U.S. Dist. LEXIS 17713 at *16 (S.D.N.Y. November 6, 1998)* (back pain and discomfort not sufficiently serious); *Jones v. New York City Health & Hosp. Corp., 1984 U.S. Dist. LEXIS 21694 at *3-4 (S.D.N.Y. November 28, 1984)* (deliberate indifference claim dismissed where plaintiff challenged treatment for bruises on head and body).

In view of the foregoing, no reasonable factfinder could conclude that plaintiff suffered a medical condition sufficiently serious to sustain an *Eighth Amendment* medical indifference claim.

2. Subjective Element

Had plaintiff been able to successfully meet the objective element of the deliberate indifference standard, his claim would nonetheless fail upon the lack of any showing in the record that any of the defendants at issue in connection [*61] with this claim were subjectively indifferent to his medical condition.

The subjective prong of the deliberate indifference standard mandates a showing of a sufficiently culpable state of mind, or deliberate indifference, on the part of one or more of the defendants. *Salahuddin, 467 F.3d at 280* (citing *Wilson, 501 U.S. at 300, 111 S.Ct. 2321*). Deliberate indifference, in a constitutional sense, exists if an official "knows of and disregards an excessive risk to inmate health or safety; the official must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and he [or

she] must also draw the inference." *Farmer, 511 U.S. at 837, 114 S.Ct. at 1979*; *Leach v. Dufrain, 103 F. Supp.2d 542, 546 (N.D.N.Y. 2000)* (Kahn, J.) (citing *Farmer, 511 U.S. at 837, 114 S.Ct. at 1979*); *Waldo v. Goord, No. 97-CV-1385, 1998 U.S. Dist. LEXIS 15948, 1998 WL 713809, at *2 (N.D.N.Y. Oct. 1, 1998)* (Kahn, J. and Homer, M.J.) (same). Deliberate indifference is a mental state equivalent to subjective recklessness as the term is used in criminal law. *Salahuddin, 467 F.3d at 280* (citing *Farmer, 511 U.S. at 839-40, 114 S.Ct. 1970*).,

Mere negligence on the part of a physician or other prison [*62] medical official in treating or failing to treat a prisoner's medical condition, on the other hand, does not implicate the *Eighth Amendment* and is not properly the subject of a *§ 1983* action. *Estelle, 429 U.S. at 105-06, 97 S.Ct. at 292*; *Chance, 143 F.3d at 703*. "Medical malpractice does not become a constitutional violation merely because the victim is a prisoner." *Estelle, 429 U.S. at 106, 97 S.Ct. at 292*. If prison officials consciously delay or otherwise fail to treat an inmate's serious medical condition "as punishment or for other invalid reasons," however, such conduct is actionable as deliberate indifference. *Harrison, 219 F.3d at 138*; *Kearsey v. Williams, 2005 U.S. Dist. LEXIS 19017, 2005 WL 2125874, at *5 (S.D.N.Y. Sep. 1, 2005)*.

With respect to Nurse Brue, the record is clear that plaintiff received medical treatment from her for the conditions of which he was complaining on February 10, 2005. Indeed, plaintiff's admits that on that date he complained of a cough, sore throat, and green phlegm, and that Nurse Brue took his temperature and determined that throat lozenges and cough syrup were appropriate for plaintiff's condition. Defendants' Rule 7.1(a)(3) Statement ¶¶4, 5. Thereafter, Nurse Brue instructed [*63] plaintiff to leave the infirmary, and although plaintiff alleges that Nurse Brue then wrote a false misbehavior report accusing plaintiff in misconduct, there are no allegations and no evidence to suggest that Nurse Brue was involved with plaintiff thereafter. To the contrary Nurse Brue has stated, without contradiction from plaintiff, that after the incident in the infirmary on February 10, 2005, she had no further involvement in the care and treatment of Hopkins. Based upon these undisputed facts, no reasonable factfinder could find in favor of plaintiff on his medical indifference claim against Nurse Brue.

Turning next to plaintiff's claim against Nurse Volpe, she states she saw plaintiff upon his admission to the SHU, at which time she observed no sign of injury, a fact that

2010 U.S. Dist. LEXIS 114368, *63

is deemed admitted by virtue of plaintiff's failure to dispute that statement in defendants' Rule 7.1(a)(3) Statement. Moreover, plaintiff has admitted that when Nurse Volpe asked if he had any injuries, he denied that he did. Hopkins Tr. at p. 91-92. Under the circumstances presented, no reasonable factfinder could conclude that Nurse Volpe was aware of and consciously disregarded a serious risk to plaintiff's [*64] health and safety.

Plaintiff's medical indifference claims against Superintendent Allard are even weaker than those interposed against Nurses Brue and Volpe. Plaintiff's deliberate indifference claim against defendant Allard appears to spring from his complaint to the superintendent on February 11, 2005 when he stopped Superintendent Allard, while making his rounds, regarding the assault the evening before. It should be noted that during the conversation with Allard plaintiff did not identify an specific injuries, nor did Allard observe any. *See* Complaint (Dkt. No. 1) ¶ 99; Allard Decl. (Dkt. No. 58-2) ¶ 25. In response to plaintiff's complaint Allard delegated investigation of the alleged assault to Deputy Superintendent D. Locke. Allard Decl. (Dkt. No. 58-2) ¶ 26. As part of that the ensuing investigation Hopkins was interviewed and photographed, and additionally was seen on February 11, 2005 by Nurse Caban, who noted a slight discoloration on his bottom lip, but no other bruises or injuries. The Defendants' Exh. G (Dkt. No. 58-16). Based upon these facts, no reasonable factfinder could conclude that defendant Allard acted with the requisite degree of medical indifference to plaintiff's [*65] medical needs.

F. Conditions of Confinement

Plaintiff advances a second claim under the *Eighth Amendment*, alleging that he was deprived of food for three days, running water in his cell for two days, and the opportunity to shower for four days. Defendants urge the court to dismiss these claims as not constitutionally viable. The conditions associated with a convicted inmate's confinement are subject to *Eighth Amendment* scrutiny, and must meet the constitutional minimum under that constitutional provision. *Farmer, 511 U.S. at 832, 114 S.Ct. at 1976* (citing *Rhodes v. Chapman, 452 U.S. 337, 349, 101 S.Ct. 2392, 2400, 69 L. Ed. 2d 59 (1981))*. While the *Eighth Amendment* does not mandate comfortable prisons, neither does it tolerate inhumane treatment of those in confinement; thus the conditions of an inmate's confinement are subject to *Eighth Amendment* scrutiny. *Farmer, 511*

*U.S. at 832, 114 S.Ct. at 1976*.

A claim alleging that prison conditions violate the *Eighth Amendment*, like plaintiff's medical indifference claim, must satisfy both an objective and subjective requirement — the conditions must be "sufficiently serious" from an objective point of view, and the plaintiff must demonstrate that prison officials [*66] acted subjectively with "deliberate indifference". *See Leach, 103 F. Supp.2d at 546* (citing *Wilson v. Seiter, 501 U.S. 294, 111 S.Ct. 2321, 115 L. Ed. 2d 271 (1991))*; *Waldo, 1998 U.S. Dist. LEXIS 15948, 1998 WL 713809, at *2*; *see also, generally, Wilson, 501 U.S. 294, 111 S.Ct. 2321, 115 L. Ed. 2d 271*.

To satisfy the objective prong of an *Eighth Amendment* conditions of confinement claim, a plaintiff must demonstrate a deprivation of "'the minimal civilized measure of life's necessities,' such as adequate food, clothing shelter, sanitation, medical care, and personal safety." *May v. DeJesus, No.3:06CV1888, 2010 U.S. Dist. LEXIS 30308, 2010 WL 1286800, at *4 (D.Conn. Mar. 30, 2010)* (quoting *Alvarez v. County of Cumberland, Civil No. 07-346(RBK), 2009 U.S. Dist. LEXIS 22150, 2009 WL 750200, at *2 (D.N.J. Mar. 18, 2009)* (citation omitted)). Conditions that are merely restrictive or harsh, however, do not implicate the *Eighth Amendment*; "they are merely part of the penalty that criminal offenders pay for their offense against society." *May, 2010 U.S. Dist. LEXIS 30308, 2010 WL 1286800, at *4* (quoting *Alvarez, 2009 U.S. Dist. LEXIS 22150, 2009 WL 750200, at *2)*. The Second Circuit has recognized that the *Eighth Amendment* requires that prisoners be provided with "nutritionally adequate food that is prepared and served under conditions which do not present an immediate danger [*67] to the health and well being of the inmates who consume it." *Robles v. Coughlin, 725 F.2d 12, 15 (2d Cir. 1983)* (citation omitted); *Brown v. Eagen, No. 9:08-Brown v. Eagen, No. 9:08CV-0009, 2009 U.S. Dist. LEXIS 24876, 2009 WL 815724, at *10 (N.D.N.Y. Mar. 26, 2009)* (McAvoy, S.J.) (citations omitted); *Midalgo v. Bass*, No. 9:03-CV-1128, 2006 WL 2795332, at * 11 (N.D.N.Y. Sept. 26 2006) (Mordue, C.J.) (citations omitted).

"While no court has explicitly said that denial of food is a *per se* violation of a prisoner's *Eighth Amendment* rights, under certain circumstances a substantial deprivation of food may well be recognized as being of constitutional dimension." *Moss v. Ward, 450 F. Supp. 591, 596-97 (W.D.N.Y. 1978)*. When corrections officials deny a prison inmate the measure of food necessary to maintain health, the *Eighth Amendment's* prohibition

2010 U.S. Dist. LEXIS 114368, *67

against cruel and unusual punishment is implicated. _Robles, 725 F.2d at 15-16_. If, on the other hand, meals are withheld from a prisoner on an isolated basis such conduct, though not necessarily to be condoned, does not typically rise to a level of constitutional significance. See _Cunningham v. Jones, 567 F.2d 653, 659-60 (2d Cir. 1977)_ (remanding case for a determination **[*68]** of nutritional adequacy where complaint alleging that prisoners were served only one meal per day had been dismissed); _Moss, 450 F. Supp. at 596-97_ (indicating that "being deprived of one or two meals might not be cruel and unusual punishment", but finding, where it was undisputed that the plaintiff was deprived food for four consecutive days, the punishment was unconstitutionally disproportionate for violation of a prison disciplinary rule).

In the face of defendants' pending motion for summary judgment, plaintiff has failed to come forward with anything of evidentiary value establishing that he was in fact deprived of food, not by his own actions but rather those of prison officials. The record before the court demonstrates that plaintiff arrived in SHU at approximately 5:55 p.m. on February 10, 2005, after the dinner meal had been served. He claims that thereafter he was not fed for four days. In support of their motion, however, defendants have produced the SHU log book reflecting the inspection and delivery of meals to inmates within the Franklin SHU. See Defendants' Exh. I (Dkt. No. 58-18). The log book reflects that on February 11, 12, 13, and 14, 2005, plaintiff was provided **[*69]** all meals except for lunch on February 12, 2005, when he was off the unit visiting with his fiancé, and dinner on that same date, which he refused. _Id._ These are facts, moreover, which are deemed admitted due to plaintiff's failure to dispute defendants' Rule 7.1(a)(3) Statement. See Defendants' Rule 7.1(a)(3) Statement (Dkt. No. 58-9) ¶¶ 79, 80, and 81.

Additionally, plaintiff does not claim the alleged deprivation of food resulted in any physical harm or threat to his well-being. In fact, there is nothing in his AHR that would suggest that he suffered physical consequences, like weight loss, dehydration, or any other medical problems, from a lack of food. Simply stated, plaintiff's allegations are no more than generalized assertions which, while perhaps troublesome at first blush, lack the specifics necessary to substantiate an _Eighth Amendment_. _Brown, 2009 U.S. Dist. LEXIS 24876, 2009 WL 815724, at *10_; see also _Cruz v. Church, No. 9:05-CV-1067, 2008 U.S. Dist. LEXIS 91022, 2008 WL 4891165, at *12 (N.D.N.Y. 2008)_ (Suddaby, J. and Peebles, M.J.).

Plaintiff's claims regarding the deprivation of water and showers are similarly without merit. Like his claims regarding food, these claims are premised upon mere allegations, which plaintiff has **[*70]** failed to substantiate in the face of defendants' evidence to the contrary. Defendant has produced unrefuted evidence that the water in plaintiff's cell could not have could not have been shut off for two days and that plaintiff was provided a drink with each meal, as well as evidence showing that plaintiff was not denied, but instead refused, a shower on two occasions. In any event, even if true, neither of these allegations is sufficient to support an _Eighth Amendment_ claim. See _Lunney v. Brureton, No. 04 Civ. 2438, 2007 U.S. Dist. LEXIS 38660, 2007 WL 1544629, at *15 (S.D.N.Y. May 29, 2007)_ (""[l]ack of access to running water, by itself, does not constitute the denial of minimal civilized measures of life's necessities") (collecting cases); _McCoy v. Goord, 255 F. Supp.2d 233, 260 (S.D.N.Y. 2003)_ (a two-week suspension of shower privileges does not suffice as a denial of "basic hygienic needs") (citation omitted).

Under these circumstances I conclude that no reasonable factfinder could determine that defendants have violated plaintiff's _Eighth Amendment_ right to be free from cruel and unusual punishment by denying him meals, water, or showers.

G. Failure to Protect

Embedded within the fourth cause of action of **[*71]** plaintiff's complaint is an allegation against defendants Gardner, Brue, Titus and Allard, as well as two John Doe correctional officers and a Jane Doe Nurse to the effect that they failed to intercede and protect plaintiff from the use of excessive force by defendants Titus and Gardner. That claim implicates the _Eighth Amendment's_ prohibition against cruel and unusual punishment. Defendants also seek summary dismissal of this cause of action.

1. _Eighth Amendment_

Unquestionably, under the _Eighth Amendment_ prison officials are required to take reasonable measures to guarantee the safety of inmates; this duty includes within it an obligation to protect prisoners from harm caused by fellow inmates. _Farmer, 511 U.S. at 833-34, 114 S.Ct. at 1976-77_; see also _Matthews v. Armitage, 36 F. Supp.2d 121, 124 (N.D.N.Y. 1999)_ (Homer, M.J.) (citing, _inter alia_, _Farmer_). On all three of plaintiff's _Eighth Amendment_ claims the analysis is virtually the same. When examining plaintiff's failure to protect claim

under the *Eighth Amendment*, the court must determine whether the inmate has demonstrated that 1) he or she was incarcerated under conditions posing a substantial risk of serious harm, and that **[*72]** 2) prison officials exhibited deliberate indifference to the inmate's plight. *Farmer, 511 U.S. at 834, 837, 114 S.Ct. at 1977, 1979*; *Matthews, 36 F. Supp.2d at 124-25*; *Coronado v. Lefevre, 886 F. Supp. 220, 224 (N.D.N.Y. 1995)* (Scullin, J.). As with plaintiff's other *Eighth Amendment* claims, the analysis of his failure to protect claim entails both an objective and subjective inquiry. *Farmer, 511 U.S. at 834, 837*.

According to the plaintiff three corrections officers, including defendant Johnston and two John Doe defendants, while not actively participants, were physically present when he was assaulted by defendants Gardner and Titus, but failed to prevent the attacks. These allegations suffice to survive summary judgment with regard to those defendants.

A corrections worker who, while not participating in an assault upon an inmate, is present while it occurs may nonetheless bear responsibility for any resulting constitutional deprivation. *See Anderson v. Branen, 17 F.3d 552, 557 (2d Cir. 1994)*. It is well-established that a law enforcement official has an affirmative duty to intervene on behalf of an individual whose constitutional rights are being violated in his presence by other **[*73]** officers. *See Mowry v. Noone, No. 02-CV-6257 Fe, 2004 U.S. Dist. LEXIS 28225, 2004 WL 2202645, at *4 (W.D.N.Y. Sept. 30, 2004)*; *see also Curley v. Village of Suffern, 268 F.3d 65, 72 (2d Cir. 2001)* ("Failure to intercede results in *[section 1983]* liability where an officer observes excessive force being used or has reason to know that it will be.") (citations omitted). In order to establish liability on the part of a defendant under this theory, a plaintiff must prove the use of excessive force by someone other than the individual, and that the defendant under consideration 1) possessed actual knowledge of the use by another corrections officer of excessive force; 2) had a realistic opportunity to intervene and prevent the harm from occurring; and 3) nonetheless disregarded that risk by intentionally refusing or failing to take reasonable measures to end the use of excessive force. *See Curley, 268 F.3d at 72*; *see also Espada v. Schneider, 522 F. Supp.2d 544, 555 (S.D.N.Y. 2007)*. Mere inattention or inadvertence, it should be noted, does not rise to a level of deliberate indifference sufficient to support liability for failure to intervene. *See, e.g., Schultz v. Amick, 955 F. Supp. 1087, 1096 (N.D. Iowa 1997)* (noting **[*74]** that "liability in a *§ 1983* 'excessive force'

action cannot be founded on mere negligence") (citing, *inter alia, Daniels v. Williams, 474 U.S. 327, 335-36, 106 S.Ct. 662, 667, 88 L. Ed. 2d 662 (1986))*.

Plaintiff's failure to protect claims against defendants Brue, Nurse Jane Doe, and Allard, however, cannot be sustained. None of those defendants had any prior awareness that plaintiff was exposed to danger at the hands of defendants Gardner and Titus, and it appears that plaintiff has admitted an inability to identify any prior acts of violence or other prior misconduct toward him by defendants Gardner and Titus. Defendants' Rule 7.1(a)(3) Statement (Dkt. No. 58-9) ¶ 96. Nor has plaintiff alleged facts plausibly suggesting, or produced evidence raising a triable issue of fact as to whether he was incarcerated under conditions posing a substantial risk of serious harm. Such conditions can be shown by evidence that an inmate had a previous altercation with his attacker and has complained about the incident or has requested separation from the attacker. *Desulma v. City of New York, No. 98 Civ.2078, 2001 U.S. Dist. LEXIS 9678, 2001 WL 798002 at *6 (S.D.N.Y. Jul. 6, 2001)*. Plaintiff's complaints to Allard regarding the assault came only **[*75]** after the assault occurred. Again, by plaintiff's own admission there is no evidence that Allard was aware of any prior acts of violence committed against plaintiff or any other inmates by Gardner and Titus. As a result, no reasonable jury could conclude that Allard, or for that matter defendants Brue and Nurse Jane Doe, knew of and disregarded a substantial risk of serious harm to plaintiff posed by Gardner and Titus. Accordingly, Hopkins' failure to protect from excessive use of force claim cannot be sustained as against those defendants.

H. Personal Involvement

As a separate basis for dismissal of plaintiff's claims, defendants challenge the sufficiency of his allegations concerning their personal involvement in the constitutional violations alleged. Plaintiff's response to this contention is directed solely to defendant Allard, who he appears to hold responsible solely as the superintendent at Franklin.

Personal involvement of defendants in alleged constitutional deprivations is a prerequisite to an award of damages under *section 1983*. *Wright v. Smith, 21 F.3d 496, 501 (2d Cir. 1994)* (citing *Moffitt v. Town of Brookfield, 950 F.2d 880, 885 (2d Cir. 1991)* and *McKinnon v. Patterson, 568 F.2d 930, 934 (2d Cir. 1977)*, **[*76]** *cert. denied*, 434 U.S. 1087, 98 S. Ct. 1282, 55 L. Ed. 2d 792 (1978))*. In order to prevail on a *section 1983* cause of action against an individual, a

2010 U.S. Dist. LEXIS 114368, *76

plaintiff must show some tangible connection between the constitutional violation alleged and that particular defendant. See *Bass v. Jackson, 790 F.2d 260, 263 (2d Cir. 1986)*.

Defendants cannot be held responsible for any alleged misconduct in which they were not involved. The only allegations against Titus and Gardner relate to the alleged assaults on February 10, 2005. Accordingly, the only claims for which those defendants may be held responsible are those relating to the alleged use of force, in violation of the *Eighth Amendment*.

With regard to defendant Allard, I note that as a supervisor he cannot be liable for damages under *section 1983* solely by virtue of his position; there is no *respondeat superior* liability under *section 1983*. *Richardson v. Goord, 347 F.3d 431, 435 (2d Cir. 2003); Wright, 21 F.3d at 501*. "[M]ere 'linkage in the prison chain of command' is insufficient to implicate a state commissioner of corrections or a prison superintendent in a *§ 1983* claim." *Richardson, 347 F.3d at 435* (citations omitted); see also, e.g., *Gill v. Mooney, 824 F.2d 192, 196 (2d Cir. 1987)* **[*77]** (dismissal appropriate where plaintiff does no more than allege that defendant was in charge of prison); *Ayers v. Coughlin, 780 F.2d 205, 210 (2d Cir. 1985)* (same). He can, however, be held accountable as a supervisory official for a civil rights in one of several ways, including when it is shown that he 1) has directly participated in the challenged conduct; 2) after learning of the violation through a report or appeal, has failed to remedy the wrong; 3) created or allowed to continue a policy or custom under which unconstitutional practices occurred; 4) was grossly negligent in managing the subordinates who caused the unlawful event; or 5) failed to act on information indicating that unconstitutional acts were occurring. *Iqbal v. Hasty, 490 F.3d 143, 152-53 (2d Cir. 2007)*, rev'd on other grounds sub nom., *Ashcroft v. Iqbal, U.S. ,129 S.Ct. 1937, 173 L. Ed. 2d 868 (2009)*; see also *Richardson, 347 F.3d at 435; Colon v. Coughlin, 58 F.3d 865, 873 (2d Cir. 1995); Wright, 21 F.3d at 501*.

Plaintiff seeks to premise liability on the part of defendant Allard for the conduct of the other corrections officers at Franklin on the basis of letters that he and his father wrote to Allard, and because he denied **[*78]** plaintiff's grievance. As was previously noted, plaintiff's complaints to Allard, including his letters, occurred after the alleged defendants had engaged in the alleged unconstitutional conduct. Significantly, immediately upon receiving plaintiff's first complaint,

which occurred on February 11, 2005 while Superintendent Allard was making rounds, the superintendent directed the deputy superintendent of security at the facility to conduct an investigation. Allard received the letter of February 15, 2005 from plaintiff's father, also relating to the assault of February 10, 2005, while the investigation was pending, which he also referred to the deputy superintendent, and Allard additionally responded to the letter.

After the investigation was concluded, finding no basis to substantiate plaintiff's claims, Hopkins wrote an undated memorandum outlining the events of February 10, 2005, which was received in the administrative office on March 3, 2005 and which Allard, once again, referred to the deputy superintendent for a comparison with the results of the investigation. The acts of receipt and referral of these complaints to subordinates for investigation are insufficient to establish **[*79]** personal involvement in the events at issue, nor do they establish that the superintendent's policies or neglect led to those events. *Garvin v. Goord, 212 F. Supp.2d 123, 126 (W.D.N.Y. 2002)*("the only contact alleged by plaintiff between himself and [defendant] are certain letters and replies between himself and [defendant]. . .[which] is insufficient to establish [defendant's] personal involvement."); see also *Hendricks v. Coughlin, 114 F.3d 390, 394 (2d Cir. 1997); Farid v. Goord, 200 F. Supp.2d 220, 234-35 (W.D.N.Y. 2002)*.

As to plaintiff's allegation that Superintendent Allard denied his grievance, the record establishes that the only grievance filed concerning the incidents forming the basis for the complaint occurred after he was transferred from Franklin to Bare Hill, and that the grievance was denied by the superintendent at Bare Hill, not Superintendent Allard. Defendants' Rule 7.1(a)(3) Statement ¶ 94. To the extent plaintiff seeks to hold Allard liable on the basis of his denial of plaintiff's request for review of the Tier III disciplinary penalty, because I have already determined that no due process violations arose out of that proceeding there is no constitutional violation **[*80]** for which Superintendent Allard can be held responsible.

I. Conspiracy

Plaintiff asserts two causes of action for conspiracy, one pursuant to *section 1983* and the other under *section 1985(3)*. Defendants' final contention is that those conspiracy claims are precluded by the intra-agency conspiracy doctrine, and in any event lack merit.

1. *Section 1983* Conspiracy

2010 U.S. Dist. LEXIS 114368, *80

To sustain a conspiracy claim under § *42 U.S.C. 1983*, a plaintiff must demonstrate that a defendant "acted in a wilful manner, culminating in an agreement, understanding or meeting of the minds, that violated the plaintiff's rights . . . secured by the Constitution or the federal courts." *Malsh v. Austin, 901 F. Supp. 757, 763 (S.D.N.Y. 1995)* (citations and internal quotation marks omitted). Conclusory, vague or general allegations of a conspiracy to deprive a person of constitutional rights do not state a claim for relief under *section 1983*. See *Sommer v. Dixon, 709 F.2d 173, 175 (2d Cir.)*, cert. denied, *464 U.S. 857, 104 S. Ct. 177, 78 L. Ed. 2d 158 (1983)*.

2. *Section 1985(3)*

To sustain a cause of action for conspiracy to violate civil rights under *section 1985(3)*, a plaintiff must allege and demonstrate that defendants acted with racial or other **[*81]** class based animus in conspiring to deprive the plaintiff of his or her equal protection of the laws, or of equal privileges and immunity secured by law. *United Brotherhood of Carpenters & Joiners, Local 610, AFL-CIO v. Scott, 463 U.S. 825, 834-39, 103 S.Ct. 3352, 3359-61, 77 L. Ed. 2d 1049 (1983)*; *Gagliardi v. Village of Pawling, 18 F.3d 188, 194 (2d Cir. 1994)*; *Gleason v. McBride, 869 F.2d 688, 694 (2d Cir. 1989)*; *Patterson v. County of Oneida, No. 00-CV-1940, 2002 U.S. Dist. LEXIS 22787, 2002 WL 31677033, at *4 (N.D.N.Y. 2002)* (Hurd, J.), aff'd in relevant part, *375 F.3d 206 (2d Cir. 2004)*; see also *LeBlanc-Sternberg v. Fletcher, 67 F.3d 412, 427 (2d Cir. 1995)*. A plaintiff asserting a claim under *section 1985(3)* need not necessarily offer proof of an explicit agreement; a conspiracy can in the alternative be evidenced circumstantially, through a showing that the parties had a "'tacit understanding to carry out the prohibited conduct.'" *LeBlanc-Sternberg, 67 F.3d at 427* (quoting *United States v. Rubin, 844 F.2d 979, 984 (2d Cir.1988))*. This notwithstanding, in order to properly plead such a claim, a plaintiff must make more than "conclusory, vague, or general allegations of conspiracy." *Sommer, 709 F.2d at 175*; *Williams v. Reilly, 743 F. Supp. 168, 173 (S.D.N.Y. 1990)* **[*82]** ("[u]nsubstantiated, conclusory, vague or general allegations of a conspiracy to deprive constitutional rights are not enough to survive [even] a motion to dismiss"). "[D]iffuse and expansive allegations are insufficient, unless amplified by specific instances of misconduct." *Ciambriello v. County of Nassau, 292 F.3d 307, 325 (2d Cir. 2002)* (quoting *Dwares v. City of New York, 985 F.2d 94, 100 (2d Cir. 1993))*.

3. Intra-Agency Conspiracy Doctrine

In a doctrine rooted in the conspiracy provision of section one of the Sherman Antitrust Act, *15 U.S.C. § 1*, and which, although developed in the context of business entities, since its inception has been expanded to apply to business corporations and public entities as well, the intra-corporate conspiracy doctrine provides that with exceptions not now presented, an entity cannot conspire with one or more of its employees, acting within the scope of employment, and thus a conspiracy claim conceptually will not lie in such circumstances. See, e.g., *Everson v. New York City Transit Auth., 216 F. Supp.2d 71, 75-76 (E.D.N.Y. 2002)*; *Griffin-Nolan v. Providence Washington Ins. Co., No. 5:05CV1453, 2005 U.S. Dist. LEXIS 12902, 2005 WL 1460424, at *10-11 (N.D.N.Y. June 20, 2005)* **[*83]** (Scullin, C.J.).

4. Merits of Plaintiff's Conspiracy Claims

Addressing the merits of plaintiff's conspiracy claims, I note that in the face of defendants' motion for summary judgment, plaintiff has come forward with no evidence to support the conclusory allegations in the complaint that two or more of the defendants conspired for the purpose of depriving plaintiff his civil rights. Instead, plaintiff does nothing more than repeat the alleged misconduct of each individual defendant. In this instance plaintiff alleges that defendants, all employees of the DOCS conspired to violate his constitutional rights. Since those conspiracy claims are asserted against the DOCS and its officers, agents or employees, each acting within the scope of his or her employment, they are precluded by virtue of the intra-corporate conspiracy doctrine. *Little v. City of New York, 487 F. Supp.2d 426, 441-42 (S.D.N.Y. 2007)* (citations omitted). "An exception to the intra-corporate conspiracy doctrine exists when individuals pursue 'personal interests wholly separate and apart from the entity.'" *Orafan v. Goord, 411 F. Supp.2d 153, 164-65 (N.D.N.Y. 2006)*, vacated and remanded on other grounds, *249 Fed. App'x 217 (2d Cir. 2007)* **[*84]** (quoting *Bond v. Bd. of Educ. of City of N.Y., No. 971337, 1999 U.S. Dist. LEXIS 3164, 1999 WL 151702, at *2 (E.D.N.Y. Mar. 17, 1999))*. Here, however, there is no suggestion that defendants were acting in furtherance of their own personal interests and outside the scope of their employment. *Walker v. New York City Dep't of Corr., No. 01 Civ. 1116, 2008 U.S. Dist. LEXIS 97109, 2008 WL 4974425, at * 12 (S.D.N.Y. Nov. 19, 2008)*; *Orafan, 411 F. Supp.2d at 164-65*.

For these reasons, I find plaintiff's *section 1983* and *1985(3)* causes of action for conspiracy subject to dismissal on the merits, even assuming inapplicability of the intra-corporate conspiracy doctrine. *Boddie, 105*

*F.3d at 862* (citing *Flaherty, 713 F.3d at 13*).

J. Dismissal of John and Jane Doe Defendants

Although defendants' motion does not explicitly request this relief, I have *sua sponte* chosen to raise the question of whether plaintiff's claims should proceed against the three remaining, unserved John and Jane Doe defendants. The decision to raise this issue is bottomed upon the requirement, imposed by *Rule 4(m) of the Federal Rules of Civil Procedure*, that service in a case be made within 120 days of issuance of the summons, absent a court order extending that period. 27 "[W]here **[*85]** good cause is shown, the court has no choice but to extend the time for service, and the inquiry is ended." *Panaras v. Liquid Carbonic Indus. Corp., 94 F.3d 338, 340 (7th Cir. 1996)*. "If, however, good cause does not exist, the court may, in its discretion, either dismiss the action without prejudice or direct that service be effected within a specified time." *Id.* (citing *Fed. R. Civ. P. 4(m)*); *Zapata v. City of New York, 502 F.3d 192, 196 (2d Cir. 2007)* ("[D]istrict courts have discretion to grant extensions even in the absence of good cause."); *Romandette v. Weetabix Co., Inc., 807 F.2d 309, 311 (2d Cir. 1986)*. When examining whether to extend the prescribed period for service, a district court is afforded ample discretion to weigh the "overlapping equitable considerations" involved in determining whether good cause exists and whether an extension may be granted in the absence of good cause. *See Zapata, 502 F.3d at 197*.

A plaintiff's *pro se* status entitles him or her to a certain degree of leniency insofar as service of process is concerned; courts generally favor resolution of a case on its merits rather than on the basis of a procedural technicality. *Poulakis v. Amtrak, 139 F.R.D. 107, 109 (N.D. Ill. 1991)*. When a plaintiff proceeds *in forma pauperis*, such as is the case in this instance, the court is obligated to issue the plaintiff's process to the United States Marshal, who must in turn effect service upon the defendants, thereby relieving the plaintiff of the burden to serve process once reasonable steps have been taken to identify for the court the defendants named in the complaint. *Byrd v. Stone, 94 F.3d 217, 219 (6th Cir. 1996)*. That does not mean, however, that a *pro se* plaintiff may stand idly by upon being notified that efforts by the U.S. Marshals Service to serve a particular defendant **[*87]** have been unsuccessful. *VanDiver v. Martin, 304 F. Supp.2d 934, 938-43 (E.D. Mich. 2004)*. In such instances it is incumbent upon the plaintiff to develop, though pretrial discovery or otherwise, any additional information necessary to permit service by the United States Marshals Service. *See VanDiver, 304 F. Supp.2d at 942*.

In this case, which has been pending since January 2, 2008, the three defendants at issue have not been served or otherwise appeared in the action within the appropriate time period. Moreover, at no time has plaintiff sought to avail himself of discovery opportunities in order to ascertain the identities of the unknown defendants. Under these circumstances I am unable to find good cause justifying plaintiff's failure to effectuate timely service, and discern no sufficient basis presented to exercise my discretion in favor of extending the governing period of service. Accordingly, since this court has never acquired jurisdiction over them, plaintiff's complaint should be dismissed as against those defendants, without prejudice. *See, e.g., Michelson v. Merrill Lynch, Pierce, Fenner & Smith, Inc., 709 F. Supp. 1279, 1282 (S.D.N.Y. 1989)* (citing *Mississippi Publishing Corp. v. Murphree, 326 U.S. 438, 444-45, 66 S.Ct. 242, 245-46, 90 L. Ed. 185 (1946)*) **[*88]** (court lacks jurisdiction until defendants properly served with summons and complaint).

IV. SUMMARY AND RECOMMENDATION

Plaintiff's complaint alleges an array of civil rights violations and the existence of a conspiracy in violation of *42 U.S.C. §§ 1983* and *1985(3)*. The focus of plaintiff's complaint, however, seems to be centered upon his contention that he was issued a false misbehavior report, denied adequate medical treatment, and assaulted in retaliation for having lodged a grievance and commenced a state court legal proceeding, both filed some months earlier. Defendants seek dismissal of all claims asserted in the complaint, except those relating to the alleged assault, on various grounds, including the procedural basis that plaintiff has failed to exhaust his administrative remedies.

---

27 That rule provides that

[i]f a defendant is not served within 120 days after the complaint is filed, the court — on motion or on its own after notice to the plaintiff — must dismiss the action without prejudice against that defendant or order that service be made **[*86]** within a specified time. But if the plaintiff shows good cause for the failure, the court must extend the time for service for an appropriate period. . . .

*Fed. R. Civ. P. 4(m)*. This court's local rules shorten the time for service from the 120 day period under *Rule 4(m)* to sixty days. *See N.D.N.Y.L.R. 4.1(b)*.

2010 U.S. Dist. LEXIS 114368, *88

As to Hopkins' claims for retaliation, denial of access to courts, issuance of a false misbehavior report, failure to protect, denial of showers while in SHU, and denial of due process in association with his disciplinary proceeding, I have determined that these claims should be dismissed either due to plaintiff's failure to exhaust his administrative remedies and/or on the merits. With regard to plaintiff's **[\*89]** *Eighth Amendment* medical indifference, conditions of confinement and conspiracy causes of action, I have found that plaintiff has failed to come forward with evidence to support viable claims, and as a result, these claims are also subject to dismissal. Finally, as an additional basis for dismissal of certain claims, I have concluded all claims against Allard as well as those against Gardner and Titus, except those relating to excessive use of force, must be dismissed due to a lack of personal involvement. [28]

Accordingly, it is hereby respectfully

RECOMMENDED, that defendants' motion for summary judgment (Dkt. No. 58) be granted in its entirety, and that all claims in plaintiff's complaint, except those relating to excessive use of force against defendants Titus and Gardner, be dismissed with prejudice; and it is further

RECOMMENDED, that all claims against the John and Jane Doe defendants be dismissed, without prejudice.

NOTICE: Pursuant to *28 U.S.C. § 636(b)(1)*, the parties may lodge written objections to the foregoing report. Such objections shall be filed with the clerk of the court within **[\*90]** FOURTEEN days of service of this report. FAILURE TO SO OBJECT TO THIS REPORT WILL PRECLUDE APPELLATE REVIEW. *28 U.S.C. § 636(b)(1)*; *Fed. R. Civ. P. 6(a)*, *6(d)*, *72*; *Roldan v. Racette, 984 F.2d 85 (2d Cir. 1993)*.

It is hereby ORDERED that the clerk of the court serve a copy of this report and recommendation upon the parties in accordance with this court's local rules.

Dated: August 23, 2010

Syracuse, New York

/s/ David E. Peebles

David E. Peebles

U.S. Magistrate Judge

---

**End of Document**

---

[28] In light of my determinations, I have declined to address defendants' claim of qualified immunity.