UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF NEW YORK
_____

DESEAN HILL,

                                    Plaintiff,

                                                        9:18-CV-1203
v.                                                      (DNH/TWD)

ANNE M. MCGRATH, et al.,

                                    Defendants.
_____

APPEARANCES:                        OF COUNSEL:

DESEAN HILL
Plaintiff *pro se*
14-A-0857
Collins Correctional Facility
P.O. Box 340
Collins, NY 14034

HON. LETITIA JAMES                  Brenda T. Baddam, Esq.
New York State Attorney General - Albany    Assistant Attorney General
The Capitol
Albany, NY 12224
Attorney for Defendants

**THÉRÈSE WILEY DANCKS**, United States Magistrate Judge

## ORDER and REPORT-RECOMMENDATION

        This matter was referred for a Report and Recommendation by the Honorable David N.

Hurd, United States District Judge, pursuant to 28 U.S.C. § 636(b) and N.D.N.Y. L.R. 72.3©).

*Pro se* Plaintiff Desean Hill ("Plaintiff" or "Hill"), an inmate in the custody of the New York

State Department of Corrections and Community Supervision ("DOCCS"), commenced this

action pursuant to 42 U.S.C. § 1983 alleging violations of his constitutional rights at Great

Meadow Correctional Facility ("Great Meadow C.F.").  (Dkt. No. 1.)

The claims remaining are Eighth Amendment failure to protect claims against Associate Commissioner Anne M. McGrath ("McGrath"), Office of Mental Health ("OMH") Therapist Kathleen Grey ("Grey"), and Guidance Staff Member M. Bernard ("Bernard").  (Dkt. Nos. 1, 48.)

Defendants now move for summary judgment pursuant to Rule 56 of the Federal Rules of Civil Procedure seeking dismissal of the complaint in its entirety.  (Dkt. No. 62.)  Plaintiff filed a response.  (Dkt. No. 65.)

For reasons explained below, the Court recommends that Defendants' motion for summary judgment be granted in part and denied in part.

## I.    BACKGROUND[1]

On June 9, 2017, Plaintiff arrived at Great Meadow C.F.  (Dkt. No. 62-4 at 5.)  On June 11, 2017, Plaintiff sent a letter to DOCCS Commissioner Anthony Annucci and claimed there was a "contract on his life" by "Blood" members.  (Dkt. No. 62-3 at 6.)  Plaintiff explained he was a "registered paid informant" for the government and, due to this status, he was previously assaulted on four occasions in four facilities by "high ranking Blood members."  *Id*.  Plaintiff expressed concern regarding his transfer from "IPC" at Attica Correctional Facility to Great Meadow C.F. where "three high rank [sic] Blood members have just been transferred[.]"  *Id*.  Plaintiff claimed he would be "safe" in other facilities including "Eastern, Sullivan, and Shawangunk" and asked to be "drafted [as] soon as possible."  *Id*.

---

[1]  The following facts are drawn from the parties' pleadings and submissions, including Plaintiff's verified complaint and Defendants' Local Rule 56.1 Statement.

On June 26, 2017, Rich Houck ("Houck"), DOCCS Correction Classification Analyst, emailed Timothy Lyman ("Lyman"), the Supervising Offender Rehabilitation Coordinator ("ORC") at Great Meadow C.F. regarding Hill.[2] (Dkt. No. 62-4 at 8.) Houck advised, "[t]he [. . .] inmate is writing to the Commissioner's Office expressing safety concerns. Please have this inmate interviewed for possible pc placement and advise of the findings[.]" *Id.* The same day, Lyman sent an email to Defendant Bernard directing her to interview Plaintiff for potential protective custody placement. *Id.* at p. 2, ¶ 6.

On June 27, 2017, Bernard met with Plaintiff to discuss potential protective custody placement. (Dkt. No. 62-4 at p. 2, ¶ 7.) The parties have differing accounts of what transpired during the meeting.

On July 5, 2017, Defendant McGrath mailed a letter to Plaintiff in response to his "recent correspondence [to Annucci] regarding protective custody[.]" (Dkt. No. 62-3 at 8.) McGrath advised, "[a] review of your record indicates you were interviewed by facility guidance staff on June 27, 2017 regarding your request for protective custody. During the interview you indicated you had no safety concerns and you signed a protective custody refusal form." *Id.* McGrath directed Plaintiff to "discuss any additional transfer or safety concerns issues with [his] assigned ORC[.]" *Id.*

On September 13, 2017, Plaintiff was attacked by an unknown inmate. (Dkt. No. 62-5 at 32-33, 41.) The inmate, who Plaintiff described as a member of the Bloods, punched him in the back of his head. *Id.* Plaintiff was escorted to the hospital after the assault. *Id.* at 131. Plaintiff received a misbehavior report related to the incident and was placed in keeplock pending a

---

[2] Houck and Lyman are not named as defendants in this action.

disciplinary hearing.  *Id.* at 131-132.  In the report, the officer noted that Plaintiff was "struck

from behind."  (Dkt. No. 62-5 at 131.)  At the disciplinary hearing, Plaintiff plead guilty to the

charges and was sentenced to thirty days in keeplock.  *Id.* at 127-130.  In the disposition, the

hearing officer noted that Plaintiff was "not the aggressor" and was defending himself.  *Id.* at

128.

On or around September 20, 2017, Plaintiff was moved to C Block.  Dkt. No. 62-5 at 40.

On October 28, 2017, Plaintiff was involved in a physical altercation with "unknown

inmate", who was a member of the Bloods.  (Dkt. No. 62-5 at 52-55, 143.)  The inmate "cut"

Plaintiff from his "ear to his chin" and as a result, Plaintiff received twenty-two stitches to the left

side of his face for a five inch laceration.  *Id.* at 53, 151.  Plaintiff was placed in Involuntary

Protective Custody ("IPC") for Plaintiff's "safety and the safety and security of the facility."  *Id.* at

151, 162, 165.

On November 6, 2017, Plaintiff sent a letter to Annucci and explained, "I am now IPC

here at Great Meadow which is not a safe environment[.]"  (Dkt. No. 62-3 at 10.)  Plaintiff

requested a transfer to another facility due to "constantly being serious[ly] assaulted."  *Id.*

On December 13, 2017, McGrath mailed a letter to Plaintiff in response to his "recent

correspondence regarding transfer[.]"  (Dkt. No. 62-3 at 12.)  McGrath explained, "[i]nmates such

as you, who have extensive transfer histories due to separation from inmates, represent a difficult

challenge when reviewing transfer options."  *Id.*  McGrath noted, "[a] SHU to SHU transfer has

been approved.  Movement will be effected as soon as appropriate space becomes available."  *Id.*

On December 18, 2017, Plaintiff was transferred out of Great Meadow C.F.  (Dkt. No.

62-4 at p. 1, ¶4.)

During his confinement at Great Meadow C.F., Plaintiff met with Defendant Grey, a social worker, on seven different occasions.  (Dkt. No. 62-5 at 35; Dkt. No. 63 at p.2, ¶¶ 6-9; Dkt. No. 63 at p. 3, ¶ 10-11; Dkt. No. 63 at p. 4, ¶17. )  The parties provide dramatically different accounts of what transpired during those meetings.

## II.    LEGAL STANDARD GOVERNING SUMMARY JUDGMENT

A court "shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a); *see Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 251-52 (1986).  The party moving for summary judgment bears the initial burden of showing, through the production of admissible evidence, that no genuine issue of material fact exists.  *Salahuddin v. Goord*, 467 F.3d 263, 272–73 (2d Cir. 2006).  The movant may meet this burden by showing that the nonmoving party has "fail[ed] to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial."  *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986).

If the moving party satisfies its burden, the nonmoving party must move forward with specific facts showing that there is a genuine issue for trial.  *Salahuddin*, 467 F.3d at 273.  In that context, the nonmoving party must do more than "simply show that there is some metaphysical doubt as to the material facts."  *Matsushita Electric Industrial Co., Ltd. v. Zenith Radio Corp*., 475 U.S. 574, 586 (1986).  "Conclusory allegations, conjecture and speculation ... are insufficient to create a genuine issue of fact."  *Kerzer v. Kingly Mfg*., 156 F.3d 396, 400 (2d Cir. 1998).

The Second Circuit has reminded that on summary judgment motions "[t]he mere existence of a scintilla of evidence in support of the plaintiff's position will be insufficient; there

must be evidence on which the jury could reasonably find for the plaintiff." *Jeffreys v. City of New York*, 426 F.3d 549, 554 (2d Cir. 2005). "At the summary judgment stage, a nonmoving party must offer some hard evidence showing that [his] version of the events is not wholly fanciful." *Id*. (citation and internal quotation marks omitted). Accordingly, statements "that are devoid of any specifics, but replete with conclusions, are insufficient to defeat a properly supported motion for summary judgment." *Bickerstaff v. Vassar Coll.*, 196 F.3d 435, 452 (2d Cir. 1999).

In determining whether a genuine issue of material fact exists, the court must resolve all ambiguities and draw all reasonable inferences against the moving party. *Major League Baseball Props., Inc. v. Salvino, Inc.*, 542 F.3d 290, 309 (2d Cir. 2008). Where a party is proceeding pro se, the court is obligated to "read [the pro se party's] supporting papers liberally, and . . . interpret them to raise the strongest arguments that they suggest." *Burgos v. Hopkins*, 14 F.3d 787, 790 (2d Cir. 1994).

In applying the summary judgment standard, the district court should not weigh evidence or assess the credibility of witnesses. *Hayes v. New York City Dep't of Corr.*, 84 F.3d 614, 619 (2d Cir. 1996); *Rule v. Brine, Inc.*, 85 F.3d 1002, 1011 (2d Cir. 1996) (credibility issues which are questions of fact for resolution by a jury, are inappropriately decided by a court on a motion for summary judgment).

## III.    ANALYSIS

Defendants move for summary judgment arguing they were not personally involved in the alleged constitutional violations. Defendants also claim, even assuming they were personally involved, the complaint must be dismissed because the Eighth Amendment claims fail on the

merits.  (*See generally* Dkt. No. 62.)  In the alternative, Defendants seek summary judgment based upon qualified immunity.  *Id.*

### A.  Plaintiff's Failure to Comply with Local Rules[3]

Pursuant to this District's Local Rules, "[t]he Court may deem admitted any properly supported facts set forth in the Statement of Material Facts that the opposing party does not specifically controvert."  N.D.N.Y. L.R. 56.1(b).  Where a party has failed to respond to the movant's statement of material facts as required by the Local Rules, the facts in the movant's statement will be accepted as true (1) to the extent they are supported by evidence in the record, and (2) the nonmovant, if proceeding pro se, has been specifically advised of the possible consequences of failing to respond to the motion.  *Champion v. Artuz*, 76 F.3d 483, 486 (2d Cir. 1996).

As required by the Local Rules, Defendants advised Plaintiff of the consequences of failing to file a response to Defendants' Statement of Material Facts.  (Dkt. No. 62 at 4.)  While Plaintiff submitted a response to Defendants' motion, he failed to do so in the manner required under Local Rule 56.1(b).[4]  "Although a pro se litigant is entitled to a liberal construction of his filings, *see Sykes v. Bank of America*, 723 F.3d 399, 403 (2d Cir. 2013), his pro se status does not relieve him of his obligation to comply with the relevant procedural rules."  *Marino v. Watts*, No.

---

[3]  The Local Rules were amended effective January 1, 2021.  In the amendment, Local Rule 7.1 was dissected and various subsections were renumbered and relocated to correspond with the appropriate Federal Rule of Civil Procedure.  The relevant substance of the rules did not change.  In the currently operative version of the Local Rules, Local Rule 56.1 deals with summary judgement motions.  Although Defendants' refer to Local Rule 7.1(a)(3), *see* Dkt. No. 62-2, because the motion was filed in 2021, the Court refers to Local Rule 56.

[4]  Local Rule 56.1(b) requires the opposing party to file a response to the movant's statement of material facts.  Under the rule, the response "shall mirror the movant's Statement of Material Facts by admitting and/or denying each of the movant's assertions in a short and concise statement, in matching numbered paragraphs.  Each denial shall set forth a specific citation to the record where the factual issue arises."

9:12-CV-801 (NAM/DJS), 2018 WL 3121612, at *1 (N.D.N.Y. Mar. 7, 2018),

*report-recommendation adopted sub nom. Marino v. Schult*, 2018 WL 1578163 (N.D.N.Y. Mar.

30, 2018), *aff'd*, 764 Fed. App'x 73 (2d Cir. 2019) (summary order).

Although this Circuit adheres to the view that nothing in Rule 56 imposes an obligation

on a court to conduct a searching and independent review of the record to find proof of a factual

dispute where a non-movant willfully fails to respond to a properly filed summary judgment

motion, *Amnesty Am. v. Town of West Hartford*, 288 F.3d 467, 470 (2d Cir. 2002), the Second

Circuit has ruled that "[a] district court has broad discretion to determine whether to overlook a

party's failure to comply with local court rules," including local rules relating to requirements

regarding the submission of and response to statements of material facts on summary judgment

motions, and whether to "conduct an assiduous review of the record." *Holtz v. Rockefeller &*

*Co., Inc.*, 258 F.3d 62, 73 (2d Cir. 2001) (citation and quotation marks omitted). In deference to

Plaintiff's pro se status, the Court has opted to review the entire summary judgment record.[5]

### B. Eighth Amendment Failure to Protect Claims

The Eighth Amendment to the United States Constitution "requires prison officials to

take reasonable measures to guarantee the safety of inmates in their custody." *Hayes v. New York*

*City Dep't of Corr.*, 84 F.3d 614, 620 (2d Cir.1996). Prison officials are liable under the Eighth

Amendment for harm incurred by an inmate if they act with deliberate indifference to the

---

[5] *See Vermont Teddy Bear Co., Inc. v. 1-800 Beargram Co.*, 373 F.3d 241, 244 (2d. Cir. 2004) ("[I]n determining whether the moving party has met [the] burden of showing the absence of a genuine issue for trial, the district court may not rely solely on the statement of undisputed facts contained in the moving party's [Statement of Material Facts]. It must be satisfied that the citation to evidence in the record supports the assertion.") (citations omitted). As to any facts not contained in Defendants' Statement, in light of the procedural posture of this case, the Court is "required to resolve all ambiguities and draw all permissible factual inferences" in favor of Plaintiff. *Terry v. Ashcroft*, 336 F.3d 128, 137 (2d Cir. 2003).

inmate's safety. *Morales v. New York State Dep't of Corr.*, 842 F.2d 27, 30 (2d Cir.1988) ("[A] state prison guard's deliberate indifference to the consequences of his conduct for those under his control and dependent upon him may support a claim under § 1983."); *see also Hendricks v. Coughlin*, 942 F.2d 109, 113 (2d Cir. 1991) ("[A]n inmate's claim that prison officials failed, as a result of their deliberate indifference, to protect [the inmate] from the violent actions of other inmates may state a viable § 1983 cause of action."); *Ayers v. Coughlin*, 780 F.2d 205, 209 (2d Cir. 1985) ("The failure of custodial officers to employ reasonable measures to protect an inmate from violence by other prison residents has been considered cruel and unusual punishment"); *Wassmann v. County of Ulster*, 528 Fed. App'x 105, 106 (2d Cir. 2013) ("Officers at correctional facilities have a duty to protect inmates from violence at the hands of other inmates.") (citing *Farmer v. Brennan*, 511 U.S. 825, 833 (1994)).

To prevail on a failure to protect claim, a plaintiff must demonstrate two elements, one objective and one subjective.

### 1. Objective Prong

To satisfy the objective prong, "the inmate must show that he is incarcerated under conditions posing a substantial risk of serious harm." *Farmer*, 511 U.S. at 834. That is, the deprivation "must be, in objective terms, 'sufficiently serious.'" *Hathaway v. Coughlin*, 37 F.3d 63, 66 (2d Cir. 1994) (quoting *Wilson v. Seiter*, 501 U.S. 294, 298 (1991)).

Despite the history of assaults, Defendants argue Plaintiff was not incarcerated under conditions posing a substantial risk of serious harm because he failed to request protective custody "at any time with any employee at Great Meadow." (Dkt. No. 62-1 at 15; Dkt. No. 62-4 at p. 2-3, 10). Relying upon Grey's declaration, Defendants also claim Plaintiff is unable to

satisfy the objective prong of the Eighth Amendment analysis because he repeatedly "made it clear" that "he had no safety concerns leading up to the fights" and "downplayed the risk to his safety because he did not want to ruin his reputation[.]" *Id.*   In support, Defendants rely upon the holding in *Gssime v. Cadian*, 2009 WL 1161040 (N.D.N.Y. Apr. 28, 2009).  In *Gssime*, the court held that the plaintiff failed to satisfy the objective prong because he "failed to produce evidence of any specific instances of inmate attacks or threats to his safety, and there is no evidence that Gssime requested to be placed in protective custody."  *Gssime*, 2014 WL 1161040 at *4.

Based upon the record, Defendants' reliance upon *Gssime* is misplaced.  Here, the evidence demonstrates that Plaintiff was subjected to prior threats and attacks.  Plaintiff was assaulted in 2014 by an inmate at Elmira Correctional Facility.  (Dkt. No. 62-5 at 18.)  The inmate "stabbed" Plaintiff in the neck and called him "a rat."  *Id*.  After receiving treatment at a hospital, Plaintiff was placed in protective custody.  *Id*.  In 2015, an inmate "cut" Plaintiff while he was confined at Clinton Correctional Facility.  (Dkt. No. 62-5 at 19.)  After the incident, Plaintiff was placed in protective custody.  *Id*.  In 2017, Plaintiff was assaulted by an inmate at Attica Correctional Facility.  *Id.* at 20.  As a result, he suffered a cut on the right side of his face requiring sutures and he was placed in protective custody.  (Dkt. No. 62-5 at 20-21.)

In September 2017, Plaintiff was assaulted at Great Meadow C.F.  (Dkt. No. 62-5 at 32.)  The officer who witnessed the assault reported, "I witnessed inmate Hill, Desean get struck from behind in the back of the head by inmate Collins while in line in the main corridor."  (Dkt. No. 62-5 at 131.)  In October 2017, Plaintiff was involved in a physical altercation in the yard at

Great Meadow C.F.  (Dkt. No. 62-5 at 150.)  Plaintiff sustained a 5 inch laceration to his face requiring treatment at an outside hospital.  *Id.* at 151.

Moreover, in this matter, there is evidence suggesting Plaintiff requested protective custody.  Plaintiff forwarded a letter to Annucci, which precipitated an interview for "possible pc placement."  (Dkt. No. 62-4 at 8.)  Plaintiff also testified that he repeatedly requested to be placed in protective custody during his meetings with Grey.  Although Plaintiff and Grey provide drastically different accounts of the conversations during their meetings, Grey's Progress Notes, which were provided by Defendants in support of summary judgment, corroborate Plaintiff's deposition testimony.  Grey's notation from their July 17, 2017 meeting reads, "Pt. reported he spoke with someone from Albany about Protective Custody due to being an ex Blood member." *Id*. at 9.

Even assuming Plaintiff did not ask for protective custody, other district courts have rejected Defendants' argument as an "improper[ ] attempt[] to shift the burden of protection to plaintiff."  *Gray v. Little*, No. 18-CV-02644, 2021 WL 3128648, at *7 (D. Colo. July 23, 2021) (internal quotation marks omitted) (citing *Farmer*, 511 U.S. at 833); *see also Walker v. Schult*, 463 F. Supp. 3d 323, 335–36 (N.D.N.Y. 2020) (rejecting the argument that the defendants "did not violate Plaintiff's constitutional rights because Plaintiff never specifically asked to be relocated out of the cell" as "misguided") (citing *Farmer*, 511 U.S. at 848).

Based upon the record evidence, the Court finds that the issue of whether Plaintiff was incarcerated under conditions that posed a substantial risk of harm is for a jury to resolve.  *See Sanchez v. City of New York*, No. 18-CV-01259, 2020 WL 5238604, at *6 (S.D.N.Y. Feb. 11, 2020) (finding that the plaintiff satisfied the objective prong where it was "undisputed that

Plaintiff was attacked by inmates on four occasions" and the plaintiff testified that, "following each attack, he requested to be transferred to protective custody.") *report and recommendation adopted*, 2020 WL 2094097 (S.D.N.Y. May 1, 2020); *see also King v. Dep't of Corr.*, No. 95 CIV. 3057, 1998 WL 67669, at *5 (S.D.N.Y. Feb. 18, 1998) (finding, on a motion for summary judgment, that the injury sustained by the plaintiff, a cut to his face, neck, and shoulder requiring stitches, and the manner in which he received the injury, were sufficient to satisfy the objective requirement of the Eighth Amendment claim); *see also Knowles v. New York City Dep't of Corr.*, 904 F.Supp. 217, 221 (S.D.N.Y. 1995) (finding that the plaintiff's injury, "a deep cut to his face which required sixty stitches to close, and the manner in which he received the injury, having his face suddenly and unexpectedly slashed with a sharp instrument possessed by a fellow inmate," satisfied the objective element of an Eighth Amendment claim) (internal quotation marks and citation omitted).

### 2. Personal Involvement and Subjective Prong

"[P]ersonal involvement of defendants in alleged constitutional deprivations is a prerequisite to an award of damages under § 1983." *McKinnon v. Patterson*, 568 F.2d 930, 934 (2d Cir. 1977). "Because vicarious liability is inapplicable to . . .§ 1983 suits, a plaintiff must plead that each Government-official defendant, through the official's own individual actions, has violated the Constitution." *Ashcroft v. Iqbal*, 556 U.S. 662, 676 (2009) ("Government officials may not be held liable for the unconstitutional conduct of their subordinates under a theory of respondeat superior."). Therefore, "a plaintiff must . . . allege a tangible connection between the acts of a defendant and the injuries suffered." *Bass v. Jackson*, 790 F.2d 260, 263 (2d Cir. 1986).

As to the second prong, "[t]o prove deliberate indifference, the plaintiff must show that the 'official [knew] of and disregard[ed] an excessive risk to inmate health or safety.'"  *Celestin v. Premo*, No. 9:12-CV-301 (GLS/RFT), 2014 WL 272443, at *5 (N.D.N.Y. Jan. 24, 2014) (quoting *Farmer*, 511 U.S. at 837) (alterations in original).  Indeed, "[t]he official must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and he must also draw the inference."  *Id*.  Mere negligence by a prison official will not suffice.  *Hayes*, 84 F.3d at 620; *Hathaway*, 37 F.3d at 66 ("Deliberate indifference requires more than negligence, but less than conduct undertaken for the very purpose of causing harm.").  On a failure to protect claim, "deliberate indifference means what that phrase suggests-that a particular defendant at issue had knowledge of circumstances presenting potential danger to an inmate but, although positioned to do so, took no measures reasonably calculated to address that danger."  *Haywood v. Woods*, No. 9:01-CV-0225 (LEK/DEP), 2007 WL 1834641, at *9 (N.D.N.Y. June 25, 2007) (citing *Farmer*, 511 U.S. at 837).

### a.  Bernard

Defendants argue Bernard was not personally involved in the alleged constitutional violations because she was not Plaintiff's assigned ORC at the time of the assault in September 2017.  (Dkt. No. 62-1 at 8; Dkt. No. 62-4 at ¶ 14).  However, Defendants' argument is not supported by relevant caselaw and belied by the record before the Court.  It is undisputed that Bernard and Plaintiff discussed safety concerns and the need for protective custody in June 2017.  (Dkt. No. 62-4 at 8; Dkt. No. 62-5 at 46.)  While Bernard and Plaintiff provide different accounts of the events that transpired at the meeting, there are genuine material issues of fact concerning

Bernard's personal involvement in the alleged constitutional violations. Accordingly, the Court recommends denying Defendants' motion for summary judgment on this ground.

Defendants further contend, even assuming Bernard was personally involved, the evidence does not demonstrate she was deliberately indifferent to Hill's safety and security. Bernard submitted a declaration in support of summary judgment and claimed she received an email directing her to interview Hill for "possible PC placement" due to the "Commissioner's Office expressing safety concerns." (Dkt. No. 62-4 at 8.) After receiving the email, Bernard "met with Plaintiff to discuss potential protective custody placement." *Id*. at p. 2, ¶ 7. Bernard avers Plaintiff, "did not have any safety, mental health, or sexual abuse concerns, and he indicated that he did not want to be placed in protective custody. Plaintiff told me that he did not want to be at Great Meadow and he would prefer to be at Eastern Correctional Facility." (Dkt. No. 62-4 at p. 2, ¶ 7.) After the meeting, Bernard prepared a memorandum for the Office of the Deputy Superintendent for Security regarding the "Protective Custody Interview," which was executed by Bernard and Plaintiff. *Id*. at 10. According to Bernard, Plaintiff "voluntarily signed a protective custody refusal form." *Id.* at ¶ 8; p. 10.

Conversely, Plaintiff testified that Bernard "went though all the safety concerns of me being assaulted" and told him she "received an email that [his] life was in danger." (Dkt. No. 62-5 at 25, 27.) According to Plaintiff, Bernard was also "looking at the computer" and knew how many times he was assaulted and "been in fights." *Id*. at 27. With regard to the Protective Custody Refusal form, Plaintiff testified:

> Well she explained to me that if you are in protective custody, you're not
> going to be able to go to the programs that's required whether it's
> vocational, you know, schooling. Any of the required programs you

> need to make your release date.  She explained that there was no
> programs so if I decide to go off the contents of this email and go to P.C.
> I'm not going to make my release date.  So she said just sign the P.C.
> refusal, stay out of trouble, stay under the radar, stay out of trouble, and
> I would be able to take my programming and I was released out of her
> office[.]

Dkt. No. 62-5 at 28.  Plaintiff  "signed the protective custody refusal form [. . . ] because [he was]

told that [he] wouldn't receive programming[.]"  *Id*. at 31.

Plaintiff's testimony, taken together with the record before the Court, creates an issue of

fact as to whether Bernard knew of and disregarded an excessive risk to Hill's health or safety.

"Credibility determinations . . . are jury functions, not those of a judge." *Anderson*, 477 U.S. at

255; *see also Rule v. Brine, Inc.*, 85 F.3d 1002, 1011 (2d Cir.1996) ("Assessments of credibility

and choices between conflicting versions of the events are matters for the jury, not for the court

on summary judgment.").  Thus, Bernard has not met her burden of showing that no genuine

issue of material fact exists.  Therefore, I recommend that the Court deny Defendants' motion for

summary judgment on this ground.

### b. Grey

Defendants argue that Grey was not personally involved in the alleged constitutional

violations because she had, "no control over where an inmate is placed" in a DOCCS facility.

(Dkt. No. 63 at p. 3, ¶ 11.)  In her declaration, Grey explains if Plaintiff requested protective

custody during any of their meetings, she would have made a recommendation to the OMH Unit

Chief at Great Meadow C.F., who would then relay the request to DOCCS security personnel.

*Id*. at ¶ 15.  To this end, Grey claims Plaintiff never made a request for protective custody and, in

fact, repeatedly rejected protective custody.  *Id.* at p. 4, ¶¶ 16, 17, 20.  In support of her

assertions, Grey provided copies of her Progress Notes from June 2017 through November 2017.

Assuming the notes are in admissible form, the burden shifts to Plaintiff to raise a triable

issue of fact regarding Grey's personal involvement.  Plaintiff testified he addressed his "security

concerns" with Grey "on numerous occasions."  (Dkt. No. 62-5 at 37-38.)  Plaintiff claims he told

Grey he was "constantly being assaulted at different facilities" and asked to be "placed in an

environment where [he is] safe, where [he] could program."  *Id.* at 38.  Plaintiff testified Grey

told him mental health housing was "not a safe haven for inmates to just go and hide there" but

she did not give him any other options.  *Id.* at 39.

Plaintiff's testimony also contradicts Grey's claim that she did not relay Plaintiff's security

concerns to the Unit Chief.  Plaintiff testified he was "moved to C Block" on September 20,

2017, but did not know who directed the move.  *Id.* at 40-41.  Plaintiff explained:

> Q.  And then after the incident of September 13, 2017, you said you
> notified her of what happened of that getting attacked on the way to the
> mess hall, is that correct?
>
> A.  Absolutely.
>
> Q.  And what did she tell you then?
>
> A. [. . . ] I let her know, this guy's a gang member.  I'm being exploited.
> They taking [sic] my cigarettes and things like that and she just basically
> said that she was going to notify the unit chief of these concerns and
> what they did was I was removed from that housing area mysteriously.
> I don't know if it was by O.M.H. or by DOCCS[.]

(Dkt. No. 62-5 at 39-40.)  Grey's declaration and notes do not contain any reference to Plaintiff's

transfer to C-Block.

A personal involvement inquiry on summary judgment "examines only whether there is record evidence to support a factfinder's conclusion that the individual under consideration was involved in the alleged conduct." *Brandon v. Schroyer*, No. 9:13-CV-0939 (TJM/DEP), 2016 WL 1638242, at *14 (N.D.N.Y. Feb. 26, 2016), *adopted by* 2016 WL 1639904 (quotation omitted). A plaintiff's deposition testimony constitutes such evidence and "[a]ny discrepancies or inconsistencies in [the] plaintiff's testimony are for a jury to assess." *Latouche v. Tompkins*, No. 9:09-CV-308 (NAM/RFT), 2011 WL 1103045, at *5 (N.D.N.Y. Mar. 23, 2011). Based upon the record and Plaintiff's deposition testimony, there are triable issues of fact regarding Grey's personal involvement. *See Williams v. Jacobson*, No. 15 CV 28, 2016 WL 2733136, at *6 (S.D.N.Y. May 9, 2016) (finding that the plaintiff plausibly alleged that the defendant "was personally involved because he was informed of the potential Eighth Amendment violation when he personally met with plaintiff [. . .], and then failed to remedy the wrong."); *see also Salahuddin v. Coughlin*, 999 F. Supp. 526, 541 (S.D.N.Y. 1998) (finding that the plaintiff sufficiently demonstrated the defendants' personal involvement in First Amendment violations with evidence including the minutes from meetings the defendants attended at which the subject religious issues were discussed). Thus, I recommend that the Court reject Grey's motion for summary judgment on this ground.

Defendants argue, even assuming Grey was personally involved, Grey is entitled to summary judgment because she was not deliberately indifferent to Plaintiff's safety. Grey avers, "[d]espite meeting with Plaintiff on more than eight occasions between June and December 2017, Plaintiff never made a request for protective custody and even expressed a desire not to be placed in protective custody more than once." (Dkt. No. 63 at p. 5, ¶ 20.)

Even assuming Plaintiff did not request protective custody, Grey's progress notes, proffered by Defendants, demonstrate that Plaintiff and Grey routinely discussed safety issues and Plaintiff's fears.  In June 2017, Grey prepared a Progress Note and reported, "Reviewed his CSRA and core history in the session.  Pt reported he was transferred here from Attica 7 days ago and so far it's been ok here.  Pt reported being cut by a Blood gang member at Attica.  Pt. denies being in a gang and he feels he is targeted due to being financially secure."  (Dkt. No. 63 at 7.)  Grey also noted, "Pt. also reported feeling on guard and some paranoia regarding staying up and listening for other inmates saying his name.  Pt. reported having flash backs of being cut and fearing people behind him."  *Id.*

In Grey's Progress Note related to the July 17, 2017 visit, she reported, "Pt. reported he spoke with someone from Albany about Protective Custody due to being an ex Blood member."  (Dkt. No. 63 at 9.)  Grey continued, "Pt has declined PC at this time and feels he can manage here in GP."  *Id.*  In notes from the August 11, 2017 session, Grey reported, "Pt. reported he was offered PC but he declined it as he wants to be able to finish his programs here and do his time."  *Id*. at 12.  Grey noted, "Pt. denied being harassed by the bloods while at this facility" and "denies any issues with officers or inmates."  *Id*.  However, "Pt. reported he is still not going to the mess hall for meals and he eats from the Commissary in his cell."  (Dkt. No. 63 at 9.)

One week after Plaintiff was attacked, Grey visited Plaintiff at his cell "due to security staffing issues."  (Dkt. No. 63 at 17.)  While Grey reported Plaintiff was "feeling safe now," it is undisputed that, at the time of that meeting, Plaintiff was in keeplock as a result of the September 13, 2017 altercation.  (Dkt. No. 62-5 at 127.)

18

In Progress Notes from September 22, 2017, Grey reported "Pt. processed the incident of another inmate punching him in the back of the head on 9/13/17.  Pt. reported the other inmate is associated with the Blood gang."  (Dkt. No. 63 at 19.)  Grey also noted, "Pt. reported he has spoken to the Lieutenant about this but he is not requesting PC and he also doesn't want IPC." *Id*.

On October 20, 2017, Grey met with Plaintiff and prepared a Progress Note:

> Pt. reported the other inmate who punched him in the head was cut in the yard by the Bloods.  Pt. reported this guy is on the gallery above his cell and Pt. requested mental health assist with a cell move.  Pt. also reported the Bloods are now asking him for money and cigarettes since they cut this other inmate for him.  Therapist discussed the benefits of requesting PC once again with Pt, Pt. is afraid being in PC will ruin his reputation with the Bloods.

(Dkt. No. 62-3 at 21.)  Grey noted, "Pt was informed [ ] mental health programs are not used for inmates to hide out from gang issues."  *Id*.  It is undisputed that Plaintiff was involved in a second physical altercation eight days later.  (Dkt. No. 62-5 at 150.)

Based upon Plaintiff's testimony and Grey's records, a reasonable factfinder could conclude that Grey's failure to take any action from June 2017 until September 2017 amounted to deliberate indifference to the danger presented.  *See Haywood*, 2007 WL 1834641, at *10 ("While the record is unclear as to what, if any, steps [the defendants] could have taken to address Plaintiff's complaints, [. . . ] I find the existence of genuine issues of material fact with respect to the subjective element of plaintiff's failure to protect [ ] claim[.]").  Thus, I recommend that the Court reject Grey's motion for summary judgment, on this ground.[6]

---

[6]  In support of summary judgment in favor of Grey, Defendants provided a certified copy of a memorandum dated September 13, 2017 regarding a "protective custody interview."  (Dkt. No. 62-5 at 135-136.) The memorandum, which was signed by Plaintiff and a Sergeant, who is not a party to this action, reads: "I do not

### c. McGrath

Traditionally, to establish supervisory liability in the Second Circuit, a plaintiff must

allege that:

> (1) the defendant participated directly in the alleged constitutional
> violation, (2) the defendant, after being informed of the violation
> through a report or appeal, failed to remedy the wrong, (3) the defendant
> created a policy or custom under which unconstitutional practices
> occurred, or allowed the continuance of such a policy or custom, (4) the
> defendant was grossly negligent in supervising subordinates who
> committed the wrongful acts, or (5) the defendant exhibited deliberate
> indifference ... by failing to act on information indicating that
> unconstitutional acts were occurring.

*Shaw v. Prindle*, 661 Fed. App'x 16, 18 (2d Cir. 2016) (quoting *Colon v. Coughlin*, 58 F.3d 865,

873 (2d Cir. 1995)).   However, the Second Circuit recently held that the *Colon* test was

abrogated by the Supreme Court's decision in *Ashcroft v. Iqbal*, 556 U.S. 662 (2009).

The Court held that:

> [A]fter *Iqbal*, there is no special rule for supervisory liability. Instead, a
> plaintiff must plead and prove "that each Government-official defendant,
> through the official's own individual actions, has violated the
> Constitution." *Iqbal*, 556 U.S. at 676.   "The factors necessary to
> establish a [§ 1983] violation will vary with the constitutional provision
> at issue" because the elements of different constitutional violations vary.
> *Id*. The violation must be established against the supervisory official
> directly.

*Tangreti v. Bachmann*, 983 F.3d 609, 618 (2d Cir. 2020) (alteration in original).   In *Tangreti*,

which involved a failure to protect claim, the Second Circuit held, "the pretrial record does not

---

need or request Protective Custody at this time.  If the need arises in the future, I will contact a supervisor
immediately." *Id.* The Sergeant who conducted the interview did not submit an affidavit or declaration in support of
the motion for summary judgment.  Moreover, the declarations submitted by Bernard, Grey, and McGrath do not
contain any reference to the document and there is no evidence suggesting that any Defendant saw or reviewed the
document.  Additionally, Plaintiff's deposition testimony lacks any reference to the document. Accordingly, the
Court has not considered the document in the context of this motion.

permit the inference that [the counselor supervisor] had subjective knowledge of the risk of the sexual abuse inflicted on Tangreti and that she decided to disregard that risk." *Id.* at 619.

Defendants argue McGrath was not personally involved in the alleged constitutional violations because as the Deputy Commissioner for Strategic Planning and Population Management, she does not have the authority to make decisions related to protective custody placement of incarcerated individuals. (Dkt. No. 62-3 at p. 1, 3.) This statement however, is unsupported by the record and undermined by arguments set forth in Defendants' Memorandum of Law.

McGrath was designated by Annucci to respond to Plaintiff's letters regarding "protective custody" and "transfer." (Dkt. No. 62-3 at 8.) On July 11, 2017 and December 13, 2017, McGrath sent letters to Plaintiff. *Id.* at 8, 12. Moreover, in Defendants' Memorandum of Law in support of summary judgment, Defendants argue that Plaintiff's security concerns were "promptly addressed by McGrath's office" and, "Defendant McGrath's office promptly scheduled a meeting so that Plaintiff could speak with his ORC about [protective custody]." (Dkt. No. 62-1 at 15.) Defendants further contend, "Defendant McGrath followed that meeting with a letter on July 5, 2017." *Id.* at 16.

McGrath also argues she was not personally involved in the alleged constitutional violations because she was not aware of the two altercations at Great Meadow C.F. until November 2017. (Dkt. No. 62-1 at 10; Dkt. No. 62-3 at p. 1, 3.) Even assuming the truth of that statement, it is undisputed that McGrath was aware of the fact that Plaintiff was assaulted on four separate occasions at the time she received Plaintiff's June 2017 letter, which Annucci referred to her. (Dkt. No. 62-3 at 6.)

21

Indeed, the record demonstrates that McGrath was aware of Plaintiff's safety concerns as early as March 2017. On March 21, 2017, McGrath sent a letter to Plaintiff at Attica C.F. acknowledging Plaintiff's "recent correspondence" to Annucci regarding "transfer and safety concerns" and advised:

> Inmates such as you, who have extensive transfer histories, represent a difficult challenge when reviewing transfer options. Be assured your safety was of the utmost concern when a determination regarding a transfer was made. Your present placement is deemed appropriate at this time.

(Dkt. No. 1-1 at 1.) Plaintiff provided a copy of the letter with his Complaint and while McGrath provided a declaration in support of summary judgment she did not mention or acknowledge this correspondence.

Accordingly, there are genuine issues of fact related to McGrath's personal involvement for a jury to resolve. *See Brandon v. Royce*, No. 16 CV 5552, 2019 WL 1227804, at *10 (S.D.N.Y. Mar. 15, 2019) (finding an issue of fact as to whether the defendant had the authority to remedy the ongoing violation where the defendant "undertook an investigation into plaintiff's complaint" and responded to the plaintiff's letter).

Defendants contend, as with Bernard and Grey, even assuming McGrath was personally involved, she was not deliberately indifferent to Plaintiff's security. On this point, the Court agrees.

As discussed in detail above, McGrath sent three letters to Plaintiff in response to correspondence Plaintiff forwarded to Annucci. The first letter, dated March 21, 2017, addressed Plaintiff's transfer and safety concerns. (Dkt. No. 1-1 at

1.)  After a review of Plaintiff's transfer history and the separation system, McGrath

found his placement in Attica to be "appropriate."  *Id.*  McGrath directed Plaintiff to

address further transfer and safety concerns with his ORC.  *Id.*  The second letter,

dated July 5, 2017, was in response to Plaintiff's June 11, 2017 letter.  (Dkt. No 1-1

at 2.)  McGrath reviewed Plaintiff's records and his interview with "facility guidance

staff" and noted that Plaintiff signed a protective custody refusal form.  *Id.*  McGrath

again directed Plaintiff to address additional transfer and safety concerns with his

ORC.  *Id.*  The third letter, dated December 13, 2017, was in response to Plaintiff's

November 6, 2017 correspondence to Annucci.  *Id.* at 3.  McGrath reviewed

Plaintiff's history and advised "[a] SHU to SHU transfer has been approved."  (Dkt.

No. 1-1 at 3.).  For a third time, Plaintiff was advised to address his transfer and

security concerns with his ORC.  *Id.*

        The record demonstrates that McGrath promptly responded to Plaintiff's

letters, explained the procedures surrounding his requests for transfers and protective

custody, and provided instruction about how to proceed with future concerns.  The

Court has not been presented with any evidence suggesting that McGrath ignored

Plaintiff's complaints.  *See Sharma v. D'Silva*, 157 F.Supp.3d 293, 305 (S.D.N.Y.

2016) (finding that allegations that the defendants responded to the plaintiff's letters

undermines claim of deliberate indifference).  Based upon the evidence, no

reasonable factfinder could conclude that McGrath acted with deliberate

indifference.  *See Varela v. Roth*, No. 14-CV-6354, 2015 WL 1579380, at *4

(W.D.N.Y. Apr. 9, 2015) (awarding summary judgment to nurse administrator who

"diligently responded to plaintiff's letters, advised plaintiff of the scope of her authority," and "explained the rationale" related to the plaintiff's medical treatment); *see Rivera v. Carroll*, No. 07 CIV 7847, 2009 WL 2365240, at *8 (S.D.N.Y. Aug. 3, 2009) (holding that the defendant's response to the plaintiff's letter with an explanation of why he was detained beyond his release date and instructions "does not rise to the level of deliberate indifference."); *see also Walker v. Donelli*, No. 08-CV-406 (FJS/DRH), 2009 WL 973445, at *4 (N.D.N.Y. Apr. 9, 2009) ("prompt communication and investigation into [the plaintiff's] claims belies any conclusory allegation that defendants were deliberately indifferent[.]").

Accordingly, the Court recommends that Defendants' motion for summary judgment and dismissal of the Eighth Amendment claims against McGrath be granted.

### D. Qualified Immunity[7]

Qualified immunity shields governmental officials performing discretionary functions from liability for damages "insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982) (citations omitted); *see also Pearson v. Callahan*, 555 U.S. 223, 232 (2009) (In determining whether a state official is entitled to qualified immunity, courts consider whether the facts alleged "make out a violation of a constitutional right," and whether "the right at

---

[7] Because the Court recommends granting summary judgment to McGrath on the merits of Plaintiff's Eighth Amendment claim, the Court does not address whether McGrath is entitled to qualified immunity.

issue was clearly established at the time of defendant's alleged misconduct.").  "A right is clearly established when 'the contours of the right are sufficiently clear that a reasonable official would understand that what he is doing violates that right.'" *Dancy v. McGinley*, 843 F.3d 93, 106 (2d Cir. 2016) (quoting *Jackler v. Byrne*, 658 F.3d 225, 242 (2d Cir. 2011)) (alterations omitted).

Inmates have long had a clearly established Eighth Amendment right to remain incarcerated in reasonably safe conditions.  *See Randle v. Alexander*, 960 F. Supp. 2d 457, 479 (S.D.N.Y. 2013) ("There can be no doubt that inmates have long had a clearly established right to remain incarcerated in reasonably safe conditions."). Moreover, at the time of the incidents alleged in the Complaint, it was well established within the Second Circuit that a prison official has a duty pursuant to the Eighth Amendment to "take reasonable measures to guarantee the safety of inmates in their custody[.]"  *See Bussey v. Miller*, No. 16-CV-00082, 2020 WL 4719957, at *12 (W.D.N.Y. July 1, 2020) (citing *Hayes*, 84 F.3d at 620), *report and recommendation adopted*, 2020 WL 4705208 (W.D.N.Y. Aug. 12, 2020).

Defendants base their qualified immunity defense on their assertion that "their actions were objectively reasonable in light of the legal rules that were clearly established at the time the actions occurred."  (Dkt. No. 62-1 at 17.)  The Court has recommended, based upon Plaintiff's deposition testimony and the record, that Defendants' request for summary judgment be denied on the grounds that there are material issues of fact in dispute.  With regard to their claim of entitlement to qualified immunity, the Court finds, assuming arguendo, that Defendants were aware

Plaintiff was incarcerated under conditions posing a substantial risk of serous harm prior to the time of the alleged assaults on Plaintiff as he claims, and that they disregarded Plaintiff's complaints as he also claims, it would not have been objectively reasonable for them to believe that their actions were lawful at the time. *Lennon v. Miller*, 66 F.3d 416, 420 (2d Cir. 1995) (citation omitted).  Therefore, the Court recommends that Defendants' motion for summary judgment be denied to the extent judgment is sought on the grounds of qualified immunity.

      **ACCORDINGLY**, it is hereby

      **RECOMMENDED** that Defendants' motion for summary judgment (Dkt. No. 62) be **GRANTED in part** with respect to Plaintiff's Eighth Amendment deliberate indifference claims against McGrath; and it is further

      **RECOMMENDED** that Defendants' motion for summary judgment be **DENIED** in all further respects; and it is further

      **ORDERED** that in accordance with *Lebron v. Sanders*, 557 F.3d 76 (2d Cir. 2009) (per curiam), the Clerks Office provide Plaintiff with copies of the unpublished decisions cited herein.

      Pursuant to 28 U.S.C. § 636(b)(1), the parties have fourteen days within which to file written objections to the foregoing report.  Such objections shall be filed with the Clerk of the Court.  **<u>FAILURE TO OBJECT TO THIS REPORT WITHIN FOURTEEN DAYS WILL PRECLUDE APPELLATE REVIEW</u>**. *Roldan v. Racette*, 984 F.2d 85 (2d Cir. 1993) (citing *Small v. Sec'y of Health and*

*Human Servs.*, 892 F.2d 15 (2d Cir. 1989) (per curiam)); 28 U.S.C. § 636(b)(1); Fed.

R. Civ. P. 72.

Dated: August 10, 2021
      Syracuse, New York

Therese Wiley Dancks
United States Magistrate Judge